1

2          Presented to the Court by the foreman of the
           Grand Jury in open Court, in the presence of
3          the Grand Jury and FILED in the U.S.
           DISTRICT COURT at Seattle, Washington.

4                  MAY 17      20 23
                           Ravi Subramanian, Clerk
5          By_____ Deputy

6

7          UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF WASHINGTON
8                     AT SEATTLE

9

10   UNITED STATES OF AMERICA,          NO. **CR23-084 TL**

11                 Plaintiff

12                                      **INDICTMENT**

13          v.

14   NEVIN SHETTY,

15                 Defendant.

16

17      The Grand Jury charges that:

18                    **COUNTS 1–4**

19                    **(Wire Fraud)**

20   **A.    The Scheme to Defraud**

21      1.    Beginning at a time unknown, but no later than January 2022, and

22   continuing until in or about May 2022, in King County, within the Western District of

23   Washington, and elsewhere, NEVIN SHETTY devised and intended to devise a scheme

24   to defraud his employer ("Company A"), and to obtain money and property from

25   Company A by means of materially false and fraudulent pretenses, representations, and

26   promises, and the omission and concealment of material facts.

27      2.    The essence of the scheme and artifice to defraud was for SHETTY to

Indictment - 1                                    UNITED STATES ATTORNEY
*United States v. Shetty*                       700 STEWART STREET, SUITE 5220
USAO No. 2022R00610                              SEATTLE, WASHINGTON 98101
                                                      (206) 553-7970

1  enrich himself by secretly transferring $35 million in Company A corporate funds to a

2  cryptocurrency investment platform that SHETTY owned and operated. SHETTY knew

3  the transfer was contrary to Company A's explicit investment policy and other

4  instructions given to him, and therefore he concealed it from Company A's board of

5  directors and other executives. He made the transfer to bolster his fledgling

6  cryptocurrency venture with its first (and only) outside investor, and to earn large profits

7  for himself from investing Company A's money. SHETTY invested the money in

8  cryptocurrency positions that could have yielded returns of 20 percent or more annually,

9  yet SHETTY intended to pay Company A just 6 percent. He thus stood to benefit by

10 taking most of the yield, and he also could charge Company A management fees. Within

11 a matter of weeks, however, SHETTY lost virtually all of Company A's money. Only

12 then did he tell Company A's executives what he had done.

13 **B.      Background**

14              *Company A Hires SHETTY as CFO*

15       3.      Company A is a private company headquartered in the Western District of

16 Washington. Company A has raised capital in multiple rounds of funding.

17       4.      Company A is incorporated in Delaware.

18       5.      Company A hired SHETTY as its chief financial officer in or around March

19 2021.

20       6.      As the CFO, SHETTY owed a fiduciary duty to Company A. Company A

21 entrusted SHETTY with, among other things, signatory authority for Company A's bank

22 accounts.

23              *Company A Decides to Move on from SHETTY*

24       7.      Soon after hiring SHETTY, Company A's board of directors developed

25 concerns about his competency. By March 2022, with their dissatisfaction with

26 SHETTY's performance having grown, Company A's chief executive officer and chief

27 operating officer told SHETTY that he could not continue as CFO. They agreed that

Indictment - 2
*United States v. Shetty*
USAO No. 2022R00610

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | SHETTY would depart Company A in or around June 2022.

2 | ***Company A Adopts a Written Policy to Manage its Cash***

3 | 8. Around the same time that it decided to move on from SHETTY, Company

4 | A's leadership adopted a new "Treasury Program" for safeguarding the company's cash

5 | until it would be used for operating expenses, acquisitions, or other business purposes.

6 | 9. Under a written "Investment Policy Statement" adopted by the board of

7 | directors in March 2022, Company A's cash was to "be invested only in fixed income

8 | instruments denominated and payable in U.S. dollars." The policy went on to state that,

9 | "[i]n order to minimize the Company's credit risk exposure," only certain investment

10 | types were "approved." Approved investment types included money market and deposit

11 | accounts, U.S. treasury obligations, U.S. federal agency or government-sponsored

12 | enterprises obligations, corporate obligations, commercial paper, and municipal

13 | securities. The policy specified minimum credit ratings for corporate obligations,

14 | commercial paper, and municipal securities. The policy further stated, "To begin with,

15 | the Treasury Program will invest in money market, deposit accounts, and treasury

16 | accounts with daily liquidity." "In the future," according to the policy, "if the company

17 | decides to invest in other obligations," several criteria had to be met, such as a

18 | requirement that any corporate bonds be investment-grade.

19 | 10. SHETTY helped draft Company A's new investment policy and was fully

20 | aware of its adoption. In an email to all members of the board concerning the new policy,

21 | on which SHETTY was copied, Company A's chief legal officer wrote, "[Company A]

22 | will be utilizing conservative treasury programs with daily liquidity across SVB, Stifel,

23 | and Rho (our current operating account). The accounts are fully liquid and the average

24 | yield is 40 bps. The attached Investment Policy Statement provides the general

25 | framework for this approach." The chief legal officer also noted, "I know Nevin

26 | [SHETTY] has spoken with some of you" about this.

27 |

Indictment - 3
*United States v. Shetty*
USAO No. 2022R00610

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

C.     **Manner and Means**

The following conduct was part of the scheme and artifice to defraud:

### *SHETTY and A.B. Create HighTower*

11.     SHETTY incorporated a company called HighTower Treasury ("HighTower") in Delaware on or about February 9, 2022. SHETTY served as president, and another person, A.B., served as chief executive officer. SHETTY and A.B. owned HighTower.

12.     SHETTY and others prepared marketing materials that described HighTower's business as "DeFi savings" and "a corporate treasury platform." DeFi stands for decentralized finance, it refers to an idea among cryptocurrency enthusiasts of conducting financial transactions without third-party intermediaries like brokers. DeFi transactions are meant to occur in cryptocurrency. HighTower purported to offer "corp savings accounts" with market-leading yields, which it claimed it could generate through investing in "a diversified set of decentralized interest-rate protocols."

13.     SHETTY and others launched a website for HighTower in or around March 2022. Descriptions of HighTower's business on the website, which SHETTY wrote, extolled the virtues of "DeFi platforms." According to the site, "DeFi platforms allow investors to lend positions, borrow funds, utilize derivatives, employ insurance, and earn yield." The site further stated that "HighTower generates yield by deploying capital to these DeFi protocols and collects interest, trading fees, and rewards that we convert back into USD-denominated yields." Customers of HighTower could access this website as well as an online portal with account statements and other information.

### *SHETTY Secretly Invests Company A's Money in Cryptocurrency through HighTower*

14.     Between April 1, 2022, and April 12, 2022, after learning that he would not continue as Company A's CFO, SHETTY secretly, and by means of interstate and foreign wire transmissions, transferred $35,000,100 of Company A's money to a bank account belonging to Circle Internet Financial ("Circle"), for the benefit of HighTower.

Indictment - 4
*United States v. Shetty*
USAO No. 2022R00610

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SHETTY had previously registered HighTower for an account with Circle, which is a financial technology company. Deposits at Circle can be held in a cryptocurrency called USD Coin ("USDC"), which is a so-called "stablecoin," meaning its value is supposed to remain stable over time. Stablecoins can be tied to the value of fiat currencies; in USDC's case, its value is pegged to the U.S. dollar.

15.     SHETTY told no one at Company A about his wire transfers to Circle at the time he made them. SHETTY personally visited a Chase bank branch on Mercer Island to order the transfers.

16.     SHETTY secretly executed a "Treasury Account Agreement" between Company A and HighTower. This agreement, dated March 31, 2022, was signed by SHETTY on behalf of Company A and A.B. on behalf of HighTower. No one at Company A apart from SHETTY knew of this agreement until over a month later. The agreement called Company A's investment a "Treasury Account," and described it in various ways, including as an unregistered debt security. For example, according to the agreement, Company A's invested funds "represent[ed] a direct, unconditional, unsubordinated and unsecured obligation of HighTower Treasury." The agreement further provided that HighTower would pay Company A interest on its investment (initially set at 6 percent APY), and that any earnings above that rate belonged to HighTower (and therefore partially to SHETTY). The agreement also stated that, although HighTower was not charging service fees at the outset, it had the right to impose fees with thirty days of advanced notice.

17.     Once SHETTY had Company A's money at Circle, he proceeded through a series of transactions to invest it (along with smaller amounts contributed by SHETTY and A.B.) in two main ways:

- First, SHETTY acquired TerraUSD ("UST"). UST was another so-called "stablecoin," although unlike USDC, UST was not backed by reserves of U.S. dollars or other dollar-denominated assets. Instead, UST was supposed

to maintain a peg to the value of the U.S. dollar through an algorithmic relationship with a "sister token" called Luna. SHETTY ultimately deposited approximately 28.8 million UST with the Anchor protocol, which was a DeFi system for lending and borrowing UST. Investors holding UST could deposit it with Anchor, and it would supposedly be lent out to others. Anchor promised as much as 20 percent interest on deposits.

- Second, SHETTY used over 8 million UST to acquire synthetic assets through Mirror. Mirror was a protocol that allowed investors holding UST to buy digital assets that tracked the prices of other assets. SHETTY bought a variety of mirrored cryptocurrencies and mirrored public equities, such as mirrored Polkadot cryptocurrency and mirrored Twitter stock. Similar to UST, investors could deposit mirrored assets into pools and earn rewards.

18.     By investing Company A's money in cryptocurrency through HighTower, SHETTY knowingly defied the board of directors' intentions for how the company should safeguard its cash. SHETTY also materially misled others about how he would carry out Company A's new investment policy. On or about February 19, 2022, SHETTY emailed a member of Company A's board of directors to preview the new policy, which he described as "relatively vanilla." He said that the company's treasury program under the new policy would be "fully liquid" and targeting returns in the range of "15bps - 40bps." In fact, he went on to secretly pursue high-yield cryptocurrency investments that were anything but "vanilla."

19.     When two members of Company A's finance team who reported to SHETTY discovered Company A's HighTower account and discussed it with him in or about April 2022, SHETTY acknowledged the account but omitted material information to conceal the nature of the investments and his self-dealing. He did not tell them that HighTower was his own company, and he did not say that his investments at HighTower involved cryptocurrency. These omissions and half-truths were material. Company A

1  would not have wanted to invest in cryptocurrency, and Company A would not have
2  wanted to pay SHETTY extra money (in the form of HighTower's carry) to manage its
3  cash when that was already his job as CFO.

4      20.    SHETTY composed the HighTower website with numerous misstatements
5  and omissions. Anyone at Company A who looked at the HighTower website or
6  associated customer portal would have found the following material misstatements and
7  omissions, among others:

8        • A claim on the website that the "6-month trailing average" annual
9          percentage yield on one of HighTower's investment offerings was six
10         percent. In truth, HighTower had only just come into existence and did not
11         have a six-month record of paying customers interest.
12       • A claim that investing in HighTower presented "no price volatility
13         exposure." In truth, the value of HighTower's investments involving
14         stablecoins like UST were highly dependent on the prices of the coins, as
15         the UST crash would demonstrate, and as was acknowledged elsewhere on
16         HighTower's website.
17       • A claim on account statements that Company A's account with HighTower
18         was a "corporate savings account." In truth, it was not a savings account,
19         HighTower was not a bank or other financial institution such as a credit
20         union, and deposits with HighTower were not protected against principal
21         loss, such as through the Federal Deposit Insurance Corporation. These
22         facts selectively appeared in places on the HighTower website, but not in a
23         way that cured the misleading nature of the "corporate savings account"
24         label.

25     21.    SHETTY used Company A's funds to give HighTower its first outside
26  investor. HighTower only ever had two other investors: (1) A.B.'s company and (2) an
27  investment fund operated by SHETTY for himself and his friends and family. For these

Indictment - 7
*United States v. Shetty*
USAO No. 2022R00610

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  insider investors, unlike Company A, SHETTY intended for HighTower to pay as much
2  as 23 percent interest.

3      22.    SHETTY planned to enrich himself at Company A's expense. Under the
4  terms of the secret agreement with Company A, as described above, HighTower stood to
5  earn an interest rate spread that far exceeded Company A's potential returns. Speaking
6  about their profits in a message to A.B. on or about May 5, 2022, SHETTY wrote: "Just
7  on Anchor we have earned $303K of interest and we owe $170K = $133K of revenue in
8  1 month." SHETTY went on to propose redesigning the HighTower website's "front
9  end" to make it "super slick." He explained, "This is too valuable not to. We just need a
10  couple of more customers…" But HighTower attracted no other customers, and within
11  days, its investments started to decline in value.

12      23.    When HighTower's investments started to decline in value, SHETTY did
13  not tell his fellow corporate officers and the board members at Company A, who still
14  knew nothing of HighTower. The price of UST dropped below its $1 peg on or about
15  May 7, 2022, and it moved further downward in the ensuing days. On May 12, 2022,
16  SHETTY wrote to A.B. that he was "[h]oping for a miracle," and still he said nothing to
17  Company A. It was not until May 13, 2022, when UST had lost nearly all its value and
18  the broader Terra ecosystem had essentially collapsed, that SHETTY informed the chief
19  executive officer and chief operating officer of Company A of what he had done. Even
20  then, he did not fully let on his own role at HighTower and other material details.

21  **D.    Execution of the Scheme to Defraud**

22      24.    On or about the dates set forth below, in King County, within the Western
23  District of Washington, NEVIN SHETTY, for the purpose of executing this scheme and
24  artifice, did knowingly cause to be transmitted by wire communication in interstate and
25  foreign commerce writings, signs, signals, pictures, and sounds, each transmission of
26  which constitutes a separate Count of this Indictment.

27

Indictment - 8
*United States v. Shetty*
USAO No. 2022R00610

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Count | Date | Sender | Recipient | Wire Transmission |
|---|---|---|---|---|
| 1 | April 1, 2022 | Company A's Chase Account No. xxxx-9944 | Circle's Silvergate Account No. xxxx-7427 | $100 wire transfer from Washington to outside of Washington |
| 2 | April 4, 2022 | Company A's Chase Account No. xxxx-9944 | Circle's Silvergate Account No. xxxx-7427 | $14,500,000 wire transfer from Washington to outside of Washington |
| 3 | April 5, 2022 | Company A's Chase Account No. xxxx-9944 | Circle's Silvergate Account No. xxxx-7427 | $5,400,000 wire transfer from Washington to outside of Washington |
| 4 | April 12, 2022 | Company A's Chase Account No. xxxx-9944 | Circle's Silvergate Account No. xxxx-7427 | $15,100,000 wire transfer from Washington to outside of Washington |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## **FORFEITURE ALLEGATION**

The allegations contained in Counts 1 through 4 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. Upon conviction of any of the offenses alleged in Counts 1 through 4, NEVIN SHETTY shall forfeit to the United States any property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the offense. All such property is forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), and includes but is not limited to a sum of money reflecting the proceeds the defendant obtained as a result of the offense.

//

Indictment - 9
*United States v. Shetty*
USAO No. 2022R00610

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     **Substitute Assets.** If any of the above-described forfeitable property, as a result of

2 any act or omission of the defendant,

3         a.     cannot be located upon the exercise of due diligence;

4         b.     has been transferred or sold to, or deposited with, a third party;

5         c.     has been placed beyond the jurisdiction of the Court;

6         d.     has been substantially diminished in value; or,

7         e.     has been commingled with other property which cannot be divided

8                without difficulty,

9 it is the intent of the United States to seek the forfeiture of any other property of the

10 defendant, up to the value of the above-described forfeitable property, pursuant to

11 Title 21, United States Code, Section 853(p).

12

13                     A TRUE BILL:

14                     DATED:

15                     *Signature of Foreperson redacted pursuant*

16                     *to the policy of the Judicial Conference of*
                                *the United States.*

17                     FOREPERSON

18

19 NICHOLAS W. BROWN

20 United States Attorney

21

22 SETH WILKINSON

23 Assistant United States Attorney

24

25 PHILIP KOPCZYNSKI

26 Assistant United States Attorney

27

Indictment - 10
*United States v. Shetty*
USAO No. 2022R00610

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970