1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

UNITED STATES OF AMERICA,

CASE NO. 2:23-cr-00084-TL

12

Plaintiff,

ORDER ON MOTION TO SUPPRESS

v.

13

NEVIN SHETTY,

14

Defendant.

15

16

17      This matter is before the Court on Defendant Nevin Shetty's Motion to Suppress. Dkt.

18  No. 41. Having considered the Government's Response (Dkt. No. 46), Mr. Shetty's Reply (Dkt.

19  No. 49), Mr. Shetty's Supplemental Brief (Dkt. No. 92), the Government's Response to the

20  Supplemental Brief (Dkt. No. 94), and the relevant record, and finding oral argument

21  unnecessary, *see* CrR 12(b)(12), the Court DENIES Mr. Shetty's motion.

22                          **I.      BACKGROUND**

23  The following summary comes from the Parties' briefing and attached exhibits.

24

**A.      Underlying Factual Background**

Defendant Nevin Shetty joined Commerce Fabric Inc. ("Fabric") as Chief Financial Officer ("CFO") in 2021. Dkt. No. 41 at 1, 3. As CFO, Mr. Shetty's role was to "revamp finances, oversee [Fabric's] bank accounts, track investments, and oversee a small team in a fiduciary role." *Id.* at 3 (quoting Dkt. No. 41-2 ¶ 7). Mr. Shetty also "had signatory authority in his role as CFO to initiate transfers on behalf of [Fabric], including access to the company's funds at Chase Bank." Dkt. No. 41 at 3 (quoting Dkt. No. 41-2 ¶ 13).

During Mr. Shetty's tenure at Fabric, in March 2022 Fabric "adopted a new investment policy," which "set out 'approved investment types' that included 'money market and deposit accounts' and 'US Treasury obligations,' among others." Dkt. No. 46 at 3 (quoting Dkt. No. 41-2 ¶ 18). The policy states that "[t]o begin with, the Treasury Program will invest in money market, deposit accounts, and treasury accounts with daily liquidity." *Id.* (quoting Dkt. No. 41-2 ¶ 18).

The policy further provides that "[Fabric] may employ the services of an investment manager and Registered Investment Advisor (collectively 'Investment Manager') to direct a portion or all of the investment activities of the Company consistent with the guidelines set forth in the investment policy." Dkt. No. 41 at 6 (quoting Dkt. No. 41-4 at 2). It then describes the "Roles & Responsibilities" of both Management (which includes the CFO) and the Investment Manager, detailing that Management is responsible for "evaluating the portfolio's performance, evaluating the Investment Manager's performance, and ensuring compliance with and implementation of the investment policy." *Id.* (citing Dkt. No. 41-4 at 2).

The policy also contains a section entitled "Policy Review & Exceptions." *Id.* (citing Dkt. No. 41-4 at 3). This section states:

> The investment policy is intended to provide operational guidelines
> for the management of the investment portfolio. Under some
> circumstances, Investment Managers may learn of an investment

transaction which falls outside of this investment policy but may
present financial merits for the Company. In those circumstances, a
written exception to the quantitative guidelines may be approved
by the Company's Chief Operating Officer ["COO"] or Chief
Financial Officer.

*Id.* (quoting Dkt. No. 41-4 at 3).

Around the same time that Fabric adopted the new investment policy, Fabric "and its board of directors . . . lost confidence in [Mr. ]Shetty's ability to perform the role of CFO for their company." Dkt. No. 46 at 3 (quoting Dkt. No. 41-2 ¶ 7). The Parties dispute whether Mr. Shetty was provided with a notice of termination or formally terminated in March 2022. *Compare* Dkt. No. 41 at 7 (citing Dkt. No. 41-5 at 3–4) (explaining that Mr. Shetty was not terminated and received no notice of termination despite concerns about his performance), *with* Dkt. No. 41-2 ¶ 7 (stating that Mr. Shetty was provided a notice of termination by Fabric around March 2022). The Parties do not dispute that Mr. Shetty continued in his role as CFO following the March 2022 performance concerns. *See* Dkt. No. 41 at 5; Dkt. No. 46 at 3.

In early April 2022, Mr. Shetty made four wire transfers totaling $35 million from Fabric's Chase Bank account to a "HighTower Treasury" account at Circle, "a peer-to-peer payment technology company that uses cryptocurrency on their platform." Dkt. No. 41 at 3 (citing Dkt. No. 41-2 ¶¶ 9–10). "These wires were sent in accordance with a 'HighTower Treasury Account Agreement' between Fabric and HighTower, which was signed by [Mr. ]Shetty on behalf of Fabric and another individual" on behalf of HighTower. *Id.* (quoting Dkt. No. 41-2 ¶ 17). Under this agreement, "HighTower would pay Fabric a set interest rate, and any earnings above that rate would belong to HighTower." *Id.* (citing Dkt. No. 41-2 ¶ 17). The Parties dispute whether other employees at Fabric were made aware of the HighTower investment. *Compare* Dkt. No. 41 at 7 (indicating that Mr. Shetty discussed the HighTower

1    investment with other members of the Fabric finance team), *with* Dkt. No. 46 at 2 (stating that

2    "[n]o one else at [Fabric] was aware of Shetty's transfers when he made them").

3           Additionally, Mr. Shetty had an ownership interest in HighTower. Dkt. No. 41 at 13. He

4    had a HighTower email address, and his name was affiliated with HighTower's Circle account.

5    *Id.* at 4 (citing Dkt. No. 41-2 ¶¶ 11–12).

6           From HighTower, Fabric's funds were invested in "Terra Coin cryptocurrency." Dkt.

7    No. 46 at 3 (citing Dkt. No. 41-2 ¶ 14). Approximately one month later, the investment crashed.

8    Dkt. No. 41 at 4. Mr. Shetty "notified the CEO and COO of Fabric that the money in the

9    HighTower account had 'significantly diminished in value . . . .'" Dkt. No. 41 at 4 (quoting Dkt.

10   No. 41-2 ¶ 14). He was immediately fired from Fabric. Dkt. No. 46 at 1.

11   **B.    The Warrant Affidavit**

12          Following the failed HighTower investment, the government began an investigation into

13   Mr. Shetty. Dkt. No. 46 at 1. In September 2022, as part of the government's investigation,

14   Federal Bureau of Investigation agent Krista Beckley (the "Affiant") applied to a magistrate

15   judge of this Court for a search warrant for Mr. Shetty's person and residence Dkt. No. 41 at 2;

16   Dkt. No. 46 at 1–2.

17          The affidavit in support of the warrant application (the "Affidavit") described the facts

18   that the Government argues constitute probable cause to believe that Mr. Shetty had committed

19   wire fraud. Among other facts, the Affidavit stated that Mr. Shetty's investment of Fabric's

20   money into cryptocurrency was in violation of Fabric's investment policy. Dkt. No. 46 at 1.

21                                    **II.    LEGAL STANDARD**

22          "The Fourth Amendment dictates that 'no Warrants shall issue, but upon probable cause,

23   supported by Oath or affirmation, and particularly describing the place to be searched, and the

24   persons or things to be seized." *United States v. Fisher*, 56 F.4th 673, 682–83 (9th Cir. 2022)

(quoting U.S. Const. amend. IV). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 683 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

An affidavit in support of a search warrant is presumptively valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). However, "a criminal defendant has the right to challenge the veracity of statements made in support of an application for a search warrant." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (citing *Franks*, 438 U.S. at 155–56). "To prevail on a *Franks* challenge, the defendant must establish two things by a preponderance of the evidence: first, that 'the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant[,]' and second, that the false or misleading statement or omission was material, *i.e.*, 'necessary to finding probable cause.'" *Id.* (quoting *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214–15 (9th Cir. 2005)). "If both requirements are met, 'the search warrant must be voided and the fruits of the search excluded.'" *Id.* (quoting *Franks*, 438 U.S. at 156). "When requesting a *Franks* hearing based on allegations of material false statements or omissions in an affidavit supporting a search warrant, a defendant must make a 'substantial preliminary showing'" of the two requirements. *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (quoting *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008)).

### III.   DISCUSSION

**A.    Intentionally or Recklessly Made False or Misleading Statements or Omissions**

Under *Franks*, a defendant must first show by a preponderance of the evidence that "the affiant knowingly and intentionally, or with reckless disregard for the truth, made false or misleading statements or omissions in support of the warrant application." *Perkins*, 850 F.3d at 1116 (citing *Martinez-Garcia*, 397 F.3d at 1214). "A negligent or innocent mistake does not

1    warrant suppression." *Id.* (citing *Franks*, 438 U.S. at 171). "[A] warrant affidavit must set forth

2    particular facts and circumstances . . . so as to allow the magistrate to make an independent

3    evaluation of the matter." *Id.* (quoting *Franks*, 438 U.S. at 165). This means that the warrant

4    affidavit must present "[s]ufficient information . . . to allow that official to determine probable

5    cause; his action cannot be a mere ratification of the bare conclusions of others." *Id.* (quoting

6    *Gates*, 462 U.S. at 239). Thus, "[a]n officer presenting a search warrant application has a duty to

7    provide, in good faith, all relevant information to the magistrate." *Id.* (quoting *United States v.*

8    *Hill*, 459 F.3d 966, 971 n.6 (9th Cir. 2006)).

9         Mr. Shetty argues that the Affidavit makes several false or misleading statements or

10   omissions: first, that the Affidavit falsely states that the HighTower investment violated Fabric's

11   investment policy; second, that the Affidavit omits facts known to the presenting officer that

12   show that the investment was made in accordance with Fabric's standard investment practices;

13   and third, that the Affidavit falsely states that Mr. Shetty was provided with a notice of

14   termination prior to making the HighTower investment. Dkt. No. 41 at 4–5. The Court addresses

15   each of these statements or omissions in turn.

16        **1.    Statements and Omissions Regarding the Investment Policy**

17             **a.    *Whether the Affidavit Misrepresents the Investment Policy***

18        Mr. Shetty's first—and primary—challenge to the Affidavit is that it claims that the

19   HighTower investment violated Fabric's investment policy. Dkt. No. 41 at 4. According to

20   Shetty, "[t]his was not true." *Id.* Specifically, the Affidavit included an excerpt from the

21   investment policy listing approved investment types but left out the "Policy Review &

22   Exceptions" section, which Mr. Shetty contends permitted him to make the HighTower

23   investment. *Id.* at 5–6. The Government argues that "[Mr. ]Shetty's claim that [the investment

24   policy] exempted him as CFO is contrary to its express terms." Dkt. No. 46 at 6.

1    The Court agrees with the Government that the plain language of the investment policy

2    can only be interpreted so as not to permit the HighTower investment. Mr. Shetty points to the

3    Policy Review & Exceptions portion of the investment policy, which addresses investments that

4    fall outside of the quantitative guidelines. *See* Dkt. No. 41-4 at 3. It states that "[u]nder some

5    circumstances, *Investment Managers* may learn of an investment which falls outside of this

6    investment policy but may present financial merits for the Company. *In those circumstances*, a

7    written exception to the quantitative guidelines may be approved by the Company's Chief

8    Operating Officer or Chief Financial Officer." *Id.* (emphases added). Mr. Shetty contends that

9    "the COO and CFO were not bound by the investment guidelines in the policy and could approve

10   *any* investment." Dkt. No. 41 at 6. But that is simply not what the investment policy states. The

11   investment policy clearly lays out the requirements for this type of exception to the policy: the

12   investment in question must be identified by an investment manager, it must fall outside of the

13   quantitative guidelines, and a written exception to those guidelines must be approved by the

14   COO or CFO. Dkt. No. 41-4 at 3. The plain language of the investment policy does not support

15   Mr. Shetty's argument.

16   Further, it is notable that the investment policy was put into place in March 2022—less

17   than a month before the HighTower investment. *See* Dkt. No. 41-3 at 1 (dating the investment

18   policy at March 2022); Dkt. No. 41-2 ¶ 10 (noting HighTower investment dates as April 1, 4, 5,

19   and 12, 2022). After listing the approved investment types, the investment policy states that "[t]o

20   begin with, the Treasury Program will invest in money market, deposit accounts, and treasury

21   accounts with daily liquidity." Dkt. No. 41-3 at 1. Yet less than a month later, Mr. Shetty made

22   an investment in cryptocurrency—not one of the approved investment types at all, let alone one

23   of the types that the policy indicates investments should be made in "to begin with." *See id.*; *see*

24

*also* Dkt. No. 41-2 ¶ 10. In light of this timing, Mr. Shetty's argument that he is not bound by the investment guidelines in the policy is particularly unpersuasive.

Finally, Mr. Shetty contends that "[i]t is absurd to believe that a board vested the CFO with absolute and final discretion (without any board oversight) to approve a non-conforming investment but limited that discretion to investments [identified by an investment manager]." Dkt. No. 49 at 5. But that is what the policy—apparently created by Mr. Shetty (Dkt. No. 41-3 at 1)—says and requires. And it is similarly absurd to believe that a board would implement an investment policy without any intent for company executives to abide by it, particularly where the policy explicitly states that "[t]he Company's Chief Operating Officer, Chief Financial Officer, or their designee, is authorized to execute transactions and perform day to day management of investments *as set forth in this policy*." Dkt. No. 41-4 at 2 (emphasis added). If the board intended for the CFO to be exempt from the investment policy, it would have stated so in the policy. *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 438 (Del. Ch. 2020) ("The Court looks to organizational documents, official minutes, duly adopted resolutions, and a stock ledger, for example, for evidence of corporate acts." (quoting *In re Numoda Corp. Shareholders Litig.*, No. CA9163, 2015 WL 402265, at *9 (Del. Ch. Jan. 30, 2015), *aff'd*, 128 A.3d 991 (Del. 2015))); *see also* Dkt. No. 92 at 7 (acknowledging that the investment policy was capable of limiting Mr. Shetty's power as CFO), 8 ("Only the board's official actions grant the power and authority for an officer to act. And only official actions can limit the power an officer has been granted."). *See generally Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 278 (9th Cir. 1992) ("The law recognizes the written integrated contract as the final word on the actual agreement of the parties . . . ."); *Int'l Brotherhood of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .").

1    Further, the policy language explicitly limits exceptions to "investment transactions

2    which fall[ ] outside of this investment policy" to those "Investment Managers may learn of,"

3    which then requires a written exception approved by the COO or CFO. Dkt. No. 41-4 at 3. A

4    CFO who might believe a change was needed to the policy is directed to "[p]ropose and

5    recommend changes to the investment policy as circumstances arise where management believes

6    the changes will be prudently beneficial." *Id.* at 2. Because the investment policy's Policy

7    Review & Exceptions section plainly does not exempt Mr. Shetty from abiding by the policy, it

8    was not a misrepresentation for the Affidavit to omit that portion of the investment policy or to

9    state that the investment policy did not permit investments in cryptocurrency.

10          **b.**     ***Whether It Was Error to Omit the Investment Policy from the Affidavit***

11    Mr. Shetty also argues that the Affidavit "fails to provide an accurate description of the

12    investment policy" because it "parrots the cherry-picked excerpts and false conclusion that

13    Fabric's lawyer . . . [relayed to the Affiant] when he was pushing the government to prosecute

14    Shetty." Dkt. No. 41 at 5. The Government argues that the Court should reject Shetty's argument

15    because the Affiant did not act "inappropriately by using information about the investment

16    policy given to her by [Fabric's] lawyer." Dkt. No. 46 at 6.

17    Mr. Shetty relies almost exclusively on *United States v. Perkins*, 850 F.3d 1109 (9th Cir.

18    2017), arguing that "[l]ike the affiant in *Perkins*, who chose to describe documents rather than

19    provide them to the magistrate judge, [the Affiant] chose to summarize select parts of the . . .

20    policy rather than provide the three-page document so the magistrate could make an independent

21    determination." Dkt. No. 41 at 10. But *Perkins* is highly distinguishable from the instant case—

22    and it was the specific circumstances of the *Perkins* case that required the affiant to include the

23    images on which he relied to the magistrate judge. *See id.* at 1118–19 ("*Given the circumstances*

24    *of this case*, Agent Ensley was required to provide copies of the images for the magistrate's

1    independent review. Instead, he merely proffered his own conclusion about the 989.jpg image,

2    based on an incomplete and misleading description of the image." (emphasis added)).

3          First, *Perkins* involved the receipt of child pornography, and there was a question of

4    whether the images in question met the federal definition of child pornography with regard to

5    "the 'lascivious exhibition of the genitals or pubic area of any person.'" *Id.* at 1116. But

6    ordinarily, "a magistrate judge must view an image in order to determine whether it depicts the

7    lascivious exhibition of a child's genitals." *Id.* (quoting *United States v. Battershell*, 457 F.3d

8    1048, 1053 (9th Cir. 2006)). That simply does not apply here.

9          Second, in *Perkins*,

10           [T]he defendant traveled through the Toronto International Airport
             on his way home from Chile to Washington. He was stopped by
11           Canadian Border Services Agency officers because he was a
             registered sex offender. A laptop he was carrying, which turned out
12           to belong to his wife, was searched, and he was arrested for being
             in possession of child pornography. The next day, a Peel Regional
13           Police Constable reviewed the two images on the laptop and
             concluded that they did not constitute child pornography under
14           Canadian law. The subsequent search warrant affidavit prepared by
             an agent of the United States Department of Homeland Security
15           (i) omitted the fact that Canadian authorities dropped the
             possession of child pornography charge because the images were
16           not pornographic, (ii) provided a misleading description of one of
             the two images, and (iii) did not attach a copy of either image.

17   *United States v. Blouin*, No. CR16-0307, 2017 WL 3485736, at *4 (W.D. Wash. Aug. 15, 2017)

18   (citing *Perkins*, 850 F.3d at 1112–23) (internal citations omitted). But unlike in *Perkins*, where

19   the photographs at issue were entirely excluded from the search warrant application, the

20   Affidavit here *did* include relevant portions of the investment policy. *See* Dkt. No. 41-2 ¶ 18.

21   Further, in *Perkins*, the affiant affirmatively misrepresented the photographs by describing them

22   in a conclusory fashion as pornographic, despite Canadian authorities having already concluded

23   that the photographs were not pornographic. *See Perkins*, 850 F.3d at 1118–19. In contrast, the

Affidavit in this case stated that the investment policy "did not allow investments in cryptocurrency," and that it "did not include cryptocurrency among the approved investment types." Dkt. No. 41-2 at 3, 7. Unlike the *Perkins* affiant's description of the photographs as "pornographic," there is no third-party evidence to contradict these descriptions of the investment policy, and further, the statements in this case appear to accurately represent the policy. *See* Dkt. No. 41-2 at 1 (listing approved investment types); *see supra* § III.A.1.a.

*Perkins* does not stand for the proposition that an affiant must provide all documents that he or she relies on in composing their affidavit to the magistrate judge, and the Parties have not pointed to—nor can the Court find—any caselaw standing for such a proposition. Thus, it was not error for the Affiant not to include the entirety of the investment policy with the Affidavit. The Court further finds that the Affiant did not intentionally or recklessly make any false or misleading representations or omissions with respect to the investment policy.

### 2.      Omissions Related to Fabric's Regular Investment Practices

Mr. Shetty next argues that the Affidavit "leaves out crucial context about Fabric's financial practices." Dkt. No. 41 at 7. Mr. Shetty contends that "while the Affidavit implies that Shetty should have sought approval from someone before investing Fabric's funds," there were no such approval or disclosure requirements in place, and Mr. Shetty had in fact discussed the HighTower investment with other Fabric employees. Dkt. No. 41 at 7. The Government contends that the witness interviews on which Mr. Shetty relies actually *add* incriminating evidence to the case, because they show that "he misled his finance team about the nature of the investment into HighTower." Dkt. No. 46 at 11.

The Affidavit does not state that Mr. Shetty was required to obtain approval before investing Fabric's funds, nor does Mr. Shetty point to any specific statements that he alleges misrepresent Fabric's financial practices. *See generally* Dkt. Nos. 41, 41-2. "'Where, as here, a

1    warrant's validity is challenged for deliberate or reckless omissions of facts that tend to mislead,

2    the affidavit must be considered with the omitted information included' to determine if probable

3    cause existed." *United States v. Hoyt*, 47 F. App'x 834, 837 (9th Cir. 2002) (quoting *United*

4    *States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992)).

5           Mr. Shetty argues that several statements from Alice Leung, a Fabric employee in the

6    finance department, should have been included in the Affidavit. Dkt. No. 41 at 7. First, Mr.

7    Shetty argues that Ms. Leung's statements that "Shetty approved bank transfers" and that

8    "[t]here was no notification system in place at Fabric that would notify anyone of particular

9    monetary transactions or flag a transaction over a certain dollar amount" counter the Affidavit's

10   "impli[cation] that [Mr. ]Shetty should have sought approval from someone before investing

11   Fabric's funds." *Id.* But, first and foremost, probable cause in this case is dependent on whether

12   Mr. Shetty had authority to make *the HighTower investment* specifically. *See* Dkt. No. 41-2 ¶¶

13   4–5. And neither of Mr. Shetty's cited statements speak to whether Mr. Shetty needed approval

14   before making the HighTower investment. The first statement, that Mr. Shetty approved bank

15   transfers, supports much of what is detailed in the Affidavit—without the authority to make bank

16   transfers for Fabric, Mr. Shetty would not have been able to "wire[] more than $35 million of his

17   employer's corporate funds to financial accounts under [his] control, including accounts at Circle

18   Inc and other cryptocurrency platforms," as the Affidavit alleges. Dkt. No. 41-2 ¶ 4. That Mr.

19   Shetty had the technical ability to make bank transfers in his capacity as CFO of Fabric is

20   inconsequential to the question of whether he was authorized to make the HighTower

21   investment. The next statement, that there was no notification system at Fabric for monetary

22   transactions, is again irrelevant to the question of whether Mr. Shetty was authorized to make the

23   HighTower investment, or even to Mr. Shetty's argued "implication" that he should have sought

24   approval before investing Fabric's funds. That there was no automatic notification system for

1  monetary transactions at Fabric does not mean that an employee could make a financial

2  transaction that did not comply with the investment policy without notifying other employees or

3  executives before making the investment (versus a day-to-day financial transaction such as

4  paying an invoice or payroll).

5       Mr. Shetty also argues that Ms. Leung's statements that "[Mr. ]Shetty told [her] that he

6  opened the HighTower account to gain more interest for Fabric and that the HighTower account

7  provided an opportunity to make money," that she "had a login to the HighTower account," and

8  that "HighTower was mentioned in a one-on-one Friday meeting" show that Mr. Shetty

9  discussed his financial activities, including the HighTower investment, with other Fabric

10 employees. Dkt. No. 41 at 7–8. But none of these statements make clear—or even imply—that

11 Mr. Shetty made other Fabric employees aware of the nature of the HighTower investment as an

12 investment in cryptocurrency, or that he was an owner of HighTower who stood to personally

13 profit from the investment. In fact, Ms. Leung said in her interview that Mr. Shetty "told

14 her . . . he was opening new bank accounts," he did not tell her "about any transfer of funds into

15 cryptocurrency," and that she "did not know who controlled HighTower." Dkt. No. 41-6 at 2–3.

16      Even if any or all of these statements been included in the Affidavit, there would still

17 have been probable cause that Mr. Shetty had committed wire fraud. None of the statements

18 challenged by Mr. Shetty negate the information provided in the Affidavit, nor do they negate a

19 finding of probable cause that Mr. Shetty violated 18 U.S.C. § 1343. Therefore, the Court finds

20 that the Affiant did not intentionally or recklessly omit additional information regarding Fabric's

21 financial practices from the Affidavit.

22      **3.      Statement that Shetty Was Terminated**

23      Finally, Mr. Shetty argues that the Affidavit "claims that Shetty was provided with a

24 notice of termination," but that he "never received a notice of termination and had full authority

1    to make investments on Fabric's behalf at the time of the HighTower investment." Dkt. No. 41 at

2    5. The Government argues that there was no deliberate misstatement by the Affiant, because the

3    interview on which Mr. Shetty relies "occurred six months after the warrant application," and

4    that, "[t]he important part . . . is that [Mr. ]Shetty was a poor performer at [Fabric], and he

5    transferred out the $35 million after learning he had no future there." Dkt. No. 46 at 10.

6         The Affidavit states that "[a]round March 2022, . . . Commerce Fabric Inc and its board

7    of directors had lost confidence in SHETTY's ability to perform the role of CFO for their

8    company, at which point they provided a notice of termination. SHETTY continued in his role as

9    CFO at Commerce Fabric Inc until May 13, 2022." Dkt. No. 41-2 ¶ 8. Mr. Shetty argues that this

10   statement is directly contradicted by an interview with a Fabric employee from March 2023,

11   which states that "[Mr. ]Shetty did not receive a formal termination letter or paperwork." Dkt.

12   No. 41-5 at 4.

13        While the Government argues that the interview contradicting the Affidavit did not occur

14   until six months after the warrant application, and thus cannot show a deliberate misstatement by

15   the Affiant, it can still support the contention that the Affiant made a misstatement with reckless

16   disregard for the truth under *Franks*. *See Perkins*, 850 F.3d at 1116. However, Mr. Shetty offers

17   no argument that the Affiant knew that he had not received a formal termination letter or other

18   paperwork before presenting the Affidavit to the Court; he simply relies on the falsehood of the

19   statement that he received a notice of termination to support his argument that it was made with

20   reckless disregard for the truth. *See* Dkt. No. 41 at 7. This is not enough. In the absence of

21   evidence that the Affiant knowingly misstated that Mr. Shetty had received a notice of

22   termination, the issue is whether her mistake constitutes reckless or merely negligent disregard

23   for the truth. *See United States v. Kyllo*, 37 F.3d 526, 528 (9th Cir. 1994) (citing *United States v.*

24   *Davis*, 714 F.2d 896 (9th Cir. 1983)). A negligent or innocent mistake does not warrant

suppression under *Franks*. *Perkins*, 850 F.3d at 1116 (citing *Franks*, 438 U.S. at 171). In addition, Mr. Shetty's argument that he had not received a "formal termination or paperwork" leaves open the question of whether he received an informal or oral notice of termination.

In *United States v. Kyllo*, the Ninth Circuit found that a defendant had made a substantial preliminary showing that the affidavit contained a misleading omission resulting from a reckless disregard of the truth. 37 F.3d at 529–40. In *Kyllo*, defendant argued that the affiant omitted statements about defendant's marital status, where the affiant relied on a police officer's verbal recounting of his report without examining the report itself, which contained the omitted facts. *Id.* at 529. But crucially, in *Kyllo*, defendant argued that the affiant was himself in possession of the omitted facts at the time he presented the affidavit to the court. Here, Mr. Shetty offers no evidence or argument that the Affiant knew at the time of presenting the Affidavit that he had not been provided with a formal termination letter or paperwork. While "[c]lear proof is not required—for it is at the evidentiary hearing itself that the defendant, aided by live testimony and cross-examination, must prove actual recklessness or deliberate falsity," Mr. Shetty must make some argument as to why the Affiant's misstatement was reckless, as opposed to negligent or innocent. *Id.* at 530 (quoting *United States v. Chesher*, 678 F.2d 1353 (9th Cir. 1982)). He has not done so.

Therefore, the Court finds that Mr. Shetty has not made a substantial showing that the misstatement that he was provided a notice of termination was made with reckless disregard for the truth. The failure of Mr. Shetty to make this required showing is sufficient grounds on its own for the Court to deny his motion. *Flyer*, 633 F.3d at 916.

**B.    Materiality of False or Misleading Statements or Omissions**

While the Court has determined that Mr. Shetty has not made a substantial showing that any of his argued misstatements or omissions were made knowingly and intentionally, or with

1    reckless disregard for the truth, the Court will nevertheless briefly address whether any of the

2    statements or omissions in question were material to a finding of probable cause. The Court finds

3    that they were not.

4         Under the second step of *Franks*, "the question is whether the omitted fact is 'material';

5    that is, whether it is 'necessary to the finding of probable cause.'" *Perkins*, 850 F.3d at 1119

6    (quoting *Franks*, 438 U.S. at 156). "The key inquiry is 'whether probable cause remains once the

7    evidence presented to the magistrate judge is supplemented with the challenged omissions.'" *Id.*

8    (quoting *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014)). "Probable cause to search a

9    location exists if, based on the totality of the circumstances, there is a 'fair probability' that

10   evidence of a crime may be found there." *Id.* (citing *Hill*, 459 F.3d at 970).

11        The indictment alleges in pertinent part that:

12             The essence of the scheme and artifice to defraud was for
               [Mr. Shetty] to enrich himself by secretly transferring $35 million
13             in [Fabric] corporate funds to a cryptocurrency investment
               platform that [Mr. Shetty] owned and operated. [Mr. Shetty] knew
14             the transfer was contrary to [Fabric's] explicit investment policy
               and other instructions given to him, and therefore he concealed it
15             from [Fabric's] board or directors and other executives. He made
               the transfer to bolster his fledgling cryptocurrency venture with its
16             first (and only) outside investor, and to earn large profits for
               himself from investing [Fabric's] money.

17
18   Dkt. No. 1 ¶ 2. With regard to the statements and omissions related to the investment policy, as

19   the Court discussed above, *see supra* § III.A.1, the Court finds that the Affidavit did not

20   misrepresent the investment policy, either in its statements regarding the policy or in its failure to

     include the entire investment policy to the magistrate judge. Mr. Shetty's reading of the
21
     investment policy as permitting him to make *any* investment without regard for the policy is
22
     simply not supported by the plain language of the policy, or by any extrinsic evidence that he has
23
     proffered to the Court. The investment policy clearly approves a list of investment types, which
24

1   does not include cryptocurrency, and states that "[t]o begin with, the Treasury Program will

2   invest in money market, deposit accounts, and treasury accounts with daily liquidity [(three of

3   the six approved investment types)]." Dkt. No. 41-4 at 1. Yet Mr. Shetty, less than one month

4   later, made an investment into cryptocurrency—not one of the investment types approved "[t]o

5   begin with," or even one of the listed approved investment types chosen by Fabric "[i]n order to

6   minimize the Company's credit risk exposure." *Id.* Therefore, Court finds that even if the

7   challenged statements regarding whether cryptocurrency investments violated the policy were

8   omitted from the Affidavit, and if the entire investment policy were included with the Affidavit,

9   probable cause to search Mr. Shetty's residence would still exist.

10      With regard to the statements and omissions related to Fabric's financial practices, none

11  of the statements offered by Mr. Shetty—even when taken together—negate a finding of

12  probable cause. Taken as a whole, these statements show that Mr. Shetty appeared to discuss the

13  HighTower account very generally with other junior employees without ever mentioning that it

14  was an investment into cryptocurrency or into his own company. In fact, at the time that financial

15  transfers were made to Circle, a Fabric employee assumed that such a large monetary transaction

16  corresponded to payroll. *See* Dkt. No. 41-6 at 3–4. Additionally, the fact that junior Fabric

17  employees may have been generally aware of the HighTower accounts and financial transfers to

18  Circle does not have any bearing on the question of whether Mr. Shetty attempted to conceal the

19  true nature of these investments from Fabric's board of directors and other executives, as the

20  indictment alleges. *See* Dkt. No. 1 ¶ 2.

21      Finally, with regard to the statement that Mr. Shetty received a notice of termination, if

22  that statement were omitted, the Court finds that the Affidavit would still support a finding of

23  probable cause. In addition to the statement that Mr. Shetty was provided with a notice of

24  termination, it also clearly states that Mr. Shetty "continued in his role as CFO at Commerce

Fabric Inc until May 13, 2022." Dkt. No. 41-2 ¶ 7. Thus, the Affidavit taken as a whole does not imply that Mr. Shetty made the HighTower investment after his employment with Fabric had ended, and the omission of the statement that he was provided with a notice of termination would have no impact on a finding of probable cause.

## IV.    CONCLUSION

Accordingly, the Court FINDS that Mr. Shetty fails to make a substantial preliminary showing of the two requirements necessary to warrant a *Franks* hearing and, therefore, DENIES his request for an evidentiary hearing. The Court further DENIES Mr. Shetty's motion to suppress.

Dated this 9th day of September 2024.

Tana Lin
United States District Judge