UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br>　v.<br><br>NEVIN SHETTY,<br><br>　　　　　Defendant. | CASE NO. 2:23-cr-00084-TL<br><br>ORDER ON MOTION TO DISMISS |

This matter is before the Court on Defendant Nevin Shetty's Motion to Dismiss. Dkt. No. 52. Having considered the Government's response (Dkt. No. 59), Mr. Shetty's reply (Dkt. No. 62), the National Association of Criminal Defense Lawyers' amicus brief (Dkt. No. 88) and the Government's response to the same (Dkt. No. 93), Mr. Shetty's supplemental brief (Dkt. No. 92) and the Government's response to the same (Dkt. No. 94), and the relevant record, and having held oral argument (Dkt. No. 97), the Court DENIES Mr. Shetty's motion.

## I. BACKGROUND

Following are the facts as alleged in the Indictment (Dkt. No. 1):

Commerce Fabric Inc. ("Fabric") is a private company headquartered in this District and incorporated in Delaware. *Id.* ¶¶ 3–4; *see also* Dkt. No. 52 at 1. Defendant Nevin Shetty joined Fabric as Chief Financial Officer ("CFO") in 2021. Dkt. No. 1 ¶ 5. As the CFO, Mr. Shetty owed a fiduciary duty to Fabric and was entrusted with, among other things, signatory authority for Fabric's bank accounts. *Id.* ¶ 6.

After approximately a year, Fabric's board of directors developed concerns about Mr. Shetty's competency. *Id.* ¶ 7. In March 2022, Fabric's chief executive officer and chief operating officer told Mr. Shetty that he could not continue as CFO, and all agreed that Mr. Shetty would depart Fabric in or around June 2022. *Id.*

Also in March 2022, Fabric adopted a new Treasury Program and a related written investment policy which set out approved investment types that included "money market and deposit accounts, U.S. treasury obligations, U.S. federal agency or government-sponsored enterprises obligations, corporate obligations, commercial paper, and municipal securities." *Id.* ¶¶ 8–9. The policy further stated that "[t]o begin with, the Treasury Program will invest in money market, deposit accounts, and treasury accounts with daily liquidity." *Id.* The policy also laid out criteria that had to be met in the possibility that Fabric made future investments in other obligations. *Id.* Mr. Shetty helped draft this investment policy and was fully aware of its adoption. *Id.* ¶ 10.

When the investment policy was adopted, Fabric's chief legal officer emailed all members of the board—including Mr. Shetty—writing, "[Fabric] will be utilizing conservative treasury programs with daily liquidity across SVB, Stifel, and Rho (our current operating account). The accounts are fully liquid and the average yield is 40 bps. The attached Investment

Policy Statement provides the general framework for this approach." *Id.* The email also noted that Mr. Shetty had spoken with several board members about the policy. *Id.* Mr. Shetty had described the policy as "relatively vanilla" in conversations with board members about the policy, and had said that Fabric's treasury program would be "fully liquid" under the new policy and targeting returns in the range of "15bps - 40bps." *Id.* ¶ 18.

In February 2022, Mr. Shetty incorporated a company called HighTower Treasury ("HighTower"). *Id.* ¶ 11. Mr. Shetty served as HighTower's president and co-owner. *Id.* HighTower was a decentralized finance platform—meaning that it conducted transactions in cryptocurrency. *Id.* ¶ 12. "HighTower purposed to offer 'corp savings accounts' with market-leading yields, which it claimed it could generate through investing in 'a diversified set of decentralized interest-rate protocols.'" *Id.* Mr. Shetty registered HighTower for an account with Circle Internet Financial ("Circle"), a financial technology company that holds deposits in a cryptocurrency called USD Coin ("USDC"). *Id.* ¶ 14. USDC is a "stablecoin," meaning that its value is supposed to remain stable over time, and its value is tied to the U.S. dollar. *Id.*

On March 31, 2022, Mr. Shetty secretly executed a "Treasury Account Agreement" between Fabric and HighTower. *Id.* ¶ 16. No one at Fabric apart from Mr. Shetty knew of this agreement until over a month later. *Id.* The agreement detailed that Fabric would invest in HighTower—which was described as a "Treasury Account"—and that the invested funds would "represent a direct, unconditional, unsubordinated and unsecured obligation of HighTower Treasury." *Id.* The agreement further provided that HighTower would pay Fabric six percent interest on its investment, and any earnings above that rate belonged to HighTower. *Id.* The account statements for Fabric's account with HighTower stated it was a "corporate savings account." *Id.* ¶ 20 (internal quotation marks omitted).

1    Between April 1 and April 12, 2022, Mr. Shetty "secretly, and by means of interstate and
2    foreign wire transmissions, transferred $35,000,100 of [Fabric's] money" to HighTower's Circle
3    account. *Id.* ¶ 14. He personally visited a Chase bank branch on Mercer Island to order the
4    transfers, which he told no one at Fabric about. *Id.* ¶ 15.
5    Following the transfer of Fabric's funds to HighTower's Circle account, Mr. Shetty
6    proceeded through a series of transfers to invest Fabric's funds in two main ways: first, in
7    TerraUSD ("UST") with the Anchor protocol, which promised as much as 20 percent interest on
8    deposits; and second, in synthetic assets with the Mirror protocol, which allowed investors
9    holding UST to buy digital assets that tracked the price of other assets. *Id.* ¶ 17.
10   In May 2022, the Terra ecosystem collapsed, resulting in UST losing nearly all its value.
11   *Id.* ¶ 23. HighTower's investments into UST and with the Mirror protocol declined precipitously
12   in value. *Id.* On May 13, 2022, Mr. Shetty informed Fabric's chief executive officer and chief
13   operating officer of Fabric's investments through HighTower, though he did not fully detail his
14   own role with HighTower. *Id.*
15   On May 17, 2023, the Government indicted Mr. Shetty on four counts of wire fraud, in
16   violation of 18 U.S.C. § 1343. *Id.* ¶ 24. On June 7, 2024, Mr. Shetty filed the instant motion to
17   dismiss. Dkt. No. 52.

18                    **II.    LEGAL STANDARD**

19   An indictment "must be a plain, concise, and definite written statement of the essential
20   facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it
21   contains the elements of the charged crime in adequate detail to inform the defendant of the
22   charge and to enable him to plead double jeopardy." *United States v. Buckley*, 689 F.2d 893, 896
23   (9th Cir. 1982) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)). Indictments alleging
24   a scheme to defraud, as here, "must provide sufficient facts to fulfill the purposes of an

indictment." *Id.* (citing *United States v. Cecil*, 608 F.2d 1294, 1297 (9th Cir. 1979)). "[T]he issue in judging the sufficiency of the indictment is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case." *Id.* (citing *United States v. Thordarson*, 646 F.2d 1323, 1337 n.25 (9th Cir. 1981)). "Because it is a drastic step, dismissing an indictment is a disfavored remedy." *United States v. Thompson*, No. CR19-159, 2022 WL 594899, at *1 (W.D. Wash. Feb. 28, 2022) (quoting *United States v. Rogers*, 751 F.2d 1074, 1076–77 (9th Cir. 1985)).

In evaluating a motion to dismiss, the Court "accepts the allegations in the indictment as true and is 'bound by the four corners of the indictment.'" *Thompson*, 2022 WL 594899, at *1 (quoting *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002)). In the indictment, the Government is not obligated to allege its theory of the case or provide supporting evidence, but it must include the "essential facts necessary to apprise a defendant of the crime charged." *Buckley*, 689 F.2d at 896 (quoting *United States v. Markee*, 425 F.2d 1043, 1047–48 (9th Cir. 1970)). The indictment must be "construed according to common sense, and interpreted to include facts which are necessarily implied." *Thompson*, 2022 WL 594899, at *1 (quoting *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007)).

### III.  DISCUSSION

To convict a defendant of wire fraud under 18 U.S.C. § 1343, the Government must prove that: (1) the defendant knowingly devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts; (2) the statements made or facts omitted as part of the scheme were material; (3) the defendant acted with the intent to defraud; and (4) the defendant used an interstate wire communication to carry out or attempt to carry out an essential part of the scheme. Ninth Cir. Model Crim. Jury Instruction 15.35 (rev. 2024); *see also United States v. Green*, 592

F.3d 1057, 1064 (9th Cir. 2010). Mr. Shetty's motion only challenges the sufficiency of the indictment with regard to the first element. Dkt. No. 52 at 6 (asserting the indictment is insufficient "because it fails to adequately allege any scheme to defraud that is cognizable under the wire fraud statute"); *id.* at 7 (titling sole heading in the motion "The indictment fails to allege a scheme to defraud Fabric of money or property under 18 U.S.C. § 1343"). In a section titled "The Scheme to Defraud," the indictment lays out the following:

> The essence of the scheme and artifice to defraud was for [Mr. Shetty] to enrich himself by secretly transferring $35 million in [Fabric] corporate funds to a cryptocurrency investment platform that [Mr. Shetty] owned and operated. [Mr. Shetty] knew the transfer was contrary to [Fabric's] explicit investment policy and other instructions given to him, and therefore he concealed it from [Fabric's] board of directors and other executives. He made the transfer to bolster his fledgling cryptocurrency venture with its first (and only) outside investor, and to earn large profits for himself from investing [Fabric's] money. [Mr. Shetty] invested the money in cryptocurrency positions that could have yielded returns of 20 percent or more annually, yet [Mr. Shetty] intended to pay [Fabric] just 6 percent. He thus stood to benefit by taking most of the yield, and he also could charge [Fabric] management fees. Within a matter of weeks, however, [Mr. Shetty] lost virtually all of [Fabric's] money. Only then did he tell [Fabric's] executives what he had done.

Dkt. No. 1 ¶ 2.

### A.  Whether the Indictment Alleges a Deprivation of a Traditional Property Interest

Mr. Shetty argues that the indictment fails to allege a scheme to defraud Fabric of a traditional property interest, which is required under the wire fraud statute and relevant jurisprudence. Dkt. No. 52 at 7. He first argues that "the indictment makes clear that Shetty's 'scheme' was not aimed at depriving Fabric of any of its money or property—it was made to benefit HighTower (and therefore [Mr. Shetty])." *Id.* This self-dealing theory fails, Mr. Shetty argues, because the indictment does not include allegations of bribery or kickbacks. *Id.*

Mr. Shetty also argues that the indictment's allegation that he deprived Fabric of information about the nature of the HighTower investment cannot support a scheme to defraud. *Id.*

### 1. Whether the Indictment Alleges a Self-Dealing Scheme

First, Mr. Shetty argues that the alleged scheme "was not aimed at depriving Fabric of any of its money or property—it was made to benefit HighTower (and therefore [Mr. Shetty]). But the Supreme Court and all the circuit courts have said for more than a decade that an employee engaged in self-dealing does not commit wire fraud absent bribery or kickbacks." Dkt. No. 52 at 7 (internal citations omitted). Mr. Shetty relies primarily on *Skilling v. United States*, 561 U.S. 358 (2010), to support this argument. *Id.*

*Skilling* arose from the Enron collapse in 2001, after which a government investigation uncovered an elaborate conspiracy to prop up Enron's stock prices by overstating the company's financial well-being. 561 U.S. at 368. In 2004, Skilling, Enron's former chief executive officer, was indicted and charged with more than 25 counts, including wire fraud, with the government alleging that he had engaged "in a wide-ranging scheme to deceive the investing public, including Enron's shareholders, . . . about the true performance of Enron's businesses by: (a) manipulating Enron's publicly reported financial results; and (b) making public statements and representations about Enron's financial performance and results that were false and misleading." *Id.* at 369. Skilling argued that his conviction was premised on an improper theory of honest-services wire fraud, maintaining that the statute was unconstitutionally vague and that his conduct did not fall within the statute's compass. *Id.* at 399.

The *Skilling* Court found that there was "no doubt" that when enacting 18 U.S.C. § 1346, Congress intended to incorporate the honest-services doctrine recognized before the Supreme Court's 1987 decision in *McNally v. United States*, 438 U.S. 350 (1987). 561 U.S. at 404. Traditional fraud is symmetrical: "the victim's loss of money or property supplie[s] the

defendant's gain, with one the mirror image of the other." *Id.* at 400. In contrast, the pre-*McNally* honest-services theory targeted instances where "the offender profited, [but] the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment." *Id.* The *Skilling* Court offered an example: "if a city mayor (the offender) accepted a bribe [(the enrichment)] from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss." *Id.* But even so, actionable harm would lie in the "denial of [the betrayed] party's right to the offender's 'honest services.'" *Id.* (citing *United States v. Dixon*, 536 F.2d 1388, 1400 (Cal. App. 1976)). After evaluating the historical context of the wire-fraud statute, the Supreme Court held that Section 1346 criminalized "*only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409. "Reading the statute to proscribe a wider range of offensive conduct," it noted, "would raise the due process concerns underlying the vagueness doctrine." *Id.*

The *Skilling* Court explicitly declined to capture another category of proscribed conduct within Section 1346's compass: "undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of *official action* by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 409 (emphasis added). In other words, the Supreme Court declined to capture pure self-dealing in the course of an official action—with no bribery or kickback—within the honest-services fraud statute's orbit. *Id.* Skilling was charged with "conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price" while working in his official position with Enron as chief operating officer and chief executive officer, profiting "through the receipt of salary and bonuses, . . . and through the sale of approximately $200 million in Enron stock." *Id.* at 368, 413. But the

1   Government in *Skilling* "did not, at any time, allege that Skilling solicited or accepted side
2   payments from a third party in exchange for making these misrepresentations." *Id.* at 413.
3   Therefore, the Supreme Court held, "Skilling did not commit honest-services fraud." *Id.*

4       Mr. Shetty argues that the instant case falls squarely within *Skilling*'s "undisclosed self-
5   dealing" category of conduct and is therefore outside of the reach of the wire-fraud statute. Dkt.
6   No. 52 at 8. He says that "[i]n other words, the indictment alleges that Shetty engaged in self-
7   dealing by investing Fabric's money through his own platform, which would receive a profit if it
8   earned a yield exceeding the 6% that it guaranteed to Fabric." *Id.* Mr. Shetty argues that he was
9   tasked with investing Fabric's money, and his investment in HighTower—an official action—
10  furthered his own undisclosed interest (because he secretly owned HighTower), but that with no
11  bribery or kickback, this is not criminal under the wire fraud statute.

12      But the Government contends that *Skilling* is inapposite, because here, Fabric was
13  defrauded of $35 million. Dkt. No. 59 at 8. This case, the Government argues, is a "traditional
14  fraud" case because "[i]t does not suffer from the lack of symmetry discussed in *Skilling*. Here,
15  [Fabric] lost $35 million when Shetty placed it in his company, HighTower, without [Fabric's]
16  knowledge or consent." *Id.* at 9. The Government provides a comparison: "*Skilling* would be
17  instructive if, for instance, [Fabric] had told Shetty to find the best cryptocurrency investment
18  platform to invest with and Shetty selected HighTower over other options without disclosing that
19  he stood to personally benefit from that selection"—in other words, if Mr. Shetty had taken
20  official action without disclosing his own self-dealing. *Id.* at 9. Mr. Shetty contends that the
21  Government's exemplar scenario is "exactly what happened here: Shetty was tasked with
22  investing Fabric's money." Dkt. No. 62 at 2. And at oral argument, Mr. Shetty argued at length
23  that the fact that Mr. Shetty was tasked with investing Fabric's funds—and because the
24

1  HighTower investment was just that: an investment—there cannot be a deprivation of a
2  traditional property interest under *Skilling*. *See* Dkt. No. 100 at 15:3–15:6.
3        As an initial matter, the Court notes that the Supreme Court's holding in *Skilling* is
4  strictly limited to honest services fraud under 18 U.S.C. § 1346—as the Third Circuit noted in
5  *United States v. Wright*, 665 F.3d 560 (3d Cir. 2012), *Skilling* "did not disturb the law of
6  traditional fraud." 665 F.3d at 573; *see Stinn v. United States*, 856 F. Supp. 2d 531, 537
7  (E.D.N.Y. 2012) ("The *Skilling* Court said nothing about the sufficiency of the government's
8  evidence to establish traditional money or property fraud. The Court merely held that, if the
9  government charges, and the jury is instructed on, an honest services theory of fraud under
10 § 1346, the government must prove that a defendant received bribes or kickbacks as part of the
11 deceptive scheme."). And the indictment does not allege honest services fraud. *See generally*
12 Dkt. No. 1.
13       But further, Mr. Shetty's argument assumes that his action was akin to *Skilling*'s "official
14 action" and, in doing so, ignores the indictment's specific allegations that the investment into
15 HighTower was "contrary to [Fabric's] explicit investment policy and other instructions given to
16 him." Dkt. No. 1 ¶ 2. Thus, according to the indictment, Mr. Shetty *did not have the authority to*
17 *transfer Fabric's money or make the HighTower investment at all*. This is a critical distinction
18 that separates this case from one of pure self-dealing because the action taken by Mr. Shetty was
19 *not* an official action. Here, the indictment alleges that Mr. Shetty transferred the $35,000,100 in
20 order to make an investment in contradiction to explicit instructions from Fabric. In *Skilling*, the
21 defendant was performing his official duty within the parameters of his position at Enron; in
22 contrast, the indictment alleges that Mr. Shetty was acting outside the scope of his position when
23 he acted in violation of the policy (Dkt. No. 1 ¶ 2). While this case does not involve bribery or
24 kickbacks, it also does not fall within the category of "official action" taken by an employee that

ORDER ON MOTION TO DISMISS - 10

"furthers his own undisclosed financial interests" that the *Skilling* Court addressed. Again, the only question on a motion to dismiss is whether the indictment adequately alleges the element of the offense and not whether the government can ultimately prove its case. *Thordarson*, 646 F.2d at 1337.

Relatedly, Mr. Shetty argues that a violation of company policy cannot create liability under the wire fraud statute. At oral argument, he gave the following example:

> [I]f, . . . Nevin Shetty took [the] money and said: I disagree or I may knowingly believe this policy is bad, I think the company is going under, I would like to save it; I'm going to send it to Morgan Stanley to put it in their aggressive crypto investment pool. Under these same facts, the government would have to tell you that that's fraud, just by the violation of policy, and that would, again, be contrary because there's no intent to deprive the company of its money.

Dkt. No. 100 at 14:20–15:2. But in Mr. Shetty's example, there *would* be an intent to deprive the company of its funds: in investing company funds in violation of the policy, Mr. Shetty would still be acting outside his authority as CFO. The difference between the instant case and Mr. Shetty's example is that the example presents a scenario with no self-interest by the defendant—and a wire fraud claim under those facts would likely fail because there would be no scheme to defraud for the purpose of *obtaining* money or property. But here, Mr. Shetty did not send Fabric's money to Morgan Stanley, an uninterested third party, but rather to his own fledgling cryptocurrency company to be invested by him, and for his profit. While Mr. Shetty is free to argue intent at trial, the question at the motion to dismiss stage is whether he is on notice of the elements of the charge.

Mr. Shetty also raised at oral argument that the transfer of Fabric's $35 million to HighTower cannot be a "taking" under the wire fraud statute because, had HighTower invested in line with Fabric's investment policy, there would be no crime. Dkt. No. 100 at 6:15–6:20. But

that is not the case before the Court. The indictment alleges that Mr. Shetty "knew the *transfer* was contrary to [Fabric's] explicit investment policy and other instructions given to him" (Dkt. No. 1 ¶ 2), and that once he had transferred Fabric's money to HighTower's Circle account, he proceeded to invest in in cryptocurrency (*id.* ¶¶ 14–17). Construing these facts according to common sense, the Court concludes that the indictment sufficiently alleges that, at the time he transferred Fabric's money to HighTower, Mr. Shetty knew that the money would be subsequently invested contrary to Fabric's investment policy. At the time he made the transfer, Mr. Shetty removed Fabric's money from its control, in contradiction to its policy and other instructions given to him; this is a taking.

To be sure, had the indictment failed to include allegations that the HighTower investment was contrary to Fabric's explicit investment policy, Mr. Shetty's argument might hold more sway—and indeed, Mr. Shetty is free to make such an argument at trial. However, at this early stage, the indictment has alleged enough facts to distinguish this case from a self-dealing case barred by *Skilling*.

**2.      Whether the Indictment Alleges a Deprivation of Information Scheme**

Mr. Shetty also argues that the indictment's allegation that Mr. Shetty deprived Fabric of information about the nature of the HighTower investment cannot support a scheme to defraud. Dkt. No. 52 at 9. The indictment alleges that "[b]y investing [Fabric's] money in cryptocurrency through HighTower, Shetty knowingly defied the board of directors' intentions for how the company should safeguard its cash." Dkt. No. 1 ¶ 18. Mr. Shetty argues that such a deprivation of information is not wire fraud under the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). Dkt. No. 52 at 9.

In *Ciminelli*, the Supreme Court held that "federal fraud statutes criminalize only schemes to deprive people of traditional property interests." 598 U.S. at 309. "Because

'potentially valuable economic information' 'necessary to make discretionary economic decisions' is not a traditional property interest," the *Ciminelli* Court held that "the right-to-control theory is not a valid basis for liability" under the wire fraud statute. *Id.* Under the right-to-control theory, the Government attempted to establish wire fraud "by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." *Id.* at 310. In *Ciminelli*, this was the New York Governor's associates' scheme with Ciminelli to tailor the bid process for the "Buffalo Billion" state initiative to ensure that Ciminelli's construction company would obtain state-funded jobs. *Id.* at 309. The Supreme Court rejected the Government's theory that Fort Schuyler's deprivation of "potentially valuable economic information that it would consider . . . in deciding how to use its assets" could form the basis of wire fraud. *Id.* at 311–12.

But for similar reasons as his self-dealing argument, Mr. Shetty's attempt to frame this case as a deprivation of information case fails. Mr. Shetty argues that "the indictment . . . complains that Shetty did not tell the board that the HighTower investment 'involved cryptocurrency,'" and that any attempt to frame this as a harm under the wire fraud statute does not pass muster. Dkt. No. 52 at 10. But the indictment does more than allege that Mr. Shetty did not tell the board that the HighTower investment was in cryptocurrency: it alleges that the board gave Mr. Shetty explicit instructions about how to invest company funds, and that he knowingly violated those instructions. *See* Dkt. No. 1 ¶ 2. This is not a deprivation of information issue. To the contrary, Fabric's board *had* the information it needed to consider when deciding how to use its assets, and it did in fact make a decision about which investment types it wanted Fabric's funds invested in. Mr. Shetty chose to reject that decision in favor of making an investment into his own fledgling cryptocurrency venture.

This is sufficient to allege a scheme to defraud. *See United States v. Spangler*, 810 F.3d 702, 711 (9th Cir. 2016) ("Specifically, the second superseding indictment alleged, among other things, that Spangler 'knowingly devised a scheme and artifice to defraud investors' by diverting their money 'into two risky private start-up companies' and concealing evidence of any wrongdoing."). While *Ciminelli* would likely be instructive if Fabric had no investment policy in place at the time of the HighTower investment, it is inapposite here. Fabric's board of directors had information about the economic risk that they wanted to endure with respect to their investments and made a decision about that risk. Mr. Shetty invested $35 million of Fabric's money contrary to that decision and for his own self-interest, and in doing so, deprived Fabric of that $35 million.

In trying to cast this case as similar to *Ciminelli* and distinguish it from *Spangler*, the argument of Amicus Curiae National Association of Criminal Defense Lawyers repeatedly rests on the false premise that "the government is attempting to criminalize an allegedly self-interested investment decision made by an executive *with the authority to make such an investment*." Dkt. No. 88 at 1; *see also id.* at 4 ("[a]s Mr. Shetty has explained, the alleged investment '*was* authorized by Fabric's board under the resolution adopting the investment policy'" (quoting Dkt. No. 62 at 6) (emphasis added)). Amicus goes on to assert "[t]he government simply fails to reckon with the fact that as CFO, *and under the company's investment policy in particular*, Mr. Shetty was authorized to make investments." *Id.* (emphasis added). But Mr. Shetty's contention that the investment policy authorized him to make investments contrary to the policy has already been addressed and dismissed by this Court. Dkt. No. 95 at 6–9. And even if Mr. Shetty's contention were correct, on a motion to dismiss, the Court is bound to take the facts contained in the indictment—which states that Mr. Shetty did not have such authority (Dkt. No. 1 ¶ 9)—as true. *Thompson*, 2022 WL 594899, at *1. Thus, the Court finds this situation more akin to the

*Yates* case described in the amicus brief: "[i]n dicta, the Ninth Circuit in [*Yates*] stated that 'the fraudulent diversion of a bank's funds for unauthorized purposes certainly could be the basis for conviction' under the bank-fraud statute." Dkt. No. 88 at 4 (quoting *United States v. Yates*, 16 F.4th 256, 268 (9th Cir. 2021)). *Yates* supports the Government's position here: as alleged in the indictment, Mr. Shetty fraudulently diverted Fabric's funds for an unauthorized investment. *See* Dkt. No. 1 ¶ 2.

Mr. Shetty argues that "just because a transaction conflicts with a company policy does not mean that the transaction deprived the company of its money," relying on *United States v. Leslie*, a Middle District of Louisiana case from 2010. Dkt. No. 62 at 5 (citing No. C09-115, 2010 WL 3210700 (M.D. La. Aug. 12, 2010)). In *Leslie*, the defendant was indicted for the alleged improper sale of horses to a private party during his time as director of a state agency, and "the government allege[d] that Leslie violated the state ethics code by engaging in self-dealing." 2010 WL 3210700, at *2. The court determined that the government had failed to show what money or property was taken (horses or money in the form of auction fees). *Leslie*, 2010 WL 3210700, at *1. The court further noted that in order to find deprivation of property in the form of the horses, the indictment would need to offer an "indication the horses were sold at less than fair market value or that the horses performed some function such that the mere act of selling them deprived the state of an irreplaceable tool or commodity." But here, it is clear what property was taken: $35,000,100 of Fabric's money. Dkt. No. 1 ¶ 14. And Mr. Shetty's act of taking the funds resulted in the irreplaceable loss of nearly all the money. *Id.* ¶ 23.

In his reply, Mr. Shetty relies on a resolution by Fabric's board of directors that adopts Fabric's investment policy, which states in part that "officers of the Company are authorized and empowered to take any and all such further action . . . as any such officer may deem necessary or advisable to effectuate the purposes and intent" of the investment policy. *See* Dkt. No. 62 at 6.

However, because Mr. Shetty raises the resolution for the first time on reply, the Court declines to consider it. *See United States v. Wright*, 215 F.3d 1020, 1030 n.3 (9th Cir. 2000) (declining to consider argument raised for the first time in reply brief). Even if the Court considered it, the Court must construe the affidavit "according to common sense," *Thompson*, 2022 WL 594899, at *1, and the affidavit's allegations about the timing of the investment policy's adoption in March 2022 and the HighTower investment just one month later lead to the common sense conclusion that the HighTower investment was not the type of "other [future] obligations" to which the investment policy referred. Dkt. No. 1 ¶¶ 2, 9.

Finally, Mr. Shetty argues that the HighTower investment did not violate the investment guidelines as a matter of law. Dkt. No. 62 at 6. First, Mr. Shetty raises for the first time on reply that HighTower qualifies as an investment manager under the investment policy, and that he therefore had the authority as CFO to approve the HighTower investments. *See* Dkt. No. 62 at 6. As Mr. Shetty raises this for the first time on reply and offers no evidence supporting this assertion, the Court will not consider it. *See Wright*, 215 F.3d at 1030 n.3. Second, as the Court has already discussed in its Order on Motion to Suppress and based upon the facts available to it at this time, the investment policy can reasonably be interpreted so as not to permit the HighTower investment. *See* Dkt. No. 95 at 6–9. Thus, the Court declines to find, as a matter of law, that the HighTower investment did not violate the investment guidelines.

**B.    Mr. Shetty's Alleged Intent to Defraud**

While Mr. Shetty's motion is based on the first element of wire fraud, he also asserts several times in his briefing that he did not have an intent to deprive Fabric of any of its money or property. Dkt. No. 52 at 7. He contends that he "never sought to deprive Fabric of the funds he invested in HighTower, just as he did not intend to deprive Fabric of funds he invested elsewhere

on Fabric's behalf." *Id.* at 10; *see also id.* at 5 ("It does not say that he intended to deprive Fabric of its $35,000,100.").

First, "a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all." *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986). Second, Mr. Shetty seems to be attempting to merge the intent element of wire fraud with the element of knowing devisement of a scheme. That he may have a defense to the intent element is not relevant on a motion to dismiss and is more appropriate for a motion for judgment of acquittal. The indictment makes allegations of intent, including that Mr. Shetty "knew the transfer was contrary to [Fabric's] explicit investment policy," that he "made the transfer to bolster his fledgling cryptocurrency venture," and that he "planned to enrich himself at [Fabric's] expense," which is sufficient to allege the intent element and fairly inform Mr. Shetty of the charge. *See United States v. Thompson*, No. CR19-159, 2022 WL 594899, at *4–6 (W.D. Wash. Feb. 28, 2022) ("The Court must only determine whether the government has sufficiently alleged facts that, *if proven*, support a finding of specific intent to deceive the named victims and deprive those victims of property." (emphasis added)).

### IV. CONCLUSION

Accordingly, the Court DENIES Mr. Shetty's Motion to Dismiss.

Dated this 4th day of December 2024.

Tana Lin
United States District Judge

ORDER ON MOTION TO DISMISS - 17