UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br>   v.<br><br>NEVIN SHETTY,<br><br>   Defendant. | CASE NO. 2:23-cr-00084-TL<br><br>ORDER ON MOTION FOR RECONSIDERATION OF THE COURT'S ORDER ON MOTION TO DISMISS |

On December 4, 2024, this Court denied Defendant Nevin Shetty's motion to dismiss the Government's indictment. Dkt. No. 101. This matter is before the Court on Mr. Shetty's Motion for Reconsideration of that Order. Dkt. No. 105. Having considered the Government's response (Dkt. No. 110) and the relevant record, the Court DENIES Mr. Shetty's motion.

I.   BACKGROUND

The Court assumes familiarity with the facts of the case. Relevant to the instant motion, on June 7, 2024, Mr. Shetty filed a motion to dismiss. Dkt. No. 52. Mr. Shetty argued that the indictment failed to allege a scheme to defraud that is cognizable under the wire fraud statute,

advancing two primary theories under which he argued that the scheme to defraud failed. *Id.* at 6. First, Mr. Shetty argued that the indictment alleged a self-dealing scheme, and that self-dealing cannot form the basis to a scheme to defraud under *Skilling v. United States*, 561 U.S. 358 (2010). Dkt. No. 52 at 7–9. Second, Mr. Shetty argued that the indictment also failed to allege that he had schemed to defraud Fabric of a traditional property interest (because he claims he deprived his former employer of economic information, *i.e.*, the nature of the investment he made), and that under *Ciminelli v. United States*, 598 U.S. 306 (2023), the federal fraud statutes applied only to traditional property rights. Dkt. No. 52 at 9–11. In its opposition, the Government argued that Mr. Shetty mischaracterized the Government's theory of the case, and that the scheme to defraud alleged in the indictment was neither a self-dealing nor a deprivation of economic information scheme that would be foreclosed by either *Skilling* or *Ciminelli*. Dkt. No. 59 at 3–11.

Following briefing by the Parties, on August 12, 2024, the National Association of Criminal Defense Lawyers ("NACDL") filed an amicus brief in support of Mr. Shetty's motion. Dkt. No. 88. The NACDL argued that the Government was "attempting to criminalize an allegedly self-interested investment decision made by an executive with the authority to make such an investment—simply because he allegedly did not disclose complete and accurate information to others at the company." *Id.* at 1–2. On August 16, with leave of the Court (Dkt. No. 91), Mr. Shetty filed a supplemental brief in support of his motion to dismiss, addressing corporate law principles relevant to the motion. Dkt. No. 92.

The Court held oral argument on November 21, 2024. Dkt. Nos. 96, 97. Mr. Shetty argued that because his job at Fabric as CFO had been to invest Fabric's money, and because his movement of the $35 million into cryptocurrency was an investment, there had been no taking of traditional property sufficient to allege a scheme to defraud under the wire fraud statute. *See* Dkt.

1  No. 100 at 25:14–20. Mr. Shetty further argued that "it cannot be that the transfer is somehow
2  the deprivation, . . . [because i]t was done to invest for Fabric." *Id.* at 32:23–33:1. In response,
3  the Government argued that although Mr. Shetty ultimately invested the money that he secretly
4  took from Fabric, "that does not make his conduct legitimate." *Id.* at 35:3.
5        On December 4, 2024, the Court denied Mr. Shetty's motion to dismiss. Dkt. No. 101.
6  On January 3, 2025, Mr. Shetty filed the instant motion for reconsideration. Dkt. No. 105. The
7  Government opposes. Dkt. No. 110.

## II. LEGAL STANDARD

9        "Motions for reconsideration are disfavored." CrR 12(b)(13). "The court will ordinarily
10 deny such motions in the absence of a showing of manifest error in the prior ruling or a showing
11 of new facts or legal authority which could not have been brought to its attention earlier with
12 reasonable diligence." *Id.* "A movant who seeks reconsideration 'shall point out with specificity
13 the matters which the movant believes were overlooked or misapprehended by the court, any
14 new matters being brought to the court's attention for the first time, and the particular
15 modifications being sought in the court's prior ruling.'" *United States v. Jefferson*, No. CR23-
16 109, 2024 WL 5119861, at *2 (W.D. Wash. Dec. 16, 2024) (quoting LCrR 12(b)(13)(B)).
17       "No precise 'rule' governs the district court's inherent power to grant or deny a motion to
18 reconsider a prior ruling in a criminal proceeding." *United States v. Lopez-Cruz*, 730 F.3d 803,
19 811 (9th Cir. 2013). "Rather, the district court's authority to revisit a ruling . . . 'is within its
20 sound judicial discretion.'" *Id.* (quoting *United States v. Raddatz*, 447 U.S. 667, 678 n.6 (1980)).

## III. DISCUSSION

22       Mr. Shetty argues that the Court's attempts to distinguish the present case from
23 foreclosed theories of liability all fail as a matter of law, making the Court's Order manifestly
24 erroneous. Dkt. No. 105 at 2. First, he contends that the Court focuses on Mr. Shetty's violation

of Fabric's company policy, arguing that the "unauthorized" nature of a transaction has nothing to do with whether a property deprivation occurs and that the Court created an "official act" test to evaluate "whether a conflict-of-interest case involves 'pure self-dealing' and thus is excluded by the honest services statute." *Id.* at 2, 7. Second, he contends that the Court's reasoning that *Skilling* was inapplicable because the indictment does not charge honest-services fraud is inapt because *Skilling*'s restrictions apply to any conflict-of-interest scheme. *Id.* Mr. Shetty additionally argues, as he did in the motion to dismiss, that a policy violation cannot establish the deprivation of a traditional property interest. *Id.* at 7. Finally, Mr. Shetty argues that the Court was wrong to consider that Fabric's pre-existing investment policy distinguished this case from the *Ciminelli* right-to-control line of caselaw, and that "[u]nder controlling precedent, the question is not whether the defendant violated company policy, but rather whether he schemed or intended to deprive the company of money or property." *Id.* at 2. The Government opposes on all grounds, arguing that the indictment does not allege an honest-services fraud theory, that the Court's Order did not create an "official act" test, and that Mr. Shetty's taking of $35 million was a traditional property deprivation. *See generally* Dkt. No. 110. The Court considers each argument in turn.

**A.    Whether the Court Committed Manifest Error in Holding that This Is Not a Self-Dealing Case Barred by *McNally* and *Skilling***

Mr. Shetty's first two arguments address the Court's rejection of his argument that this case is a self-dealing case barred by the United States Supreme Court's decisions in *McNally v. United States*, 483 U.S. 350 (1987), and *Skilling*.

**1.    The Court's Discussion of an "Official Act"**

In its Order, the Court discussed whether the indictment alleged a self-dealing scheme within the scope of the Supreme Court's holding in *Skilling*, as Mr. Shetty contended. The Court

noted a "critical distinction" between the instant allegations—which included that the investment into HighTower was "contrary to [Fabric's] explicit investment policy and other instructions given to [Mr. Shetty]"—and the allegations in *Skilling*, where the defendant "was performing his official duty within the parameters of his position at Enron." Dkt. No. 101 at 10. Mr. Shetty argues that the Court's focus on this distinguishing fact ignores the broader context of the *Skilling* Court's analysis, which differentiates "between cases involving bribery or kickbacks (which the honest services statute revived) and those involving 'nondisclosure of a conflicting financial interest' (which it did not)." Dkt. No. 105 at 6.

But as an initial matter, Mr. Shetty's argument—both in his original briefing on the motion to dismiss and the instant briefing—ignores that there is no allegation of honest-services fraud in this action. Honest-services fraud, codified at 18 U.S.C. § 1346 and enacted by Congress in 1988 in response to the Supreme Court's decision in *McNally*, is a "scheme or artifice to deprive another of the intangible right of honest services." In *Skilling*, "the Supreme Court rejected the claim that 18 U.S.C. § 1346 was unconstitutionally vague and held that '§ 1346 covers the "core" of pre-*McNally* honest-services case law and does not apply to "*all* intangible rights on honest services whatever they might be thought to be."'" *United States v. Solakyan*, 119 F.4th 575, 583 (9th Cir. 2024) (quoting *Percoco v. United States*, 598 U.S. 319, 328 (2023) (quoting *Skilling*, 561 U.S. at 404–05)). "The Supreme Court thus pared back honest-services fraud to 'only the bribe-and-kickback core of the pre-*McNally* case law.'" *Id.* (quoting *Skilling*, 561 U.S. at 409).

Here, Mr. Shetty is not charged with defrauding Fabric of the intangible right of honest services. Instead, the Government alleges that Mr. Shetty's actions directly deprived Fabric of $35 million. *See generally* Dkt. No. 1; *see also United States v. Avery*, 719 F.3d 1080, 1085 n.3 (9th Cir. 2013) (noting that defendant was innocent of honest-services fraud where he received

no bribe or kickback for abusing fiduciary obligations and position as trustee to acquire over $52 million through loan arrangement using trust as collateral, but that his conduct "may still constitute money-or-property based wire fraud"); *United States v. Pelisamen*, 641 F.3d 399, 406 (9th Cir. 2011) ("[T]he crime of honest-services fraud was initially created by courts to cover situations in which 'the victim's loss of money or property [did not supply] the defendant's gain'—in other words, to cover cases of fraud that are more complex or subtle than those in which the defendant steals money or tangible property from the victims. This is clearly not such a case. Here, the allegation is that Defendant's actions directly deprived [the victims] of their money." (internal citation omitted)). And as the Court has already noted, *Skilling* "did not disturb the law of traditional fraud." Dkt. No. 101 at 10 (quoting *United States v. Wright*, 665 F.3d 650 (3d Cir. 2012)). Indeed, the *Skilling* Court itself distinguished between traditional fraud and honest-services fraud, noting that "[u]nlike traditional fraud, in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest services doctrine targeted corruption that lacked similar symmetry. While the offender profited, *the betrayed party suffered no deprivation*." *Skilling*, 561 U.S. at 358 (emphasis added).

Further, the Court did not, as Mr. Shetty argues, create or apply an "official action" test; rather, it used the "official action" language to demonstrate to Mr. Shetty how his actions in taking $35 million from Fabric were distinguishable from the *Skilling* defendant's actions taken in the course of his employment at Enron. *See* Dkt. No. 101 at 10–11. In *Skilling*, the defendant and his co-conspirators "engaged in a wide-ranging scheme to deceive the investing public, including Enron's shareholders, . . . about the true performance of Enron's businesses by: (a) manipulating Enron's publicly reported financial results; and (b) making public statements and representations about Enron's financial performance and results that were false and misleading." 561 U.S. at 369. They did not enrich themselves as a *direct* result of the scheme,

but rather "through salary, bonuses, grants of stock and stock options, other profits, and prestige." *Id.*

In contrast, Mr. Shetty allegedly engaged in a scheme to take $35 million from Fabric that he was not permitted to take—as the investment policy makes clear. The Government then alleges that Mr. Shetty was directly enriched by this taking, because he invested that $35 million into a cryptocurrency fund under his control and ownership for the purpose of enriching himself through the payment of fees and profits from investing Fabric's money. Dkt. No. 1 ¶ 2. That Mr. Shetty subsequently invested the $35 million into TerraUSD and ultimately lost the value of his investment does not mean that Mr. Shetty never "obtained" the money, as Mr. Shetty argues; he obtained the $35 million when he impermissibly took it from Fabric without authorization from Fabric. This is an allegation of traditional wire fraud. *See also infra* Section III.A.3.

### 2.      Whether *Skilling* Applies to Any Conflict-of-Interest Scheme

Mr. Shetty additionally argues that *Skilling* is not limited to honest-services fraud, but rather applies to any conflict-of-interest scheme and should therefore be applied to this case. Dkt. No. 105 at 2. But as the Ninth Circuit noted in *United States v. Avery*, 719 F.3d 1080 (9th Cir. 2013), one course of action may constitute both honest-services fraud and money-or-property based fraud, and *Skilling* only governs allegations of honest-services fraud.

In *Avery*, the defendant served as a trustee for the *May Smith Trust* and was charged with engaging "in a fraudulent financing scheme in which he abused his fiduciary obligations and his position of trust to acquire over $52 million dollars through an ambiguous loan arrangement which used the *May Smith Trust* as collateral." 719 F.3d at 1082. In furtherance of his scheme, "Avery executed margin loans secured by the trust assets and used the loaned funds to purchase [a] speculative aircraft venture, to pa[y] personal debts, and to purchase . . . personal assets." *Id.* (alterations in original) (internal quotations omitted). Following Avery's bankruptcy and the

collapse of his business, he "defaulted on the margin loans and the lender foreclosed on the $52 million of trust collateral that secured their repayment." *Id.* The *Avery* court noted that, in light of *Skilling*, Avery was innocent of honest-services fraud, because his conviction was "based solely on a conflict of interest through breach of his fiduciary duties, without any bribery or kickback allegations." *Id.* at 1082–83. But the *Avery* court clarified that "while Avery is innocent of honest-services fraud, as that theory has been defined by the Supreme Court in *Skilling*, Avery's conduct may still constitute money-or-property based wire fraud." *Id.* at 1085 n.3.

*Avery* makes clear that the same course of conduct may support both an honest services theory and a money-or-property based theory of fraud, but *Skilling* and its progeny are only applicable to honest-services fraud. *See also, e.g.*, *Pelisamen*, 641 F.3d at 406; *United States v. Tehin*, No. CR03-236, 2012 WL 3638543, at *11 (N.D. Cal. Aug. 22, 2012) (holding that conviction of honest-services fraud invalidated under *Skilling* was harmless error where jury also based conviction on valid money-or-property fraud). Thus, the Court did not err in holding that *Skilling* was not applicable to the Government's indictment in this case, which alleges a money-based fraud.

3.  **Whether the Government Alleges a Deprivation of Traditional Property Interests**

Mr. Shetty additionally argues that the Court erred in concluding "that the transaction deprived Fabric of its $35 million because the investment was made contrary to the investment policy." Dkt. No. 105 at 7. Mr. Shetty contends:

> The Court acknowledges that "a wire fraud claim under those facts would likely fail because there would be no scheme to defraud for the purpose of *obtaining* money or property." (Dkt. 101 at 11) (emphasis in original). This concession reveals the fundamental flaw in the Court's reasoning: it fails to appreciate that the "obtaining" and the deprivation are inextricably linked— one cannot exist without the other. You cannot have a deprivation of property without someone obtaining that property. If Shetty did not

>"obtain" the money by investing it contrary to policy in the Morgan Stanley example, he could not have "obtained" (or deprived Fabric of) it by investing it contrary to the policy here.

Dkt. No. 105 at 9–10. But this argument ignores that Mr. Shetty *did* obtain the $35 million by taking it from Fabric. According to the indictment, Mr. Shetty allegedly "secretly . . . transferred $35,000,100 of Company A's money to a bank account belonging to Circle Internet Financial [ ], for the benefit of High Tower [a company co-owned by Shetty]." Dkt. No. 1 ¶14; *see also* Dkt. No. 110 at 7 ("The transaction deprived Company A of its $35 million because the transaction removed $35 million from Company A's control—without its knowledge or permission—and into Shetty's."). In other words, Mr. Shetty allegedly took approximately $35 million of Fabric's money into his possession without any authorization (which is why he presumably did it "secretly"), and Fabric lost $35 million of its money at that point in time. That is the moment the wire fraud occurred, accepting the other allegations in the indictment as true, as the Court must on a motion to dismiss. As the Government points out, while "[t]he policy helps explain the taking—showing the intentions of both the wronged and the wrongdoer" (Dkt. No. 110 at 7)—a violation of it does not, in and of itself, constitute the crime alleged.

Under the Morgan Stanley example, the chief financial officer ("CFO") never takes possession of the money but, rather, directly transfers it from the company's financial account to the third party's account so there is no taking by the CFO. That the CFO might have done it to save the company from going under (if there had been wire fraud, which there wasn't) would go to the third element of wire fraud (intent), not the first element (scheme or plan). Likewise, Mr. Shetty's asserted intent of benefitting Fabric (in addition to benefitting himself) by then depositing the funds he took into an account with the company he co-owned, albeit in the name of Fabric, and investing it addresses the third, and not the first, element of wire fraud. Mr. Shetty attempts to sidestep his taking of the funds by using *McNally* and *Skilling* but misunderstands

that line of caselaw as barring any scheme including a conflict of interest from the scope of the wire fraud statute. Not so. The fact that this case involves self-dealing does not foreclose it, as demonstrated by *Avery*. *See supra* Section III.A.2.

Further, Mr. Shetty asserts that "investment decisions [are] squarely within [an individual's] role as CFO" so a "violation of a company investment policy does not strip an action of its official character." Dkt. No. 105 at 6. Adopting Mr. Shetty's position, regardless of the circumstances, would mean that a CFO can do anything with the CFO's company's assets, and it will never be illegal. But that simply cannot be so.

*   *   *

Accordingly, the Court did not commit manifest error in finding that this case was not foreclosed by *McNally* and *Skilling*.

**B.      Whether the Court Committed Manifest Error in Distinguishing This Case From a Right-to-Control Case**

Mr. Shetty next argues that the Court committed manifest error by finding that "because the [investment] policy pre-dated the investment, Shetty's violation differs from typical right-to-control cases where defendants fail to disclose risks that would have informed the victim's decision-making." Dkt. No. 105 at 10–11. Mr. Shetty misunderstands the Court's Order. The Court did not hold that Mr. Shetty's violation of company policy was, in and of itself, a property deprivation; it held that the violation of company policy made clear that Mr. Shetty's taking of $35 million was unauthorized. It was Mr. Shetty's taking of $35 million that constitutes a deprivation. As with *Skilling*, the Court utilized the timing of the investment policy to demonstrate to Mr. Shetty why his case was distinguishable from a right-to-control case.

"Under the right-to-control theory, a defendant is guilty of wire fraud if he schemes to deprive the victim of 'potentially valuable economic information' 'necessary to make

discretionary economic decisions.'" *Ciminelli*, 598 U.S. at 309 (quoting *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021) (judgment vacated by *Ciminelli*, as acknowledged by *Kaloyeros v. United States*, 143 S.Ct. 452 (2023))). The *Ciminelli* defendant was not, as here, charged with taking any money or property; the money he obtained as part of his scheme was pursuant to a contract for a state-funded job. *Id.* at 310. The "taking" in *Ciminelli* was of "intangible interests such as the right to control the use of one's assets." *Id.* at 311.

But Mr. Shetty is not charged with depriving Fabric of information that affected its assessment of the benefits or burdens of a transaction. Instead, he is charged with taking $35 million out of Fabric's control and placing it into his own control. *See Ciminelli*, 598 U.S. at 311. Mr. Shetty points to the Morgan Stanley hypothetical discussed at oral argument and in the Court's Order as demonstrating that "violating an investment policy . . . does not constitute 'obtaining' property." Dkt. No. 105 at 11 (quoting Dkt. No. 101 at 11). But he again misreads the Court's Order, as explained above. *See supra* Section III.A.3.

Further, as the Government points out, all of Mr. Shetty's cited cases illustrate that the right-to-control theory applies to cases where no money or property was lost. For example, Mr. Shetty acknowledges that in *Cleveland v. United States*, "the Court held that licenses issued by a state were not 'property' in the hands of the state for purposes of the mail fraud statute, even though the state had pre-existing rules about who could receive them." *Id.* at 11 (citing 531 U.S. 12, 20 (2000)). But he does not explain how this holding undermines the Court's finding that the Government's allegation that Mr. Shetty took $35 million was an allegation of property deprivation.

\* \* \*

The issue on a motion to dismiss an indictment is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge. The

Government has sufficiently provided notice to Mr. Shetty of the alleged facts it believes, *if proven*, support the first element of wire fraud, and Mr. Shetty fails to show that the Court made a manifest error with regard to its ruling on the Government's motion to dismiss.

### IV. CONCLUSION

Accordingly, Mr. Shetty's Motion for Reconsideration (Dkt. No. 105) is DENIED.

Dated this 24th day of January 2025.

_____
Tana Lin
United States District Judge