CHASE ◉

**BUSINESS ACCOUNT ADD SIGNERS FORM**

NAME OF BUSINESS  COMMERCE FABRIC, INC.

TAXPAYER ID NO.

BUSINESS ADDRESS  113 CHERRY ST, PMB 56786, SEATTLE, WA 98104-2205

BRANCH NAME AND NO.  MERCER ISLAND - 740160

BANK NO.  702

BRANCH PHONE NO.  (206) 484-9923

INTEROFFICE MAILCODE  WA1-2076

PREPARED BY: NAME  ANTHONY TARANTOLA

DATE:  03/10/2021

Please add the following signer to the accounts listed below (other authorized signers on record do not change):

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| Nevin Shetty | SIGNER | | 3/10/21 |

| Identification | ID Number | Issuer | Issuance Date | Expiration Date |
|---|---|---|---|---|
| 1) Driver's License, | | WA | 12/24/2020 | 02/10/2027 |
| 2) here, | | | | |

Account Numbers:
| | 2644 | | | |
|---|---|---|---|---|
| 5686 | 5780 | | | |

Please add the following signer to the accounts listed below (other authorized signers on record do not change):

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| | | | |

| Identification | ID Number | Issuer | Issuance Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

Account Numbers:

Please add the following signer to the accounts listed below (other authorized signers on record do not change):

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| | | | |

| Identification | ID Number | Issuer | Issuance Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

Account Numbers:

**CERTIFICATION**

The undersigned hereby certifies that the person(s) added as authorized signers on the account(s) selected above have been added in accordance with resolutions or other documents of the Business regarding signing authority for bank accounts. The undersigned further certifies that for those added as authorized signers, the names, titles and signatures are correct.

| For a Corporation or Unincorporated Association/Organization: | | For Sole Proprietorship: | | For Partnership or Limited Liability Company: | | For Government Entity: | |
|---|---|---|---|---|---|---|---|
| | 3/10/21 | | | | | | |
| Secretary Date | Date | Owner/Sole Proprietor | Date | Partner/Member/Manager | Date | Certifying Official | Date |

USA_00012639

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-2
Admitted:_____

CHASE

**BUSINESS/ACCOUNT/ADD SIGNERS FORM**

NAME OF BUSINESS: COMMERCE FABRIC, INC.

TAXPAYER ID NO.

BUSINESS ADDRESS: 113 CHERRY ST, PMB 66768, SEATTLE, WA 98104-2205

BRANCH NAME/AND NO: OVERLAKE PARK - 740037     BANK NO: 702     BRANCH PHONE NO: (425) 590-6038

INTEROFFICE MAILCODE: WA1-2040    PREPARED BY: NAME: DESIREE BROWN     DATE: 08/10/2021

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| Ryan Shetty | SIGNER | PRE-AUTHORIZED SIGNER TO BE ADDED BY 0x/0x/0x | 08/10/2021 |
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |

Account Numbers:

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |

Account Numbers:

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |

Account Numbers:

CERTIFICATION:

USA_00012640

G-2-002

BUSINESS ACCOUNT ADD SIGNERS FORM

CHASE

NAME OF BUSINESS  COMMERCE FABRIC, INC.

TAXPAYER ID NO.

BUSINESS ADDRESS 115 CHERRY ST, PMB 66708, SEATTLE, WA 98104-2205
BRANCH NAME AND NO.  OVERLAKE PARK - 740037          BANK NO  707          BRANCH PHONE NO  (425) 590-4003
INTERBRANCE MAIL CODE  WA1-2240       PREPARED BY, NAME  DESIREE BROWN          DATE  03/10/2021

| Name of the Signer to Add | Title | Signature | | Date |
|---|---|---|---|---|
| Nisha Sharfy | SIGNER: | PRE-AUTHORIZED SIGNER TO BE ADDED BY 04/30/2021 | | 03/10/2021 |
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |
| ☐ Driver's License | | WA | | |
| ☐ Other | | | | |
| Account Numbers: | | | | |

| Name of the Signer to Add | Title | Signature | | Date |
|---|---|---|---|---|
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |
| Account Numbers: | | | | |

| Name of the Signer to Add | Title | Signature | | Date |
|---|---|---|---|---|
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |
| Account Numbers: | | | | |

CERTIFICATION

CHASE ○

BUSINESS ACCOUNT ADD SIGNERS FORM

NAME OF BUSINESS: COMMERCE FABRIC, INC.

TAXPAYER ID NO

BUSINESS ADDRESS: 113 CHERRY ST, PMB 88768, SEATTLE, WA 98104-2205
BRANCH NAME AND NO. OVERLAKE PARK - 740037     BANK NO. 702     BRANCH PHONE NO. (425) 800-6608
INTEROFFICE MAILCODE WA1-2240     PREPARED BY: NAME  DÉSIREE BROWN     DATE: 03/10/2021

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| Noam Shafiy | SIGNER | PRE-AUTHORIZED SIGNER TO BE ADDED BY 04/09/207 | 03/10/2021 |
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |
| 1) Driver's Licence | | | | |
| 2) None | | | | |
| Account Numbers: | | | | |
| 763 | 654 | | | |

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |

Account Numbers:

| Name of the Signer to Add | Title | Signature | Date |
|---|---|---|---|
| Identification | ID Number | Issuer | Issuance Date | Expiration Date |

Account Numbers:

CERTIFICATION

| Signature | Date | Owner/Sole Proprietor | Title | For Partnership | Date | For Government Entity | Title |
|---|---|---|---|---|---|---|---|

SB1333394-F1     28



**CHASE** ⬠
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

00002078 DRE 702 2 0 124 22 NNNNNNNNNNN  1 000000000 DZ 0000
COMMERCE FABRIC, INC.
113 CHERRY ST
PMB 69768
SEATTLE WA 98104-2205

April 01, 2022 through April 29, 2022
Account Number:                **9944**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |



| **CHECKING SUMMARY** | Chase Platinum Business Checking | |
|---|---|---|
| | INSTANCES | AMOUNT |
| Beginning Balance | | $4,497,598.76 |
| Deposits and Additions | 7 | 70,198,202.17 |
| Electronic Withdrawals | 7 | -35,000,100.05 |
| Fees | 1 | -25.00 |
| **Ending Balance** | **15** | **$39,695,675.88** |

Your account ending in 6077 is linked to this account for overdraft protection.

Your Chase Platinum Business Checking account provides:
• No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
• 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
• $25,000 in cash deposits per statement cycle
• Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

### DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 04/01 | Fedwire Credit Via: Evolve Bank & Trust/084106768 B/O: Synapse Financial Technologies San Francisco CA 94105 Ref: Chase Nyc/Ctr/Bnf=Commerce Fabric, Inc. Seattle WA 981042205 US/Ac-000 000004589 Rfb=O/B Evolve B & T Obi= JPMorgan Chase Bank NA New York, NY , US 62472D7E9B76E9G89BC8C9B0/Fund T Ransfer From Imad: 0401Mmqjmpd1000824 Trn: 0963300091Ff | $10,000,000.00 |
| 04/01 | Online Transfer From Mma ...6077 Transaction#: 14014118161 | 10,368.15 |
| 04/04 | Fedwire Credit Via: Evolve Bank & Trust/084106768 B/O: Synapse Financial Technologies San Francisco CA 94105 Ref: Chase Nyc/Ctr/Bnf=Commerce Fabric, Inc. Seattle WA 981042205 US/Ac-000 000004589 Rfb=O/B Evolve B & T Obi= JPMorgan Chase Bank NA New York, NY , US 62470A9800E5F0B82A6B449D/Fund T Ransfer From Imad: 0404Mmqjmpd1000792 Trn: 0763860094Ff | 60,000,000.00 |
| 04/05 | Orig CO Name:Mso Indust         Orig ID:1676394000 Desc Date:220405 CO Entry Descr:Payments Sec:PPD  Trace#:021000024519360 Eed:220405  Ind.ID: Ind Name:Commerce Fabric Inc Trn: 0954519360Tc | 12,000.00 |

Page 1 of 4

**SB1333394-F1**

**422**

USA_00013036

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-4
Admitted:_____

## CHASE ⬡

April 01, 2022 through April 29, 2022
Account Number: ▮▮▮▮9944

## DEPOSITS AND ADDITIONS (continued)

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/05 | Orig CO Name:Msc Indust        Orig ID:1676394000 Desc Date:220405 CO Entry Descr:Payments Sec:PPD  Trace#:021000024519059 Eed:220405  Ind ID: Ind Name:Commerce Fabric Inc Trn: 0954519359Tc | 7,000.00 |
| 04/08 | Orig CO Name:General Nutritio      Orig ID:9251124574 Desc Date:220406 CO Entry Descr:Payables Sec:CCD  Trace#:021000024725214 Eed:220408  Ind ID:002098505 Ind Name:Fabric Inc | 168,834.00 |
| 04/18 | Orig CO Name:Commerce Fabric,       Orig ID:6506940771 Desc Date:220415 CO Entry Descr:Refund  Sec:CCD  Trace#:091000013311388 Eed:220418  Ind ID:Com1099 Ind Name:Commerce Fabric, Inc. Trn: 1083311388Tc | 0.02 |

**Total Deposits and Additions**                        $70,198,202.17

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/01 | 04/01 Online Domestic Wire Transfer Via: Silvergate Lajolla/322286803 A/C: Circle Internet Financial Inc Boston MA 02110 US Ref: Cir36Emg38/Bnf/Cir36Emg38 Imad: 0401B1Qgc04C004756 Trn: 3093032091Es | $100.00 |
| 04/04 | 04/04 Domestic Wire Transfer Via: Silvergate Lajolla/322286803 A/C: Circle Internet Financial Inc Ref: Reference ID: Cir36Emg38/Bnf/Reference ID: Cir36Emg38 Imad: 0404B1Qgc03C012316 Trn: 3588812094Es | 14,500,000.00 |
| 04/05 | 04/05 Domestic Wire Transfer Via: Silvergate Lajolla/322286803 A/C: Circle Internet Financial Inc Ref: Reference ID: Cir36Emg38/Bnf/Reference ID: Cir36Emg38 Imad: 0405B1Qgc03C007841 Trn: 3302572095Es | 5,400,000.00 |
| 04/12 | 04/12 Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Kronos Saashr Inc Ref./Time/15:14 Imad: 0412B1Qgc07C013495 Trn: 0175910102Fg | 0.02 |
| 04/12 | 04/12 Fedwire Debit Via: Wells Fargo NA/121000248 A/C: Kronos Saashr Inc Ref./Time/15:15 Imad: 0412B1Qgc06C015239 Trn: 0174040102Fg | 0.02 |
| 04/12 | 04/12 Domestic Wire Transfer Via: Silvergate Lajolla/322286803 A/C: Circle Internet Financial Inc Ref: Reference ID: Cir36Emg38/Bnf/Reference ID: Cir36Emg38 Imad: 0412B1Qgc01C009779 Trn: 3368402102Es | 15,100,000.00 |
| 04/13 | Orig CO Name:Kronos Saashr IN    Orig ID:6506940718 Desc Date:      CO Entry Descr:EDI Pymntssec:CCD  Trace#:091000013219591 Eed:220413  Ind ID:351Acru11Du3N82 Ind Name:Commerce Fabric, Inc. | 0.01 |

**Total Electronic Withdrawals**                        $35,000,100.05

## FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/05 | Service Charges For The Month of March | $25.00 |

**Total Fees**                        $25.00

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 04/01 | $14,507,866.91 |
| 04/04 | 60,007,866.91 |
| 04/05 | 54,626,841.91 |
| 04/08 | 54,795,675.91 |
| 04/12 | 39,695,675.87 |
| 04/13 | 39,695,675.86 |
| 04/18 | 39,695,675.88 |

## SERVICE CHARGE SUMMARY

Chase Platinum Business Checking Accounts Included: ▮▮▮▮ 9698

Page 2 of 4

**SB1333394-F1**                        **423**

CHASE

April 01, 2022 through April 29, 2022
Account Number: [redacted]9944

## SERVICE CHARGE SUMMARY *(continued)*

| | | |
|---|---|---|
| Monthly Service Fee | $0.00 | |
| Other Service Charges | $85.00 | |
| **Total Service Charges** | **$85.00** | Will be assessed on 5/4/22 |

The monthly service fee was waived on your Chase Platinum Business Checking account because you maintained the required relationship balance.

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee Waived | 0 | | | $95.00 | $0.00 |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 6 | Unlimited | 0 | $0.40 | $0.00 |
| **Credits** | | | | | |
| Non-Electronic Transactions | 7 | 500 | 0 | $0.40 | $0.00 |
| **Electronic Credits** | | | | | |
| Domestic Incoming Wire Fee | 2 | Unlimited | 0 | $15.00 | $0.00 |
| **Miscellaneous Fees** | | | | | |
| Domestic Wire Fee | 5 | 4 | 1 | $35.00 | $35.00 |
| Online Domestic Wire Fee | 1 | 0 | 1 | $25.00 | $25.00 |
| **Cash Management Services** | | | | | |
| Online ACH Payments Maint | 1 | 0 | 1 | $25.00 | $25.00 |
| **Subtotal Other Service Charges (Will be assessed on 5/4/22)** | | | | | **$85.00** |

| ACCOUNT [redacted]9944 | |
|---|---|
| **Other Service Charges:** | |
| **Electronic Credits** | |
| Electronic Credits | 6 |
| **Credits** | |
| Non-Electronic Transactions | 7 |
| **Electronic Credits** | |
| Domestic Incoming Wire Fee | 2 |
| **Miscellaneous Fees** | |
| Domestic Wire Fee | 5 |
| Online Domestic Wire Fee | 1 |
| **Cash Management Services** | |
| Online ACH Payments Maint | 1 |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

EQUAL HOUSING LENDER **JPMorgan Chase Bank, N.A. Member FDIC**

April 01, 2022 through April 29, 2022
Account Number: 9944

This Page Intentionally Left Blank

Page 1 of 1

**SB1333394-F1**

**425**

USA_00013039

G-4-004



CIRCLE00213

USA_00008917

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-8
Admitted:_____



CIRCLE00214

| job_id | product | job_create_date | job_activity_state | customer_id | account_number | transaction_id | destination | activity | from_curre<br>ncy | to_currenc<br>y |
|---|---|---|---|---|---|---|---|---|---|---|
| 13ed3dc-a8cc-4b5a-8c3a-c759e18f6804 | payments | 2022-03-04T14:53:15.389Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 6bef173e-2ffe-48ce-86a9-5300647f8e123 | payments | 2022-03-34T16:20:34.522Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| c21d5891-8f46-4a5e-aaf3-e6e0fdf5f5ce | payments | 2022-04-01T13:07:25.421Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 3f08391d-d428-43be-9725-622e16324a08 | payments | 2022-04-04T20:20:43.978Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 361e0b2e-83d3-4571-8b13-f97acda2b1e6 | payments | 2022-04-05T17:10:11.288Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 761507e1-c11c-41a5-adb4-9ce9f1fa1a5b | payments | 2022-04-11T08:10:12.788Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 520f7079-fc0a-4a6c-b61a-8e558586fd3b | payments | 2022-04-12T22:40:16.104Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 8d3d8247-d2e6-41ac-a6fa-0172f160f27a | payments | 2022-04-13T20:00:21.765Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 79df468a-3e69-34ca-80cc-38833f046c43 | payments | 2022-04-5-05T20:58:19.563Z | complete | 155376012 | | 4010 4PVvYy5AP9ttPaLqpjfD3jgOCHAkhd5tn97EyKF0m58F3lUuxqXbvsDgTbik5Ry8YP84AN1DQlyENHeD4ee6Dno7 | 4010 receive | USD | USD | |
| 9b5ac245-d82d-4bnd-a880-ee9f96e1d05d | payments | 2022-05-06T08:30:03.486Z | complete | 155376012 | | 4010 null | 4010 receive | USD | USD | |
| 84f021c3-9c38-3437-bbc8-2a0ece46f189 | payments | 2022-05-06T16:43:28.161Z | complete | 155376012 | | 4010 3yy2Emhn674swwDWk5gG9Y5SnQmI5YLCGoR2tVQTX1LN15TbqG6IkVSP3MDXMtxuiHpmgiS47b4EC7DtHVF5E7Fzs5 | 4010 receive | USD | USD | |
| 31c788d4-9b51-3abc-81cf-1be9b3a72266 | payments | 2022-05-06T23:10:57.799Z | complete | 155376012 | | 4010 8J71B59Xc14fnd32914D0250d86b46c53e98Ie4e23f0b666nedaD3864D057 | 4010 receive | USD | USD | |
| 5e87e2f1-5787-34df-8832-a24ef571b398 | payments | 2022-05-08T23:13:19.734Z | complete | 155376012 | | 4010 65eb105c6fb7433c755729cc334189494d8821c046eeb86207b7318863acaeb | 4010 receive | USD | USD | |

CIRCLE00215

| btc_amount | usd_value | message | ip_address | activity_method | id | other_customer phone_district | other_customer city | other_customer district | other_customer country | fee_currency | funding_type | recipient_type | recipient | destination_type | blockchain |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 900 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | ad7c1e5c-b0fa-4d35-8610-3b68f1f174a6 | account | null |
| 0 | 100 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | 7d141837-930f-4f8e-8477-3d207b66625d | account | null |
| 0 | 100 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | 7259d8ca-8212-4fbf-9d42-766d2a2a69a5 | account | null |
| 0 | 14500000 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | 782a27dd-2396-4d87-ba25-4a651428583f | account | null |
| 0 | 5400000 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | 98dd5757-a3e7-4e7d-852a-e9abf73cd8ad | account | null |
| 0 | 100 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | 81905b8a-6844-470f-849f-e5fb896f112d | account | null |
| 0 | 15100000 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | 123a8408-2a3f-4af1-b8c6-4db28b984149 | account | null |
| 0 | 2500000 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | 625f0959-ca12-4a0c-8d59-82e5e25e0576 | account | null |
| 0 | 102 null | null | null | null | null | null | null | null | null | blockchain | address | 7r7H0Ab9z4tLjgVDjVQqw5bjs57MPX6QxfMT0735NCTz | account | USDCSOL |
| 0 | 50000 null | null | business_account_push_payment | null | null | null | null | null | null | null | fiat_account | sft | b6568586-333a-459b-6abc-a3edb27a081f | account | null |
| 0 | 2541514.35 null | null | null | null | null | null | null | null | null | blockchain | address | 7r7HAh4t4LgtVDjVQqw5bjs57MPX6QxfMT0735NCTz | account | USDCSOL |
| 0 | 100 null | null | null | null | null | null | null | null | null | blockchain | address | TMvv8t5IPTBHLJKg7xCg596JKSLkn5wLZ | account | USDCTRX |
| 0 | 2549990 null | null | null | null | null | null | null | null | null | blockchain | address | TMvv8t5IPTBHLJKg7xCg596JKSLkn5wLZ | account | USDCTRX |

CIRCLE00216

| Device ID | Fingerprint | Fingerprint Version | IP Address | Create Date | Manufacturer | Model | Model Versi | Device OS | Device OS Version | Browser OS | Browser OS Version | Type | App Client | App Client Version |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| e141b226-a068-4d87-a881-d15be58a4acd | eb39699ee9d38a8f5906cd6f2ea14a60 | 1.1.6 | 73.254.156.54 | Mar 01 2022 12:41:05 PM -05:00 | | | | Windows | 10 | Chrome | 98.0.4758.102 | computer | tokenizer-web | 0.0.1 |
| e141b226-a068-4d87-a881-d15be58a4acd | eb39699ee9d38a8f5906cd6f2ea14a60 | 1.1.6 | 73.254.156.54 | Mar 01 2022 12:41:05 PM -05:00 | | | | Windows | 10 | Chrome | 98.0.4758.102 | computer | tokenizer-web | 0.0.1 |
| e4c63456-1a98-4c59-a7cb-4ae5cc715b4c | ade337a4d302e516b630e10dadd047bd | 1.1.6 | 207.237.186.122 | Feb 24 2022 1:32:39 PM -05:00 | | | | Windows | 10 | Chrome | 98.0.4758.102 | computer | tokenizer-web | 0.0.1 |
| cd5em5e-77da-4e92-bf4b-051c5b5d3e33 | 646ab4ab92d26fo63b1dda56334b5533 | 1.1.6 | 73.254.156.54 | Feb 11 2022 1:43:08 PM -05:00 4 months ago | | | | Windows | 10 | Chrome | 98.0.4758.82 | computer | tokenizer-web | 0.0.1 |

CIRCLE00217

Message

| From: | Chase [no-reply@alertsp.chase.com] |
|---|---|
| on behalf of | Chase <no-reply@alertsp.chase.com> [no-reply@alertsp.chase.com] |
| Sent: | 4/1/2022 2:03:06 PM |
| To: | ryan@fabric.inc |
| Subject: | [External] Important Business Banking Alert |

Dear Customer,

At Chase, we're committed to providing the tools you need to help you monitor your account(s). Below is a list of the latest transactions for the accounts in your profile:

    *We've started to process a wire transfer to HighTower Treasury at  in the amount of 100.00 has been debited from your account ending in 9944 on 04/01/2022.  The reference number for this wire transfer is 0401B1QGC04C004756 and may be shared with your recipients to assist them in tracking this transfer with their financial institution.

If you have questions about the transaction(s) or this alert, please call 1-877-CHASEPC (1-877-242-7372). Our customer service representatives are available from 6 AM to midnight Eastern time, seven days a week.

Please do not reply to this automatic alert. Instead, you can sign in to
https://urldefense.com/v3/__http://www.Chase.com/businessbanking__;!!Lc2sURbN!_yT97bChmuyz5nAdRk2rwSfWrSz 92M4tAOhJSnI7tHgTIzJo_SnSOTjPv-xI_MjI_Tb2u95EA8CDQwJuplq4hg$  to send us a secure message.

We appreciate your business.

Sincerely,

Online Business Banking Team

CF0000328

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-11
Admitted:_____

Message

| | |
|---|---|
| **From:** | HighTower Treasury [notifications@hightowertreasury.com] |
| **on behalf of** | HighTower Treasury <notifications@hightowertreasury.com> [notifications@hightowertreasury.com] |
| **Sent:** | 4/1/2022 4:41:48 PM |
| **To:** | eric.chan@fabric.inc |
| **Subject:** | [External] Nevin has invited to HighTower Treasury |



## Hello Eric,

Nevin has added you as a user to the Fabric Inc HighTower Treasury account.

To complete your account set up, please use the link below.



Thanks,
The HighTower Treasury Team

FAQs  Privacy Policy  Terms of Service

Copyright @ 2022 HighTower Treasury, Corp. All rights reserved.

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with HighTower Treasury are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by HighTower Treasury. Rates for HighTower Treasury products are subject to change.

CF0000329

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-12
Admitted:_____

CF0000330

G-12-002

Message

| | |
|---|---|
| **From**: | HighTower Treasury [notifications@hightowertreasury.com] |
| **on behalf of** | HighTower Treasury <notifications@hightowertreasury.com> [notifications@hightowertreasury.com] |
| **Sent**: | 4/4/2022 4:28:57 PM |
| **To**: | lucy.harrington@fabric.inc |
| **Subject**: | [External] Welcome to HighTower Treasury: Your account is active |



# Hello Lucy,

Thanks for completing the creation of your HighTower Treasury account.

You can now login to your account, view balances and download reports.

Login to HighTower Treasury

If you have any questions, please contact us at
support@hightowertreasury.com)

Thanks,
The HighTower Treasury Team



FAQs Privacy Terms of Policy Service

Copyright @ 2022 HighTower Treasury, Corp. All rights reserved.

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with HighTower Treasury are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all

**CF0000417**

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-15
Admitted:_____

geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by HighTower Treasury. Rates for HighTower Treasury products are subject to change.

Message

| | |
|---|---|
| **From:** | Alice Leung [alice@fabric.inc] |
| **on behalf of** | Alice Leung <alice@fabric.inc> [alice@fabric.inc] |
| **Sent:** | 4/4/2022 8:41:43 PM |
| **To:** | Nevin Shetty [nevin@fabric.inc] |
| **CC:** | Lucy Harrington [lucy.harrington@fabric.inc] |
| **Subject:** | Re: [External] Re: $60M Wire |

Hi Nevin,

I saw the $60M is pending at Chase. Please see below:

| Date | Description | Type | Amount |
|---|---|---|---|
| Pending | DOMESTIC WIRE TRANSFER VIA: SILVERGATE LA JOLLA/322286603 A/C: CIRCLE INTERNET FINANCIAL INC REF: REFERENCE ID: CIR36EMG38/BN F/REFERENCE ID: CIR36EMG38 TRN: 3583812094E5 04/04 | Outgoing wire transfer | -$14,500,000.00 |
| | FEDWIRE CREDIT VIA: EVOLVE BANK & TRUST/084106768 B/O: SYNAPSE FINANCIAL TECHNOLOGIES SAN FRANCISCO CA 94105 REF: CHASE NYC/CTR/BNF=COMMERCE FABRIC, INC SEATTLE WA 981042295 US/AC: 000004569 RFB=O/B EVOLVE B & T OBI= JPMORGAN CHASE BANK NA NEW YORK, NY , US 62470A/9209ESF0882A6B4490/FUND TRANSFER FROM RHO TO CHASE TRN: 0763860094FF | Incoming wire transfer | $60,000,000.00 |

**Alice Leung**
Accounting Lead
778-710-2225

::: fabric

On Mon, Apr 4, 2022 at 12:32 PM Jovana Lazic <jovana@rho.co> wrote:
Hi Nevin,

We are still waiting on our banking partner to send us the trace details for this wire, we have just followed up with them again. I will send you the IMAD/OMAD numbers securely as soon as we have them!

Sincerely,

On Mon, Apr 4, 2022 at 9:05 PM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Jovana, any details you can share with me?  A reference number or trace ID for the wire that I can share with Chase?

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**CONFIDENTIAL**

**CF0004200**

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-20
Admitted:_____

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

On Mon, Apr 4, 2022 at 9:28 AM Jovana Lazic <jovana@rho.co> wrote:
Hi Nevin,

Thank you for your email! We usually receive Federal Tracing Details from our banking partner by 7pm EST on the day the wire settles, however, we will reach out to them momentarily to see if they are able to provide us with the details sooner! I will follow up as soon as I have an update here!

Sincerely,

On Mon, Apr 4, 2022 at 6:12 PM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Jovana.

I see the wire as settled at Rho. Can you please send us the Fed Wire Reference number and any other details so we can track it at Chase? Thanks!

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce

On Fri, Apr 1, 2022 at 4:24 PM Alice Leung <alice@fabric.inc> wrote:
Hi Nevin,

I think it is at the bottom. The status is pending.

CONFIDENTIAL

CF0004201



All Recent Activity

| Date | Sender / Recipient | User | Type | Budget | Amount | |
|------|-------------------|------|------|--------|--------|---|
| 04/01/22 | Internal Transfer – Treasu... | A. Leung | INTERNAL | | -$20,000,000.00 | Pending |
| 04/01/22 | Commerce Fabric Solutio... | A. Leung | WIRE-INT | ● Not Assigned ~ | -$20,016.00 | Pending |
| 04/01/22 | Buying Time Ltd | N. Shetty | WIRE-INT | ● Not Assigned ~ | -$13,312.12 | Pending |
| 04/01/22 | Freelance Labs, Inc. | N. Shetty | ACH-US | ● Not Assigned ~ | -$10,400.00 | Pending |
| 04/01/22 | Freelance Labs, Inc. | N. Shetty | ACH-US | ● Not Assigned ~ | -$3,600.00 | Pending |
| 04/01/22 | Freelance Labs, Inc. | N. Shetty | ACH-US | ● Not Assigned ~ | -$320.00 | Pending |
| 04/01/22 | Freelance Labs, Inc. | N. Shetty | ACH-US | ● Not Assigned ~ | -$360.00 | Pending |
| 04/01/22 | Freelance Labs, Inc. | N. Shetty | ACH-US | ● Not Assigned ~ | -$1,040.00 | Pending |
| 03/31/22 | Commerce Fabric, Inc. | A. Leung | WIRE-DOM | ● Not Assigned ~ | -$60,000,000.00 | Pending |

**Alice Leung**
Accounting Lead
778-710-2225

::: fabric

On Fri, Apr 1, 2022 at 4:17 PM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Jovana, thank you - I see the $10M settled at Chase. However, I don't see the $60M in our account - there is no line item showing pending or queued. Was the wire processed on Rho's end or will it process first thing Monday morning?



Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch

CONFIDENTIAL

CF0004202

G-20-003

Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

On Fri, Apr 1, 2022 at 2:16 PM Jovana Lazic <jovana@rho.co> wrote:
Hi Nevin,

Apologies for the delay here! I just wanted to follow up and confirm that the $10mm wire settled on our
end and the Federal Tracing Details (IMAD/OMAD numbers) should populate in the Memo line of the
transaction by 7-8p EST should you need them! The $60mm wire was pushed through by our banking
partner and is now processing as well, however, it will unfortunately settle on Monday in the recipient
account.

Sincerely,

On Fri, Apr 1, 2022 at 8:19 PM Jovana Lazic <jovana@rho.co> wrote:
Hi Nevin,

The $10mm wire is still processing as expected and there are currently no issues with it on our end. We
followed up again with our back office regarding the $60mm one and we are expecting an update from
them at any moment. I will let you know as soon as I have more information to share!

Sincerely,

On Fri, Apr 1, 2022 at 8:11 PM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Jovana, can you provide an update on both the $10M and $60M wire transfers?


Best,



**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

**CONFIDENTIAL**

On Fri, Apr 1, 2022 at 9:57 AM Jovana Lazic <jovana@rho.co> wrote:
Hi Nevin and Alice,

We just released the $10mm wire and it is currently processing! We are closely communicating with our back office regarding the $60mm one and working on getting it pushed through as well. The wire was flagged by our banking partner's compliance team due to its size and will need to be pushed through manually.

I will reach out with a confirmation as soon as it has been pushed through!

Sincerely,

On Fri, Apr 1, 2022 at 6:46 PM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Rho team,

We need some money to move today - we just initiated an additional $10M wire from Rho to our Chase account. Please approve and release asap.

Then approve and release the $60M as well. So a total $70M should move today. Worst case scenario - just move the $10M.

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

## ::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

On Fri, Apr 1, 2022 at 9:15 AM Alice Leung <alice@fabric.inc> wrote:
+ Added Lucy

**Alice Leung**
Accounting Lead
778-710-2225

**CONFIDENTIAL**

::: fabric

On Fri, Apr 1, 2022 at 9:09 AM Jovana Lazic <jovana@rho.co> wrote:
Hi Nevin,

Thank you for your email! We have escalated this with our back office with utmost urgency and we will make sure to reach out the moment we have an update!

Sincerely,

On Fri, Apr 1, 2022 at 5:55 PM Nevin Shetty <nevin@fabric.inc> wrote:
Hello, what is the status of the $60M wire transfer to our account at Chase? This 100% needs to be processed in the next hour - please escalate ASAP.

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

--
Rho



Jovana Lazic / Client Service Manager /

**Find us at**
100 Crosby Street
New York, NY 10012

**Support available 8am-8pm, M-F, 9am-6pm Sa-Su**
Telephone: 855-7-GETRHO
Email: bank@rho.co

Get fee-free corporate cards, banking, payments, and complimentary AP for your entire team. Plus earn up to 1.75% unlimited cash back.  Sign up today @ rho.co.

Latest Press: Tech Crunch | Join the Rho Team at Rho Careers

---

*Do not transmit sensitive information via email. No SSN's, account numbers or photo ID's. No one at Rho will ever ask you for your password or for authentication codes for your account.*
*Rho is not a bank. Rho is a financial technology company that partners with FDIC-insured banks to deliver banking products and services.*



Rho

**Jovana Lazic / Client Service Manager /**

**Find us at**
100 Crosby Street
New York, NY 10012

**Support available 8am-8pm, M-F, 9am-6pm Sa-Su**
Telephone: 855-7-GETRHO
Email: bank@rho.co

Get fee-free corporate cards, banking, payments, and complimentary AP for your entire team. Plus earn up to 1.75% unlimited cash back.  Sign up today @ rho.co.

Latest Press: Tech Crunch | Join the Rho Team at Rho Careers

---

*Do not transmit sensitive information via email. No SSN's, account numbers or photo ID's. No one at Rho will ever ask you for your password or for authentication codes for your account.*
*Rho is not a bank. Rho is a financial technology company that partners with FDIC-insured banks to deliver banking products and services.*

Rho

**Jovana Lazic / Client Service Manager /**

**Find us at**
100 Crosby Street
New York, NY 10012

**Support available 8am-8pm, M-F, 9am-6pm Sa-Su**
Telephone: 855-7-GETRHO
Email: bank@rho.co

Get fee-free corporate cards, banking, payments, and complimentary AP for your entire team. Plus earn up to 1.75% unlimited cash back.  Sign up today @ rho.co.

Latest Press: Tech Crunch | Join the Rho Team at Rho Careers

---

*Do not transmit sensitive information via email. No SSN's, account numbers or photo ID's. No one at Rho will ever ask you for your password or for authentication codes for your account.*
*Rho is not a bank. Rho is a financial technology company that partners with FDIC-insured banks to deliver banking products and services.*

Rho

**Jovana Lazic / Client Service Manager /**

**CONFIDENTIAL**

**Find us at**
100 Crosby Street
New York, NY 10012

**Support available 8am-8pm, M-F, 9am-6pm Sa-Su**
Telephone: 855-7-GETRHO
Email: bank@rho.co

Get fee-free corporate cards, banking, payments, and complimentary AP for your entire team. Plus earn up to 1.75% unlimited cash back. Sign up today @ rho.co.

Latest Press: Tech Crunch | Join the Rho Team at Rho Careers

*Do not transmit sensitive information via email. No SSN's, account numbers or photo ID's. No one at Rho will ever ask you for your password or for authentication codes for your account.*
*Rho is not a bank. Rho is a financial technology company that partners with FDIC-insured banks to deliver banking products and services.*



**Jovana Lazic / Client Service Manager /**

**Find us at**
100 Crosby Street
New York, NY 10012

**Support available 8am-8pm, M-F, 9am-6pm Sa-Su**
Telephone: 855-7-GETRHO
Email: bank@rho.co

Get fee-free corporate cards, banking, payments, and complimentary AP for your entire team. Plus earn up to 1.75% unlimited cash back. Sign up today @ rho.co.

Latest Press: Tech Crunch | Join the Rho Team at Rho Careers

*Do not transmit sensitive information via email. No SSN's, account numbers or photo ID's. No one at Rho will ever ask you for your password or for authentication codes for your account.*
*Rho is not a bank. Rho is a financial technology company that partners with FDIC-insured banks to deliver banking products and services.*



**Jovana Lazic / Client Service Manager /**

**Find us at**
100 Crosby Street
New York, NY 10012

**Support available 8am-8pm, M-F, 9am-6pm Sa-Su**
Telephone: 855-7-GETRHO
Email: bank@rho.co

Get fee-free corporate cards, banking, payments, and complimentary AP for your entire team. Plus earn up to 1.75% unlimited cash back. Sign up today @ rho.co.

Latest Press: Tech Crunch | Join the Rho Team at Rho Careers

*Do not transmit sensitive information via email. No SSN's, account numbers or photo ID's. No one at Rho will ever ask you for your password or for authentication codes for your account.*
*Rho is not a bank. Rho is a financial technology company that partners with FDIC-insured banks to deliver banking products and services.*

**CONFIDENTIAL**

Message

| | |
|---|---|
| **From**: | Alice Leung [alice@fabric.inc] |
| on behalf of | Alice Leung <alice@fabric.inc> [alice@fabric.inc] |
| **Sent**: | 4/1/2022 4:05:40 PM |
| **To**: | Nevin Shetty [nevin@fabric.inc] |
| **CC**: | Finance [finance@fabric.inc] |
| **Subject**: | Re: Finance Wire Flows |

Hi Nevin,

I've moved $20M from Rho Operating Account to Rho Treasury Account. Please see below:

| | |
|---|---|
| Amount | $20,000,000.00 |
| Transfer From | Cash (Checking) |
| Transfer To | Treasury |
| To Be Executed | Immediately |
| Frequency | One Time Only |

**Alice Leung**
Accounting Lead
778-710-2225

⋮⋮⋮ fabric

On Thu, Mar 31, 2022 at 11:13 AM Alice Leung <alice@fabric.inc> wrote:
Hi Nevin,

I've created the $60M wire from Rho to Chase. Please approve in Rho. Thank you!

| Payee | Commerce Fabric, Inc. | Phone Number | +1 206-853-7300 |
|---|---|---|---|
| Routing Number | *****0021 | Email | finance@fabric.inc |
| Account Number | *****9944 | To Be Executed | Immediately |
| Account Type | Checking | Estimated Arrival | April 1st, 2022 |
| Amount | $60,000,000.00 | Frequency | One Time Only |
| Payee Address | 113 Cherry St., PMB 66768 ... | Reference/Memo | Fund transfer from Rho to ... |

**CONFIDENTIAL**

CF0004348

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-21
Admitted:_____

**Alice Leung**
Accounting Lead
778-710-2225

∷∷ fabric

On Thu, Mar 31, 2022 at 10:53 AM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Alice,

Can you please tee up:
- $60M wire transfer from our Rho Operating Account to our Chase Business account (9944)
     - I will approve tomorrow morning

- Tomorrow morning please move $20M internal transfer from Rho Operating Account to Rho Treasury
Account


Best,



**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

∷∷ fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase


Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

--
You received this message because you are subscribed to the Google Groups "Finance" group.
To unsubscribe from this group and stop receiving emails from it, send an email to
finance+unsubscribe@fabric.inc.
To view this discussion on the web visit
https://groups.google.com/a/fabric.inc/d/msgid/finance/CAOX%3D_50DAEdrFta%3DB9G%2BJpUF0sHBV
JVBrZ0HugM4uYAUCRjGYQ%40mail.gmail.com.

**CONFIDENTIAL**

**CF0004349**

G-21-002

Message

| | |
|---|---|
| **From:** | team faisal [team-fm@fabric.inc] |
| on behalf of | team faisal <team-fm@fabric.inc> [team-fm@fabric.inc] |
| **Sent:** | 5/13/2022 6:04:11 PM |
| **To:** | Nevin Shetty [nevin@fabric.inc] |
| **CC:** | faisal masud [fm@fabric.inc]; Stacy Saal [stacy@fabric.inc]; Sophie Cave [sophie.cave@fabric.inc] |
| **Subject:** | Re: Urgent |

We have booked for 12:30pmPT today.

On Fri, May 13, 2022 at 10:55 AM Nevin Shetty <nevin@fabric.inc> wrote:
FM, Stacy, a catastrophic event has happened that has impacts me and fabric. Can we please
hop on a 15 min zoom today. I need both of you on the call.

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**::: fabric**

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

--
**Executive Support Team (Katheryn Grice, Ella Evans)**
**On behalf of Faisal Masud**

**CONFIDENTIAL**

**CF0004791**

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-22
Admitted:_____



**From: Nevin Shetty** <nevin.shetty@gmail.com>
Date: Sat, May 14, 2022, 1:48 PM
Subject: [External] UST Terra Update
To: Faisal Masud <fm@fabric.inc>, <stacy@fabric.inc>
Cc: Krupa Shah <krupa@fabric.inc>

Faisal, Stacy,

It appears that there is a possibility of exiting the positions on Anchor and Aperture and converting the UST into USD at $0.15 on the dollar. The market has continued to be volatile, and I do not know how long this opportunity will last or whether there is enough liquidity at various exchanges to actually facilitate the conversion, but I am monitoring the situation closely.

Given a potential recovery plan in the Terra ecosystem, UST may increase in value toward repegging but it's unclear. This is a fluid situation—the markets may change quickly and our view of the best timing and price of an exit may change quickly. There will not be a clear right or wrong answer on when to attempt to exit.

Given the fast-moving nature of the situation, I would like Fabric's marching orders on how to proceed. Unless I hear otherwise from you, we plan to use our best judgment to decide when to attempt to sell in order to maximize the interests of all HighTower customers. But I would be glad to deal with Fabric's interests differently if you instruct me otherwise. That is, we can try to exit immediately at any conversion rate we can get; or we can hold no matter what we see in the market; or we can comply with some other instruction.

This market is highly volatile and I want to mitigate the losses as best I can. Please tell as soon as you are able if you'd like HighTower to act in some specified manner with regards to Fabric's interests. If I do not hear back from you, I plan

1

USA_00000136

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-29
Admitted:_____

to treat Fabric's interests the same as every other Hightower customer—we sell or hold based on our best judgment on how to maximize the return to investors in these very difficult circumstances.

I will continue to keep you apprised as I know more. Thank you for understanding the timely nature of this communication. Please call my cell phone if you have any questions or would like to discuss this.

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

2

USA_00000137
G-29-002

---------- Forwarded message ---------
From: **HighTower Treasury Notifications** <notifications@hightowertreasury.com>
Date: Mon, May 16, 2022 at 4:45 PM
Subject: [External] HighTower Treasury Withdrawal Notice
To: <stacy@fabric.inc>, <eric.chan@fabric.inc>, <lucy.harrington@fabric.inc>,
<alice@fabric.inc>

Hello,

Since our last update, the crypto market conditions are still very poor. To reiterate, due to ongoing volatility and market dynamics, 1 UST (the stablecoin we use to access yields) is currently worth less than 1 US dollar. This difference in value means that **HighTower Treasury cannot guarantee the exchange rate of the UST-USD pair** upon any withdrawal. All withdrawals remain subject to our Terms of Service.

As a reminder, due to market conditions, **the current displayed value on your dashboard does not represent the accurate dollar value of your funds.**

This unprecedented event has caused massive financial loss across the entire blockchain industry. To mitigate any further losses, you have the option to withdraw your funds at the exchange rates available and subject to transaction fees applicable at the time of the withdrawal. We received your withdrawal request of $100,000.00 in principal on 5/13/22. If you decide to withdraw, and pursuant to Section 14 of the Terms of Service, we will require a confirmation of approval via email and then, once approved, process your withdrawal as expeditiously as possible.

If you wish to continue with your withdrawal at this time, you will not receive the 1:1 exchange rate, rather you will receive the market UST-USD exchange rate at the time we process your withdrawal, subject to any transaction fees. Based on the current UST-USD

USA_00000212

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-30
Admitted:_____

exchange rate, a withdrawal into USD will result in a material loss of your principal. Upon receiving your confirmation, we will process your withdrawal as expeditiously as possible.

By confirming your request to withdraw your holdings out of UST, you acknowledge that HighTower Treasury cannot guarantee any particular exchange rate and that the exchange rate you receive will be based solely on the UST-USD market price at the time HighTower Treasury receives your confirmation and processes your request.

**Please respond to this email** with "I CONFIRM" if you agree and acknowledge the foregoing and wish to authorize your withdrawal. If you wish to reverse your withdrawal request, thereby keeping your funds in UST, respond "I DO NOT CONFIRM."

We are here to support you and answer any additional questions you may have to the best of our ability.

- The HighTower Team

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

**To:** 'Ryan Bartley'[ryan@fabric.inc]; BB CM Implementations[bb.cm.implementations@chase.com]
**Cc:** Finance[finance@fabric.inc]; HR[hr@fabric.inc]; Nevin Shetty[nevin@fabric.inc]
**From:** BB CM Implementations[bb.cm.implementations@chase.com]
**Sent:** Mon 3/28/2022 9:48:28 AM (UTC-07:00)
**Subject:** [External] RE: NEXT STEP RE: Implementation Request: IR ID: 2618984 [Pontley]

Hello,
I am sorry, I was already gone on Friday. I will get my backup Ok Williams to give you a call today.

Jackie Pontley

**Jackie Pontley** (She/Her/Hers) | Product Implementation Specialist | Business Banking Cash Management | **JPMorgan Chase Bank, N.A.** |
8181 Communications Pkwy Bldg B Floor 2 | Plano,TX 75024 | T: 214-965-3105 | Platinum Business Service Team: 877-425-8100

**From:** Ryan Bartley <ryan@fabric.inc>
**Sent:** Friday, March 25, 2022 3:15 PM
**To:** BB CM Implementations <bb.cm.implementations@chase.com>
**Cc:** Finance <finance@fabric.inc>; HR <hr@fabric.inc>; Nevin Shetty <nevin@fabric.inc>
**Subject:** Re: NEXT STEP RE: Implementation Request: IR ID: 2618984 [Pontley]

Hi Jackie,

I'm available anytime this afternoon. If I don't pick up, just text me and I'll call you back asap 408-596-0111

Ryan

On Fri, Mar 25, 2022 at 11:37 AM, Nevin Shetty <nevin@fabric.inc> wrote:
Hi Jackie, please call Ryan at 408 596 0111

Ryan, this is to enable a reverse wire component at Chase that is required by UKG our new HR / payroll provider.

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.


On Fri, Mar 25, 2022 at 11:31 AM BB CM Implementations <bb.cm.implementations@chase.com> wrote:
Per audit my coworker will need to call one of the other signers, either Faisal or Ryan. I will need their phone number and
perhaps a good time to call. In only takes a few minutes- and then the drawdown can be complete within 24-48 hours.

Jackie Pontley

**Jackie Pontley** (She/Her/Hers) | Product Implementation Specialist | Business Banking Cash Management | **JPMorgan Chase Bank, N.A.** |

CommerceFabric0001

USA_00000969

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-31
Admitted:_____

8181 Communications Pkwy Bldg B Floor 2 | Plano,TX 75024 | T: 214-965-3105 | Platinum Business Service Team: 877-425-8100

**From:** Nevin Shetty <nevin@fabric.inc>
**Sent:** Friday, March 25, 2022 10:50 AM
**To:** BB CM Implementations <bb.cm.implementations@chase.com>
**Cc:** brown, desiree (CCB, USA) <desiree.brown@chase.com>; Janosick, Kristen L (CCB, USA) <kristen.janosick@chase.com>; Finance <finance@fabric.inc>; HR <hr@fabric.inc>
**Subject:** Re: Implementation Request: IR ID: 2618984 [Pontley]

Hi Jackie, I have executed the form. Please keep finance@ and HR@ looped into these emails going forward. Thank you.

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

On Fri, Mar 25, 2022 at 5:56 AM BB CM Implementations <bb.cm.implementations@chase.com> wrote:

Dear Nevin,

I have summarized my understanding of your request below. My goal throughout the implementation process is to exceed your expectations.
Please review the information below and provide any modifications you may deem necessary.
**Summary of Products Requested:**

| ACCOUNT NAME | ACCOUNT | PRODUCT |
|---|---|---|
| Your company | xxxxx9944 | Drawdowns |

**Next Steps:**

• **Documentation Action**: Please have the below document(s) signed by an authorized signer. Once completed, please return the signed documentation to my attention via email.

  ○ Drawdown and Direct Debit Transfer Authorization, terms will send DocuSign to Nevin Shetty**

• **Callback Action**: Be advised that once I receive the signed document(s), one of my colleagues will complete a one-time verification callback to a second signer. It is is recommended the second authorized

CommerceFabric0002

USA_00000970
G-31-002

signer keep a copy of the signed document. ==Please let me know which other signer will my coworker call, I need their name and phone number.==

Please see the below for an expected project timeline. You will receive a completion email once we have implemented all the requested products and services.

| Documentation Milestones | | |
|---|---|---|
| **Task** | **Responsible Parties** | **Duration** |
| Provide required product authorizing document(s) for setup | Chase | 1 day |
| Sign and return setup document(s) | Client | 1-5 days |
| Complete document and signature verification | Chase | 2 day |

| Product Specific Milestones | | |
|---|---|---|
| **Task** | **Responsible Parties** | **Duration** |
| **Drawdown** | | |
| Complete the one-time callback | Chase | 1 day |
| Complete service setup | Chase | 2 days |
| Advise client of the completed setup | Chase | 1 day |

| Deal Closure Phase | | |
|---|---|---|
| Review product satisfaction in a post-implementation review | Chase & Client | 1 day |
| Transition to Customer Service | Chase | 1 day |

Thank you for choosing Chase. I look forward to working with you on making this implementation experience smooth and successful.

Best Regards,

Jackie Pontley

**Jackie Pontley** (She/Her/Hers) | Product Implementation Specialist | Business Banking Cash Management | **JPMorgan Chase Bank, N.A.** | 8181 Communications Pkwy Bldg B Floor 2 | Plano,TX 75024 | T: 214-965-3105 | Platinum Business Service Team: 877-425-8100

CommerceFabric0003

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

CommerceFabric0004

**To:**      brown, desiree[desiree.brown@chase.com]
**From:**    Nevin Shetty[nevin@fabric.inc]
**Sent:**    Wed 3/30/2022 9:59:51 AM (UTC-07:00)
**Subject:** Wire Limit

Hi Desiree,

As you know we will be moving funds back to our Chase account for a portion of our operations. What is the max wire amount I can send online? At one level do I have to physically have to go into a branch to process a wire transfer?

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

⁝⁝ fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

CommerceFabric0031

USA_00000999

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-32
Admitted:_____

**To:**      'Nevin Shetty'[nevin@fabric.inc]
**From:**    brown, desiree[desiree.brown@chase.com]
**Sent:**    Thur 3/31/2022 7:04:29 PM (UTC-07:00)
**Subject:** [External] RE:  Meeting at Chase Mercer Island Branch

The Branch Manager responded at 6:40pm;

I will get back to you tomorrow. She already has a couple appointments I'm sorry I couldn't respond until now.

It's rough running a branch. 😊  I'll let you know when he responds tomorrow.

**From:** Nevin Shetty <nevin@fabric.inc>
**Sent:** Thursday, March 31, 2022 5:57 PM
**To:** brown, desiree (CCB, USA) <desiree.brown@chase.com>
**Subject:** Re: Meeting at Chase Mercer Island Branch

Hi Desiree, please try again in the morning at the Mercer Island branch. I appreciate your help!

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**::: fabric**

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

.

On Thu, Mar 31, 2022 at 5:24 PM brown, desiree <desiree.brown@chase.com> wrote:
I did not receive a response regarding the earlier appointment request and unfortunately, they must have been too busy to
answer my phone call.  I will let you know if I get a response in the morning.  Sorry.  I can always try another branch too?

**From:** Nevin Shetty <nevin@fabric.inc>
**Sent:** Thursday, March 31, 2022 2:50 PM
**To:** brown, desiree (CCB, USA) <desiree.brown@chase.com>
**Subject:** Re: Meeting at Chase Mercer Island Branch

Actually is there something earlier like 9am or 9:30am when the bank opens?

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**::: fabric**

Fabric News:
Fabric in Bloomberg

CommerceFabric0033

USA_00001001

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-33
Admitted:_____

Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

.
.

On Thu, Mar 31, 2022 at 2:48 PM Nevin Shetty <nevin@fabric.inc> wrote:
Yes, that will work. Thank you.

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

.

On Thu, Mar 31, 2022 at 1:46 PM brown, desiree <desiree.brown@chase.com> wrote:
Hi Nevin,

I connected with the Mercer Island Branch Manager and he scheduled a meeting with Mikayla for 11:30 Monday.  I tried to make it earlier, sorry, will 11:30am work?

Thanks,

**Desiree Brown |** Business Relationship Manager | Chase Business Banking
1955 156th Ave NE, Bellevue, WA 98007 | c: 425.830.1203 | **desiree.brown@chase.com**
For excellent service log on to **www.chase.com**, or call our business Platinum Support Line: 877.425.8100

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

CommerceFabric0034

**To:**       'Nevin Shetty'[nevin@fabric.inc]
**From:**     brown, desiree[desiree.brown@chase.com]
**Sent:**     Thur 3/31/2022 10:04:23 AM (UTC-07:00)
**Subject:**  [External] RE:  Wire Limit

Hi Nevin,

Can you please give me a call, regarding the token?

Please let me know if you have any issues scheduling a meeting from our site.  I can email the Branch Manager too but this process is supposed to put the appointment directly on the banker's schedule so that the time you requested is blocked off and dedicated for you.

Personal    Business    Commercial

CHASE ◯

Checking & Savings    Credit Cards    Home Loans    Auto    Investing by J.P. Mo

**Deposit chec**
**our app**

Use your phone's camera t
check with the Chase Mobi

**Learn more**

**From:** Nevin Shetty <nevin@fabric.inc>
**Sent:** Thursday, March 31, 2022 9:38 AM
**To:** brown, desiree (CCB, USA) <desiree.brown@chase.com>
**Subject:** Re: Wire Limit

Hi Desiree, just checking in - how quickly can you send me the token? Alternatively, how do I make an appointment at the Mercer Island branch to send a large wire? I need the appt Monday.

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

CommerceFabric0035

USA_00001003

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-34
Admitted:_____

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

.
..

On Wed, Mar 30, 2022 at 12:50 PM Nevin Shetty <nevin@fabric.inc> wrote:
Yes, we will have a few large wires and need the increase up to $10M. Can you send the token to my house? When will it arrive?

Nevin Shetty

Mercer Island, WA 98040

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

:

On Wed, Mar 30, 2022 at 12:43 PM brown, desiree <desiree.brown@chase.com> wrote:
Hi Nevin,

We have a daily wire limit of $500,00 per signer.  For example, if you needed to send $1MM in a day, you could send $500K and another signer could send $500K.  If you routinely exceed that limit, we can increase up to $10MM with the addition of a token. Do you think a token will be necessary?

Thanks,

**Desiree Brown** | Business Relationship Manager | Chase Business Banking
1955 156th Ave NE, Bellevue, WA 98007 | c: 425.830.1203 | **desiree.brown@chase.com**
For excellent service log on to **www.chase.com**, or call our business Platinum Support Line: 877.425.8100

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are

CommerceFabric0036

not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

CommerceFabric0037

USA_00001005

G-34-003

————— Forwarded message —————
From: **HighTower Treasury** <notifications@hightowertreasury.com>
Date: Fri, Apr 1, 2022 at 9:20 AM
Subject: [External] Welcome to HighTower Treasury: Your account is active
To: <alice@fabric.inc>

# Hello Alice,

## Thanks for completing the creation of your HighTower Treasury account.

You can now login to your account, view balances and download reports.

Login to HighTower Treasury

If you have any questions, please contact us at
support@hightowertreasury.com}

Thanks,
The HighTower Treasury Team

**FAQs**    **Privacy Policy**    **Terms of Service**

Copyright @ 2022 HighTower Treasury, Corp. All rights reserved.

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with HighTower Treasury are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by HighTower Treasury. Rates for HighTower Treasury products are subject to change.

CommerceFabric0038

USA_00001006

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-35
Admitted:_____



————— Forwarded message —————
From: **HighTower Treasury** <notifications@hightowertreasury.com>
Date: Fri, Apr 1, 2022 at 9:14 AM
Subject: [External] Nevin has invited to HighTower Treasury
To: <alice@fabric.inc>

## Hello Alice,

Nevin has added you as a user to the Fabric Inc HighTower Treasury account.

To complete your account set up, please use the link below.

Complete HighTower Treasury Account

Thanks,
The HighTower Treasury Team

**FAQs**      **Privacy Policy**      **Terms of Service**

Copyright @ 2022 HighTower Treasury, Corp. All rights reserved.

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with HighTower Treasury are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by HighTower Treasury. Rates for HighTower Treasury products are subject to change.

CommerceFabric0045

USA_00001013

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-36
Admitted:_____



---------- Forwarded message ----------
From: Nevin Shetty <nevin@fabric.inc>
Date: Saturday, February 19 2022 at 3:29 PM PDT
Subject: Re: [External] Re: Treasury Program
To: Alex Bard <Alex@redpoint.com>
Cc: Stacy Saal <stacy@fabric.inc>

Sounds good. I know them well. Will start work on it after all the wires clear.

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300



Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for

USA_00001026

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-37
Admitted:_____

reinventing retail and e-commerce.

On Sat, Feb 19, 2022 at 3:07 PM Alex Bard <Alex@redpoint.com> wrote:
I would go with svb. We have a very strong relationship with them and prob can help you if you need a bit of leverage.

----

Alex
Redpoint Ventures

On Sat, Feb 19 2022 at 1:04 PM, Nevin Shetty <nevin@fabric.inc> wrote:
Hi Alex,

I have spoken with the treasury groups at SVB, JPM and Stifel - they are all very similar. Given Faisal's mandate to stay opportunistic on acquisitions, I would recommend a fully liquid program 15bps - 40bps (as opposed to laddering).

Are there any other banks you want me to reach out to?

I received sample Investment Policy Statements (IPS) from all the banks - again all very similar. Although we will stay relatively vanilla, I will draft an IPS based on the examples and send it to the board for approval.

Have a wonderful rest of the weekend.

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**::: fabric**

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

| From: | Nevin Shetty <nevin.shetty@gmail.com> |
| --- | --- |
| Sent: | Thursday, January 27, 2022 9:35 AM |
| To: | Adam Brazg <adam@bilberry.com> |
| Cc: | Ross Dzikovskyi <ross@bilberrry.com> |
| Subject: | Re: Big Business Idea |

Guys, just got off the phone with the CEO of OUSD - he offered me a job on the call :) This is way bigger than I thought. They have grown from $30M in November to $200M and their biggest problem is on/off ramp. Our treasury product solves it. We need to build a slick looking MVP version asap so we can just get it into the market. We will eventually get acquired by a large crypto protocol just like Dharma did.

Opensea Acquires Dharma Labs, Co-Founder Is Named New CTO – Metaverse Bitcoin News

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

On Wed, Jan 26, 2022 at 9:38 PM Adam Brazg <adam@bilberrry.com> wrote:
> Thanks Nevin. Ross and I have a meeting scheduled tomorrow morning to discuss a roadmap and next steps so this is great timing. We will touch base with you no later than Friday with next steps.
>
> Adam
>
> On Wed, Jan 26, 2022 at 9:36 PM Nevin Shetty <nevin.shetty@gmail.com> wrote:
>> Adam, Ross,
>>
>> I have updated the google sheet with the MVP components - there is a website tab and product tab.
>>
>> Please let me know the next steps on your end and timeline so I can plan accordingly on my end.
>>
>> Best,
>>
>> Nevin Shetty
>> 206.853.7300
>> nevin.shetty@gmail.com
>>
>> On Tue, Jan 25, 2022 at 3:15 AM Ross Dzikovskyi <ross@bilberrry.com> wrote:
>>> Hey,
>>>
>>> I'm digging into DeFi and Anchor.
>>>
>>> Here is one example of what I've found:
>>>
>>> Anchor collected $6B of deposits and $2B of loans
>>> $6B * 19% = $1.16B/year to be paid out to lenders
>>> $2B * 13% = $0.26B/year from borrowers
>>> Around $0.9B/year they will get from reinvestments of deposits.

USA_00008404

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-38
Admitted:_____

At the moment they are losing $1M/day, and as of today, Anchor has around $48M left.

I'm not an expert so relying on the information I get from my friends in the crypto space.

From those numbers looks like reasonable APY in Achor should be around 4% to make it sustainable long-term.

Another risk is if Anchor collapse it will impact UST. So, there is a risk transferring UST back to USD in case everything goes south.

Let's discuss today.

R

On Fri, Jan 21, 2022 at 7:22 PM Nevin Shetty <nevin.shetty@gmail.com> wrote:
> Yes, both companies are doing manual transfers and that's what we would do for the foreseeable future. Since we are catering to companies it should be higher dollar values with lower volume of transactions. It's just like trading, I (or someone else) would login in 2x a day and make all the trades and transfers.
>
> I am not sure how I got past StableGains. I believe I gave my ID as well. Don't rat me out!
>
> Best,
>
> Nevin Shetty
> 206.853.7300
> nevin.shetty@gmail.com
>
>
> On Thu, Jan 20, 2022 at 4:31 PM Adam Brazg <adam@bilberrry.com> wrote:
>> Nevin. I just sent over an invite. See my responses below in green.
>>
>> On Thu, Jan 20, 2022 at 3:23 PM Nevin Shetty <nevin.shetty@gmail.com> wrote:
>>> See answer below in blue
>>>
>>> Best,
>>>
>>> Nevin Shetty
>>> 206.853.7300
>>> nevin.shetty@gmail.com
>>>
>>>
>>> On Thu, Jan 20, 2022 at 2:50 PM Adam Brazg <adam@bilberrry.com> wrote:
>>>> Nevin,
>>>>
>>>> I signed up for a corporate account on BlockFi, corporate account on StableGains and personal account on Beema and have shared a figma file with you screenshots of the flows (you should have received an email notification).
>>>>
>>>> Please note that I am waiting for my application to be approved on BlockFi and that Stablegains did not accept my application as they requested verification that I actually reside in one of the states they operate in. You can see the email from Stablegains here.
>>>>
>>>> A few other thoughts/questions for you:

1. Do you currently have money invested in the Anchor Protocol? I tried doing it but it's really difficult and not worth if for small sums of money. As a next step, you should try to get money on to Anchor or any other DeFi proctocl - it's hard. That's why this is such a big idea - bringing DeFi yield to traditional finance in the form of a conventional UI/UX. Obviously, if we decide to move forward we will have to do it to test all the various routes to get money on the DeFI protocals for the least amount of fees. Agree with you on all counts. I am working on some options now. This is definitely a huge pain in the ass to do.

2. As outlined in your fund flows, Beema Finance flow into the Anchor Protocol is currently done semi-manually. Do you imagine taking this manual approach for the MVP if we were to move forward? Where do you see semi-annual? That is a typo, I believe both companies are transferring twice a day from Circle to Anchor. I said "semi-MANUALLY" not "semi-annually". What I meant is that they are manually getting the money into the Anchor Protocal once the funds are deposited into Circle. Not doing it programatically.

3. Beema Finance is using Plaid for deposits into Circle, which has a limit of $2,999 in a day, $10,000 in a week and $20,000 per month. This might be a banking transfer limit on my personal account but do you have insight into the approach we would need to take for users to deposit large sums of money? It would have to be wire only. And that is what corporations want. I wired money into StableGains which works through Circle. How did you get a StableGains account verified? Blueberry Technologies LLC is a Deleware corp but it still asked me to send more proof given my license is from Washington. Did you not run into this?

4. How do you imagine we would partner on this if we were to move forward? What are you thinking in terms of ownership? Can discuss on our call

5. Do you anticipate offering insurance? Yes, in my excel spread sheet you will see a lower yield (6%) that is the insurance backed yield choice. OUSD makes you purchase the insurance from Nexus Mutual and InsurAce separately. We would combine so on a customers dashboard they can just choose between the lower yield product and the higher yield product (and only make changes at the beginning of each month or some set interval). Makes sense.

6. Do you have time tomorrow or early next week to discuss this in further detail? Morning is best for us. Let us know what works best on your end. Do any of these times (PST) work for you?

January 21 (Tomorrow / Friday):
• 8:30 AM - 9:00 AM

January 25 (Tuesday):
• 9:00 AM - 9:30 AM
• 10:00 AM - 10:30 AM

Adam

On Wed, Jan 19, 2022 at 10:02 PM Nevin Shetty <nevin.shetty@gmail.com> wrote:
Sounds good.

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

On Wed, Jan 19, 2022 at 4:21 PM Adam Brazg <adam@bilberrry.com> wrote:
Nevin, I have been doing some research on this and plan to go through the sign up process (and document) each of the accounts in the spreadsheet tomorrow. I am also syncing with Ross in the am. We will be in touch.

Adam

On Wed, Jan 19, 2022 at 7:06 AM Nevin Shetty <nevin.shetty@gmail.com> wrote:
Sorry - attached.

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

On Wed, Jan 19, 2022 at 4:55 AM Ross Dzikovskyi <ross@bilberrry.com> wrote:
Nevin,

jumping right on it. Can you share with me "Beema Finance's architecture chart"

On Tue, Jan 18, 2022 at 10:13 PM Nevin Shetty <nevin.shetty@gmail.com> wrote:
Adam, Ross,

Great chatting as always. As a follow up, here is the google sheet link with a high level model and tabs for Adam to fill in as you sign up for each service.

Adam,
- Sign up for Blockfi corporate account (please use this referral link)
- Sign up for Stablegains corporate account (please use this referral link)
- Sign up for Beema Finance personal account (please use this referral code: 000002s2u7lZh56DEusFyBDW9Rs)
- Please record all the information that each application asks for in the google sheet

Ross,
- Check out the APIs on Circle this would be our top level bank account where we accept money then move into DeFi
- Review Beema Finance's architecture chart
- Review the Fund flows tab in the google sheet

Best Youtube Explainer on Anchor Protocol

Best,

Nevin Shetty

206.853.7300
nevin.shetty@gmail.com

On Mon, Jan 17, 2022 at 4:05 AM Ross Dzikovskyi <ross@bilberrry.com> wrote:
haha, Nevin you won't believe it, I was thinking about you the other day.

In fact, we have the Ideas Brainstorm day on Wednesday with a team, so the
timing can't be better.

On Mon, Jan 17, 2022, 03:06 Adam Brazg <adam@bilberrry.com> wrote:
Great, I just sent out an invite for Tuesday at 9am.

You remembered correctly, I had a little boy. His name is Boaz :)

Speak with you soon.

Adam

On Sun, Jan 16, 2022 at 4:08 PM Nevin Shetty <nevin.shetty@gmail.com>
wrote:
Glad to hear things are going well at home. It's a boy right? What's his name?

Do any of these times (PST) work for you? If it's easier, you can click on a
slot below to book:

January 18 (Tuesday):
 • 9:00 AM - 9:30 AM
January 19 (Wednesday):
 • 9:00 AM - 10:00 AM
January 20 (Thursday):
 • 9:00 AM - 10:00 AM

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

On Sun, Jan 16, 2022 at 4:03 PM Adam Brazg <adam@bilberrry.com>
wrote:
Nevin,

Great to hear from you. I don't even need to sync with Ross first to tell you
that we are interested in hearing more. We do have some capacity freeing
up and would love to discuss. What times work for you this week to
connect? Mornings are best for us.

Adam

And sleep is few and far between as you are well aware :) but overall things
are going great!

On Sun, Jan 16, 2022 at 3:25 PM Nevin Shetty <nevin.shetty@gmail.com>
wrote:

Ross, Adam,

I have an idea in the crypto space that plays on all three of our strengths -
finance, technology and marketing. I think we can do it as a side hustle
until we get traction and with less than $100K in upfront costs. Let me
know if you have capacity and want to discuss this week.

Adam, hope you are getting some sleep!

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com
--

Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436

--

Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436

--

Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436

--

Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436

--

Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436

--



Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436

**Bilberrry**

| From: | Adam Brazg <adam@bilberrry.com> |
| --- | --- |
| Sent: | Friday, February 4, 2022 5:57 AM |
| To: | Ross Dzikovskyi <ross@bilberrry.com> |
| Cc: | Nevin Shetty <nevin.shetty@gmail.com> |
| Subject: | Re: C Corp Set up |

Nevin,

This will work. I'm confirming the voting and economic interest of the 67% will be split between Ross and me.

Adam

On Thu, Feb 3, 2022 at 11:58 PM Ross Dzikovskyi <ross@bilberrry.com> wrote:
Works for me.

On Fri, Feb 4, 2022, 08:04 Nevin Shetty <nevin.shetty@gmail.com> wrote:
Adam, Ross,

Initially I was going to set up the corp with all of us as equal owners. After thinking about it, given that Ross is an foreign national and a beneficial owner, it makes setting up a bank account and registering with different entities (e.g. Circle) more complicated.

If it's ok with you Ross (assuming you trust Adam enough :) I propose on the incorporation forms Adam be listed with 67% and myself 33%. I am comfortable with that if Adam confirms here that the actual voting split and economic interest split will be 33% each.

Let me know.

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

--


Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436
**Bilberrry**

USA_00008411

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-39
Admitted:_____

| From: | Nevin Shetty <nevin.shetty@gmail.com> |
|---|---|
| Sent: | Saturday, May 14, 2022 10:39 AM |
| To: | Adam Brazg <adam@bilberrry.com>; Adam Brazg <adam@hightowertreasury.com> |
| Subject: | Draft to Fabric |

Adam, let me know your thoughts on the below

Faisal, Stacy,

It appears that there is a possibility of exiting the positions on Anchor and Aperture and converting the UST into USD at $0.15 on the dollar. The market has continued to be volatile, and I do not know how long this opportunity will last or whether there is enough liquidity at various exchanges to actually facilitate the conversion, but I am monitoring the situation closely.

Given a potential recovery plan in the Terra ecosystem, and our belief in the asset, $ 0.15 cents remains undervalued in our view and we do not recommend immediately selling. If we could exit at closer to $ 0.50, we would recommend attempting to sell. But this is a fluid situation—the markets may change quickly and our view of the best timing and price of an exit may change quickly. There will not be a clear right or wrong answer on when to attempt to exit.

Given the fast-moving nature of the situation, I would like Fabric's marching orders on how to proceed. Unless I hear otherwise from you, we plan to use our best judgment to decide when to attempt to sell in order to maximize the interests of all HighTower customers. But I would be glad to deal with Fabric's interests differently if you instruct me otherwise. That is, we can try to exit immediately at any conversion rate we can get; or we can hold no matter what we see in the market; or we can comply with some other instruction.

This market is highly volatile and I want to mitigate the losses as best I can. Please tell as soon as you are able if you'd like HighTower to act in some specified manner with regards to Fabric's interests. If I do not hear back from you, I plan to treat Fabric's interests the same as every other Hightower customerr—we sell or hold based on our best judgment on how to maximize the return to investors in these very difficult circumstances.

I will continue to keep you apprised as I know more. Thank you for understanding the timely nature of this communication. Please call my cell phone if you have any questions or would like to discuss this.

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

USA_00008412

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-40
Admitted:_____

## HIGHTOWER TREASURY ACCOUNT AGREEMENT

This Account Agreement (the "**Agreement**") is dated March 31, 2022, (the "**Effective Date**") and is between HighTower Treasury Corp, a Delaware corporation ("**HighTower Treasury**" or **"HighTower"**), and Commerce Fabric Inc, a Delaware corporation ("**Customer**"). HighTower Treasury and Customer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

For good and valuable consideration, the Parties hereby agree as follows:

### 1. DEFINITIONS.

**1.1** Definitions. The following terms, as used herein, have the meanings ascribed to them below:

"*Access Protocols*" means the technical specifications, connectivity standards, protocols, or other procedures or mechanisms relevant to allow Customer to access the HighTower Treasury Platform and Services.

"*Aggregate Data*" means any data derived or aggregated in de-identified form from any Customer Materials or Customer's Use of the Services, including any usage data or trends with respect to the Services.

"*Authorized User*" means an employee or contractor whom Customer authorizes to Use the Services.

"*HighTower Treasury API*" means any application programming interfaces provided by HighTower Treasury.

"*HighTower Treasury Platform*" means the platform that HighTower Treasury makes available to Customer to enable Customer's Use of the Services, including the HighTower Treasury API, a web portal or browser-based user interface, and any manual processes specified by HighTower Treasury in writing.

"*HighTower Treasury Technology*" means the computer programs, algorithms, software, code, application program interfaces, works of authorship, know-how, inventions, processes, data, technical specifications, information, tables, and other technology and systems that are used by HighTower Treasury in connection with the Services, and all improvements, derivative works, modifications, enhancements, updates, fixes, and new releases thereof, including the Documentation, Related Information, HighTower Treasury Platform, Access Protocols, and HighTower Treasury API, but excluding Customer Materials.

"*Decentralized Finance Protocol*" means open-source software consisting of smart contracts establishing a decentralized protocol for digital asset interest rate markets commonly known DeFi Protocols.

"*Token*" means an interest-bearing digital asset created programmatically by the HighTower Treasury Protocol which represents the power to redeem a corresponding digital asset supplied to the HighTower Treasury Protocol.

"*Customer Materials*" means all information, data, content, and other materials, in any form or medium, that is submitted, posted, collected, transmitted, or otherwise provided by or on behalf of Customer through the Services or to HighTower Treasury in connection with Customer's Use of the Services, but excluding Aggregate Data and any other information, data, data models, content, or materials owned or controlled by HighTower Treasury and made available through or in connection with the Services.

"*Documentation*" means the technical materials provided by HighTower Treasury to Customer in electronic or written form regarding the Services or HighTower Treasury Technology.

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-42
Admitted:_____

"*Feedback*" means feedback, suggestions, improvements, and recommendations regarding the HighTower Treasury Technology or Services.

"*Funds*" means the sum of then outstanding cash, Stablecoins, Tokens, and other digital assets as monitored by Treasury Account, including Earned APR, but not including Excess APR or any other amounts due.

"*Initial* Term" means a period commencing on the Effective Date and continuing for one (1) month, during which time HighTower Treasury will not change the Rate as further described in Section 3.5.

"*Intellectual Property Rights*" means patent rights (including patent applications and disclosures), inventions, copyrights, trade secrets, know-how, data and database rights, mask work rights, and any other intellectual property rights recognized in any country or jurisdiction in the world.

"*Partner Financial Institution*" means the applicable regulated financial services companies that HighTower Treasury utilizes to offer the Services, as further described in Section 3.

"*Person*" means any individual, corporation, partnership, trust, limited liability company, association, governmental authority, or other entity.

"*Related Information*" means any information delivered by HighTower Treasury to Customer in connection with the Services, including Transaction status and return details.

"*Services*" has the meaning set forth in Section 3.

"*Stablecoin*" means a digital asset intended to maintain a value of $1.00 USD per unit, and which is either algorithmically stabilized or backed on a full-reserve basis by reserves of fiat currency, short-term securities, digital assets, or other valuable assets, including USDC issued by the Centre Consortium.

"*Support Services*" means the commercially reasonable efforts that HighTower Treasury will carry out to ensure that Customer has the ability to Use the Services during the Term, as further described in Section 11.

"*Transaction*" means any monetary transfer necessary to fund the Treasury Account or receive payouts of Funds, and all information required to effect the transfer, including payment instructions.

"*Treasury Account*" means the sum total of all outstanding amounts owed but unpaid under this Agreement, whether due or not, including Funds, Excess APR, fees, costs, expenses, and any other amounts.

"*Use*" means to use or access the Services in accordance with this Agreement and the Documentation.

## 2. SERVICES AND LICENSE RIGHTS.

**2.1** License. Subject to the terms and conditions of this Agreement, HighTower Treasury grants to Customer a limited, non-exclusive, non-transferable right to Use the Services, solely for Customer's internal business purposes, and as specifically set forth herein. To the extent the Services include access to the HighTower Treasury Platform, subject to this Agreement: (i) on or as soon as reasonably practicable after the Effective Date, HighTower Treasury will provide to Customer the Access Protocols to allow Customer to access the HighTower Treasury Platform; and (ii) HighTower Treasury grants Customer a nonexclusive, royalty-free, non-transferable, non-sublicensable right during the Term to access and use the HighTower Treasury Platform, solely for its internal business purposes, and to use and reproduce a reasonable number of copies of the Documentation for internal use in order to support Customer's Use of the HighTower Treasury Platform in accordance with this Agreement. Customer will use commercially reasonable efforts to prevent unauthorized access to, or use of, the Access Protocols and HighTower Treasury Technology,

Related Information, and Services. Customer must notify HighTower Treasury promptly of any such unauthorized use known to Customer.

**2.2** Restrictions. Customer will not, and will not authorize or permit any Person to, directly or indirectly: (i) reverse engineer, disassemble, decompile, or otherwise attempt to derive source code from the HighTower Treasury Technology; (ii) make the HighTower Treasury Technology, Related Information, or Services available to any third parties other than as expressly permitted herein; (iii) modify, adapt, translate, or create derivative works based on, or information accessed from, the HighTower Treasury Technology, Related Information, or Services except as may be expressly permitted herein; (iv) reproduce any portion of the HighTower Treasury Technology, Related Information, or Services except as expressly permitted herein; (v) employ any automated process implementing a bot or web crawler for copying or extracting data through the HighTower Treasury Technology, Related Information, or Services, including web scraping and data scraping; (vi) use the HighTower Treasury Technology, Related Information, or Services to create a product or services that competes with, is similar to, or would serve as a substitute for the HighTower Treasury Technology, Related Information, or Services; or (vii) otherwise use the HighTower Treasury Technology, Related Information, or Services in any manner that exceeds the scope of use permitted hereunder.

**2.3** Authorized Users. Customer will not allow any Person other than Authorized Users to Use the Services. Customer may permit one or more Authorized Users to Use the Services, provided that Customer ensures each Authorized User complies with all applicable terms and conditions of this Agreement. Customer is responsible for all acts and omissions by Authorized Users in connection with their Use of the Services.

## 3. TREASURY ACCOUNT SERVICES.

**3.1** Treasury Account Services. Customer will initiate Transactions to one or more HighTower Treasury account(s) held by a partner financial institution (collectively, a "HighTower Treasury Account") to subscribe to the Treasury Account. HighTower Treasury will leverage its integration with the Partner Financial Institution to acquire Stablecoins for its HighTower Treasury Account. Such Stablecoin balance will be held and used by HighTower Treasury to earn interest in DeFi Protocols by obtaining Tokens corresponding to the Stablecoins (collectively, "**Services**"). The Services allow Customer to monitor and generate the amount of Funds owed to Customer through the Treasury Account. HighTower Treasury acknowledges and agrees that it will use the balance of any HighTower Treasury Account to earn interest in DeFi Protocols, including by supplying and borrowing Stablecoins for the benefit of the Customer. Funds represent a direct, unconditional, unsubordinated and unsecured obligation of HighTower Treasury. Customer, on behalf of itself, grants HighTower Treasury the irrevocable right to retain and use of the Funds for the purpose set forth in this Agreement. Such entitlement and use shall not relieve HighTower Treasury of any of its obligations hereunder. Upon Customer's receipt of Funds in accordance with Section 3.9, HighTower Treasury's obligation to Customer is satisfied in whole unless otherwise specified by this Agreement.

**3.2** Treasury Account. Once subscribed to the Treasury Account, Customer's Treasury Account will reflect the aggregate balance of Funds owed by HighTower Treasury to Customer. Customer will not be allowed to instruct a Partner Financial Institution to perform any third-party digital asset transactions, including receiving or transferring digital assets to or from third-party wallet addresses, or converting between different types of digital assets. Except as otherwise set forth herein, the Treasury Account may only be used to: (i) to monitor any generated Funds using the Services; (iii) transfer Funds to a Linked Bank Account as instructed by Customer for the purpose of a payout; and (iv) disburse Excess APR and any other amounts held therein pursuant to the terms and conditions hereunder.

**3.3** Partner Financial Institutions. Customer will Use the Services by transmitting instructions to HighTower Treasury through the HighTower Treasury Platform. HighTower Treasury will provide Transaction instruction details to Partner Financial Institutions. All Transactions will be processed and disbursed by Partner Financial Institutions in their capacity as the financial institutions that hold funds and perform funds transfers on behalf of HighTower Treasury. For the avoidance of doubt, Partner Financial

Institutions are not responsible for the fulfillment of HighTower Treasury's obligations hereunder, and HighTower Treasury is not acting in capacity as an agent for any Partner Financial Institutions.

**3.4** Linked Bank Account. Customer must provide HighTower Treasury with account information for Customer's account held at a state- or federally-chartered bank or credit union in the United States (each, a "**Linked Bank Account**"). Cash transfers from Customer to HighTower Treasury must be made in U.S. dollars by wire transfer of immediately available funds, or by another payment method mutually agreed upon by the Parties. HighTower Treasury may require Customer to verify its ownership of any Linked Bank Account in a commercially reasonable manner, at HighTower Treasury's discretion and specification. When Customer transmits payment instructions to HighTower Treasury using the Services, Customer authorizes HighTower Treasury to send such instructions to its relevant Partner Financial Institutions, whom Customer further authorizes to process and carry out such instructions.

**3.5** Interest. During the Initial Term, HighTower Treasury will pay to Customer an interest rate on the balance of Funds ("**Rate**") of 6.00%. After the Initial Term, the Rate may be adjusted from time to time at HighTower Treasury's sole and exclusive discretion and without prior notice to Customer. HighTower Treasury will inform Customer of any such adjustments by sending a notice as required herein. The Rate is and will be quoted as an annual percentage rate ("**APR**").

**3.6** APR Interest Calculation. Interest on all Funds will HighTower Treasury on a daily basis. Daily interest will be calculated by taking the annual yield rate and dividing it by 365, rounding down to the nearest hundredth (100th). Interest on Customer Fund transfers will be calculated at the applicable Rate disclosed by HighTower Treasury herein or in writing. Company will start accruing APR on the value of each Transaction associated with Customer's Treasury Account within twenty-four (24) hours of settlement with the Partner Financial Institution, provided such transfer is not rejected or suspended by HighTower Treasury or a Partner Financial Institution. All interest will be paid in cash and transferred into the Customer's Linked Bank Account by wire transfer upon Customer's request. Calculated interest will be rounded to the nearest hundredth (100th).

**3.7** Earned APR. HighTower Treasury will calculate Earned APR owed to Customer on a daily basis, based on: (i) the Rate offered by HighTower Treasury on a given calendar day; and (ii) all Funds held in the Treasury Account on such calendar day ("**Earned APR**"). HighTower Treasury will provide Customer with the calculation of Earned APR through the HighTower Treasury Platform or upon Customer's request.

**3.8** Excess APR. Depending on market conditions and other factors, the Treasury Account may yield interest in excess of the Rate offered by HighTower Treasury ("**Excess APR**"). As between the Parties, HighTower Treasury will have exclusive right, title, and interest in all Excess APR. Customer authorizes HighTower Treasury and its Partner Financial Institutions to transfer Excess APR to accounts held by HighTower Treasury at any time without notice.

**3.9** Payouts. Customer has the right to receive the dollar value of its Funds balance on a daily basis by requesting a Funds payout to a Linked Bank Account. Customer must initiate all payouts by submitting a payout instruction to HighTower Treasury through the HighTower Treasury Platform during the Repayment Availability period specified by HighTower Treasury. HighTower Treasury and its Partner Financial Institutions will process payout instructions within one (1) business day after submission by initiating a same-day wire transfer to the Linked Bank Account specified by Customer. HighTower Treasury and its Partner Financial Institutions will not transfer the cash balance of Funds to any account or location other than a Linked Bank Account.

**3.10** Account Statements. HighTower Treasury will provide Customer with a statement ("**Account Statement**") allowing Customer to review and verify Transactions, Earned APR, fees, and other relevant information related to Funds and the Services. If Customer identifies an error in the Account Statement, Customer must notify HighTower Treasury of such error within thirty (30) calendar days.

**3.11** Compliance with Applicable Law and Partner Financial Institution Rules. Each Party will comply with: (i) all applicable laws, rules, regulations, and orders of any federal, state, local, or other government; and (ii) any written policies that a Partner Financial Institution may provide to the Parties (collectively, "**Applicable Law**"). HighTower Treasury may make changes to the Services, or to this Agreement, if necessary to comply with changes to Applicable Law. If this occurs, HighTower Treasury will notify Customer within ten (10) days.

**3.12** Enhancements. HighTower Treasury may enhance, revise, upgrade, improve, correct, or issue a new version of all or part of the Services, including the HighTower Treasury Platform (an "**Enhancement**") at any time, provided that HighTower Treasury provides notice of the availability and benefits of such Enhancement and the Enhancement does not materially degrade the Services. HighTower Treasury will not charge Customer for any Enhancement. If Customer is required to update or otherwise alter its systems to make use of an Enhancement, then Customer will be responsible for its own costs and expenses.

**3.13** Additional Terms. HighTower Treasury may require Customer to accept additional terms and conditions for Customer's use of certain services and features offered via the Services, if necessary to comply with Applicable Law ("**Additional Terms**"). All Additional Terms are made a part of this Agreement by reference. Customer agrees to abide by all Additional Terms, including representing that Customer is eligible to use or participate in such service or feature.

## 4. CUSTOMER'S USE OF THE SERVICES.

**4.1** Business Use. Customer must be a registered business or other legal entity in good standing, located in a jurisdiction not otherwise prohibited from accessing the Services. Customer may use the Treasury Account and the Services solely for its own internal business purposes only, and not for personal, family, or household purposes.

**4.2** Accreditation and Compliance Review. Customer must follow HighTower Treasury's compliance procedures to verify Customer's eligibility to use the Services pursuant to Applicable Law. HighTower Treasury may require Customer to provide due diligence information, supporting documentation, and other compliance-related materials and information necessary to verify Customer's eligibility to Use the Services. Customer will provide accurate, complete, and current information upon request, and will update such information as necessary to ensure it remains accurate, complete, and current at all times that Customer has a Treasury Account with HighTower Treasury for the Services. If Customer fails to update this information, HighTower Treasury may suspend or terminate the Services. HighTower Treasury reserve the right to reassess Customer's eligibility for the Services at any time.

**4.3** Customer Access. The Treasury Account may only be accessed through the Services and must be used in accordance with this Agreement. Customer is responsible for all Transactions and other activity within the Treasury Account that Customer authorizes through the Services. Customer will, and will require all Authorized Users to, use all reasonable means to secure usernames, passwords, hardware, software, and other credentials ("**Credentials**") used to access the Services in accordance with customary security protocols, and will promptly notify HighTower Treasury if Customer knows or reasonably suspects that any Credential has been compromised. Customer will not give or make available any Credentials or any other means of accessing the Services to any unauthorized individuals or entities. Customer may not access the Services until and unless such access has been verified and authenticated pursuant to the commercially reasonable security procedures required by HighTower Treasury. Customer assumes all liability for all Transactions initiated after such security procedures have been followed, even if Customer did not intend a Transaction to occur or did not actually authorize such Transaction.

**4.4** Unauthorized Transactions. Customer must contact HighTower Treasury immediately if Customer believes that: (i) the Treasury Account has been accessed without Customer's authorization; (ii) a Transaction has occurred that Customer did not authorize or anticipate; or (iii) a Transaction has been processed incorrectly ("**Unauthorized Transactions**"). When Customer notifies HighTower Treasury of an Unauthorized Transaction, Customer must provide such information as reasonably requested by

HighTower Treasury or its Partner Financial Institutions to determine the nature of the Unauthorized Transaction. HighTower Treasury will diligently investigate such Unauthorized Transaction and will inform Customer of the results of its investigation as soon as reasonably practicable after the investigation is complete.

**4.5** Customer Responsibilities. Customer is solely responsible for: (i) its Use of the Services and HighTower Treasury Technology, up to the point of HighTower Treasury's receipt of a valid Transaction request from Customer, including a full and complete payment instruction (the "**Demarcation Point**"); (ii) reporting all amounts earned to the proper tax authorities, and for the payment of all taxes due thereon; (iii) maintenance and management of its computer networks, servers, software, hardware, equipment, and services related to its Use of the Services; (iv) the configuration of its systems in accordance with any instructions provided by HighTower Treasury, as may be necessary for provision of access to the HighTower Treasury Platform; and (v) the storage and backup of all relevant existing data and software.

**4.6** HighTower Treasury Responsibilities. Without limiting any other terms herein, HighTower Treasury is solely and directly responsible for all aspects of the Services after the Demarcation Point. HighTower Treasury will also report to the proper tax authorities all amounts paid to Customer, as required or advisable.

**4.7** Audit. HighTower Treasury reserves the right to audit, examine, and otherwise monitor Customer's compliance with this Agreement. Customer must cooperate fully with any such audit at Customer's sole cost. Within ten (10) days of receiving notice of an audit from HighTower Treasury, Customer will provide to HighTower Treasury or its third-party auditor access to and assistance with documents, records, reports, or other data, information, or materials compiled, maintained, or otherwise available, to the extent related to Customer's compliance with this Agreement and not prohibited from disclosure by Applicable Law. If HighTower Treasury or its third-party auditor determines that Customer is not in compliance with this Agreement, Customer will take appropriate action to remedy its non-compliance and will provide HighTower Treasury with evidence of the steps taken to achieve compliance within a timeframe mutually agreed upon by the Parties.

**4.8** Suspension. HighTower Treasury reserves the right, in its sole and absolute discretion, to decline, terminate, suspend, restrict, or otherwise limit any Transaction and Customer's access to the Services, without notice, for any reason whatsoever, including if Customer violates this Agreement or in the event that HighTower Treasury reasonably determines, based on any of the review processes described herein, that Customer has become ineligible for the Services. HighTower Treasury will restrict, suspend, or terminate Customer's access to the Services if: (i) HighTower Treasury reasonably determines that the risk associated with Customer's activities poses unacceptable risk to HighTower Treasury; or (ii) Customer does not provide HighTower Treasury with all information as reasonably required or requested by HighTower Treasury.

## 5. SUPPORT SERVICES.

**5.1** Support. HighTower Treasury intends to make the Services available to Customer through the HighTower Treasury Platform at all times, and will undertake commercially reasonable measures to limit the amount of time during which the Services are unavailable. From time to time, HighTower Treasury may need to suspend access to the HighTower Treasury Platform in order to perform planned maintenance or upgrades. HighTower Treasury will make good faith efforts to notify Customer of any such scheduled downtime at least twenty-four (24) hours in advance of suspending access to the HighTower Treasury Platform, and to continue offering the Services without disruption, including by processing Transactions via manual or other methods.

**5.2** Incidents. If Customer experiences any technical issues with the HighTower Treasury Platform, Customer may report the incident to HighTower Treasury by email to support@hightowertreasury.com or by any other method of communication. HighTower Treasury will use commercially reasonable efforts to respond to incident reports within four (4) hours of receipt, and to promptly resolve all incidents to Customer's satisfaction.

## 6. PRIVACY AND SECURITY.

**6.1** Compliance Standards. During the Term, HighTower Treasury will maintain and enforce an information security program including safety, physical, and technical security policies and procedures with respect to its processing of Customer Materials that meets or exceeds industry standard practices. HighTower Treasury will periodically test its systems for potential areas where security could be breached and monitor for suspected breaches, and will promptly report to Customer any breach of security or unauthorized access to Customer Materials that HighTower Treasury detects or becomes aware of.

**6.2** Mutual Responsibility. Each Party is responsible for the security of all data in its possession or control, and for its compliance with Applicable Law in connection with its data handling and management practices. Each Party is responsible for maintaining commercially reasonable data security controls to protect and secure data from unauthorized use, access, or disclosure. Customer agrees to provide HighTower Treasury with any evidence to demonstrate Customer's compliance with this Section upon request by HighTower Treasury.

**6.3** Monitoring. HighTower Treasury is under no obligation and does not assume any obligation to monitor the information included in, transmitted to, or made accessible via the Services. However, Customer agrees that HighTower Treasury may monitor the Services in an effort to protect Customer and information relating to the Services, and to comply with Applicable Law. All information provided by HighTower Treasury in connection with the Services that must be disclosed to any other person or entity to complete Customer's requested Transaction or to comply with Applicable Law will not be considered confidential for such purposes.

**6.4** Permitted Data Uses. HighTower Treasury is permitted to use Customer Materials as reasonably necessary to offer the Services, to perform its obligations hereunder, to enforce Customer's obligations, and as reasonably necessary to comply with Applicable Law. HighTower Treasury is free to use, disclose, and distribute Customer Materials to its Partner Financial Institutions, employees, contractors, and other third parties as appropriate to improve the Services, for other internal purposes, or as required to comply with Applicable Law. HighTower Treasury may also aggregate, de-identify, or anonymize any Customer Materials so that they no longer meet the definition of Customer Materials set forth in Section 1, and may use such aggregated, de-identified, or anonymized data to promote, market, train, develop, improve, or otherwise enhance the Services. HighTower Treasury will not, and will not attempt to, re-identify any previously aggregated, de-identified, or anonymized data. Nothing contained herein will apply to, limit, or prohibit the use of any information or data owned or held by HighTower Treasury, to the extent that such information or data has been independently obtained by HighTower Treasury from a source other than Customer.

**6.5** Privacy Notices. If required by Applicable Law, each Party will provide privacy notices that comply with Applicable Law and contain disclosures that are consistent with the data ownership and use provisions of this Agreement. Such privacy notices must disclose information-sharing practices contemplated hereunder, and Customers have the right to opt out to the extent required by Applicable Law.

## 7. FEES AND PAYMENT.

**7.1** Fees. Customer will pay HighTower Treasury non-refundable fees for the Services without offset or deduction as set forth herein ("Fees"). During the Initial Term, Customer will pay no Fees to HighTower Treasury. After the Initial Term, the Fees may be adjusted from time to time at HighTower Treasury's sole and exclusive discretion, provided that HighTower Treasury must give written notice to Customer stating any change in Fees at least thirty (30) days before such Fees become effective.

**7.2** Payments. Payments due to HighTower Treasury hereunder must be made in the manner designated by HighTower Treasury, or by another payment method mutually agreed upon by the Parties, in writing. All payments are non-refundable. Neither Party will have the right to set off, discount, or otherwise reduce or refuse to pay any amounts due to the other Party hereunder. If Customer fails to make any

payment when due, late charges will accrue at the rate of 1% per month, and HighTower Treasury may suspend Services until all payments are made in full. Customer will reimburse HighTower Treasury for all reasonable costs and expenses incurred in collecting any late payments or interest, including reasonable attorneys' fees.

**7.3** Taxes. Customer is responsible for all sales, use, ad valorem, and excise taxes, and any other taxes, duties, and charges of any kind imposed by any local, state, federal, or multinational governmental regulatory authority on any amount payable by Customer to HighTower Treasury hereunder, but not including any income taxes imposed on HighTower Treasury. In the event that Customer is required to deduct or withhold any taxes from amounts payable to HighTower Treasury hereunder, Customer will pay an additional amount so that HighTower Treasury receives the amounts due to it in full, as if there were no withholding or deduction.

## 8. HIGHTOWER TREASURY'S RIGHTS.

**8.1** HighTower Treasury Technology. HighTower Treasury is the exclusive owner of, and hereby retains all right, title, and interest in and to, the HighTower Treasury Technology. Except as specifically provided herein, HighTower Treasury does not grant to Customer any right or license, express or implied, in the Services, the HighTower Treasury Technology, or any other HighTower Treasury Intellectual Property Rights. Unless otherwise expressly specified in writing, HighTower Treasury hereby retains all right, title, and interest in and to any deliverables related hereto, including all Intellectual Property Rights.

**8.2** Feedback. HighTower Treasury will own all Feedback. Customer hereby assigns to HighTower Treasury any rights, title, and interest, including all Intellectual Property Rights, in any Feedback, derivative works, modifications, enhancements, or improvements related to the Services or HighTower Treasury Technology that Customer or any of its representatives provide, propose, create, conceive, author, or develop. At HighTower Treasury's Request, Customer will execute and deliver any additional documents deemed reasonably necessary to perfect, maintain, or enforce HighTower Treasury's rights described above and the intent of this Section.

## 9. CUSTOMER MATERIALS.

**9.1** Ownership in Customer Materials. Except as otherwise provided herein, as between Customer and HighTower Treasury, Customer owns and retains all right, title, and interest in and to all Customer Materials.

**9.2** License to HighTower Treasury. Subject to HighTower Treasury's confidentiality obligations hereunder, Customer grants HighTower Treasury a non-exclusive, worldwide, royalty-free right to use, host, reproduce, display, and modify the Customer Materials solely for the purpose of hosting, operating, training, developing, improving, and providing the Services and HighTower Treasury's other related products and services. Notwithstanding anything set forth herein, HighTower Treasury may use Customer Materials to create, use, sell, license, distribute, disclose, publish, promote, and market Aggregate Data.

## 10. CONFIDENTIALITY.

**10.1** Confidential Information. Each Party (the "**Receiving Party**") acknowledges that by reason of its relationship to the other Party (the "**Disclosing Party**") hereunder, the Receiving Party will have access to certain information and materials concerning the Disclosing Party's business, plans, technology, products, and services that are confidential and of substantial value to the Disclosing Party, which is either identified as "confidential" at the time of disclosure or that would be reasonably understood to be confidential given its nature or the circumstances surrounding its disclosure ("**Confidential Information**"), including: (i) all information of a party marked "confidential" or with a similar designation; (ii) Customer Data; (iii) business information regarding the business and operations of such Party, including information that relates to past, present, or future business affairs, financial matters, marketing, pricing, products, services, policies, and procedures; (iv) product plans, security measures, research, developments, hardware, software, source code, inventions, designs, drawings, formulae, algorithms, regulatory information, legal memoranda,

financial information, agreements with third parties, Intellectual Property Rights, and other proprietary information and data; and (v) the terms and conditions of this Agreement.

**10.2** Obligations. The Receiving Party will: (i) not use any Confidential Information except as necessary to perform its obligations or exercise its rights hereunder; (ii) take every reasonable precaution to protect the confidentiality of Confidential Information, and not disclose any Confidential Information to any third party, directly or indirectly; (iii) restrict disclosure of Confidential Information to individuals who have a need to know, and who are subject to confidentiality obligations at least as protective as those provided by this Agreement; (iv) not reverse engineer, disassemble, decompile, or create derivative works from the Confidential Information without written authorization from the Disclosing Party; and (v) take reasonable measures to avoid unauthorized disclosure or use of any Confidential Information.

**10.3** Exclusions. Confidential Information shall not include any information that: (a) was rightfully in the Receiving Party's possession before it was received from the Disclosing Party; (b) is or becomes a matter of public knowledge through no fault of the Receiving Party; (c) is rightfully received from a third party without a duty of confidentiality; (d) is developed by the Receiving Party independently without reference to, use of, or reliance on any Confidential Information; or (e) is identified in a separate written agreement between the Parties authorizing public disclosure.

**10.4** Compelled Disclosure. To the extent permitted by law, If the Receiving Party is required by law, regulation, subpoena, court order, or similar mandate or device to disclose any Confidential Information, the Receiving Party must promptly notify the Disclosing Party in writing of the existence, terms, and circumstances surrounding such required disclosure so that the Disclosing Party may seek a protective order or other appropriate remedy from the proper authority. The Parties will cooperate with each other in seeking such order or remedy. If required to disclose any Confidential Information to any third party, court, regulatory body, or other governmental entity, the Receiving Party will furnish only that portion of Confidential Information that is legally required, and will exercise reasonable efforts to obtain assurances that confidential treatment at least as protective as the restrictions in this Agreement will be accorded to the Confidential Information.

## 11. REPRESENTATIONS AND WARRANTIES.

**11.1** Mutual. Each Party understands, represents, and warrants that:

(a) it is duly organized and validly existing under the laws of the jurisdiction in which it is organized;

(b) it has full power and authority, and has obtained all approvals, permissions, and consents necessary, to enter into this Agreement and to perform its obligations hereunder;

(c) this Agreement is legally binding upon it;

(d) the execution, delivery, and performance of this Agreement does not and will not conflict with any other agreement to which it is a party;

(e) it has not relied on the other Party for any tax or accounting advice concerning this Agreement, and has made its own determination as to the tax and accounting treatment of the funds received or provided hereunder;

(f) it is a sophisticated party and fully familiar with the inherent risks involved in the Transactions and Services contemplated herein, including the risk of new financial regulatory requirements, potential loss of money, and risks due to volatility of the price of the Funds including Stablecoins and Tokens, and voluntarily takes full responsibility for all such risks; and

(g) it is not insolvent and is not subject to any bankruptcy or insolvency proceedings.

**11.2** Customer. Customer further understands, represents, and warrants that:

(a) all information, data, and documents that Customer provides to HighTower Treasury under this Agreement, including Customer Materials, are accurate and complete; and

(b) it will keep all information, data, and documents provided to HighTower Treasury for compliance purposes up to date at all times;

(c) it has all rights necessary to provide the Customer Materials to HighTower Treasury;

(d) HighTower Treasury may rely on, and hold Customer responsible for, each instruction attributable to Customer that HighTower Treasury verifies or authenticates;

(e) Customer is acquiring a Treasury Account for Customer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof;

(f) Customer has no present intention of selling, granting participation in, or otherwise distributing the Treasury Account to any third party;

(g) Customer does not presently have any contract, undertaking, agreement, or arrangement with any Person to sell, transfer, or grant participation in the Treasury Account to any third party;

(h) Customer has not been formed for the specific purpose of acquiring the Treasury Account;

(i) Customer understands that the Treasury Account has not been, and will not be, registered under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Customer's representations as expressed herein;

(j) Customer understands that the Treasury Account may be considered a "restricted security" under applicable U.S. federal and state securities laws, and that, pursuant to these laws and the terms hereunder, Customer will not be permitted to transfer the Treasury Account;

(k) Customer acknowledges that HighTower Treasury will not register or qualify the Treasury Account, and that the Treasury Account is non-transferable;

(l) Customer understands that no public market now exists for the Treasury Account, and that a public market will never exist for the Treasury Account;

(m) Customer understands that the Treasury Account, including any representation thereof, will be and hereby is notated with the following legends:

> 1. "THE TREASURY ACCOUNT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER, SALE, OR DISTRIBUTION MAY BE EFFECTED.";
>
> 2. Any legend required by the securities laws of any state, to the extent such laws are applicable to the Treasury Account;

(n) Customer is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. Customer has accurately and completely completed the accredited investor verification process required by HighTower Treasury;

(o) This Agreement accurately and completely provides Customer's address; and

(p) Other than as set forth herein, Customer has not relied upon any representation or warranty made by HighTower Treasury, or by any other person on HighTower Treasury's behalf, in respect of the acquisition of the Treasury Account hereunder.

## 12. TERM AND TERMINATION.

**12.1** Term. The term of this Agreement will commence on the Effective Date and continue until and unless terminated by either Party as set forth herein.

**12.2** Termination. This Agreement may be terminated by either Party for any reason at any time, provided that the Party terminating the Agreement must provide written notice one (1) day before the effective date of the termination or by clicking the "Withdraw" button on the HighTower Treasury Platform. Upon expiration or termination of this Agreement, HighTower Treasury will promptly transfer all Funds to a Linked Bank Account and send Customer a final Account Statement.

**12.3** Effect of Expiration or Termination. Upon expiration or termination of this Agreement: (a) the rights granted under Section 2 will terminate; and (b) Customer will return or destroy, at HighTower Treasury's sole option, all HighTower Treasury Confidential Information in its possession or control, including permanent removal of such HighTower Treasury Confidential Information from any storage devices or other hosting environments in Customer's possession or control, and at HighTower Treasury's request, certify in writing that the HighTower Treasury Confidential Information has been returned, destroyed, or deleted. Expiration or termination will not affect Customer's obligation to pay all Fees that become due or otherwise accrue through the effective date of expiration or termination, or entitle Customer to any refund.

**12.4** Unclaimed Property. Any remaining Funds that HighTower Treasury is unable to transfer to Customer may be deemed abandoned after a certain period of inactivity as provided by Applicable Law (a "**Dormant Account**"). If appropriate, HighTower Treasury will attempt to notify Customer if it believes Customer's account may be deemed a Dormant Account. If Customer does not respond to such attempts by providing instructions as to how to handle Customer's remaining Funds, HighTower Treasury's relevant Partner Financial Institutions may deliver them to the appropriate government authority.

**12.5** Survival. Sections 6 through 14, and any provisions herein which must survive to fulfill their intended purposes, will survive the expiration or termination of this Agreement for any reason.

## 13. INDEMNIFICATION.

**13.1** Customer Indemnification. Customer will defend, indemnify, and hold harmless HighTower Treasury and its affiliates, officers, directors, employees, and agents ("**HighTower Treasury Indemnified Parties**") from and against any and all claims, demands, causes of action, suits, and proceedings ("**Action**"), including liabilities, damages, losses, expenses, fines, penalties, fees, and costs (collectively, "**Losses**") arising out of or in connection with: (a) any breach of Applicable Law or this Agreement by Customer or its affiliates, officers, directors, employees, or agents; (b) any provision of, or data breach involving, unauthorized access to the Services; (c) Customer's fraud or other act of gross negligence or willful misconduct; or (d) any action alleging that the performance, provision, or utilization of the Services by Customer as contemplated herein constitutes an infringement, violation, or misappropriation of any third-party Intellectual Property Rights.

**13.2** HighTower Treasury Indemnification. HighTower Treasury will defend, indemnify, and hold harmless Customer against: (a) any Action alleging that Customer's Use of the Services infringes, violates, or misappropriates any third-party Intellectual Property Rights, and (b) any damages, fees, and costs awarded against Customer or agreed upon in settlement by HighTower Treasury resulting from such Action.

**13.3** Exclusions. HighTower Treasury's obligations under this Section will not apply if the Action arises out of or in connection with: (i) Customer's breach of this Agreement, negligence, willful misconduct, or fraud; (ii) any Customer Materials; (iii) Customer's failure to use any enhancements, modifications, or

updates to the Services provided by HighTower Treasury; (iv) modifications to the Services by anyone other than HighTower Treasury; or (v) combinations of the Services with software, data, or materials not provided by HighTower Treasury.

**13.4** IP Remedies. If HighTower Treasury reasonably believes that the Services or any component thereof could infringe any third-party Intellectual Property Rights, HighTower Treasury may, at its sole option and expense, use commercially reasonable efforts to: (a) modify or replace the Services, or any component or part thereof, to make it non-infringing; or (b) procure the right for Customer to continue Use. If HighTower Treasury determines that neither alternative is commercially practicable, HighTower Treasury may terminate this Agreement, in its entirety or with respect to the affected component, by providing written notice to Customer. The rights and remedies set forth in this Section constitute Customer's sole and exclusive remedy for any infringement or misappropriation of Intellectual Property Rights in connection with the Services.

**13.5** Indemnification Procedures. The Party seeking indemnity (the "**Indemnified Party**") will notify the other Party (the "**Indemnifying Party**") of the Action for which indemnity is being sought no later than thirty (30) days after becoming aware of facts or circumstances that could reasonably give rise to the Action, and will reasonably cooperate with the Indemnifying Party in the defense and potential settlement thereof. The Indemnifying Party will have the sole right to conduct the defense of any Action for which the Indemnifying Party is responsible hereunder, provided that the Indemnifying Party may not settle any Action without the Indemnified Party's prior written approval (unless the settlement is for a monetary amount, unconditionally releases the Indemnified Party from all liability without prejudice, does not require any admission by the Indemnified Party, and does not place restrictions upon the Indemnified Party's business, products, or services). The Indemnified Party may participate in the defense or settlement of any such Action at its own expense and with its own choice of counsel. If the Indemnifying Party refuses to fulfill its obligation of defense, the Indemnified Party may defend itself and seek reimbursement from the Indemnifying Party.

## 14. DISCLAIMER AND LIMITATION OF LIABILITY.

**14.1** DISCLAIMER OF WARRANTIES. THE SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, HIGHTOWER TREASURY EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT, AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. CUSTOMER UNDERSTANDS AND EXPRESSLY ACCEPTS THAT IT HAS NOT RELIED ON ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR WARRANTIES MADE BY HIGHTOWER TREASURY OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS, ADVISORS, OR OTHER AGENTS OUTSIDE OF THIS AGREEMENT, INCLUDING CONVERSATIONS OF ANY KIND, WHETHER THROUGH ORAL OR ELECTRONIC COMMUNICATION, OR ANY WHITEPAPER RELATING TO ANY FUNDS. THE SOLE RESPONSIBILITY OF HIGHTOWER TREASURY IS TO ALLOCATE AND DELIVER THE RATE IDENTIFIED HEREIN OR IN WRITING TO CUSTOMER. WITHOUT LIMITING THE FOREGOING, HIGHTOWER TREASURY DISCLAIMS ALL WARRANTIES THAT ANY OF ITS PRODUCTS, TECHNOLOGY, OR SERVICES WILL MEET THE REQUIREMENTS OF THIS AGREEMENT, OR THAT THE RECEIPT, USE, OR OPERATION THEREOF WILL BE UNINTERRUPTED OR ERROR-FREE.

**14.2** EXCLUSION OF DAMAGES. EXCEPT FOR INFRINGEMENT BY ONE PARTY OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, FRAUD, WILLFUL MISCONDUCT, OR BREACH OF CONFIDENTIALITY OR PAYMENT OBLIGATIONS HEREUNDER, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR FOR ANY BUSINESS INTERRUPTION, LOSS OF INCOME, OTHER ECONOMIC LOSS, OR THE COST OF COVER OR SUBSTITUTE SERVICES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR HIGHTOWER TREASURY'S INTELLECTUAL PROPERTY RIGHTS, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON CONTRACT, TORT, OR

OTHERWISE, AND WHETHER OR NOT SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.

**14.3** THIRD-PARTY SERVICES. CERTAIN FEATURES AND FUNCTIONALITIES WITHIN THE SERVICES MAY ALLOW CUSTOMER TO ACCESS OR USE THIRD-PARTY WEBSITES, SERVICES, PRODUCTS, AND CONTENT THAT ARE NOT OWNED OR CONTROLLED BY HIGHTOWER TREASURY ("THIRD-PARTY SERVICES"). HIGHTOWER TREASURY ASSUMES NO RESPONSIBILITY FOR ANY CONTENT, POLICIES, ERRORS, COMPATIBILITY ISSUES, DAMAGES, OR LOSSES RELATED TO OR CAUSED IN WHOLE OR IN PART BY CUSTOMER'S USE OF OR RELIANCE ON THIRD-PARTY SERVICES.

**14.4** LIMITATION OF LIABILITY. IN NO EVENT WILL HIGHTOWER TREASURY'S TOTAL LIABILITY TO CUSTOMER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE SUM TOTAL OF THE AMOUNT OF THE FUNDS DUE TO CUSTOMER PURSUANT TO THIS AGREEMENT, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY ON WHICH THE ACTION IS BASED, AND WHETHER OR NOT HIGHTOWER TREASURY WAS ADVISED OF THE POSSIBILITY OF CUSTOMER'S DAMAGES OR LOSSES.

**14.5** BASIS OF THE BARGAIN. THE PARTIES HEREBY ACKNOWLEDGE AND AGREE THAT THE LIMITATIONS OF LIABILITY IN THIS SECTION ARE AN ESSENTIAL PART OF THE BASIS OF THE BARGAIN BETWEEN HIGHTOWER TREASURY AND CUSTOMER, AND WILL APPLY EVEN IF THE REMEDIES AVAILABLE HEREUNDER ARE FOUND TO FAIL THEIR ESSENTIAL PURPOSE.

**15. MISCELLANEOUS.**

**15.1** Injunctive Relief. The Parties acknowledge that the breach or threatened breach of the confidentiality obligations herein, or any infringement, violation, or misappropriation of either Party's Intellectual Property Rights by the other Party, would cause irreparable harm to the non-breaching Party, the extent of which would be difficult to ascertain. Accordingly, in addition to any other remedies to which a Party may be legally entitled, a Party may seek immediate injunctive relief in the event of a threat of irreparable harm.

**15.2** Publicity. Neither Party, in its capacity as owner or licensor ("**Licensor**") of certain names, trademarks, service marks or logos ("**Marks**"), may use the Marks of the party without the Licensor's prior written approval and subject to any marketing guidelines provided by the Licensor to the Marks user upon such written approval. Any use by Marks User of Licensor's Marks, and all goodwill associated therewith, including any rights in trade, shall inure to the benefit of said Licensor. Upon expiration or termination of this Agreement, Marks User must immediately discontinue use of Licensor's Marks. Customer further permits HighTower Treasury to distribute, publish, promote, and market Aggregate Data created using Customer Materials in accordance with this Agreement.

**15.3** Transferability and Assignment. Neither Party may transfer, assign, or delegate this Agreement or any of its rights or duties hereunder, including access to or any benefits of the Treasury Account, directly, indirectly, by operation of law, or otherwise, without the written consent of the other Party, and any purported transfer, assignment, or delegation without such consent will be void. Notwithstanding the foregoing, HighTower Treasury may assign or transfer this Agreement to a successor to all or substantially all of its business or assets to which this Agreement relates, whether by merger, acquisition, reorganization, sale, or other transfer of equity or assets, or other similar Transaction. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties and their permitted successors and assigns.

**15.4** Waiver and Amendment. Except as otherwise provided, no modification, waiver, or amendment of any provision of this Agreement will be effective unless expressed in writing and signed by both Parties. No delay or failure by either Party in exercising any right, power, or remedy hereunder will operate as a waiver of any such right, power, or remedy. The waiver of a particular obligation in one

circumstance will not prevent either Party from subsequently requiring compliance with such obligation in the future.

**15.5** Subcontracting. HighTower Treasury may use subcontractors and other third-party providers ("**Subcontractors**") in connection with the performance of its own obligations hereunder as it deems appropriate, provided that HighTower Treasury will remain responsible for the performance of each such Subcontractor. HighTower Treasury will use commercially reasonable efforts to guard against any damages or issues arising in connection with Subcontractors, but will not be liable for the acts or omissions of such Subcontractors except to the extent that such damages or issues are caused directly by the gross negligence or willful misconduct of HighTower Treasury.

**15.6** Export Regulation. Customer will comply with all applicable federal laws, regulations, and rules that prohibit or restrict the export of the Services, or any Customer Materials, outside of the United States.

**15.7** Choice of Law. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any principles of conflict of laws that would lead to the application of the laws of another jurisdiction. The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply.

**15.8** Dispute Resolution. In case of a dispute between the Parties relating to or arising out of this Agreement, the Parties will first attempt to resolve the dispute personally and in good faith. If these personal attempts at resolution fail, the Parties will submit the dispute to binding arbitration conducted by a single arbitrator in San Francisco, California pursuant to the California Arbitration Act and the Rules of the American Arbitration Association ("**AAA**"). The arbitrator will have no authority to add Parties, vary the provisions of this Agreement, award punitive damages, or certify a class. The Parties will share the cost of the arbitration equally, and each will be responsible for their own attorneys' fees and costs. The Parties expressly waive any rights they may have to a jury trial for any dispute relating to or arising out of this agreement. Judgment upon the award rendered by the arbitrator may be entered in any court having appropriate jurisdiction.

**15.9** Electronic Communications. Customer consents to receive all communications, terms, disclosures, notices, demands, requests, and statements ("**Communications**") from HighTower Treasury electronically and confirms that it can access, receive, and retain such Communications. HighTower Treasury will provide Communications by emailing them to Customer at the email address included in this Section, or by another method specified by Customer in writing. Because the Services require delivery of Communications electronically, HighTower Treasury must suspend the Services if Customer withdraws such consent.

**15.10** Addresses and Methods of Giving Notice. Any Communication provided or permitted to be given hereunder must be in writing. Communications will have been deemed to have been properly given, unless explicitly stated otherwise, if sent to the physical or email address for each Party listed below by: (a) Federal Express or other comparable overnight courier with signature required; (b) registered or certified mail, postage prepaid, return receipt requested; or (c) electronic mail. All Communications will be deemed given and received seven (7) days after being deposited in the mail, two (2) business days after being deposited with an overnight carrier, or one (1) business day after being sent via electronic mail.

**To HighTower Treasury:**                            **To Customer:**
600 1st Ave, Suite 102-1080                           _____
Seattle, WA 98104                                     _____
support@hightowertreasury.com                         _____

**15.11** Independent Contractors. The Parties are independent contractors with respect to each other. Each Party is not and will not be deemed an employee, agent, partner, joint venturer, franchisee, or legal representative of the other for any purpose, and will not have any right, power, or authority to create any obligation or responsibility on behalf of the other, unless otherwise set forth in an Order Form.

**15.12** No Third-Party Beneficiaries. Except with respect to Partner Financial Institutions, nothing express or implied herein is intended to confer nor will confer any rights, remedies, obligations, or liabilities whatsoever upon any person other than the Parties and their respective permitted successors and assigns.

**15.13** Severability. If any provision herein is held to be contrary to law or unenforceable, such provision will be modified and interpreted to best accomplish the objectives of the original provision to the fullest extent allowed by law, and the remaining provisions herein will remain in full force and effect.

**15.14** Force Majeure. Except with respect to obligations to make payments hereunder, neither Party will be deemed in default hereunder, nor will it hold the other Party responsible for, any cessation, interruption, or delay in the performance of its obligations hereunder due to causes beyond its reasonable control, including: earthquake, flood, fire, storm, pandemic, epidemic, or other natural disaster, act of God, labor controversy or threat thereof, civil disturbance or commotion, disruption of the public markets, war or armed conflict, or the inability to obtain sufficient material, supplies, labor, transportation, power, or other essential commodity or service required in the conduct of its business, including internet access, or any change in or the adoption of any law, ordinance, rule, regulation, order, judgment, or decree.

**15.15** Headings and Construction. The titles, captions, and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement. The word 'including' means including without limitation, and the words 'herein', 'hereby', 'hereto', and 'hereunder' refer to this Agreement as a whole.

**15.16** Inconsistencies or Conflicts. In the event of inconsistencies or conflicts between this Agreement and any Additional Terms or exhibit hereunder, the terms of this Agreement will control, unless any Additional Term or exhibit expressly states that it supersedes this Agreement.

**15.17** Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one instrument. This Agreement may be executed and delivered in a ".pdf" file by email or by another electronic format, such as the HelloSign platform. A signature delivered by electronic means will be deemed an original.

**15.18** Entire Agreement. This Agreement, including all Additional Terms and exhibits, constitutes the final, complete, exclusive agreement between the Parties with respect to the subject matter hereof, and supersedes any prior or contemporaneous agreement, either written or oral.

[Page Intentionally Blank]

IN WITNESS WHEREOF, this Agreement has been signed and executed as of the Effective Date by and on behalf of the Parties through their duly authorized officers or agents:

**HIGHTOWER TREASURY CORP.**

By: _____

Name:

Title:

Date:

Commerce Fabric Inc.

By: _____

Name: Nevin Shetty

Title: CFO

Date: March 31st 2022

## HIGHTOWER TREASURY CORP.

### ACTION BY WRITTEN CONSENT OF DIRECTORS

#### IN LIEU OF ORGANIZATIONAL MEETING OF DIRECTORS

#### FEBRUARY 16, 2022

The undersigned, being all of the directors of HighTower Treasury Corp., a Delaware corporation, (the "**Corporation**"), pursuant to General Corporation Law of the State of Delaware, Title 8 § 141, does hereby consent to the adoption of the following resolutions and agree that said resolutions shall have the same force and effect as if duly adopted at a meeting of the directors held for the purpose:

#### Additional Stock Issuance

RESOLVED:    This Corporation has been authorized issue to the following persons, Three Million One Hundred Thirty Seven Thousand Two Hundred Fifty Five Shares (3,137,255) shares of its authorized and unissued Common Stock, with the intention that such shares qualify as "Section 1244 Stock" under Section 1244 of the Internal Revenue Code (the amount to be received by this Corporation for stock in this offering and any previous offering being less than $1,000,000, as measured under Section 1244); that upon consummation of the conversion, the officers are authorized and directed to issue and deliver to such stockholder a stock certificate for such shares, which shares shall be fully paid and nonassessable; and that, upon issuance of such shares, an amount equal to their aggregate par value shall be credited to this Corporation's account, and the remainder of the consideration shall be credited to its additional paid-in capital account:

| Purchaser | Number of Shares |
|---|---|
| Nevin Shetty | 3,137,255 |

WHEREAS:    For the avoidance of doubt, the new total number of shares is as follows:

| Purchaser | Number of Shares |
|---|---|
| Nevin Shetty | 6,437,255 |
| Adam Brazg | 6,700,000 |

*[Remainder of page left intentionally blank]*

HighTower Treasury Corp.
Organizational Consent of Directors

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-43
Admitted:_____

This consent in lieu of organizational meeting of directors shall be filed with the minutes of the meeting of directors of this Corporation and shall be treated for all purposes as resolutions taken at a meeting.

_____
Nevin Shetty

_____
Adam Brazg

| From: | Nevin Shetty <nevin.shetty@gmail.com> |
|---|---|
| Sent: | Thursday, May 12, 2022 10:25 AM |
| To: | Adam Brazg <adam@bilberrry.com> |
| Subject: | Revised Shares and Treasury Agreement |
| Attach: | HighTower Treasury Account Agreement April 2022 - Fabric.pdf; HighTower Treasury Corp - Additional Stock Issuance 2.16.22.pdf; Quick Equity Split Math.xlsx |

Hi Adam,

See attached.

Best,

Nevin Shetty
206.853.7300
nevin.shetty@gmail.com

USA_00008452

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-47
Admitted:_____

| From: | Adam Brazg <adam@bilberrry.com> |
|---|---|
| Sent: | Friday, April 1, 2022 8:03 AM |
| To: | Nevin Shetty <nevin@hightowertreasury.com> |
| Cc: | Ross <ross@bilberrry.com> |
| Subject: | Re: We have received a wire transfer of 100.00 USD and credited it to your Circle Account. |

On Fri, Apr 1, 2022 at 7:00 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
Fabric test wire came through! Real test is Monday - will wire 15M. Keep your fingers crossed!

--------- Forwarded message ---------
From: Circle <do-not-reply@circle.com>
Date: Fri, Apr 1, 2022 at 6:11 AM
Subject: We have received a wire transfer of 100.00 USD and credited it to your Circle Account.
To: <nevin@hightowertreasury.com>



### Hi Nevin Shetty,

We have received a wire transfer of 100.00 USD and credited it to your Circle Account.

### Details

Transfer Amount: 100.00 USD
Fee: 0.00 USD
Total Amount: 100.00 USD
Date: April 1, 2022, 01:07:25 PM UTC
Reference: CIR36EMG38

VIEW DETAILS

This email is intended for **nevin@hightowertreasury.com**.

Please don't reply to this email as a real human won't receive it. Instead, try our Help Center.

Circle Internet Financial, LLC, NMLS # 1201441, is a licensed provider of money transmission services.
Circle Payments, LLC, License # 2549,

USA_00008457

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-49
Admitted:_____

is registered under the California Department of Business Oversight.
A full list of Circle's licenses can be found here.

All rights reserved.

© 2022 Circle Internet Financial, LLC.

PO Box 52235
Boston, MA 02210

User Agreement          Privacy

--
Best,

Nevin
--

 **Bilberry** Adam Brazg
Co-Founder I CEO
bilberrry.com I 206-818-7436

USA_00008458
G-49-002

| From: | Downey, Jack <jdowney@stifelbank.com> |
|---|---|
| Sent: | Wednesday, April 13, 2022 10:16 AM |
| To: | Adam Brazg <adam@hightowertreasury.com>; Nevin Shetty <nevin@fabric.inc> |
| Cc: | Stone, Nat (StifelBank - NY) <nstone@stifelbank.com> |
| Subject: | RE: [EXTERNAL] Nat <> Adam - Fabric DACA |

Thanks everyone!

**From:** Adam Brazg <adam@hightowertreasury.com>
**Sent:** Wednesday, April 13, 2022 1:09 PM
**To:** Nevin Shetty <nevin@fabric.inc>
**Cc:** Downey, Jack (StifelBank - NY) <jdowney@stifelbank.com>; Stone, Nat (StifelBank - NY) <nstone@stifelbank.com>
**Subject:** Re: [EXTERNAL] Nat <> Adam - Fabric DACA

Received. Thanks all.

Adam

On Wed, Apr 13, 2022 at 9:15 AM Nevin Shetty <nevin@fabric.inc> wrote:

Just signed it. Thanks.

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**::: fabric**

Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

Fabric is a recognized leader in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.


On Wed, Apr 13, 2022 at 8:53 AM Downey, Jack <jdowney@stifelbank.com> wrote:

Adam – thanks for the note. We are just awaiting Nevin's signature. Once fully executed I can reply to this email chain with the fully executed document.

@Nevin – if you have any trouble with the DocuSign please let me know.

Thanks,
Jack

**From:** Adam Brazg <adam@hightowertreasury.com>
**Sent:** Wednesday, April 13, 2022 11:45 AM
**To:** Downey, Jack (StifelBank - NY) <jdowney@stifelbank.com>
**Cc:** Nevin Shetty <nevin@fabric.inc>; Stone, Nat (StifelBank - NY) <nstone@stifelbank.com>

USA_00008491

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-50
Admitted:_____

**Subject:** Re: [EXTERNAL] Nat <> Adam - Fabric DACA

Jack,

I received and signed the document in Docusign yesterday but have not received a copy from Docusign of the fully executed version. Can you look into this?

Thanks,

Adam

On Tue, Apr 12, 2022 at 12:27 PM Downey, Jack <jdowney@stifelbank.com> wrote:

> Thanks, Nevin and Adam. You should have received a DocuSign to complete the DACA. Attached, is the Stifel executed version for your reference.
>
> Let me know if you have any issues.
> Thanks,
> Jack
>
> **JACK DOWNEY** | Associate
> *Venture Banking Group*
> **(212) 271-3464** office  |  **(518) 641-8308** cell
> JDOWNEY@STIFELBANK.COM
>
> **From:** Adam Brazg <adam@hightowertreasury.com>
> **Sent:** Tuesday, April 12, 2022 12:33 PM
> **To:** Stone, Nat (StifelBank - NY) <nstone@stifelbank.com>
> **Cc:** Nevin Shetty <nevin@fabric.inc>; Downey, Jack (StifelBank - NY) <jdowney@stifelbank.com>
> **Subject:** Re: [EXTERNAL] Nat <> Adam - Fabric DACA
>
> All redlines are accepted. Thanks Nat and Nevin. Attached is an executable version.
>
> Regards,
>
> Adam
>
> On Tue, Apr 12, 2022 at 8:23 AM Stone, Nat <nstone@stifelbank.com> wrote:
>
>> Nevin – thanks. From our side, we will use a wet ink signature (happy to relay on docusign from your side). @Adam, if you could provide an execution version, we will get a signed version back to you and Nevin for you to docusign.
>>
>> Thanks.
>>
>> **From:** Nevin Shetty <nevin@fabric.inc>
>> **Sent:** Tuesday, April 12, 2022 11:17 AM
>> **To:** Stone, Nat (StifelBank - NY) <nstone@stifelbank.com>
>> **Cc:** Adam Brazg <adam@hightowertreasury.com>; Downey, Jack (StifelBank - NY) <jdowney@stifelbank.com>
>> **Subject:** Re: [EXTERNAL] Nat <> Adam - Fabric DACA
>>
>> Nat, all the redlines are accepted.
>>
>> Adam, can you circulate an executable copy for signature via Docusign?

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300



Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

On Mon, Apr 11, 2022 at 2:24 PM Stone, Nat <nstone@stifelbank.com> wrote:

> Hi Adam – attaching a slightly marked-up and clean version of the DACA. Please let us know any questions
> or comments. Happy to discuss or connect our legal counsel on the matter.
> Best,
> Nat
>
> **From:** Adam Brazg <adam@hightowertreasury.com>
> **Sent:** Monday, April 11, 2022 2:36 PM
> **To:** Stone, Nat (StifelBank - NY) <nstone@stifelbank.com>
> **Cc:** Nevin Shetty <nevin@fabric.inc>
> **Subject:** Re: [EXTERNAL] Nat <> Adam - Fabric DACA
>
> Hi Nat,
>
> It's a pleasure to meet you. Please see attached for a completed DACA which I believe Stifel and
> Fabric are accustomed to. Assuming the DACA is in good order, let me know if you would like to
> circulate via Docusign to the relevant parties.
>
> Regards,
>
> Adam
>
> On Mon, Apr 11, 2022 at 11:04 AM Stone, Nat <nstone@stifelbank.com> wrote:
>
>> Thanks Nevin.
>> @Adam – we will stand by. Let me know if we can help at all.
>> Best,
>> Nat
>>
>> **From:** Nevin Shetty <nevin@fabric.inc>
>> **Sent:** Monday, April 11, 2022 2:02 PM
>> **To:** Stone, Nat (StifelBank - NY) <nstone@stifelbank.com>; adam@hightowertreasury.com
>> **Subject:** [EXTERNAL] Nat <> Adam - Fabric DACA
>>
>> Nat, I hope you had a great weekend. As discussed, I would like to introduce you to Adam of
>> Hightower Treasury. He will send over a DACA that will hopefully keep this easy for both of us.

Adam, as discussed, we have a LOC with Stifel and we need a DACA in place. Nat and I are committed to keeping this streamlined for you.

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300



Fabric News:
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

This message, and any of its attachments, is for the intended recipient(s) only, and it may contain information that is privileged, confidential, and/or proprietary and subject to important terms and conditions available at http://www.stifel.com/disclosures/emaildisclaimers/. If you are not the intended recipient, please delete this message and immediately notify the sender. No confidentiality, privilege, or property rights are waived or lost by any errors in transmission.

| From: | Nevin Shetty <nevin.shetty@gmail.com> |
|---|---|
| **Sent:** | Sunday, May 15, 2022 1:05 PM |
| **To:** | Adam Brazg <adam@hightowertreasury.com> |
| **Subject:** | Draft for HighTower |

Hi Adam, as discussed, here is a draft of what to send HighTower Customers. Edit as you see fit.
---------

Dear_____,

Due to ongoing volatility and market dynamics on the Terra Network, 1 UST (the stablecoin used to access yields on Anchor Protocol and Aperture Finance) is currently worth less than 1 US dollar. This difference in value means that HighTower Treasury cannot guarantee the exchange rate of the UST-USD upon any transfer.

As a response to this unprecedented situation, we have disabled new deposits. You are still able to withdraw, although doing so will require additional approval via email and may result in a partial loss of principal. Users should carefully consider the risks of making withdrawals in the current environment.

As an example, a $100K withdrawal request, at the prevailing exchange rate, net of any exchange fees and bid/ask spreads, would mean HighTower would redeem $100K of UST from the relevant protocols or wallets, and then convert into USD at approximately $.10 on the dollar.

*How did this happen and will it be resolved?*
The founder of Terra has put out an official statement on Twitter. We will update you when we know more; we don't have additional information at this time.

*If I withdraw, what rate will I get?*
Due to market conditions and network congestion, you will not receive a 1 to 1 exchange rate; rather, you will receive the market UST-USD exchange rate prevailing at the time we process your transfer, net of any exchange fees and bid/ask spreads. For a better idea of the approximate current rate, you may refer to CoinGecko and CoinMarketCap.

*What are my options?*

1. Withdraw and receive the market exchange rate prevailing at the time we process the transfer. This may lead to a partial loss of principal.
2. Hold your deposits and hope the exchange rate balances. This could lead to a 1 to 1 exchange or further loss of value.
3. Request to transfer your deposit share of UST to a TerraStation wallet of your choosing.

We are here to support you and answer any additional questions you may have to the best of our ability.

- The HighTower Team

USA_00008499

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-51
Admitted:_____

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
|---|---|
| Sent: | Saturday, April 9, 2022 2:48 PM |
| To: | Adam Brazg <adam@hightowertreasury.com> |
| Subject: | Deposit Acct Control Agreement |
| Attach: | DACA Springing - HighTower Treasury - Deposit Account Control Agreement.docx; DACA Springing - HighTower Treasury - Deposit Account Control Agreement.pdf |

Adam,

On Monday, I will send an email to you and Nat Stone at Stifel bank connecting you two. You respond to the email with this.

Hi Nat,

It's a pleasure to meet you. Please see attached for a completed DACA which I believe Stifel and Fabric are accustomed to. Assuming the DACA is in good order, let me know if you would like to circulate via Docusign to the relevant parties.

Best,

Nevin

USA_00008605

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-61
Admitted:_____

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
|---|---|
| Sent: | Tuesday, March 29, 2022 8:00 AM |
| To: | Novello, Dara <DNovello@signatureny.com>; Saryan, Sarmen <SSaryan@signatureny.com> |
| Cc: | Private Client Group - Seibert (159) <PrivateClientGroup-Seibert159@signatureny.com>; adam@hightowertreasury.com |
| Subject: | Re: HighTower Treasury Corp - Signature Bank Review |

Sarmen, can you please call me - 206 853 7300

On Tue, Mar 29, 2022 at 6:48 AM Novello, Dara <DNovello@signatureny.com> wrote:

> Greetings,
>
> Upon further review of your business model & entity, unfortunately at this time we cannot proceed with a banking relationship for your firm.
>
> We apologize for any time wasted.
>
> **Sincerely,**



- SIGNATURE CONFIDENTIAL -

Content is not to be distributed or shared outside of participating parties.

The information contained in this message is intended only for use by the individual or entity to which it is addressed and may contain confidential, proprietary, and/or privileged information of Signature Bank and/or its subsidiaries ("Signature"). If you are not the intended recipient of this message, any review, retransmission, dissemination, or other use of, or taking of any action in reliance upon, this information is

USA_00008634

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-66
Admitted:_____

prohibited. If you have received this communication in error, please delete this message and notify the sender immediately.

Signature does not guarantee that messages transmitted electronically are timely, secure, accurate, error-free, or complete, and disclaims all liability to the fullest extent permitted by applicable law for any loss, damage, or delay arising from any use of or reliance on this message in any way. Any messages transmitted through Signature's systems are subject to monitoring, review, retention, and external production in order to comply with relevant laws, regulations, and regulatory requests.

--

Best,

Nevin

| | |
|---|---|
| **From:** | Nevin Shetty <nevin@hightowertreasury.com> |
| **Sent:** | Tuesday, March 29, 2022 8:36 AM |
| **To:** | mlevey@silvergate.com |
| **Bcc:** | adam@hightowertreasury.com |
| **Subject:** | NAV Connection |

Hi Mark,

I am a current client of NAV consulting through a crypto hedge fund I operate. I am working on another project that is a treasury platform connecting corporations to DeFi and I already have $30M secured from several CFOs.

NAV suggested I reach out to you for banking services. Do you have 30 min to chat this week?

Best,

Nevin

USA_00008647

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-69
Admitted:_____

| | |
|---|---|
| **From:** | Nevin Shetty <nevin@hightowertreasury.com> |
| **Sent:** | Tuesday, March 29, 2022 8:33 AM |
| **To:** | codriscoll@dmsbank.com |
| **Bcc:** | adam@hightowertreasury.com |
| **Subject:** | NAV Connection |

Hi Colm,

I am a current client of NAV consulting through a crypto hedge fund I operate. I am working on another project that is a treasury platform connecting corporations to DeFi and I already have $30M secured from several CFOs.

NAV suggested I reach out to you for banking services. Do you have 30 min to chat this week?

Best,

Nevin

USA_00008648

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-70
Admitted:_____

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
| --- | --- |
| Sent: | Tuesday, March 29, 2022 8:35 AM |
| To: | Krupa.Tantuwaya@bmo.com; Maureen.watson@bmo.com |
| Bcc: | adam@hightowertreasury.com |
| Subject: | NAV Connection |

Hi Krupa, Maureen,

I am a current client of NAV consulting through a crypto hedge fund I operate. I am working on another project that is a treasury platform connecting corporations to DeFi and I already have $30M secured from several CFOs.

NAV suggested I reach out to you for banking services. Do you have 30 min to chat this week?

Best,


Nevin

USA_00008649

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-71
Admitted:_____

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
|-------|--------------------------------------------|
| Sent: | Tuesday, March 29, 2022 8:25 AM |
| To: | jburns@wintrust.com; plovig@wintrust.com |
| Bcc: | adam@hightowertreasury.com |
| Subject: | NAV Connection |

Hi Jeanette, Pam,

I am a current client of NAV consulting through a crypto hedge fund I operate. I am working on another project that is a treasury platform connecting corporations to DeFi and I already have $30M secured from several CFOs.

NAV suggested I reach out to you for banking services. Do you have 30 min to chat this week?

Best,

Nevin

USA_00008650

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-72
Admitted:_____

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
|-------|---------------------------------------------|
| Sent: | Tuesday, March 29, 2022 8:24 AM |
| To: | dteets@mcbankny.com |
| Bcc: | adam@hightowertreasury.com |
| Subject: | NAV Connection |

Hi Denney,

I am a current client of NAV consulting through a crypto hedge fund I operate. I am working on another project that is a treasury platform connecting corporations to DeFi and I already have $30M secured from several CFOs.

NAV suggested I reach out to you for banking services. Do you have 30 min to chat this week?

Best,

Nevin

USA_00008651

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-73
Admitted:_____

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
| --- | --- |
| Sent: | Monday, April 11, 2022 8:19 AM |
| To: | Amber Cortez <acortez@circle.com> |
| Cc: | Adam Brazg <adam@hightowertreasury.com> |
| Subject: | Re: Quick Q: Transfer Limits |

Got it. Will circle back. Thanks!

On Mon, Apr 11, 2022 at 8:02 AM Amber Cortez <acortez@circle.com> wrote:
Should be reset by tomorrow.

We need reason for an increase as compliance makes that decision. Do you have funding news or bank statements supporting the $35M request.

Amber

On Mon, Apr 11, 2022 at 7:54 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
Hi Amber,

I hope you had a nice weekend. Can you send us exact timing for when the 7 day rolling limits reset? We deposited $14.5M into our circle account on 4/4 so I would have expected our limit to reset today (4/11) but it has not.

Also, is it a heavy lift to increase our limit to $35M?

Best,


Nevin

--
Amber Cortez
Director, Enterprise Sales
C: 805 415 7756 | Circle

--
Best,


Nevin

USA_00008662

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-74
Admitted:_____

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
|---|---|
| Sent: | Monday, March 21, 2022 7:35 AM |
| To: | Saryan, Sarmen <SSaryan@signatureny.com> |
| Cc: | Adam Brazg <adam@hightowertreasury.com>; Dozier, Deshawn <DDozier@signatureny.com>; Private Client Group - Seibert (159) <PrivateClientGroup-Seibert159@signatureny.com>; Simpson, Orlando <OSimpson@signatureny.com> |
| Subject: | Re: HighTower Treasury Bank Account Application |

Hi Sarmen, Orlando,

I hope you both had a nice weekend. Just following up. We have $30M committed so let me know what's needed to accelerate the accounting opening.

Thanks for your help.

Best,

Nevin

On Fri, Mar 18, 2022 at 3:01 PM Nevin Shetty <nevin@hightowertreasury.com> wrote:
Hi Sarmen,

Awesome. Any follow ups from the review?

On Thu, Mar 17, 2022 at 5:44 PM Saryan, Sarmen <SSaryan@signatureny.com> wrote:

Yes.

**Sarmen Saryan**

*Group Director – VP* | **Digital Asset Banking**

**T:** (646) 949 4023

1400 Broadway 26th Floor, New York NY 10018

ssaryan@signatureny.com



**SIGNATURE BANK®**
Looking Forward. Giving Back.

**SIGNET™**
A Brand of Signature Bank

USA_00008671

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-76
Admitted:_____

**From:** Nevin Shetty <nevin@hightowertreasury.com>
**Sent:** Thursday, March 17, 2022 8:11 PM
**To:** Saryan, Sarmen <SSaryan@signatureNY.com>
**Cc:** Adam Brazg <adam@hightowertreasury.com>; Dozier, Deshawn <DDozier@signatureNY.com>; Private Client Group -
Seibert (159) <PrivateClientGroup-Seibert159@signatureNY.com>; Simpson, Orlando <OSimpson@signatureNY.com>
**Subject:** Re: HighTower Treasury Bank Account Application

---

**ATTENTION:** This message was sent by an external sender. Do not open attachments or click on links from unknow
senders or unexpected emails. Sender: **nevin@hightowertreasury.com**

Great. Will you be able to upload and get it into risk review tomorrow?

The quick response and turnaround is greatly appreciated!

On Thu, Mar 17, 2022 at 1:46 PM Saryan, Sarmen <SSaryan@signatureny.com> wrote:

> Received. Thank you.
>
> **Sarmen Saryan**
>
> *Group Director – VP* | **Digital Asset Banking**
>
> **T:** (646) 949 4023
>
> 1400 Broadway 26th Floor, New York NY 10018
>
> ssaryan@signatureny.com
>
> 
>
> **SIGNATURE BANK®**
> **Looking Forward. Giving Back.**
>
> **SIGNET™**
> A Brand of Signature Bank
>
> ---
>
> **From:** nevin@hightowertreasury.com <nevin@hightowertreasury.com>
>
> **Date:** Thursday, Mar 17, 2022, 4:29 PM
>
> **To:** Private Client Group - Seibert (159) <PrivateClientGroup-Seibert159@signatureNY.com>

**Cc:** Dozier, Deshawn <DDozier@signatureNY.com>, Simpson, Orlando <OSimpson@signatureNY.com>, Saryan, Sarmen <SSaryan@signatureNY.com>, nevin@hightowertreasury.com <nevin@hightowertreasury.com>

**Subject:** HighTower Treasury Bank Account Application

**ATTENTION:** This message was sent by an external sender. Do not open attachments or click on links from unknown senders or unexpected emails. Sender: **nevin@hightowertreasury.com**

Hi Sarmen & Team,

As discussed, please see attached for the applicaton for my other venture, HighTower Treasury, a platform that connects AML/KYB screened institutional clients to leading DeFi platforms. I have attached:

1. Due Dilience Overview

   o Articles of Incorportion and ByLaws
   o AML Compliance Policy
   o Background on myself and Adam

2. ISCQ
3. Personal Short Form - Nevin

   o Proof of Address
   o DL

4. Personal Short Form - Adam

   o Proof of Address
   o DL

Please let me know if you need anything else.

Best,


Nevin

The information contained in this message is intended only for use by the individual or entity to which it is addressed and may contain confidential, proprietary, and/or privileged information of Signature Bank and/or its subsidiaries ("Signature"). If you are not the intended recipient of this message, any review, retransmission, dissemination, or other use of, or taking of any action in reliance upon, this information is prohibited. If you have received this communication in error, please delete this message and notify the sender immediately.

Signature does not guarantee that messages transmitted electronically are timely, secure, accurate, error-free, or complete, and disclaims all liability to the fullest extent permitted by applicable law for any loss, damage, or delay arising from any use of or reliance on this message in any way. Any messages transmitted through Signature's systems are subject to monitoring, review, retention, and external production in order to comply with relevant laws, regulations, and regulatory requests.

Best,

USA_00008673
G-76-003

Nevin

- SIGNATURE CONFIDENTIAL -

Content is not to be distributed or shared outside of participating parties.

The information contained in this message is intended only for use by the individual or entity to which it is addressed and may contain confidential, proprietary, and/or privileged information of Signature Bank and/or its subsidiaries ("Signature"). If you are not the intended recipient of this message, any review, retransmission, dissemination, or other use of, or taking of any action in reliance upon, this information is prohibited. If you have received this communication in error, please delete this message and notify the sender immediately.

Signature does not guarantee that messages transmitted electronically are timely, secure, accurate, error-free, or complete, and disclaims all liability to the fullest extent permitted by applicable law for any loss, damage, or delay arising from any use of or reliance on this message in any way. Any messages transmitted through Signature's systems are subject to monitoring, review, retention, and external production in order to comply with relevant laws, regulations, and regulatory requests.

--
Best,

Nevin

| From: | Nevin Shetty <nevin@hightowertreasury.com> |
|---|---|
| Sent: | Wednesday, March 23, 2022 12:30 PM |
| To: | Amber Cortez <acortez@circle.com> |
| Cc: | Adam Brazg <adam@hightowertreasury.com>; Ross Dzikovskyi <ross@hightowertreasury.com>; Xinyi Koh <xinyi.koh@circle.com> |
| Subject: | Re: Your Circle Account has been approved! |

Hi Amber, I see the deposit and withdrawals updated in our account. Thank you!

Best,

Nevin

On Wed, Mar 23, 2022 at 6:47 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
  Wonderful! What are the limits exactly?

  Thanks Amber!

  On Wed, Mar 23, 2022 at 6:45 AM Amber Cortez <acortez@circle.com> wrote:
    Your new limits are approved.

    On Mon, Mar 21, 2022 at 2:08 PM Nevin Shetty <nevin@hightowertreasury.com> wrote:
      Great. Please keep me posted. We will be ready to wire $20M either end of this week or next week

      Best,

      Nevin

      On Mon, Mar 21, 2022 at 1:28 PM Amber Cortez <acortez@circle.com> wrote:
        Hi Nevin,

        I'll work on the minting increase. The wire needs to come from one of your own verified bank accounts. If you use a third party, it's considered a payment.

        Amber

        On Mon, Mar 21, 2022 at 11:21 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
          Hi Amber, I hope you had a nice weekend. I just wanted to circulate this to the top of your inbox. Please let us know on the below questions as soon as you can. Thank you!

          Best,

          Nevin

          On Fri, Mar 18, 2022 at 9:47 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
            Hi Amber,

USA_00008678

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-77
Admitted:_____

Happy Friday! We just received a commitment for $20M from a company that I know well. Two questions:
- Can you have our weekly max increased deposit and withdrawal limits increased to $20M?
- Can the company wire money directly to our circle account? That's how StableGains and Beema do it but for some reason I remember our account being different and I can't remember why.

Thank you for your help!

Best,

Nevin

On Tue, Mar 1, 2022 at 10:32 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
Wonderful. Thank you.

Best,

Nevin

On Tue, Mar 1, 2022 at 10:22 AM Amber Cortez <acortez@circle.com> wrote:
Hi Nevin,

That's an internal request I'll get done today.

Amber

On Tue, Mar 1, 2022 at 10:20 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
Hi Amber, Xinyi,

I have $30 million in commitments for our offering from several CFOs. However, I see a $1M weekly deposit limit and $500K withdrawal limit. How do I get our deposit and withdrawal limits increased to $10M?

Best,

Nevin

On Fri, Feb 25, 2022 at 7:50 AM Amber Cortez <acortez@circle.com> wrote:
Hi Nevin,

Yes, our on chain services are 24/7. You might even see the funds land less than 15 min. The wire transfers from your bank account are subject to standard banking hours.

Amber

On Fri, Feb 25, 2022 at 6:59 AM Nevin Shetty <nevin@hightowertreasury.com> wrote:
Hi Xinyi,

Wonderful! Thank you!

Once the funds hit the Circle account, are transfers 24/7? i.e. can I transfer money from our Circle account to our Solana wallet on Sunday morning or Monday at 8pm EST (and I'll see it credited on our Solana wallet approx 15 min later)?

Best,


Nevin


On Fri, Feb 25, 2022 at 1:29 AM Xinyi Koh <xinyi.koh@circle.com> wrote:
Hi Nevin,

Congratulations, your Circle Account is ready to use!

You can now deposit up to $ 1,000,000 into USDC per week and withdraw up to $500,000 per week.*

I've copied Amber Cortez from the Circle team, who can help you with next steps regarding our APIs and other services.

To get started depositing, withdrawing, and sending digital dollars on-chain, log in below with the credentials you set up during onboarding.

**Log in**

For additional information, please consult our Support Center.

If you have any questions as you get started, don't hesitate to let us know by replying to this message. We're here to help!

Best,

--
**Xinyi KOH**
AML Analyst, Know Your Customer
Circle Internet Financial, LLC
circle.com


*Please go here to learn more about your limits.

Circle Internet Financial, LLC, NMLS # 1201441, is a licensed provider of money transmission services. Circle Payments, LLC, License # 2549, is registered under the California Department of Business Oversight. A full list of Circle's licenses can be found here.

All rights reserved. Circle Internet Financial Limited. PO Box, Boston, Massachusetts 02210, United States.

Click here to view our Privacy Policy.



Amber Cortez
Director, Enterprise Sales
C: 805 415 7756 | Circle

--
Best,

Nevin

USA_00008681

G-77-004



——— Forwarded message ———
From: **Nevin Shetty** <nevin@fabric.inc>
Date: Mon, Mar 14, 2022 at 10:28 AM
Subject: Re: [External] Re: Treasury Program
To: Tim Guleri <tguleri@sierraventures.com>
Cc: Stacy Saal <stacy@fabric.inc>

Hi Tim,

I hope you are having a good start to the week. I just wanted to follow up on the below. We will be utilizing conservative treasury programs with daily liquidity across SVB, Stifel, and Rho (our current operating account). The accounts are fully liquid and the average yield is 40 bps. Are you good with Krupa sending the attachment to the board for approval / consent?

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**⫶⫶⫶ fabric**

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.


On Sun, Mar 6, 2022 at 2:55 PM Nevin Shetty <nevin@fabric.inc> wrote:
> Hi Tim,
>
> I hope you are having a nice weekend. We will be utilizing conservative treasury programs with daily liquidity across
> SVB, Stifel, and Rho (our current operating account). The accounts are fully liquid and the average yield is 40 bps.

USA_00125471

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-82
Admitted:_____

Please see attached for the IPS. I wanted to get your blessing before sending it to the board for approval. Please let me know if you have any comments or if it's good to send to the board (Krupa will send the consent).

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.


On Sun, Feb 20, 2022 at 8:56 AM Nevin Shetty <nevin@fabric.inc> wrote:
> Yep - agreed and understood.

>> On Sun, Feb 20, 2022 at 7:37 AM Tim Guleri <tguleri@sierraventures.com> wrote:
>> Nev
>>
>> We want to stay conservative, so the programs will all look the same. I like all 3 and not much to add...pick the one that you are most comfortable with and gives the best deal...if/ when we go public public, JPMC will be the place to be as best connections...
>>
>> TG
>>
>>> On Sat, Feb 19, 2022 at 3:03 PM Nevin Shetty <nevin@fabric.inc> wrote:
>>> Hi Tim,
>>>
>>> I have spoken with the treasury groups at SVB, JPM and Stifel - they are all very similar. Given Faisal's mandate to stay opportunistic on acquisitions, I would recommend a fully liquid program 15bps - 40bps (as opposed to laddering).
>>>
>>> Are there any other banks you want me to reach out to?
>>>
>>> I received sample Investment Policy Statements (IPS) from all the banks - again all very similar. Although we will stay relatively vanilla, I will draft an IPS based on the examples and send it to the board for approval.
>>>
>>> Have a wonderful rest of the weekend.
>>>
>>> Best,
>>>
>>>
>>> **Nevin Shetty**
>>> Chief Financial Officer
>>> M: 206 853 7300



**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

Tim Guleri | Managing Partner | Sierra Ventures
M: 415.999.5797  |  E: tguleri@sierraventures.com
EA: Dora Prado   | dprado@sierraventures.com

--

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

---

📄 **fabric - Treasury Investment Policy March 2022 3.5.2022.pdf**
256K

USA_00125473
G-82-003

     **Krupa Shah <krupa@fabric.inc>**

## Commerce Fabric - Consent to adopt Investment Policy Statement
11 messages

**Krupa Shah** <krupa@fabric.inc>                                                Thu, Mar 17, 2022 at 1:22 PM
To: Alex Bard <alex@redpoint.com>, Scott Beechuk <sbeechuk@nvp.com>, Tim Guleri <tguleri@sierraventures.com>,
Robert Kaplan <robert.kaplan@softbank.com>, Ron Shah <ron@stripes.co>, faisal masud <fm@fabric.inc>, Ryan Bartley
<ryan@fabric.inc>
Cc: Nevin Shetty <nevin@fabric.inc>, Stacy Saal <stacy@fabric.inc>

fabric BoD,

I know Nevin has spoken with some of you, but fabric will be utilizing  conservative treasury programs with daily liquidity
across SVB, Stifel, and Rho (our current operating account). The accounts are fully liquid and the average yield is 40 bps.
The attached Investment Policy Statement provides the general framework for this approach.

I have also attached a proposed consent to adopt the Investment Policy Statement and authorize Faisal, Stacy, and Nevin
to act in furtherance of the stated goals. Let Stacy, Nevin, or I know if you have any questions; otherwise, I will circulate
the consent via DocuSign later today.

**Krupa Shah**
General Counsel | Head of Partnerships
pronouns: she/her/hers



**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**2 attachments**

 **2022 03 15 UWC Treasury Program (1).docx**
14K

 **fabric - Treasury Investment Policy March 2022.pdf**
256K

**Alex Bard** <Alex@redpoint.com>                                               Thu, Mar 17, 2022 at 1:33 PM
To: Krupa Shah <krupa@fabric.inc>
Cc: Scott Beechuk <sbeechuk@nvp.com>, Tim Guleri <tguleri@sierraventures.com>, Robert Kaplan
<robert.kaplan@softbank.com>, Ron Shah <ron@stripes.co>, faisal masud <fm@fabric.inc>, Ryan Bartley
<ryan@fabric.inc>, Nevin Shetty <nevin@fabric.inc>, Stacy Saal <stacy@fabric.inc>

Should we put 50% in Bitcoin? :)

—

Alex

USA_00125506

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-83
Admitted:_____

Redpoint Ventures
[Quoted text hidden]

---

**Ron Shah** <ron@stripes.co>                                                      Thu, Mar 17, 2022 at 2:05 PM
To: Alex Bard <Alex@redpoint.com>, Krupa Shah <krupa@fabric.inc>
Cc: Scott Beechuk <sbeechuk@nvp.com>, Tim Guleri <tguleri@sierraventures.com>, Robert Kaplan
<robert.kaplan@softbank.com>, faisal masud <fm@fabric.inc>, Ryan Bartley <ryan@fabric.inc>, Nevin Shetty
<nevin@fabric.inc>, Stacy Saal <stacy@fabric.inc>


Alex, you are going to give Robert a heart attack.


I think you meant dogecoin...


**From:** Alex Bard <Alex@redpoint.com>
**Sent:** Thursday, March 17, 2022 1:33 PM
**To:** Krupa Shah <krupa@fabric.inc>
**Cc:** Scott Beechuk <sbeechuk@nvp.com>; Tim Guleri <tguleri@sierraventures.com>; Robert Kaplan
<robert.kaplan@softbank.com>; Ron Shah <ron@stripes.co>; faisal masud <fm@fabric.inc>; Ryan Bartley
<ryan@fabric.inc>; Nevin Shetty <nevin@fabric.inc>; Stacy Saal <stacy@fabric.inc>
**Subject:** Re: Commerce Fabric - Consent to adopt Investment Policy Statement


Should we put 50% in Bitcoin? :)




—


Alex

Redpoint Ventures


On Thu, Mar 17 2022 at 11:22 AM, Krupa Shah <krupa@fabric.inc> wrote:

fabric BoD,


I know Nevin has spoken with some of you, but fabric will be utilizing conservative treasury programs with daily liquidity
across SVB, Stifel, and Rho (our current operating account). The accounts are fully liquid and the average yield is 40
bps.

The attached Investment Policy Statement provides the general framework for this approach.


I have also attached a proposed consent to adopt the Investment Policy Statement and authorize Faisal, Stacy, and
Nevin to act in furtherance of the stated goals. Let Stacy, Nevin, or I know if you have any questions; otherwise, I will
circulate the consent via DocuSign later today.

USA_00125507
G-83-002

**Krupa Shah**
General Counsel | Head of Partnerships
pronouns: she/her/hers



[Quoted text hidden]

---

**Robert Kaplan** <robert.kaplan@softbank.com>                    Thu, Mar 17, 2022 at 2:35 PM
To: Ron Shah <ron@stripes.co>, Alex Bard <Alex@redpoint.com>, Krupa Shah <krupa@fabric.inc>
Cc: Scott Beechuk <sbeechuk@nvp.com>, Tim Guleri <tguleri@sierraventures.com>, faisal masud <fm@fabric.inc>, Ryan Bartley <ryan@fabric.inc>, Nevin Shetty <nevin@fabric.inc>, Stacy Saal <stacy@fabric.inc>

Might as well throw in a bored ape, can be a personality piece for Faisal...

Looks good to me Krupa, thanks!

Get Outlook for iOS

**From:** Ron Shah <ron@stripes.co>
**Sent:** Thursday, March 17, 2022 11:05:44 AM
**To:** Alex Bard <Alex@redpoint.com>; Krupa Shah <krupa@fabric.inc>
**Cc:** Scott Beechuk <sbeechuk@nvp.com>; Tim Guleri <tguleri@sierraventures.com>; Robert Kaplan <robert.kaplan@softbank.com>; faisal masud <fm@fabric.inc>; Ryan Bartley <ryan@fabric.inc>; Nevin Shetty <nevin@fabric.inc>; Stacy Saal <stacy@fabric.inc>
**Subject:** RE: Commerce Fabric - Consent to adopt Investment Policy Statement

[Quoted text hidden]
CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

*This message may contain confidential, proprietary and/or privileged information for the sole use of the designated recipient(s). If you received this in error, please immediately notify the sender, delete the message, and do not copy or disclose it to anyone else.*

---

**faisal masud** <fm@fabric.inc>                    Thu, Mar 17, 2022 at 2:58 PM
To: Robert Kaplan <robert.kaplan@softbank.com>
Cc: Alex Bard <Alex@redpoint.com>, Krupa Shah <krupa@fabric.inc>, Nevin Shetty <nevin@fabric.inc>, Ron Shah <ron@stripes.co>, Ryan Bartley <ryan@fabric.inc>, Scott Beechuk <sbeechuk@nvp.com>, Stacy Saal <stacy@fabric.inc>, Tim Guleri <tguleri@sierraventures.com>

😃 I'm all for BAYC!
[Quoted text hidden]
–

Faisal Masud | ceo
(425) 802-0542 | Asst: Katie | @fm



---

**Tim Guleri** <tguleri@sierraventures.com>                    Thu, Mar 17, 2022 at 3:12 PM
To: faisal masud <fm@fabric.inc>
Cc: Robert Kaplan <robert.kaplan@softbank.com>, Alex Bard <Alex@redpoint.com>, Krupa Shah <krupa@fabric.inc>, Nevin Shetty <nevin@fabric.inc>, Ron Shah <ron@stripes.co>, Ryan Bartley <ryan@fabric.inc>, Scott Beechuk <sbeechuk@nvp.com>, Stacy Saal <stacy@fabric.inc>

I know this trick......all you guys trying to appear "unqualified" for the audit committee. Noice !

USA_00125508
G-83-003

Kurpa, approved from my side

TG
Tim Guleri | Managing Partner | Sierra Ventures
M: 415.999.5797 | E: tguleri@sierraventures.com
EA: Dora Prado | dprado@sierraventures.com

[Quoted text hidden]

---

**Ron Shah** <ron@stripes.co>                                    Thu, Mar 17, 2022 at 3:14 PM
To: Tim Guleri <tguleri@sierraventures.com>, faisal masud <fm@fabric.inc>
Cc: Robert Kaplan <robert.kaplan@softbank.com>, Alex Bard <Alex@redpoint.com>, Krupa Shah <krupa@fabric.inc>, Nevin Shetty <nevin@fabric.inc>, Ryan Bartley <ryan@fabric.inc>, Scott Beechuk <sbeechuk@nvp.com>, Stacy Saal <stacy@fabric.inc>

I'm good as well – approved.


Someone please send me a Solana contract.

[Quoted text hidden]

---

**Scott Beechuk** <sbeechuk@nvp.com>                             Thu, Mar 17, 2022 at 3:14 PM
To: Tim Guleri <tguleri@sierraventures.com>, faisal masud <fm@fabric.inc>
Cc: Robert Kaplan <robert.kaplan@softbank.com>, Alex Bard <Alex@redpoint.com>, Krupa Shah <krupa@fabric.inc>, Nevin Shetty <nevin@fabric.inc>, Ron Shah <ron@stripes.co>, Ryan Bartley <ryan@fabric.inc>, Stacy Saal <stacy@fabric.inc>

I can't even spell Awedid.


Approved!

---

**From:** Tim Guleri <tguleri@sierraventures.com>
**Date:** Thursday, March 17, 2022 at 12:13 PM
**To:** faisal masud <fm@fabric.inc>

[Quoted text hidden]

[Quoted text hidden]

---

**Krupa Shah** <krupa@fabric.inc>                                Fri, Mar 18, 2022 at 1:14 PM
To: Tim Guleri <tguleri@sierraventures.com>
Cc: Robert Kaplan <robert.kaplan@softbank.com>

Tim and Robert,

I still need your signature on the DocuSign. I am going to resend the request but wanted to flag here as well.

Thanks!

Krupa
[Quoted text hidden]

USA_00125509
G-83-004

**Robert Kaplan** <robert.kaplan@softbank.com>            Fri, Mar 18, 2022 at 3:41 PM
To: Krupa Shah <krupa@fabric.inc>, Tim Guleri <tguleri@sierraventures.com>

Sent - thanks!

Get Outlook for iOS

---

**From:** Krupa Shah <krupa@fabric.inc>
**Sent:** Friday, March 18, 2022 10:14:53 AM
**To:** Tim Guleri <tguleri@sierraventures.com>
**Cc:** Robert Kaplan <robert.kaplan@softbank.com>
[Quoted text hidden]

[Quoted text hidden]

---

**Krupa Shah** <krupa@fabric.inc>            Fri, Mar 18, 2022 at 3:43 PM
To: Robert Kaplan <robert.kaplan@softbank.com>

Thank you.
[Quoted text hidden]

USA_00125510
G-83-005

## MINUTES OF A MEETING OF
## THE BOARD OF DIRECTORS OF
## COMMERCE FABRIC, INC.

March 4, 2022
9:00 a.m. Pacific Time

The following are the minutes of a meeting of the Board of Directors (the "***Board***") of Commerce Fabric, Inc., a Delaware corporation (the "***Company***"), at the above time, pursuant to notice duly given to all members of the Board.

**DIRECTORS PRESENT:**     Faisal Masud
                           Alex Bard
                           Ryan Bartley
                           Scott Beechuk
                           Tim Guleri
                           Ron Shah
                           Robert Kaplan

**OTHERS PRESENT:**        Rashmi Gopinath
                           Ripley Carroll
                           Nevin Shetty
                           Mike Hann
                           Karen Brewer
                           Prakash Muppirala
                           Umer Sadiq
                           Valerie Rupp
                           Stacy Saal
                           Logan Mackie
                           Sanchana Vasikaran
                           Morgan Dollard
                           Matt Jones
                           Mustafa Masud
                           Krupa Shah
                           Josh Seidenfeld, Cooley LLP

### CALL TO ORDER

Ms. Shah called the meeting to order and reviewed the agenda.

### APPROVAL OF MEETING MINUTES

The Board reviewed the minutes of the meeting of the Board held on December 3, 2021, a copy of which had been circulated to the Board prior to the meeting (the "***Prior Minutes***"). After a discussion, and upon motion duly made and seconded, the Board unanimously adopted the following resolution:

**RESOLVED**, that the Prior Minutes be, and they hereby are, adopted in all respects.

267704929 v2

1

**CONFIDENTIAL**

**CF0002473**

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-86
Admitted:_____

## GOVERNANCE

Ms. Shah presented a review of the Company's governance matters, which included a summary of the Company's Series C preferred stock financing, the issuance of a warrant for commercial matters, and a review of the Company's 409a valuation and option pool. Questions were asked and answered, and a discussion ensued.

## EXECUTIVE UPDATE

Mr. Faisal Masud presented the Company's fundraising progress, hiring plans, organizational changes, and business strategies for 2022. Questions were asked and answered, and a discussion ensued.

## MARKETING

Ms. Brewer presented the current performance and future outlook of the Company's marketing efforts. Questions were asked and answered, and a discussion ensued.

## REVENUE

Mr. Hann presented a summary of the Company's 2021 progress, Q4 revenue performance data and future forecasts. Questions were asked and answered, and a discussion ensued.

## PARTNERSHIPS

Ms. Shah reviewed the Company's partnership growth in 2021, which included a focus on new priorities and a summary of onboarding the partners. Questions were asked and answered, and a discussion ensued.

## PRODUCT & ENGINEERING

Mr. Sadiq, Mr. Muppirala and Mr. Dollard presented a summary of the Company's 2021 engineering and product progress, which included a detailed review of Q4 product developments and product advances for 2022. Questions were asked and answered, and a discussion ensued.

## MARKETPLACE

Mr. Bartley reviewed the Company's Q4 strategic progress and presented an overview of the Company's Q1 initiatives. Questions were asked and answered, and a discussion ensued.

## LEGAL

Ms. Shah presented an executive summary of the Company's 2021 legal initiatives and redefined the Company's goals and strategies for 2022. Questions were asked and answered, and a discussion ensued.

## PEOPLE

Ms. Rupp presented an update on the Company's employees and compensation, as well as a summary of the Company's 2021 hiring efforts. Questions were asked and answered, and a discussion ensued.

## PRODUCT DEMO

267704929 v2

2

CONFIDENTIAL

CF0002474

G-86-002

Mr. Goodwin, Mr. Jones and Mr. Mustafa Masud presented a demonstration of the Company's products. Questions were asked and answered, and a discussion ensued.

**EXECUTIVE SESSION**

The Board convened in an executive session, whereby only members of the Board were in attendance. The Board reported that they discussed and approved executive compensation, as presented by the members of the Compensation Committee, during this session.

**CONCLUSION**

There being no further business to come before the meeting, the meeting was concluded.

**RESPECTFULLY SUBMITTED,**

*krupa Shah*
_____

Krupa Shah
Secretary

**CONFIDENTIAL**

::: fabric    fabric.inc

## INVESTMENT POLICY STATEMENT
March 2022

**OBJECTIVES**

The Company's primary objectives when investing excess cash ("Treasury Program") are:

- Preservation of capital
- Provide sufficient liquidity to satisfy operational and capital needs;
- Maintain appropriate diversification;
- Generate returns based on the Company's investment policy parameters and market

**INVESTMENT GUIDELINES**

*Approved Instruments*

Funds will be invested only in fixed income instruments denominated and payable in U.S. dollars. In order to minimize the Company's credit risk exposure, the following investment types are approved:

| Investment Type | Minimum Credit Rating |
|---|---|
| Money Market & Deposit Accounts | N/A |
| US Treasury Obligations | N/A |
| US Federal Agencies or Gov. Sponsored Enterprises | N/A |
| Corporate Obligations | Baa2/BBB/BBB |
| Commercial Paper | A2/P2/F2 |
| Municipal Securities | A3/A-/SP2/MIG2/F2 |

To begin with, the Treasury Program will invest in money market, deposit accounts, and treasury accounts with daily liquidity.

In the future, if the company decides to invest in other obligations, the following criteria must be met:
- The portfolio assets will be in instruments that have final maturities of three (3) years or less
- The portfolio's weighted average maturity should not exceed twenty-four (24) months
- Fixed and floating rate securities as well as callable securities are allowed
- For corporate obligations, only investment grade bonds are permissible for investment
- Corporate obligations, commercial paper and municipal securities must carry ratings by at least two of three Nationally Recognized Statistical Rating Organizations (NRSROs), specifically Standard & Poor's, Moody's or Fitch.

USA_00000153

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-89
Admitted:_____

- The Company may employ the services of an investment manager or Registered Investment Advisor (collectively "Investment Manager") to direct a portion or all of the investment activities of the Company consistent with the guidelines set forth in the investment policy.

## ROLES & RESPONSIBILITIES

### Management

The Company's Chief Operating Officer, Chief Financial Officer, or their designee, is authorized to execute transactions and perform day to day management of investments as set forth in this policy.

The Company's Chief Operating Officer, Chief Financial Officer, or their designee shall:

- Evaluate the portfolio's performance to monitor that targeted investment objectives are achieved
- Evaluate the Investment Manager's performance, if applicable, to monitor that targeted investment objectives are achieved
- Ensure compliance with and implementation of investment policy
- Propose and recommend changes to the investment policy as circumstances arise where management believes the changes will be prudently beneficial
- Ensure that the company's investment portfolio is properly accounted for at all times

### Investment Managers (if applicable)

- The Investment Manager or RIA will be expected to keep the Company informed on a timely basis of major changes in its investment outlook, investment strategy, asset allocation, and other matters affecting its investment policies or philosophy
- Whenever an Investment Manager believes that any particular guideline should be altered, it will be the Investment Manager's responsibility to communicate with the Company expressing its views and recommendations
- Investment Manager will contact the Company's Chief Operating Officer, Chief Financial Officer, or designee as soon as reasonably practicable upon the occurrence of any of the following events:
  - A security held is downgraded
  - A security is downgraded causing the credit quality to fall below the minimum standards stated in this investment Policy
- Investment Manager will provide timely notices of transaction activity as well as monthly performance reports.
  - A timely monthly investment package to be provided by the Investment Managers should contain, at a minimum, a listing of the portfolio investments as of the date of the report including but not limited to the following:
    - Description of security
    - Investment rating
    - Yield

::: fabric                                                                                        fabric.inc

- Maturity due date
- Cost
- Market value
- Accrued but unpaid interest
- Paid interest
- Percentage mix of portfolio by type of investment
- Investment Manager or its custodian will provide a SSAE 16 report annually to the Company

**POLICY REVIEW & EXCEPTIONS**

This investment policy is intended to provide operational guidelines for the management of the investment portfolio. Under some circumstances, Investment Managers may learn of an investment transaction which falls outside of this investment policy but may present financial merits for the Company. In those circumstances, a written exception to the quantitative guidelines may be approved by the Company's Chief Operating Officer or Chief Financial Officer.

This investment policy will be reviewed at least annually and modified to remain current with Company goals and the changing market environment. Proposed amendments to this policy will be subject to the review of the Board of Directors.

## DEPOSIT ACCOUNT CONTROL AGREEMENT

THIS DEPOSIT ACCOUNT CONTROL AGREEMENT (this "**Agreement**") is made as of
4/13/2022 | 9:59 AM PDT
_____, by and among HighTower Treasury Corp, a Delaware corporation
("**Company**"), Stifel Bank, a Missouri stated chartered bank ("**Lender**"), and Commerce Fabric, Inc., a
Delaware corporation ("**Borrower**").

## BACKGROUND

A. Borrower and Lender have entered into a loan and security agreement dated November 11,
2021, which may be amended, restated, modified or supplemented from time to time ("**Loan Agreement**")
pursuant to which Lender has made, and will make, loans (collectively, the "**Loans**") to Borrower pursuant
to the terms of the Loan Agreement. The Loans will be secured by, among other things, a lien and security
interest in substantially all of the assets of the Borrower (as more fully provided in the Loan Agreement).

B. Pursuant to the terms of the Loan Agreement, Lender requires that Borrower provide for
the payment of remittances sent by the Borrower's customers into Deposit Account (as defined below), and
grant to Lender a lien on and security interest in such Deposit Account and all money deposited therein,
which account will be maintained for the benefit of Lender and administered in accordance with the terms
of this Agreement.

C. The parties are entering into this Agreement to set forth their rights and obligations with
respect to such deposit account.

**The parties therefore agree as follows:**

## ARTICLE 1

## DEFINED TERMS

Section 1.01. Defined Terms. Capitalized terms used in this Agreement and not specifically
defined in this Agreement have the meaning provided in the Loan Agreement. The following terms have
the respective meanings set forth below:

(a) "**Account Maintenance Liabilities**" has the meaning set forth in Section 8.03 hereof.

(b) "**Business Day**" means any day other than a Saturday, Sunday or a Company holiday.

(c) "**Deposit Account**" has the meaning set forth in Section 2.01 hereof.

(d) "**Control Notice**" shall mean the written notice Lender forwards to Company in the event
Borrower defaults on the Loans and Lender elects to exercise control of the Deposit Accounts as set forth
herein, that is in substantially similar form as Appendix A.

(e) "**Cost of Uncollectible Drafts**" has the meaning set forth in Section 3.03 hereof.

1

USA_00013730

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-93
Admitted:_____

(f) "**Designated Account**" shall mean the account established through the Company as Lender shall have at the time in question most recently specified by notice to the Company.

(g) "**Minimum Balance**" shall mean $0.00.

(h) "**UCC**" means the Uniform Commercial Code in effect in New York, as from time to time amended or restated.

(i) "**Uncollectible Draft**" has the meaning in Section 3.03 hereof.

## ARTICLE 2

### DEPOSIT ACCOUNT

Section 2.01. Establishment and Purpose of Deposit Account. Borrower has caused, or will cause, Company or its designee to establish an interest-bearing demand deposit account, for the benefit of Lender, being account no.        7556, and routing no(s). 322286803 (the "**Deposit Account**"). The Deposit Account will be maintained by Borrower for the purposes of (a) receiving and holding all collections and proceeds of Collateral (as defined in the Loan Agreement) and other related income and (b) disbursing sums on deposit therein in accordance with this Agreement. The Deposit Account shall be assigned the federal taxpayer identification number (TIN) of the Borrower, which Borrower certifies is:

Section 2.02. Control of Deposit Account. On and after the date Lender delivers a Control Notice to Company, Borrower acknowledges and agrees that neither Borrower, nor any other party claiming on behalf of, or through, Borrower, shall have any right, title or interest, whether express or implied, in the Deposit Account or to withdraw or make use of any amounts from the Deposit Account.

Section 2.03. Funds in Deposit Account as Security for the Loan; Grant of Security Interest. As security for full payment of the Loan and timely performance of Borrower's obligations under the Loan Agreement and this Agreement, Borrower hereby pledges, transfers, assigns and sets over to Lender, and grants to Lender a continuing security interest in and to, the Deposit Account, all money deposited therein from time to time, and all profits and proceeds thereof. Borrower agrees to execute, acknowledge, deliver, file or do, at its sole expense, all other acts, assignments, notices, agreements or other instruments as Lender may reasonably require in order to perfect the foregoing security interest, pledge and assignment or otherwise to fully effectuate the rights granted to Lender by this Section. This Agreement constitutes a "security agreement" and the Deposit Account constitutes a "deposit account" within the meaning of Article 9 of the UCC. In addition to all other rights and remedies provided for herein or otherwise available at law or in equity, Lender shall have all rights of a secured party under Article 9 of the UCC with respect to the Deposit Account and funds deposited therein.

Section 2.04. No Other Hypothecation of Borrower's Interest. Borrower shall not, without Lender's prior written consent, further pledge, assign, encumber or grant any security interest in the Deposit Account, nor permit any lien to attach thereto, except those created in Lender's favor in connection with the Loan.

2

USA_00013731
G-93-002

## ARTICLE 3

## DEPOSIT ACCOUNT SERVICES AND MAINTENANCE FEES; PERIODIC ACCOUNT STATEMENTS

Section 3.01. Establishment of Deposit Account. Borrower agrees not to make disbursements from or debits to the Deposit Account, other than in accordance with this Agreement. Company agrees to notify Lender promptly upon Company's receipt of any notice by any other party claiming rights in, or a lien upon, the Deposit Account.

Section 3.02. Payee Endorsements. The parties agree that items deposited in the Deposit Account shall be deemed to bear the valid and legally binding endorsement of the payee and to comply with all legal requirements for supplying missing endorsements by a depository Company, now or hereafter in effect. Any deposit made by or on behalf of Borrower into the Deposit Account shall be deemed deposited into the Deposit Account when the funds in respect of such deposit shall become collected funds.

Section 3.03. Insufficient Funds in Payor Account. Any item deposited by or on behalf of Borrower in the Deposit Account that is returned for insufficient or uncollected funds will be debited to the Deposit Account and re-deposited one time ("**Re-deposited Items**"). If such Re-deposited Item is returned unpaid a second time or if an item is returned for any reason other than insufficient or uncollected funds, including without limitation by any "stop payment order" having been applied to such item, or if such amount is otherwise uncollectible by Company ("**Uncollectible Drafts**"), Company may debit the Deposit Account for (a) fees due to Company or charges incurred by Company in connection with its deposit or collection attempts (provided such amounts are not in excess of the fees or charges Company regularly and customarily charges its customers with respect to Uncollectible Drafts and Re-deposited Items), and (b) the amount represented by such Uncollectible Draft if such amount has actually been credited by Company to the Deposit Account prior to Company's collection thereof (together, "**Costs of Uncollectible Drafts**"); provided, however, that amounts in the Deposit Account will first be applied to reimburse Company for amounts contemplated by the foregoing clause (b). If the amount of collected funds in the Deposit Account is insufficient to fully reimburse Company for the Costs of Uncollectible Drafts, Borrower agrees to pay such deficiency to Company. In the event Borrower fails to pay such deficiency, Lender will be responsible for reimbursing Company for such deficiencies to the extent the proceeds of Uncollectible Drafts were transferred to Lender, but in no event shall such obligation exceed the amount actually received by Lender.

Section 3.04. Corrections for Processing Errors. Company is granted the further right to debit from the Deposit Account any amounts deposited therein in error or as necessary to correct processing errors and Company's reasonable fees and expenses owed by Borrower for the maintenance of the Deposit Account and for Company's services under this Agreement.

Section 3.05. Fees and Expenses. Company agrees to look solely to Borrower for payment of its fees in connection with the maintenance of the Deposit Account and its services hereunder, and Borrower agrees to pay such fees to Company on demand therefore; provided, however, that the fees which Company may charge to Borrower shall not exceed the fees and charges customarily charged by Company to its customers with respect to the customary and standard maintenance of a Deposit Account and with respect to services similar to those provided under this Agreement. In the event that Borrower fails to pay for fees,

3

USA_00013732
G-93-003

charges, costs and expenses in connection with the Deposit Account, Company may deduct such fees, charges, costs and expenses from the Deposit Account. Borrower acknowledges and agrees that it solely shall be, and at all times remains, liable to Company and Lender for all fees, charges, costs and expenses in connection with the Deposit Account, this Agreement and the enforcement hereof, including, without limitation, the reasonable fees and expenses of legal counsel to Company and Lender as needed to enforce performance of this Agreement. The standard fees of the Company currently in effect are set forth in the Company's fee schedule attached hereto as Schedule 1.

Section 3.06. Subordination of Company Liens. Company hereby subordinates all security interests, liens, claims and, except as noted in Sections 3.03, 3.04 and 3.05 above, rights of setoff it may have, now or in the future, against the Deposit Account or any funds in the Deposit Account to the security interests, liens and claims of Lender.

Section 3.07. Periodic Account Statements. Company shall send periodic statements to Borrower itemizing activity with respect to the Deposit Account in accordance with Company's regular practices for providing account statements to its customers and shall provide a duplicate copy of such statement to Lender or its agent. Borrower shall be deemed at all times to have consented to the Company's release of such account information to Lender. In addition, the Borrower and/or Lender may opt for internet banking view only access to the Deposit Account by providing information necessary to set-up this service and sign all forms and agreements required for such service. If Lender opts for this service, Borrower shall be deemed to have authorized Company to provide Lender with such access. The Company's liability for failure to comply with this Section shall not exceed the cost of providing such information.

## ARTICLE 4

## DEPOSITS INTO DEPOSIT ACCOUNT

Section 4.01. Deposits. Borrower shall deposit into the Deposit Account all customer remittances within one (1) Business Day of Borrower's receipt thereof and shall be deemed to have received such funds in trust for Lender until so deposited. If, however, the Deposit Account is not established with Company as of the date hereof, Borrower's obligations under this Section shall commence as of the date Lender notifies Borrower that the Deposit Account has been established. If, however, the Deposit Account is not established with Company as of the date hereof, Borrower's obligations under this Section shall commence as of the date Lender notifies Borrower that the Deposit Account has been established.

## ARTICLE 5

## CONTROL OF DEPOSIT ACCOUNT

Section 5.01. Lender Control of Deposit Account. Until a Control Notice is received by Company, Borrower may make disbursements from or debits to the Deposit Account. Promptly (and in any event within two (2) Business Days) following receipt of the Control Notice by Company, Lender shall have the sole dominion and control over the Deposit Account and Company shall comply only with instructions given by Lender regarding the Deposit Account and any money on deposit therein by deeming such instructions to be Borrower instructions. Lender shall complete and sign any agreement, application, form or document simultaneously with the signing of this Agreement that the Company deems necessary

4

for the Company to take instructions from the Lender.

## ARTICLE 6

### OPERATION OF DEPOSIT ACCOUNT

Section 6.01. <u>Transfers to Designated Account</u>. On and after the date Company receives the Control Notice, Borrower hereby irrevocably instructs Company to cause to be transferred each Business Day at Borrower's expense all collected funds on deposit in the Deposit Account that exceeds the Minimum Balance to the Designated Account for the payment of any and all debts, liabilities and obligations of Borrower to Lender pursuant to, or in connection with, the Loan, the Loan Agreement and this Agreement, in such order, proportion and priority as Lender may determine in its sole discretion. Transfers to the Designated Account contemplated by this Section 6.01 are to be made by wire transfer, other electronic transfer or any other form of transfer of immediately available funds. Lender reserves the right to change its account from time to time upon written notice from Lender to Company, and thereupon all payments to Lender shall be remitted to the new account so designated by Lender. Company shall have a reasonable time to act upon Lender's notice of change in account.

Section 6.02. <u>Borrower's Responsibility for Sufficient Funds</u>. Notwithstanding anything to the contrary herein, Borrower acknowledges that Borrower is responsible for monitoring the sufficiency of funds deposited in the Deposit Account and that Borrower is liable for any deficiency in available funds, irrespective of whether Borrower has received any account statement, notice or demand from Lender or Company.

Section 6.03. <u>No Obligation of Company to Verify Instruction Amounts or Lender Notices</u>. Notwithstanding anything to the contrary herein, Company shall have no liability or responsibility for monitoring the application of payments made by Company in accordance with Lender's directions or Lender notices to Company (including the Control Notice). Company is not liable for any Borrower obligations under the Loan Agreement or otherwise.

## ARTICLE 7

### TERMINATION OF AGREEMENT

Section 7.01. <u>Right to Terminate</u>. Borrower may not terminate this Agreement for any reason without Lender's prior written consent. Company, acting alone, may terminate this Agreement at any time and for any reason by written notice delivered to Borrower and Lender not less than thirty (30) days prior to the effective termination date, provided that Company may terminate this Agreement immediately upon written notice to Borrower and Lender in the event of suspected fraud or other illegal activity in connection with the Deposit Account or this Agreement or under any statute, rule or regulation or any court or administrative order or decree. Lender, acting alone, may terminate this Agreement at any time by not less than thirty (30) days prior written notice delivered to Borrower and Company. If Company so terminates this Agreement or if Lender so terminates this Agreement but requires that a Deposit Account with a different depository be established, Lender shall select a new depository, and thereupon Lender and Borrower shall promptly enter into a deposit account control agreement with such depository which is substantially similar to this Agreement. Borrower hereby instructs Company to take all reasonable action

5

USA_00013734
G-93-005

necessary to initiate the transfer of any funds held in the Deposit Account to the replacement depository selected by Lender.

Section 7.02. Termination Upon Payment of Loan and Certain Other Events. Unless terminated in accordance with Section 7.01, this Agreement shall terminate upon payment in full of the Loan. Lender will notify Company in writing of any termination pursuant to this Section.

Section 7.03. Obligations Upon Termination. Upon termination of this Agreement by Lender pursuant to Section 7.01 where Lender does not require the re-establishment of a Deposit Account with another depository or pursuant to Section 7.02, the funds remaining in the Deposit Account shall be disbursed to Borrower after deducting all outstanding charges or fees due to Company in connection with this Agreement. No termination of this Agreement shall impair the rights of any party with respect to items processed prior to the termination date.

## ARTICLE 8

## CERTAIN MATTERS AFFECTING THE COMPANY

Section 8.01. Reliance on Parties' Instructions. Company may rely, and shall be protected in acting or refraining from acting, upon any written notice (including, notice sent by telecopier) believed by it to be genuine and to have been signed or presented by the proper party or parties, and Company shall have no obligation to review or confirm that actions taken pursuant to such notice in accordance with this Agreement comply with any other agreement or document.

Section 8.02. Duties Expressly Stated in this Agreement. The duties and obligations of Company shall be determined solely by the express provisions of this Agreement, and, except as expressly set forth herein, Company will not be charged with knowledge of any provisions of the Loan Agreement or any of the other documents related thereto or any other agreements entered into between Lender and Borrower. Company shall not be liable except for its gross negligence or willful misconduct in the performance of its duties and obligations as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against Company.

Section 8.03. Limitation on Liability; Indemnification. Company shall not be liable for any claims, suits, actions, costs, damages, liabilities, or expense, or for any interruption of services ("**Account Maintenance Liabilities**") in connection with the subject matter of this Agreement, other than Account Maintenance Liabilities caused by the gross negligence or willful misconduct of Company or any of its directors, officers, employees or agents (collectively, "**Indemnified Parties**"). In no event will Company be liable for any lost profits or for any incidental, special, consequential or punitive damages whether or not Company knew of the possibility or likelihood of such damages. Company's substantial compliance with its standard procedures for provision of the services required under this Agreement shall be deemed to constitute the exercise of ordinary care. Company liability hereunder shall not exceed the aggregate of fees charged in respect of the Designated Account during the ninety (90) days prior to the event giving rise to liability. Borrower hereby agrees to indemnify and hold harmless the Indemnified Parties, and the successors and assigns of Company, from and against any and all Account Maintenance Liabilities asserted against them in connection with this Agreement, other than those Account Maintenance Liabilities caused

6

USA_00013735
G-93-006

by the gross negligence or willful misconduct of Company or such indemnified party. To the extent Borrowr has not complied with the foregoing, Lender hereby agrees to indemnify and hold harmless the Indemnified Parties, and the successors and assigns of Company, from and against any and all Account Maintenance Liabilities asserted against them in connection with honoring or following any instructions that the Company shall receive from (or shall believe in good faith to be from) the Lender under this Agreement, other than those Account Maintenance Liabilities caused by the gross negligence or willful misconduct of Company or such indemnified party. This section shall survive termination of the Agreement.

Section 8.04. Borrower Bankruptcy. If Borrower becomes subject to a voluntary or involuntary proceeding under the Bankruptcy Code, or if Company is otherwise served with legal process which Company in good faith believes affects funds deposited in the Deposit Account, Company shall have the right, at its discretion, to cause a hold on funds deposited in the Deposit Account to apply until such time as Company receives an appropriate court order or other assurances reasonably satisfactory to Company establishing that the funds may continue to be disbursed according to the instructions contained in this Agreement.

Section 8.05. Conflicting Instructions. Following receipt of the Control Notice, Company shall promptly (and in any event within two (2) Business Days) follow only Lender's instructions with respect to the Deposit Account notwithstanding any conflicting instruction from Borrower and shall deem such Lender instructions to be instructions of the Borrower.

## ARTICLE 9

## MISCELLANEOUS

Section 9.01. Notices. All notices and other communications under this Agreement shall be in writing and addressed to each party as set forth below. Demand notices shall be deemed to have been duly given upon the earlier of: (a) actual receipt; (b) one (1) Business Day after having been timely deposited for overnight delivery, fee prepaid, with a reputable overnight courier service, having a reliable tracking system; (c) one (1) Business Day after having been sent by telecopier (with answer back acknowledged) provided an additional notice is given pursuant to (b); or (d) five (5) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail, postage prepaid, return receipt requested, and in the case of clause (b) and (d) irrespective of whether delivery is accepted. A new address for notice may be established by written notice to the other parties hereto; provided, however, that no change of address will be effective until written notice thereof actually is received by the party to whom such address change is sent. Notice to outside counsel or parties other than the named Borrower and Lender, now or hereafter designated by a party as entitled to notice, are for convenience only and are not required for notice to a party to be effective in accordance with this section. Notice addresses are as follows:

Address for Lender:

Stifel Bank
787 7th Avenue, 11th Floor
New York, NY 10019
Attention: Loan Services

7

USA_00013736
G-93-007

Email: loanservices@stifelbank.com

Address for Borrower:

COMMERCE FABRIC, INC.
113 Cherry Street, PMB 66768
Seattle, WA 98104
Attn: Finance Team
Email: finance@fabric.inc

Address for Company:

HighTower Treasury Corp.
600 1st Ave, Suite 102-1080
Seattle, WA 98040
Email: support@hightowertreasury.com
Attn: Adam Brazg

Section 9.02. Entire Agreement; Modification. This Agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces all prior discussions, representations, communications and agreements (oral and written) by and among the parties hereto with respect thereto, including, without limitation, any other account agreement between Borrower and Company. This Agreement shall not be modified, supplemented, or terminated, or any provision hereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing. Nothing in this Agreement shall limit the obligations of Borrower or rights of Company under all agreements in respect of Company services or the Designated Account, such as they may be from time to time.

Section 9.03. Binding Effect; Joint and Several Obligations. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, whether by voluntary action of the parties or by operation of law. (The foregoing does not modify any conditions applicable to Transfers.) If there is more than one Borrower, each Borrower is jointly and severally liable hereunder.

Section 9.04. Unenforceable Provisions. Any provision of this Agreement which is determined by a government body or court of competent jurisdiction to be invalid, unenforceable or illegal shall be ineffective only to the extent of such holding and shall not affect the validity, enforceability or legality of any other provision, nor shall such determination apply in any circumstance or to any party not controlled by such determination.

Section 9.05. Duplicate Originals; Counterparts. This Agreement may be executed in any number of duplicate originals, and each duplicate original shall be deemed to be an original. This Agreement (and each duplicate original) also may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed Agreement even though all signatures do not appear on the same document.

Section 9.06. Construction of Certain Terms. Defined terms used in this Agreement may be

8

used interchangeably in singular or plural form, and pronouns shall be deemed to cover all genders. Article or section headings shall not be used in interpretation of this Agreement; "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or other subdivision; "section" refers to the entire section and not to any particular subsection, paragraph or other subdivision; and "Agreement" and each other Loan Agreement referred to herein means the agreement as originally executed and as hereafter modified, supplemented, extended, consolidated, or restated from time to time. Reference to days for performance shall mean calendar days unless Business Days are expressly indicated.

Section 9.07. Successors and Assigns; Assignments. This Agreement shall bind and inure to the benefit of and be enforceable by the Company, Borrower and Lender and their respective successors and assigns. Lender shall have the right to assign or transfer its rights under this Agreement without limitation, provided that Lender's assignee or transferee (and its servicer) meets the Company's Know Your Customer policy, has complied with the Company's account documentation requirement and the Company is not prohibited under applicable law from providing banking or other services with such assignee, transferee or its servicer or agent. Any assignee or transferee of Lender shall be entitled to all the benefits afforded Lender under this Agreement; provided, however, that such assignee or transferee shall have delivered to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and is also the assignee or transferee of the Loan Agreement and complied with the above requirements of the Company. The Company shall have the right to assign or transfer its rights and obligations hereunder only in connection with a termination, as set forth in Article 7, or with the prior consent of Lender. Borrower shall have the right to assign and transfer its rights and obligations hereunder only with the prior consent of Lender or as may be otherwise permitted under the Loan Agreement. Any corporation into which the Company may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Company shall be a party, or any corporation to which substantially all the deposit account business of the Company may be transferred, shall be the Company under this Agreement without further act.

Section 9.08. Governing Law. This Agreement shall be governed by and construed and enforced in all respects in accordance with the laws of the State of New York without regard to conflicts of law principles of such State. Regardless of any provision in any other agreement, for purposes of the UCC, New York shall be deemed to be the "Company's jurisdiction" and the "securities intermediary's jurisdiction" of the Company (within the meaning of Sections 8-110 and 9-304 of the UCC), respectively.

**Section 9.09. WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY TO THIS AGREEMENT WAIVES AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS AGREEMENT.**

[Remainder of page is blank; signatures appear on next page.]

9

USA_00013738
G-93-009

The parties have signed this agreement as of the Effective Date

Lender: Stifel Bank

Name:   James C. Binz
Title:   EVP
Date:    4/12/2022

Borrower: Commerce Fabric, Inc.

Nevin Shetty
591A00C733674AA...
Name: Nevin Shetty
Title: CFO
Date: 4/13/2022  |  9:59 AM PDT

Company: HighTower Treasury Corp.

C8DA80235751404...
Name: Adam Brazg
Title: CEO
Date: 4/13/2022  |  9:59 AM PDT

10

USA_00013739
G-93-010

## SCHEDULE 1

### Fee Schedule

The account control agreement fee is $0.00.

11

USA_00013740

G-93-011

## APPENDIX A

### NOTICE OF EXCLUSIVE CONTROL

[Date]

HighTower Treasury Corp.
600 1st Ave, Suite 102-1080
Seattle, WA 98040
Email: support@hightowertreasury.com
Attn: Adam Brazg

> Re:    Deposit Account Number(s):        7556
>        Notice of Exclusive Control

Ladies and Gentlemen:

Reference is made to the Deposit Account Control Agreement dated as of _____, 2022 (the "Agreement") by and among Commerce Fabric, Inc (the "Borrower"), Stifel Bank (as "Lender") and HighTower Treasury Corp. ("Company") regarding the above-described deposit account(s) (whether one or more, individually and collectively, the "Deposit Account(s)"). A copy of the Agreement is attached hereto.

In accordance with this Agreement, we hereby give you notice of our exercise of exclusive control over the Deposit Account.

Very truly yours,

STIFEL BANK,
as Lender

By: _____
Name: _____
Title: _____

12

USA_00013741
G-93-012

## DEPOSIT ACCOUNT CONTROL AGREEMENT

THIS DEPOSIT ACCOUNT CONTROL AGREEMENT (this "**Agreement**") is made as of November 24, 2021, by and among Under Technologies Inc, dba Rho Technologies, a New York state-based bank platform ("**Bank Platform**"), STIFEL BANK, a Missouri stated chartered bank ("**Lender**"), and Commerce Fabric, Inc., a Delaware corporation ("**Borrower**").

## BACKGROUND

A. Borrower and Lender are entering into a certain loan and security agreement dated November 11, 2021 which may be amended from time to time ("**Loan Agreement**") pursuant to which Lender will make loans (collectively, the "**Loan**") to Borrower pursuant to the terms of the Loan Agreement. The Loan will be secured by, among other things, a lien and security interest in substantially all of the assets of the Borrower (as more fully provided in the Loan Agreement).

B. As a condition to making the Loan, Lender requires that Borrower provide for the payment of remittances sent by the Borrower's customers into deposit accounts established with Bank Platform [1] and to grant to Lender a lien on and security interest in such deposit account and all money deposited therein, which account will be maintained for the benefit of Lender and administered in accordance with the terms of this Agreement.

C. The parties are entering into this Agreement to set forth their rights and obligations with respect to such deposit account.

**The parties therefore agree as follows:**

## ARTICLE 1

### DEFINED TERMS

Section 1.01. Defined Terms. Capitalized terms used in this Agreement and not specifically defined in this Agreement have the meaning provided in the Loan Agreement. The following terms have the respective meanings set forth below:

(a) "**Account Maintenance Liabilities**" has the meaning set forth in Section 8.03 hereof.

(b) "**Business Day**" means any day other than a Saturday, Sunday or a Bank Platform holiday.

---

ǀ

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-94
Admitted:_____

(c) "**Deposit Account**" has the meaning set forth in Section 2.01 hereof.

(d) "**Cost of Uncollectible Drafts**" has the meaning set forth in Section 3.03 hereof.

(e) "**Designated Account**" shall mean the account established through the Bank Platform as Lender shall have at the time in question most recently specified by notice to the Bank Platform.

(f) "**Minimum Balance**" shall mean $0.00.

(g) "**Control Notice**" shall mean the written notice Lender forwards to Bank Platform in the event Borrower defaults on the Loan that is in substantially similar form as Appendix A.

(h) "**UCC**" means the Uniform Commercial Code in effect in New York, as from time to time amended or restated.

(i) "**Uncollectible Draft**" has the meaning in Section 3.03 hereof.

## ARTICLE 2

## DEPOSIT ACCOUNT

Section 2.01. Establishment and Purpose of Deposit Account. Borrower has caused, or will cause, Bank Platform or its designee to establish a non-interest bearing demand deposit account, for the benefit of Lender, being account no(s).　　　　6603,　　　　1911 and routing no(s). 084106768 (the "**Deposit Account**"). The Deposit Account will be maintained by Borrower for the purposes of (a) receiving and holding all collections and proceeds of Collateral (as defined in the Loan Agreement) and other related income and (b) disbursing sums on deposit therein in accordance with this Agreement. The Deposit Account shall be assigned the federal taxpayer identification number (TIN) of the Borrower, which Borrower certifies is:

Section 2.02. Control of Deposit Account. As of when Lender delivers notice (such notice, the "Control Notice") to Bank Platform that Borrower is in default under the Loan, Borrower acknowledges and agrees that neither Borrower, nor any other party claiming on behalf of, or through, Borrower, shall have any right, title or interest, whether express or implied, in the Deposit Account or to withdraw or make use of any amounts from the Deposit Account.

Section 2.03. Funds in Deposit Account as Security for the Loan; Grant of Security Interest. As security for full payment of the Loan and timely performance of Borrower's obligations under the Loan Agreement and this Agreement, Borrower hereby pledges, transfers, assigns and sets over to Lender, and grants to Lender a continuing security interest in and to, the Deposit Account, all money deposited therein from time to time, and all profits and proceeds thereof. Borrower agrees to execute, acknowledge, deliver, file or do, at its sole expense, all other acts, assignments, notices, agreements or other instruments as Lender may reasonably require in order to perfect the foregoing security interest, pledge and assignment or otherwise to fully effectuate the rights granted to Lender by this Section. This Agreement constitutes a "security agreement" and the Deposit Account constitutes a "deposit account" within the meaning of Article 9 of the UCC. In addition to all other rights and remedies provided for herein or otherwise available at law or in equity, Lender shall have all rights of a secured party under Article 9 of the UCC with respect to the

USA_00013743
G-94-002

Deposit Account and funds deposited therein.

Section 2.04. No Other Hypothecation of Borrower's Interest. Borrower shall not, without Lender's prior written consent, further pledge, assign, encumber or grant any security interest in the Deposit Account, nor permit any lien to attach thereto, except those created in Lender's favor in connection with the Loan.

## ARTICLE 3

## DEPOSIT ACCOUNT SERVICES AND MAINTENANCE FEES; PERIODIC ACCOUNT STATEMENTS

Section 3.01. Establishment of Deposit Account. Borrower agrees not to make disbursements from, or debits to the Deposit Account, other than in accordance with this Agreement. Bank Platform agrees to notify Lender promptly upon Bank Platform's receipt of any notice by any other party claiming rights in, or a lien upon, the Deposit Account.

Section 3.02. Payee Endorsements. The parties agree that items deposited in the Deposit Account shall be deemed to bear the valid and legally binding endorsement of the payee and to comply with all legal requirements for supplying missing endorsements by a depository Bank Platform, now or hereafter in effect. Any deposit made by or on behalf of Borrower into the Deposit Account shall be deemed deposited into the Deposit Account when the funds in respect of such deposit shall become collected funds.

Section 3.03. Insufficient Funds in Payor Account. Any item deposited by or on behalf of Borrower in the Deposit Account that is returned for insufficient or uncollected funds will be debited to the Deposit Account and re-deposited one time ("**Re-deposited Items**"). If such Re-deposited Item is returned unpaid a second time or if an item is returned for any reason other than insufficient or uncollected funds, including without limitation by any "stop payment order" having been applied to such item, or if such amount is otherwise uncollectible by Bank Platform ("**Uncollectible Drafts**"), Bank Platform may debit the Deposit Account for (a) fees due to Bank Platform or charges incurred by Bank Platform in connection with its deposit or collection attempts (provided such amounts are not in excess of the fees or charges Bank Platform regularly and customarily charges its customers with respect to Uncollectible Drafts and Re-deposited Items), and (b) the amount represented by such Uncollectible Draft if such amount has actually been credited by Bank Platform to the Deposit Account prior to Bank Platform's collection thereof (together, "**Costs of Uncollectible Drafts**"); provided, however, that amounts in the Deposit Account will first be applied to reimburse Bank Platform for amounts contemplated by the foregoing clause (b). If the amount of collected funds in the Deposit Account is insufficient to fully reimburse Bank Platform for the Costs of Uncollectible Drafts, Borrower agrees to pay such deficiency to Bank Platform. Lender will be responsible for reimbursing Bank Platform to the extent the proceeds of Uncollectible Drafts were transferred to Lender but in no event shall exceed the amount actually received by Lender.

Section 3.04. Corrections for Processing Errors. Bank Platform is granted the further right to debit from the Deposit Account any amounts deposited therein in error or as necessary to correct processing errors and Bank Platform's reasonable fees and expenses owed by Borrower for the maintenance of the Deposit Account and for Bank Platform's services under this Agreement.

3

Section 3.05. Fees and Expenses. Bank Platform agrees to look solely to Borrower for payment of its fees in connection with the maintenance of the Deposit Account and its services hereunder, and Borrower agrees to pay such fees to Bank Platform on demand therefore; provided, however, that the fees which Bank Platform may charge to Borrower shall not exceed the fees and charges customarily charged by Bank Platform to its customers with respect to the customary and standard maintenance of a Deposit Account and with respect to services similar to those provided under this Agreement. In the event that Borrower fails to pay for fees, charges, costs and expenses in connection with the Deposit Account, Bank Platform may deduct such fees, charges, costs and expenses from the Deposit Account. Borrower acknowledges and agrees that it solely shall be, and at all times remains, liable to Bank Platform and Lender for all fees, charges, costs and expenses in connection with the Deposit Account, this Agreement and the enforcement hereof, including, without limitation, the reasonable fees and expenses of legal counsel to Bank Platform and Lender as needed to enforce performance of this Agreement. The standard fees of the Bank Platform currently in effect are set forth in the Bank Platform's fee schedule attached hereto as Schedule 1.

Section 3.06. Subordination of Bank Platform Liens. Bank Platform hereby subordinates all security interests, liens, claims and, except as noted in Sections 3.03, 3.04 and 3.05 above, rights of setoff it may have, now or in the future, against the Deposit Account or any funds in the Deposit Account to the security interests, liens and claims of Lender.

Section 3.07. Periodic Account Statements. Bank Platform shall send periodic statements to Borrower itemizing activity with respect to the Deposit Account in accordance with Bank Platform's regular practices for providing account statements to its customers and shall provide a duplicate copy of such statement to Lender or its agent. Borrower shall be deemed at all times to have consented to the Bank Platform's release of such account information to Lender. In addition, the Borrower and/or Lender may opt for internet banking view only access to the Deposit Account by providing information necessary to set-up this service and sign all forms and agreements required for such service. If Lender opts for this service, Borrower shall be deemed to have authorized Bank Platform to provide Lender with such access. The Bank Platform's liability for failure to comply with this Section shall not exceed the cost of providing such information.

## ARTICLE 4

## DEPOSITS INTO DEPOSIT ACCOUNT

Section 4.01. Deposits. Borrower shall deposit into the Deposit Account all customer remittances within two (2) Business Days of Borrower's receipt thereof and shall be deemed to have received such funds in trust for Lender until so deposited.

## ARTICLE 5

## CONTROL OF DEPOSIT ACCOUNT

Section 5.01. Lender Control of Deposit Account. Until a Control Notice is received by Bank Platform, Borrower may make disbursements from or debits to the Deposit Account. Promptly (and in any event within two (2) Business Days) following receipt by Bank Platform of the Control Notice from Lender

4

that Borrower is in default under the Loan, Lender shall have the sole dominion and control over the Deposit Account and Bank Platform shall comply only with instructions given by Lender regarding the Deposit Account and any money on deposit therein by deeming such instructions to be Borrower instructions. Lender shall complete and sign any agreement, application, form or document simultaneously with the signing of this Agreement that the Bank Platform deems necessary for the Bank Platform to take instructions from the Lender.

## ARTICLE 6

### OPERATION OF DEPOSIT ACCOUNT

Section 6.01. Transfers to Designated Account. As of when Lender delivers the Control Notice to Bank Platform that Borrower is in default under the Loan, at Lender's request, Borrower hereby irrevocably instructs Bank Platform to cause to be transferred each Business Day at Borrower's expense all collected funds on deposit in the Deposit Account that exceeds the Minimum Balance to the Designated Account for the payment of any and all debts, liabilities and obligations of Borrower to Lender pursuant to, or in connection with, the Loan, the Loan Agreement and this Agreement, in such order, proportion and priority as Lender may determine in its sole discretion. Transfers to the Designated Account contemplated by this Section 6.01 are to be made by wire transfer, other electronic transfer or any other form of transfer of immediately available funds. Lender reserves the right to change its account from time to time upon written notice from Lender to Bank Platform, and thereupon all payments to Lender shall be remitted to the new account so designated by Lender. Bank Platform shall have a reasonable time to act upon Lender's notice of change in account.

Section 6.02. Borrower's Responsibility for Sufficient Funds. Notwithstanding anything to the contrary herein, Borrower acknowledges that Borrower is responsible for monitoring the sufficiency of funds deposited in the Deposit Account and that Borrower is liable for any deficiency in available funds, irrespective of whether Borrower has received any account statement, notice or demand from Lender or Bank Platform.

Section 6.03. No Obligation of Bank Platform to Verify Instruction Amounts or Lender Notices. Notwithstanding anything to the contrary herein, Bank Platform shall have no liability or responsibility for monitoring the application of payments made by Bank Platform, or the timeliness thereof, in accordance with Lender's directions or Lender notices to Bank Platform, including but not limited to notices from Lender to Bank Platform that Borrower is in default under the Loan. Bank Platform is not liable for any Borrower obligations under the Loan Agreement or otherwise.

## ARTICLE 7

### TERMINATION OF AGREEMENT

Section 7.01. Right to Terminate. Borrower may not terminate this Agreement for any reason without Lender's prior written consent. Bank Platform, acting alone, may terminate this Agreement at any time and for any reason by written notice delivered to Borrower and Lender not less than thirty (30) days prior to the effective termination date, provided that Bank Platform may terminate this Agreement immediately upon written notice to Borrower and Lender in the event of suspected fraud or other illegal

5

activity in connection with the Deposit Account or this Agreement or under any statute, rule or regulation or any court or administrative order or decree. Lender, acting alone, may terminate this Agreement at any time by not less than thirty (30) days prior written notice delivered to Borrower and Bank Platform. If Bank Platform so terminates this Agreement or if Lender so terminates this Agreement but requires that a Deposit Account with a different depository be established, Lender shall select a new depository, and thereupon Lender and Borrower shall promptly enter into a deposit account control agreement with such depository which is substantially similar to this Agreement. Borrower hereby instructs Bank Platform to take all reasonable action necessary to initiate the transfer of any funds held in the Deposit Account to the replacement depository selected by Lender.

Section 7.02. Termination Upon Payment of Loan and Certain Other Events. Unless terminated in accordance with Section 7.01, this Agreement shall terminate upon payment in full of the Loan. Lender will notify Bank Platform in writing of any termination pursuant to this Section.

Section 7.03. Obligations Upon Termination. Upon termination of this Agreement by Lender pursuant to Section 7.01 where Lender does not require the re-establishment of a Deposit Account with another depository or pursuant to Section 7.02, the funds remaining in the Deposit Account shall be disbursed to Borrower after deducting all outstanding charges or fees due to Bank Platform in connection with this Agreement. No termination of this Agreement shall impair the rights of any party with respect to items processed prior to the termination date.

## ARTICLE 8

### CERTAIN MATTERS AFFECTING THE BANK PLATFORM

Section 8.01. Reliance on Parties' Instructions. Bank Platform may rely, and shall be protected in acting or refraining from acting, upon any written notice (including, notice sent by telecopier) believed by it to be genuine and to have been signed or presented by the proper party or parties, and Bank Platform shall have no obligation to review or confirm that actions taken pursuant to such notice in accordance with this Agreement comply with any other agreement or document.

Section 8.02. Duties Expressly Stated in this Agreement. The duties and obligations of Bank Platform shall be determined solely by the express provisions of this Agreement, and, except as expressly set forth herein, Bank Platform will not be charged with knowledge of any provisions of the Loan Agreement or any of the other documents related thereto or any other agreements entered into between Lender and Borrower. Bank Platform shall not be liable except for its gross negligence or willful misconduct in the performance of its duties and obligations as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against Bank Platform.

Section 8.03. Limitation on Liability; Indemnification. Bank Platform shall not be liable for any claims, suits, actions, costs, damages, liabilities, or expense, or for any interruption of services ("**Account Maintenance Liabilities**") in connection with the subject matter of this Agreement, other than Account Maintenance Liabilities caused by the gross negligence or willful misconduct of Bank Platform or any of its directors, officers, employees or agents (collectively, "**Indemnified Parties**"). In no event will Bank Platform be liable for any lost profits or for any incidental, special, consequential or punitive damages

6

whether or not Bank Platform knew of the possibility or likelihood of such damages. Bank Platform's substantial compliance with its standard procedures for provision of the services required under this Agreement shall be deemed to constitute the exercise of ordinary care. Bank Platform liability hereunder shall not exceed the aggregate of fees charged in respect of the Designated Account during the ninety (90) days prior to the event giving rise to liability. Borrower hereby agrees to indemnify and hold harmless the Indemnified Parties, and the successors and assigns of Bank Platform, from and against any and all Account Maintenance Liabilities asserted against them in connection with this Agreement, other than those Account Maintenance Liabilities caused by the gross negligence or willful misconduct of Bank Platform or such indemnified party. Lender hereby agrees to indemnify and hold harmless the Indemnified Parties, and the successors and assigns of Bank Platform, from and against any and all Account Maintenance Liabilities asserted against them in connection with honoring or following any instructions that the Bank Platform shall receive from (or shall believe in good faith to be from) the Lender under this Agreement, other than those Account Maintenance Liabilities caused by the gross negligence or willful misconduct of Bank Platform or such indemnified party. This section shall survive termination of the Agreement.

Section 8.04. Borrower Bankruptcy. If Borrower becomes subject to a voluntary or involuntary proceeding under the Bankruptcy Code, or if Bank Platform is otherwise served with legal process which Bank Platform in good faith believes affects funds deposited in the Deposit Account, Bank Platform shall have the right, at its discretion, to cause a hold on funds deposited in the Deposit Account to apply until such time as Bank Platform receives an appropriate court order or other assurances reasonably satisfactory to Bank Platform establishing that the funds may continue to be disbursed according to the instructions contained in this Agreement.

Section 8.05. Conflicting Instructions. Following receipt by Bank Platform of notice from Lender that Borrower is in default under the Loan, Bank Platform shall promptly (and in any event within two (2) Business Days of the receipt of the Control Notice) begin to follow only Lender's instructions with respect to the Deposit Account notwithstanding any conflicting instruction from Borrower and shall deem such Lender instructions to be instructions of the Borrower.

## ARTICLE 9

## MISCELLANEOUS

Section 9.01. Notices.    All notices and other communications under this Agreement shall be in writing and addressed to each party as set forth below. Demand notices shall be deemed to have been duly given upon the earlier of: (a) actual receipt; (b) one (1) Business Day after having been timely deposited for overnight delivery, fee prepaid, with a reputable overnight courier service, having a reliable tracking system; (c) one (1) Business Day after having been sent by telecopier (with answer back acknowledged) provided an additional notice is given pursuant to (b); or (d) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail, postage prepaid, return receipt requested, and in the case of clause (b) and (d) irrespective of whether delivery is accepted. A new address for notice may be established by written notice to the other parties hereto; provided, however, that no change of address will be effective until written notice thereof actually is received by the party to whom such address change is sent. Notice to outside counsel or parties other than the named Borrower and Lender, now or hereafter designated by a party as

7

entitled to notice, are for convenience only and are not required for notice to a party to be effective in accordance with this section. Notice addresses are as follows:

Address for Lender:

Stifel Bank
787 7ᵗʰ Avenue, 11ᵗʰ Floor
New York, NY 10019
Attention: Loan Services
Email: loanservices@stifelbank.com

Address for Borrower:

COMMERCE FABRIC, INC.
113 Cherry Street, PMB 66768
Seattle, WA 98104
Attn: Office of the General Counsel
EMAIL: legal@fabric.inc

Address for Bank Platform:

Rho Business Banking
100 Crosby Street, Suite 607
New York, NY 10012
Email: DACA@rho.co
Attn: Everett Cook

Section 9.02. Entire Agreement; Modification. This Agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces all prior discussions, representations, communications and agreements (oral and written) by and among the parties hereto with respect thereto, including, without limitation, any other account agreement between Borrower and Bank Platform. This Agreement shall not be modified, supplemented, or terminated, or any provision hereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing. Nothing in this Agreement shall limit the obligations of Borrower or rights of Bank Platform under all agreements in respect of Bank Platform services or the Designated Account, such as they may be from time to time.

Section 9.03. Binding Effect; Joint and Several Obligations. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, whether by voluntary action of the parties or by operation of law. (The foregoing does not modify any conditions applicable to Transfers.) If there is more than one Borrower, each Borrower is jointly and severally liable hereunder.

Section 9.04. Unenforceable Provisions. Any provision of this Agreement which is determined by a government body or court of competent jurisdiction to be invalid, unenforceable or illegal shall be

8

USA_00013749
G-94-008

ineffective only to the extent of such holding and shall not affect the validity, enforceability or legality of any other provision, nor shall such determination apply in any circumstance or to any party not controlled by such determination.

Section 9.05. Duplicate Originals; Counterparts. This Agreement may be executed in any number of duplicate originals, and each duplicate original shall be deemed to be an original. This Agreement (and each duplicate original) also may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed Agreement even though all signatures do not appear on the same document.

Section 9.06. Construction of Certain Terms. Defined terms used in this Agreement may be used interchangeably in singular or plural form, and pronouns shall be deemed to cover all genders. Article or section headings shall not be used in interpretation of this Agreement; "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or other subdivision; "section" refers to the entire section and not to any particular subsection, paragraph or other subdivision; and "Agreement" and each other Loan Agreement referred to herein means the agreement as originally executed and as hereafter modified, supplemented, extended, consolidated, or restated from time to time. Reference to days for performance shall mean calendar days unless Business Days are expressly indicated.

Section 9.07. Successors and Assigns; Assignments. This Agreement shall bind and inure to the benefit of and be enforceable by the Bank Platform, Borrower and Lender and their respective successors and assigns. Lender shall have the right to assign or transfer its rights under this Agreement without limitation, provided that Lender's assignee or transferee (and its servicer) meets the Bank Platform's Know Your Customer policy, has complied with the Bank Platform's account documentation requirement and the Bank Platform is not prohibited under applicable law from providing banking or other services with such assignee, transferee or its servicer or agent. Any assignee or transferee of Lender shall be entitled to all the benefits afforded Lender under this Agreement; provided, however, that such assignee or transferee shall have delivered to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and is also the assignee or transferee of the Loan Agreement and complied with the above requirements of the Bank Platform. The Bank Platform shall have the right to assign or transfer its rights and obligations hereunder only in connection with a termination, as set forth in Article 7, or with the prior consent of Lender. Borrower shall have the right to assign and transfer its rights and obligations hereunder only with the prior consent of Lender or as may be otherwise permitted under the Loan Agreement. Any corporation into which the Bank Platform may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Bank Platform shall be a party, or any corporation to which substantially all the deposit account business of the Bank Platform may be transferred, shall be the Bank Platform under this Agreement without further act.

Section 9.08. Governing Law. This Agreement shall be governed by and construed and enforced in all respects in accordance with the laws of the State of New York without regard to conflicts of law principles of such State. Regardless of any provision in any other agreement, for purposes of the UCC, New York shall be deemed to be the "Bank Platform's jurisdiction" and the "securities intermediary's jurisdiction" of the Bank Platform (within the meaning of Sections 8-110 and 9-304 of the UCC),

9

respectively.

**Section 9.09. <u>WAIVER OF JURY TRIAL</u>. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY TO THIS AGREEMENT WAIVES AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS AGREEMENT.**

[Remainder of page is blank; signatures appear on next page.]

10

The parties have signed this agreement as of the Effective Date

Lender: Stifel Bank

Name:
Title: **James C. Binz**
Date:

**Executive Vice President**

Borrower: Commerce Fabric, Inc.

Krupa Shah

Name: Krupa Shah
Title: General Counsel
Date: 12/17/2021

Bank Platform: Under Technologies, Inc. dba Rho Technologies

Joseph Giordano

Name: Joseph Giordano
Title: General Counsel
Date: December 16, 2021

11

USA_00013752
G-94-011

## SCHEDULE 1

### Fee Schedule

The account control agreement fee is [$ ] per agreement. For other fees, please refer to the Pricing page on our website at rho.co.

Additional consideration provided to Bank Platform includes Borrower's continued business activity with Bank Platform.

12

## APPENDIX A

## NOTICE OF EXCLUSIVE CONTROL

[Date]

Under Technologies, Inc. dba Rho Technologies
100 Crosby Street, Suite 607
New York, NY 10012

      Re:    Deposit Account Number(s):_____
              Notice of Exclusive Control

Ladies and Gentlemen:

      Reference is made to the Deposit Account Control Agreement dated as of _____, 20__ (the "Agreement") by and among _____ (the "Company"), _____ (as "Lender") and Under Technologies, Inc. ("Bank Platform") regarding the above-described deposit account(s) (whether one or more, individually and collectively, the "Deposit Account(s)"). A copy of the Agreement is attached hereto.

      In accordance with this Agreement, we hereby give you notice of our exercise of exclusive control over the Deposit Account.

Very truly yours,

_____
as Lender

By: _____
Name: _____
Title: _____

13

### COMMERCE FABRIC, INC.
### ACTION BY UNANIMOUS WRITTEN CONSENT
### OF THE BOARD OF DIRECTORS

Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, the undersigned, constituting all of the members of the Board of Directors (the "Board") of Commerce Fabric, Inc., a Delaware corporation (the "Company"), hereby take the following actions and adopt the following resolutions by unanimous written consent:

#### 2022 TREASURY INVESTMENT POLICY

**WHEREAS,** the Board has determined that it is in the best interests of the Company to adopt a 2022 Investment Policy Statement, attached as Exhibit A, (the "**Treasury Policy**").

**RESOLVED**, the Treasury Policy be, and it is hereby, adopted, authorized and approved in all respects; and

**RESOLVED FURTHER**, The Company's Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, or their designee, is authorized to execute transactions and perform day to day management of investments and evaluate the portfolio's performance to monitor the targeted investment objectives are achieved as set forth in this Treasury Policy.

#### OMNIBUS RESOLUTIONS

**RESOLVED**, that the officers of the Company are authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents, certificates and communications and to pay such expenses, in the name and on behalf of the Company or such officer, as any such officer may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents, certificates or communications and the payment of such expenses by any such officer to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED**, that any and all actions taken by the directors or officers of the Company to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, adopted, ratified and confirmed.

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-95
Admitted:_____

This Action may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. This Action shall be filed with the minutes of the proceedings of the Board.

**IN WITNESS WHEREOF**, the undersigned have executed this Action by Unanimous Written Consent of the Board of Directors as of the last date set forth below.

DocuSigned by:

_____
F99D7649B2B4470
Faisal Masud

Date: 3/17/2022

DocuSigned by:

*Ryan Bartley*
ABA137FA58E7452
Ryan Bartley

Date: 3/17/2022

DocuSigned by:

*Tim Guleri*
C313247B955E4FD
Tim Guleri

Date: 3/22/2022

DocuSigned by:

_____
D299BC95AED249E
Alex Bard

Date: 3/17/2022

DocuSigned by:

*Scott Beechuk*
CFC0932564154F4
Scott Beechuk

Date: 3/17/2022

DocuSigned by:

*Ron Shah*
4C24928AE9F7467
Ron Shah

Date: 3/17/2022

DocuSigned by:

_____
A77F6661CC0941C
Robert Kaplan

Date: 3/18/2022

2

**EXHIBIT A**

**TREASURY POLICY**

3

USA_00120676

G-95-003

**HighTower**
TREASURY

# As former CEOs, CFOs and CTOs, we were always searching for ways to maximize every dollar in our businesses.

## UNLOCK YOUR BALANCE SHEET

Regardless of the size of the business, earning interest on idle cash that we can reinvest into the business has simply been a dream in a low interest rate world.

We have spoken with every major treasury program offered today – BofA, JPM, and SVB to name a few. In those programs, a company can earn between 0.10% – 0.20% for a fully liquid program and earn between 0.15% – 0.40% if you lock your company's money up for at least 1 year.

By employing a diversified set of decentralized interest-rate protocols, HighTower Treasury cuts out all middlemen to offer your business the highest APYs in the market. We help unlock the power

USA_00000012

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-100
Admitted:_____