By employing a diversified set of decentralized interest-rate protocols, HighTower Treasury cuts out all middlemen to offer your business the highest APYs in the market. We help unlock the power of your balance sheet.

# Opening an account is easy.

Sign up, fund your account, and start earning yield now.

Sign Up



**HighTower**
TREASURY

**Company**

About Us

**Products**

FAQ

6% Fully Liquid Corp Savings Account

9% High Yield Corp Savings Account

**Contact**

info@hightowertreasury.com

1(888) 296-7880

USA_00000013

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-101
Admitted:_____



# High Yield Business Savings Account

Powered by a diversified set of decentralized interest-rate protocols, we cut out all middlemen to offer your business the highest APYs.

**Get started**

HighTower
TREASURY

About Us     Products     FAQ     Login     Sign Up

# We bring you DeFi savings in a 100% USD demonimated account.







USA_00000020

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-108
Admitted:_____



## HighTower Fully Liquid Corp Savings Account


Up to 6% APY


Fully Liquid


Over Collateralized


Zero Fees



The HighTower Variable Yield Corporate Savings account is fully liquid and over collateralized with zero fees. The interest rate is variable and subject to change. Our trailing 6-month trailing average is 6% APY, accrued and earned daily. Interest will start accruing in your account once the deposit

USA_00000037

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-125
Admitted:_____

GETTING STARTED

Introduction

How It Works

Getting Started

PRODUCTS

Variable Rate Yield

Fixed Rate Yield

Custom Rate Yield

RISKS & SECURITY

Risks

Audits

Insurance

OTHER

FAQs

LEGAL

Terms of Use

Privacy Policy

AML / BSA / KYB Program

# Risks

Copy link

Security is the highest priority at HighTower Treasury. We have implemented policies and procedures to ensure the safety and dependability of the platform. All DeFi platforms we work with have contract codes and balances that are publicly verifiable.

That said, you must use HighTower Treasury at your own risk. Do not deploy more capital than you are willing to lose.

As with any yield-generating DeFi product, there are associated risks that are important to understand. These risks can be broadly classified into 3 categories:

- Smart contract risk
- Third-party platform risk
- Stablecoin risk

*Smart Contract Risk*

We only deploy capital on protocols whose smart contracts have been audited by multiple, well-respected security firms. However, it is important to note that smart contracts involve complex math and logic. Even with formal audits, it is still possible for there to be logic errors that could lead to the loss of funds. While we have taken every precaution to ensure the safety and security of our smart contracts, clients are reminded to use at their own risk. HighTower Treasury will not be held responsible for any loss of funds, regardless of which party is at fault.

*Third-Party Platform Risk*

HighTower Treasury utilizes third parties to process deposits / withdrawals, transfer funds, convert funds across crypto chains, and for general daily operations. We choose to work with platforms that manage and process billions of dollars and have made a reasonable effort to ensure the security of their protocols. However, there are no guarantees that the underlying third-party platforms will continue to work as intended, and any failure in an underlying strategy would potentially lead to a loss of funds.

*Stablecoin Risks*

Any loss of value to an underlying stablecoin asset will cause a similar loss to the value to the USD account. While every stablecoin utilized is designed to maintain a 1:1 relationship between supply and number of backing stablecoins, it does not guarantee which stablecoins will make up that backing nor the value of those coins.

It is important to note that each of the supported stablecoins introduces counter-party risk. Tether,

USA_00000041

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-129
Admitted:_____

GETTING STARTED

Introduction

How It Works

Getting Started

PRODUCTS

Variable Rate Yield

Fixed Rate Yield

Custom Rate Yield

RISKS & SECURITY

Risks

Audits

Insurance

OTHER

FAQs

LEGAL

Terms of Use

Privacy Policy

AML / BSA / KYB Program

### 6. You agree to us using your information

By accepting this agreement, you agree to us using your information to provide you our services. If you're no longer happy for us to use your information, we'll have to close your account. But we may keep your personal data and use it where we have lawful grounds to do so. For example, any records we need to keep for regulatory reasons (see our Privacy Policy).

Copy link

### 7. What HighTower Treasury is

HighTower Treasury is a website facilitating yield on corporate savings by deploying capital to Decentralized Finance ("DeFi") protocols which collect interest, trading fees, and rewards that we convert back into USD-denominated yields (the "Services"). The Services include HighTower Treasury performing the necessary steps to deposit your funds with the protocols. This might include conversions between stablecoins and engaging with the protocols software (executing smart contracts).

### 8. Decentralized Finance Protocols

Digital finance protocols are open, blockchain-based permissionless protocols that are not controlled by HighTower Treasury. HighTower Treasury works with leading protocols that have a proven track record, audited smart contracts, and have successfully lent hundreds of millions of dollars. We are currently work with the following platforms that collectively manage over $3B in daily volume:

AAVE

Anchor

Alchemix

APY Finance

Compound

Curve

Frax

mStable

Trader Joe

Origin Dollar

HighTower Treasury reserves the right to add or remove decentralized finance protocols at any time with no notice.

### 9. How HighTower Treasury works

After you sign up with HighTower Treasury and complete the anti-money laundering (AML) and

USA_00000046

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-134
Admitted:_____

GETTING STARTED

Introduction

How It Works

Getting Started

PRODUCTS

Variable Rate Yield

Fixed Rate Yield

Custom Rate Yield

RISKS & SECURITY

Risks

Audits

Insurance

OTHER

FAQs

LEGAL

Terms of Use

Privacy Policy

AML / BSA / KYB Program

### 9. How HighTower Treasury works

After you sign up with HighTower Treasury and complete the anti-money laundering (AML) and Know Your Business (KYB) screening, you will receive access to your HighTower Treasury account where you can deposit USD funds. HighTower Treasury then performs the necessary steps to deposit your funds with the protocols. This might include conversions between stablecoins and engaging with the protocols software (executing smart contracts). As interest is earned on the DeFi protocol, interest is reflected in your balance in the dashboard in USD.

You can read more about the terms that apply to depositing and withdrawing funds, directing funds into DeFi protocols, as well as earning interest, below.

### 10. HighTower Treasury deals with digital currencies

HighTower Treasury currently trades in a variety of digital currencies but primarily trades in stablecoins including USDC, UST, BUSD, GUSD, and DAI. HighTower Treasury may amend the list of accepted stablecoins from time to time. Stablecoins (such as USDC and UST) are not legal tender, are not backed by any government, and value balances on HighTower Treasury are not subject to FDIC or Securities Investor Protection Corporation (SIPC) protections. Further, HighTower Treasury is not a bank and does not offer checking accounts, regulated savings accounts, or any fiduciary services.

### 11. Depositing with HighTower Treasury

HighTower Treasury only accepts deposits by bank wire transfer. We process deposits within 1 business day. You should see your deposit in your HighTower Treasury dashboard within 1-2 business days of making the deposit.

### 12. Directing funds into digital finance protocols

When you deposit funds with HighTower Treasury, you agree to HighTower Treasury moving your funds into a variety of DeFi protocols. To deposit your funds with a protocol, HighTower Treasury might need to exchange deposit into various digital currencies that can be deployed with the relevant protocol.

HighTower Treasury retains the right to determine when deposits into the protocols are executed. We typically process deposits into the protocols within 1 business day. However, under some circumstances, including when the UST/USDC rate is unstable, which can happen during extreme market volatility, HighTower Treasury may wait for the price to stabilize before executing the deposit into the lending platform. In these cases, you will be informed in the dashboard that deposits might take longer than usual.

Importantly, choosing to have HighTower Treasury direct your deposit into a digital finance protocol involves risk. Under no circumstances shall HighTower Treasury be liable for any losses or damages incurred, which relates to the failure of the digital finance protocols, including smart contract failures, hacking, etc.

Copy link

 Powered By GitBook

USA_00000047

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-135
Admitted:_____

## HIGHTOWER TREASURY ACCOUNT AGREEMENT

This Account Agreement (the "**Agreement**") is dated March 31, 2022, (the "**Effective Date**") and is between HighTower Treasury Corp, a Delaware corporation ("**HighTower Treasury**" or **"HighTower"**), and Commerce Fabric Inc, a Delaware corporation ("**Customer**"). HighTower Treasury and Customer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

For good and valuable consideration, the Parties hereby agree as follows:

## 1. DEFINITIONS.

**1.1** Definitions. The following terms, as used herein, have the meanings ascribed to them below:

"*Access Protocols*" means the technical specifications, connectivity standards, protocols, or other procedures or mechanisms relevant to allow Customer to access the HighTower Treasury Platform and Services.

"*Aggregate Data*" means any data derived or aggregated in de-identified form from any Customer Materials or Customer's Use of the Services, including any usage data or trends with respect to the Services.

"*Authorized User*" means an employee or contractor whom Customer authorizes to Use the Services.

"*HighTower Treasury API*" means any application programming interfaces provided by HighTower Treasury.

"*HighTower Treasury Platform*" means the platform that HighTower Treasury makes available to Customer to enable Customer's Use of the Services, including the HighTower Treasury API, a web portal or browser-based user interface, and any manual processes specified by HighTower Treasury in writing.

"*HighTower Treasury Technology*" means the computer programs, algorithms, software, code, application program interfaces, works of authorship, know-how, inventions, processes, data, technical specifications, information, tables, and other technology and systems that are used by HighTower Treasury in connection with the Services, and all improvements, derivative works, modifications, enhancements, updates, fixes, and new releases thereof, including the Documentation, Related Information, HighTower Treasury Platform, Access Protocols, and HighTower Treasury API, but excluding Customer Materials.

"*Decentralized Finance Protocol*" means open-source software consisting of smart contracts establishing a decentralized protocol for digital asset interest rate markets commonly known DeFi Protocols.

"*Token*" means an interest-bearing digital asset created programmatically by the HighTower Treasury Protocol which represents the power to redeem a corresponding digital asset supplied to the HighTower Treasury Protocol.

"*Customer Materials*" means all information, data, content, and other materials, in any form or medium, that is submitted, posted, collected, transmitted, or otherwise provided by or on behalf of Customer through the Services or to HighTower Treasury in connection with Customer's Use of the Services, but excluding Aggregate Data and any other information, data, data models, content, or materials owned or controlled by HighTower Treasury and made available through or in connection with the Services.

"*Documentation*" means the technical materials provided by HighTower Treasury to Customer in electronic or written form regarding the Services or HighTower Treasury Technology.

USA_00000162

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-142
Admitted:_____

"*Feedback*" means feedback, suggestions, improvements, and recommendations regarding the HighTower Treasury Technology or Services.

"*Funds*" means the sum of then outstanding cash, Stablecoins, Tokens, and other digital assets as monitored by Treasury Account, including Earned APR, but not including Excess APR or any other amounts due.

"*Intellectual Property Rights*" means patent rights (including patent applications and disclosures), inventions, copyrights, trade secrets, know-how, data and database rights, mask work rights, and any other intellectual property rights recognized in any country or jurisdiction in the world.

"*Partner Financial Institution*" means the applicable regulated financial services companies that HighTower Treasury utilizes to offer the Services, as further described in Section 3.

"*Person*" means any individual, corporation, partnership, trust, limited liability company, association, governmental authority, or other entity.

"*Related Information*" means any information delivered by HighTower Treasury to Customer in connection with the Services, including Transaction status and return details.

"*Services*" has the meaning set forth in Section 3.

"*Stablecoin*" means a digital asset intended to maintain a value of $1.00 USD per unit, and which is either algorithmically stabilized or backed on a full-reserve basis by reserves of fiat currency, short-term securities, digital assets, or other valuable assets, including USDC issued by the Centre Consortium.

"*Support Services*" means the commercially reasonable efforts that HighTower Treasury will carry out to ensure that Customer has the ability to Use the Services during the Term, as further described in Section 11.

"*Transaction*" means any monetary transfer necessary to fund the Treasury Account or receive payouts of Funds, and all information required to effect the transfer, including payment instructions.

"*Treasury Account*" means the sum total of all outstanding amounts owed but unpaid under this Agreement, whether due or not, including Funds, Excess APR, fees, costs, expenses, and any other amounts.

"*Use*" means to use or access the Services in accordance with this Agreement and the Documentation.

## 2. SERVICES AND LICENSE RIGHTS.

2.1 License. Subject to the terms and conditions of this Agreement, HighTower Treasury grants to Customer a limited, non-exclusive, non-transferable right to Use the Services, solely for Customer's internal business purposes, and as specifically set forth herein. To the extent the Services include access to the HighTower Treasury Platform, subject to this Agreement: (i) on or as soon as reasonably practicable after the Effective Date, HighTower Treasury will provide to Customer the Access Protocols to allow Customer to access the HighTower Treasury Platform; and (ii) HighTower Treasury grants Customer a nonexclusive, royalty-free, non-transferable, non-sublicensable right during the Term to access and use the HighTower Treasury Platform, solely for its internal business purposes, and to use and reproduce a reasonable number of copies of the Documentation for internal use in order to support Customer's Use of the HighTower Treasury Platform in accordance with this Agreement. Customer will use commercially reasonable efforts to prevent unauthorized access to, or use of, the Access Protocols and HighTower Treasury Technology, Related Information, and Services. Customer must notify HighTower Treasury promptly of any such unauthorized use known to Customer.

**2.2** Restrictions. Customer will not, and will not authorize or permit any Person to, directly or indirectly: (i) reverse engineer, disassemble, decompile, or otherwise attempt to derive source code from the HighTower Treasury Technology; (ii) make the HighTower Treasury Technology, Related Information, or Services available to any third parties other than as expressly permitted herein; (iii) modify, adapt, translate, or create derivative works based on, or information accessed from, the HighTower Treasury Technology, Related Information, or Services except as may be expressly permitted herein; (iv) reproduce any portion of the HighTower Treasury Technology, Related Information, or Services except as expressly permitted herein; (v) employ any automated process implementing a bot or web crawler for copying or extracting data through the HighTower Treasury Technology, Related Information, or Services, including web scraping and data scraping; (vi) use the HighTower Treasury Technology, Related Information, or Services to create a product or services that competes with, is similar to, or would serve as a substitute for the HighTower Treasury Technology, Related Information, or Services; or (vii) otherwise use the HighTower Treasury Technology, Related Information, or Services in any manner that exceeds the scope of use permitted hereunder.

**2.3** Authorized Users. Customer will not allow any Person other than Authorized Users to Use the Services. Customer may permit one or more Authorized Users to Use the Services, provided that Customer ensures each Authorized User complies with all applicable terms and conditions of this Agreement. Customer is responsible for all acts and omissions by Authorized Users in connection with their Use of the Services.

## 3. TREASURY ACCOUNT SERVICES.

**3.1** Treasury Account Services. Customer will initiate Transactions to one or more HighTower Treasury account(s) held by a partner financial institution (collectively, a "HighTower Treasury Account") to subscribe to the Treasury Account. HighTower Treasury will leverage its integration with the Partner Financial Institution to acquire Stablecoins for its HighTower Treasury Account. Such Stablecoin balance will be held and used by HighTower Treasury to earn interest in DeFi Protocols by obtaining Tokens corresponding to the Stablecoins (collectively, "**Services**"). The Services allow Customer to monitor and generate the amount of Funds owed to Customer through the Treasury Account. HighTower Treasury acknowledges and agrees that it will use the balance of any HighTower Treasury Account to earn interest in DeFi Protocols, including by supplying and borrowing Stablecoins for the benefit of the Customer. Funds represent a direct, unconditional, unsubordinated and unsecured obligation of HighTower Treasury. Customer, on behalf of itself, grants HighTower Treasury the irrevocable right to retain and use of the Funds for the purpose set forth in this Agreement. Such entitlement and use shall not relieve HighTower Treasury of any of its obligations hereunder. Upon Customer's receipt of Funds in accordance with Section 3.9, HighTower Treasury's obligation to Customer is satisfied in whole unless otherwise specified by this Agreement.

**3.2** Treasury Account. Once subscribed to the Treasury Account, Customer's Treasury Account will reflect the aggregate balance of Funds owed by HighTower Treasury to Customer. Customer will not be allowed to instruct a Partner Financial Institution to perform any third-party digital asset transactions, including receiving or transferring digital assets to or from third-party wallet addresses, or converting between different types of digital assets. Except as otherwise set forth herein, the Treasury Account may only be used to: (i) to monitor any generated Funds using the Services; (iii) transfer Funds to a Linked Bank Account as instructed by Customer for the purpose of a payout; and (iv) disburse Excess APR and any other amounts held therein pursuant to the terms and conditions hereunder.

**3.3** Partner Financial Institutions. Customer will Use the Services by transmitting instructions to HighTower Treasury through the HighTower Treasury Platform. HighTower Treasury will provide Transaction instruction details to Partner Financial Institutions. All Transactions will be processed and disbursed by Partner Financial Institutions in their capacity as the financial institutions that hold funds and perform funds transfers on behalf of HighTower Treasury. For the avoidance of doubt, Partner Financial Institutions are not responsible for the fulfillment of HighTower Treasury's obligations hereunder, and HighTower Treasury is not acting in capacity as an agent for any Partner Financial Institutions.

**3.4** Linked Bank Account. Customer must provide HighTower Treasury with account information for Customer's account held at a state- or federally-chartered bank or credit union in the United States (each, a "**Linked Bank Account**"). Cash transfers from Customer to HighTower Treasury must be made in U.S. dollars by wire transfer of immediately available funds, or by another payment method mutually agreed upon by the Parties. HighTower Treasury may require Customer to verify its ownership of any Linked Bank Account in a commercially reasonable manner, at HighTower Treasury's discretion and specification. When Customer transmits payment instructions to HighTower Treasury using the Services, Customer authorizes HighTower Treasury to send such instructions to its relevant Partner Financial Institutions, whom Customer further authorizes to process and carry out such instructions.

**3.5** Interest. During the Term, HighTower Treasury will pay to Customer an interest rate on the balance of Funds ("**Rate**") of 6.00%. The Rate may be adjusted from time to time at HighTower Treasury's sole and exclusive discretion and without prior notice to Customer. The Rate is and will be quoted as an annual percentage rate ("**APR**").

**3.6** APR Interest Calculation. Interest on all Funds will HighTower Treasury on a daily basis. Daily interest will be calculated by taking the annual yield rate and dividing it by 365, rounding down to the nearest hundredth (100th). Interest on Customer Fund transfers will be calculated at the applicable Rate disclosed by HighTower Treasury herein or in writing. Company will start accruing APR on the value of each Transaction associated with Customer's Treasury Account within twenty-four (24) hours of settlement with the Partner Financial Institution, provided such transfer is not rejected or suspended by HighTower Treasury or a Partner Financial Institution. All interest will be paid in cash and transferred into the Customer's Linked Bank Account by wire transfer upon Customer's request. Calculated interest will be rounded to the nearest hundredth (100th).

**3.7** Earned APR. HighTower Treasury will calculate Earned APR owed to Customer on a daily basis, based on: (i) the Rate offered by HighTower Treasury on a given calendar day; and (ii) all Funds held in the Treasury Account on such calendar day ("**Earned APR**"). HighTower Treasury will provide Customer with the calculation of Earned APR through the HighTower Treasury Platform or upon Customer's request.

**3.8** Excess APR. Depending on market conditions and other factors, the Treasury Account may yield interest in excess of the Rate offered by HighTower Treasury ("**Excess APR**"). As between the Parties, HighTower Treasury will have exclusive right, title, and interest in all Excess APR. Customer authorizes HighTower Treasury and its Partner Financial Institutions to transfer Excess APR to accounts held by HighTower Treasury at any time without notice.

**3.9** Payouts. Customer has the right to receive the dollar value of its Funds balance on a daily basis by requesting a Funds payout to a Linked Bank Account. Customer must initiate all payouts by submitting a payout instruction to HighTower Treasury through the HighTower Treasury Platform during the Repayment Availability period specified by HighTower Treasury. HighTower Treasury and its Partner Financial Institutions will process payout instructions within one (1) business day after submission by initiating a same-day wire transfer to the Linked Bank Account specified by Customer. HighTower Treasury and its Partner Financial Institutions will not transfer the cash balance of Funds to any account or location other than a Linked Bank Account.

**3.10** Account Statements. HighTower Treasury will provide Customer with a statement ("**Account Statement**") allowing Customer to review and verify Transactions, Earned APR, fees, and other relevant information related to Funds and the Services. If Customer identifies an error in the Account Statement, Customer must notify HighTower Treasury of such error within thirty (30) calendar days.

**3.11** Compliance with Applicable Law and Partner Financial Institution Rules. Each Party will comply with: (i) all applicable laws, rules, regulations, and orders of any federal, state, local, or other government; and (ii) any written policies that a Partner Financial Institution may provide to the Parties (collectively, "**Applicable Law**"). HighTower Treasury may make changes to the Services, or to this

Agreement, if necessary to comply with changes to Applicable Law. If this occurs, HighTower Treasury will notify Customer within ten (10) days.

**3.12** <u>Enhancements</u>. HighTower Treasury may enhance, revise, upgrade, improve, correct, or issue a new version of all or part of the Services, including the HighTower Treasury Platform (an "**Enhancement**") at any time, provided that HighTower Treasury provides notice of the availability and benefits of such Enhancement and the Enhancement does not materially degrade the Services. HighTower Treasury will not charge Customer for any Enhancement. If Customer is required to update or otherwise alter its systems to make use of an Enhancement, then Customer will be responsible for its own costs and expenses.

**3.13** <u>Additional Terms</u>. HighTower Treasury may require Customer to accept additional terms and conditions for Customer's use of certain services and features offered via the Services, if necessary to comply with Applicable Law ("**Additional Terms**"). All Additional Terms are made a part of this Agreement by reference. Customer agrees to abide by all Additional Terms, including representing that Customer is eligible to use or participate in such service or feature.

## 4. CUSTOMER'S USE OF THE SERVICES.

**4.1** <u>Business Use</u>. Customer must be a registered business or other legal entity in good standing, located in a jurisdiction not otherwise prohibited from accessing the Services. Customer may use the Treasury Account and the Services solely for its own internal business purposes only, and not for personal, family, or household purposes.

**4.2** <u>Accreditation and Compliance Review</u>. Customer must follow HighTower Treasury's compliance procedures to verify Customer's eligibility to use the Services pursuant to Applicable Law. HighTower Treasury may require Customer to provide due diligence information, supporting documentation, and other compliance-related materials and information necessary to verify Customer's eligibility to Use the Services. Customer will provide accurate, complete, and current information upon request, and will update such information as necessary to ensure it remains accurate, complete, and current at all times that Customer has a Treasury Account with HighTower Treasury for the Services. If Customer fails to update this information, HighTower Treasury may suspend or terminate the Services. HighTower Treasury reserve the right to reassess Customer's eligibility for the Services at any time.

**4.3** <u>Customer Access</u>. The Treasury Account may only be accessed through the Services and must be used in accordance with this Agreement. Customer is responsible for all Transactions and other activity within the Treasury Account that Customer authorizes through the Services. Customer will, and will require all Authorized Users to, use all reasonable means to secure usernames, passwords, hardware, software, and other credentials ("**Credentials**") used to access the Services in accordance with customary security protocols, and will promptly notify HighTower Treasury if Customer knows or reasonably suspects that any Credential has been compromised. Customer will not give or make available any Credentials or any other means of accessing the Services to any unauthorized individuals or entities. Customer may not access the Services until and unless such access has been verified and authenticated pursuant to the commercially reasonable security procedures required by HighTower Treasury. Customer assumes all liability for all Transactions initiated after such security procedures have been followed, even if Customer did not intend a Transaction to occur or did not actually authorize such Transaction.

**4.4** <u>Unauthorized Transactions</u>. Customer must contact HighTower Treasury immediately if Customer believes that: (i) the Treasury Account has been accessed without Customer's authorization; (ii) a Transaction has occurred that Customer did not authorize or anticipate; or (iii) a Transaction has been processed incorrectly ("**Unauthorized Transactions**"). When Customer notifies HighTower Treasury of an Unauthorized Transaction, Customer must provide such information as reasonably requested by HighTower Treasury or its Partner Financial Institutions to determine the nature of the Unauthorized Transaction. HighTower Treasury will diligently investigate such Unauthorized Transaction and will inform Customer of the results of its investigation as soon as reasonably practicable after the investigation is complete.

**4.5** Customer Responsibilities. Customer is solely responsible for: (i) its Use of the Services and HighTower Treasury Technology, up to the point of HighTower Treasury's receipt of a valid Transaction request from Customer, including a full and complete payment instruction (the "**Demarcation Point**"); (ii) reporting all amounts earned to the proper tax authorities, and for the payment of all taxes due thereon; (iii) maintenance and management of its computer networks, servers, software, hardware, equipment, and services related to its Use of the Services; (iv) the configuration of its systems in accordance with any instructions provided by HighTower Treasury, as may be necessary for provision of access to the HighTower Treasury Platform; and (v) the storage and backup of all relevant existing data and software.

**4.6** HighTower Treasury Responsibilities. Without limiting any other terms herein, HighTower Treasury is solely and directly responsible for all aspects of the Services after the Demarcation Point. HighTower Treasury will also report to the proper tax authorities all amounts paid to Customer, as required or advisable.

**4.7** Audit. HighTower Treasury reserves the right to audit, examine, and otherwise monitor Customer's compliance with this Agreement. Customer must cooperate fully with any such audit at Customer's sole cost. Within ten (10) days of receiving notice of an audit from HighTower Treasury, Customer will provide to HighTower Treasury or its third-party auditor access to and assistance with documents, records, reports, or other data, information, or materials compiled, maintained, or otherwise available, to the extent related to Customer's compliance with this Agreement and not prohibited from disclosure by Applicable Law. If HighTower Treasury or its third-party auditor determines that Customer is not in compliance with this Agreement, Customer will take appropriate action to remedy its non-compliance and will provide HighTower Treasury with evidence of the steps taken to achieve compliance within a timeframe mutually agreed upon by the Parties.

**4.8** Suspension. HighTower Treasury reserves the right, in its sole and absolute discretion, to decline, terminate, suspend, restrict, or otherwise limit any Transaction and Customer's access to the Services, without notice, for any reason whatsoever, including if Customer violates this Agreement or in the event that HighTower Treasury reasonably determines, based on any of the review processes described herein, that Customer has become ineligible for the Services. HighTower Treasury will restrict, suspend, or terminate Customer's access to the Services if: (i) HighTower Treasury reasonably determines that the risk associated with Customer's activities poses unacceptable risk to HighTower Treasury; or (ii) Customer does not provide HighTower Treasury with all information as reasonably required or requested by HighTower Treasury.

## 5. SUPPORT SERVICES.

**5.1** Support. HighTower Treasury intends to make the Services available to Customer through the HighTower Treasury Platform at all times, and will undertake commercially reasonable measures to limit the amount of time during which the Services are unavailable. From time to time, HighTower Treasury may need to suspend access to the HighTower Treasury Platform in order to perform planned maintenance or upgrades. HighTower Treasury will make good faith efforts to notify Customer of any such scheduled downtime at least twenty-four (24) hours in advance of suspending access to the HighTower Treasury Platform, and to continue offering the Services without disruption, including by processing Transactions via manual or other methods.

**5.2** Incidents. If Customer experiences any technical issues with the HighTower Treasury Platform, Customer may report the incident to HighTower Treasury by email to support@hightowertreasury.com or by any other method of communication. HighTower Treasury will use commercially reasonable efforts to respond to incident reports within four (4) hours of receipt, and to promptly resolve all incidents to Customer's satisfaction.

## 6. PRIVACY AND SECURITY.

**6.1** Compliance Standards. During the Term, HighTower Treasury will maintain and enforce an information security program including safety, physical, and technical security policies and procedures with respect to its processing of Customer Materials that meets or exceeds industry standard practices. HighTower Treasury will periodically test its systems for potential areas where security could be breached and monitor for suspected breaches, and will promptly report to Customer any breach of security or unauthorized access to Customer Materials that HighTower Treasury detects or becomes aware of.

**6.2** Mutual Responsibility. Each Party is responsible for the security of all data in its possession or control, and for its compliance with Applicable Law in connection with its data handling and management practices. Each Party is responsible for maintaining commercially reasonable data security controls to protect and secure data from unauthorized use, access, or disclosure. Customer agrees to provide HighTower Treasury with any evidence to demonstrate Customer's compliance with this Section upon request by HighTower Treasury.

**6.3** Monitoring. HighTower Treasury is under no obligation and does not assume any obligation to monitor the information included in, transmitted to, or made accessible via the Services. However, Customer agrees that HighTower Treasury may monitor the Services in an effort to protect Customer and information relating to the Services, and to comply with Applicable Law. All information provided by HighTower Treasury in connection with the Services that must be disclosed to any other person or entity to complete Customer's requested Transaction or to comply with Applicable Law will not be considered confidential for such purposes.

**6.4** Permitted Data Uses. HighTower Treasury is permitted to use Customer Materials as reasonably necessary to offer the Services, to perform its obligations hereunder, to enforce Customer's obligations, and as reasonably necessary to comply with Applicable Law. HighTower Treasury is free to use, disclose, and distribute Customer Materials to its Partner Financial Institutions, employees, contractors, and other third parties as appropriate to improve the Services, for other internal purposes, or as required to comply with Applicable Law. HighTower Treasury may also aggregate, de-identify, or anonymize any Customer Materials so that they no longer meet the definition of Customer Materials set forth in Section 1, and may use such aggregated, de-identified, or anonymized data to promote, market, train, develop, improve, or otherwise enhance the Services. HighTower Treasury will not, and will not attempt to, re-identify any previously aggregated, de-identified, or anonymized data. Nothing contained herein will apply to, limit, or prohibit the use of any information or data owned or held by HighTower Treasury, to the extent that such information or data has been independently obtained by HighTower Treasury from a source other than Customer.

**6.5** Privacy Notices. If required by Applicable Law, each Party will provide privacy notices that comply with Applicable Law and contain disclosures that are consistent with the data ownership and use provisions of this Agreement. Such privacy notices must disclose information-sharing practices contemplated hereunder, and Customers have the right to opt out to the extent required by Applicable Law.

## 7. FEES AND PAYMENT.

**7.1** Fees. Customer will pay HighTower Treasury non-refundable fees for the Services without offset or deduction as set forth herein ("Fees"). During the Term, Customer will pay no Fees to HighTower Treasury. Fees may be adjusted from time to time at HighTower Treasury's sole and exclusive discretion, provided that HighTower Treasury must give written notice to Customer stating any change in Fees at least thirty (30) days before such Fees become effective.

**7.2** Payments. Payments due to HighTower Treasury hereunder must be made in the manner designated by HighTower Treasury, or by another payment method mutually agreed upon by the Parties, in writing. All payments are non-refundable. Neither Party will have the right to set off, discount, or otherwise reduce or refuse to pay any amounts due to the other Party hereunder. If Customer fails to make any payment when due, late charges will accrue at the rate of 1% per month, and HighTower Treasury may suspend Services until all payments are made in full. Customer will reimburse HighTower Treasury for all

reasonable costs and expenses incurred in collecting any late payments or interest, including reasonable attorneys' fees.

**7.3** Taxes. Customer is responsible for all sales, use, ad valorem, and excise taxes, and any other taxes, duties, and charges of any kind imposed by any local, state, federal, or multinational governmental regulatory authority on any amount payable by Customer to HighTower Treasury hereunder, but not including any income taxes imposed on HighTower Treasury. In the event that Customer is required to deduct or withhold any taxes from amounts payable to HighTower Treasury hereunder, Customer will pay an additional amount so that HighTower Treasury receives the amounts due to it in full, as if there were no withholding or deduction.

## 8. HIGHTOWER TREASURY'S RIGHTS.

**8.1** HighTower Treasury Technology. HighTower Treasury is the exclusive owner of, and hereby retains all right, title, and interest in and to, the HighTower Treasury Technology. Except as specifically provided herein, HighTower Treasury does not grant to Customer any right or license, express or implied, in the Services, the HighTower Treasury Technology, or any other HighTower Treasury Intellectual Property Rights. Unless otherwise expressly specified in writing, HighTower Treasury hereby retains all right, title, and interest in and to any deliverables related hereto, including all Intellectual Property Rights.

**8.2** Feedback. HighTower Treasury will own all Feedback. Customer hereby assigns to HighTower Treasury any rights, title, and interest, including all Intellectual Property Rights, in any Feedback, derivative works, modifications, enhancements, or improvements related to the Services or HighTower Treasury Technology that Customer or any of its representatives provide, propose, create, conceive, author, or develop. At HighTower Treasury's Request, Customer will execute and deliver any additional documents deemed reasonably necessary to perfect, maintain, or enforce HighTower Treasury's rights described above and the intent of this Section.

## 9. CUSTOMER MATERIALS.

**9.1** Ownership in Customer Materials. Except as otherwise provided herein, as between Customer and HighTower Treasury, Customer owns and retains all right, title, and interest in and to all Customer Materials.

**9.2** License to HighTower Treasury. Subject to HighTower Treasury's confidentiality obligations hereunder, Customer grants HighTower Treasury a non-exclusive, worldwide, royalty-free right to use, host, reproduce, display, and modify the Customer Materials solely for the purpose of hosting, operating, training, developing, improving, and providing the Services and HighTower Treasury's other related products and services. Notwithstanding anything set forth herein, HighTower Treasury may use Customer Materials to create, use, sell, license, distribute, disclose, publish, promote, and market Aggregate Data.

## 10. CONFIDENTIALITY.

**10.1** Confidential Information. Each Party (the "**Receiving Party**") acknowledges that by reason of its relationship to the other Party (the "**Disclosing Party**") hereunder, the Receiving Party will have access to certain information and materials concerning the Disclosing Party's business, plans, technology, products, and services that are confidential and of substantial value to the Disclosing Party, which is either identified as "confidential" at the time of disclosure or that would be reasonably understood to be confidential given its nature or the circumstances surrounding its disclosure ("**Confidential Information**"), including: (i) all information of a party marked "confidential" or with a similar designation; (ii) Customer Data; (iii) business information regarding the business and operations of such Party, including information that relates to past, present, or future business affairs, financial matters, marketing, pricing, products, services, policies, and procedures; (iv) product plans, security measures, research, developments, hardware, software, source code, inventions, designs, drawings, formulae, algorithms, regulatory information, legal memoranda, financial information, agreements with third parties, Intellectual Property Rights, and other proprietary information and data; and (v) the terms and conditions of this Agreement.

**10.2** Obligations. The Receiving Party will: (i) not use any Confidential Information except as necessary to perform its obligations or exercise its rights hereunder; (ii) take every reasonable precaution to protect the confidentiality of Confidential Information, and not disclose any Confidential Information to any third party, directly or indirectly; (iii) restrict disclosure of Confidential Information to individuals who have a need to know, and who are subject to confidentiality obligations at least as protective as those provided by this Agreement; (iv) not reverse engineer, disassemble, decompile, or create derivative works from the Confidential Information without written authorization from the Disclosing Party; and (v) take reasonable measures to avoid unauthorized disclosure or use of any Confidential Information.

**10.3** Exclusions. Confidential Information shall not include any information that: (a) was rightfully in the Receiving Party's possession before it was received from the Disclosing Party; (b) is or becomes a matter of public knowledge through no fault of the Receiving Party; (c) is rightfully received from a third party without a duty of confidentiality; (d) is developed by the Receiving Party independently without reference to, use of, or reliance on any Confidential Information; or (e) is identified in a separate written agreement between the Parties authorizing public disclosure.

**10.4** Compelled Disclosure. To the extent permitted by law, If the Receiving Party is required by law, regulation, subpoena, court order, or similar mandate or device to disclose any Confidential Information, the Receiving Party must promptly notify the Disclosing Party in writing of the existence, terms, and circumstances surrounding such required disclosure so that the Disclosing Party may seek a protective order or other appropriate remedy from the proper authority. The Parties will cooperate with each other in seeking such order or remedy. If required to disclose any Confidential Information to any third party, court, regulatory body, or other governmental entity, the Receiving Party will furnish only that portion of Confidential Information that is legally required, and will exercise reasonable efforts to obtain assurances that confidential treatment at least as protective as the restrictions in this Agreement will be accorded to the Confidential Information.

## 11. REPRESENTATIONS AND WARRANTIES.

**11.1** Mutual. Each Party understands, represents, and warrants that:

(a) it is duly organized and validly existing under the laws of the jurisdiction in which it is organized;

(b) it has full power and authority, and has obtained all approvals, permissions, and consents necessary, to enter into this Agreement and to perform its obligations hereunder;

(c) this Agreement is legally binding upon it;

(d) the execution, delivery, and performance of this Agreement does not and will not conflict with any other agreement to which it is a party;

(e) it has not relied on the other Party for any tax or accounting advice concerning this Agreement, and has made its own determination as to the tax and accounting treatment of the funds received or provided hereunder;

(f) it is a sophisticated party and fully familiar with the inherent risks involved in the Transactions and Services contemplated herein, including the risk of new financial regulatory requirements, potential loss of money, and risks due to volatility of the price of the Funds including Stablecoins and Tokens, and voluntarily takes full responsibility for all such risks; and

(g) it is not insolvent and is not subject to any bankruptcy or insolvency proceedings.

**11.2** Customer. Customer further understands, represents, and warrants that:

(a) all information, data, and documents that Customer provides to HighTower Treasury under this Agreement, including Customer Materials, are accurate and complete; and

(b) it will keep all information, data, and documents provided to HighTower Treasury for compliance purposes up to date at all times;

(c) it has all rights necessary to provide the Customer Materials to HighTower Treasury;

(d) HighTower Treasury may rely on, and hold Customer responsible for, each instruction attributable to Customer that HighTower Treasury verifies or authenticates;

(e) Customer is acquiring a Treasury Account for Customer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof;

(f) Customer has no present intention of selling, granting participation in, or otherwise distributing the Treasury Account to any third party;

(g) Customer does not presently have any contract, undertaking, agreement, or arrangement with any Person to sell, transfer, or grant participation in the Treasury Account to any third party;

(h) Customer has not been formed for the specific purpose of acquiring the Treasury Account;

(i) Customer understands that the Treasury Account has not been, and will not be, registered under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Customer's representations as expressed herein;

(j) Customer understands that the Treasury Account may be considered a "restricted security" under applicable U.S. federal and state securities laws, and that, pursuant to these laws and the terms hereunder, Customer will not be permitted to transfer the Treasury Account;

(k) Customer acknowledges that HighTower Treasury will not register or qualify the Treasury Account, and that the Treasury Account is non-transferable;

(l) Customer understands that no public market now exists for the Treasury Account, and that a public market will never exist for the Treasury Account;

(m) Customer understands that the Treasury Account, including any representation thereof, will be and hereby is notated with the following legends:

> 1. "THE TREASURY ACCOUNT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER, SALE, OR DISTRIBUTION MAY BE EFFECTED.";

> 2. Any legend required by the securities laws of any state, to the extent such laws are applicable to the Treasury Account;

(n) Customer is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. Customer has accurately and completely completed the accredited investor verification process required by HighTower Treasury;

(o) This Agreement accurately and completely provides Customer's address; and

(p) Other than as set forth herein, Customer has not relied upon any representation or warranty made by HighTower Treasury, or by any other person on HighTower Treasury's behalf, in respect of the acquisition of the Treasury Account hereunder.

## 12. TERM AND TERMINATION.

**12.1** Term. The term of this Agreement will commence on the Effective Date and continue until and unless terminated by either Party as set forth herein.

**12.2** Termination. This Agreement may be terminated by either Party for any reason at any time, provided that the Party terminating the Agreement must provide written notice one (1) day before the effective date of the termination or by clicking the "Withdraw" button on the HighTower Treasury Platform. Upon expiration or termination of this Agreement, HighTower Treasury will promptly transfer all Funds to a Linked Bank Account and send Customer a final Account Statement.

**12.3** Effect of Expiration or Termination. Upon expiration or termination of this Agreement: (a) the rights granted under Section 2 will terminate; and (b) Customer will return or destroy, at HighTower Treasury's sole option, all HighTower Treasury Confidential Information in its possession or control, including permanent removal of such HighTower Treasury Confidential Information from any storage devices or other hosting environments in Customer's possession or control, and at HighTower Treasury's request, certify in writing that the HighTower Treasury Confidential Information has been returned, destroyed, or deleted. Expiration or termination will not affect Customer's obligation to pay all Fees that become due or otherwise accrue through the effective date of expiration or termination, or entitle Customer to any refund.

**12.4** Unclaimed Property. Any remaining Funds that HighTower Treasury is unable to transfer to Customer may be deemed abandoned after a certain period of inactivity as provided by Applicable Law (a "**Dormant Account**"). If appropriate, HighTower Treasury will attempt to notify Customer if it believes Customer's account may be deemed a Dormant Account. If Customer does not respond to such attempts by providing instructions as to how to handle Customer's remaining Funds, HighTower Treasury's relevant Partner Financial Institutions may deliver them to the appropriate government authority.

**12.5** Survival. Sections 6 through 14, and any provisions herein which must survive to fulfill their intended purposes, will survive the expiration or termination of this Agreement for any reason.

## 13. INDEMNIFICATION.

**13.1** Customer Indemnification. Customer will defend, indemnify, and hold harmless HighTower Treasury and its affiliates, officers, directors, employees, and agents ("**HighTower Treasury Indemnified Parties**") from and against any and all claims, demands, causes of action, suits, and proceedings ("**Action**"), including liabilities, damages, losses, expenses, fines, penalties, fees, and costs (collectively, "**Losses**") arising out of or in connection with: (a) any breach of Applicable Law or this Agreement by Customer or its affiliates, officers, directors, employees, or agents; (b) any provision of, or data breach involving, unauthorized access to the Services; (c) Customer's fraud or other act of gross negligence or willful misconduct; or (d) any action alleging that the performance, provision, or utilization of the Services by Customer as contemplated herein constitutes an infringement, violation, or misappropriation of any third-party Intellectual Property Rights.

**13.2** HighTower Treasury Indemnification. HighTower Treasury will defend, indemnify, and hold harmless Customer against: (a) any Action alleging that Customer's Use of the Services infringes, violates, or misappropriates any third-party Intellectual Property Rights, and (b) any damages, fees, and costs awarded against Customer or agreed upon in settlement by HighTower Treasury resulting from such Action.

**13.3** Exclusions. HighTower Treasury's obligations under this Section will not apply if the Action arises out of or in connection with: (i) Customer's breach of this Agreement, negligence, willful misconduct, or fraud; (ii) any Customer Materials; (iii) Customer's failure to use any enhancements, modifications, or

updates to the Services provided by HighTower Treasury; (iv) modifications to the Services by anyone other than HighTower Treasury; or (v) combinations of the Services with software, data, or materials not provided by HighTower Treasury.

**13.4** IP Remedies. If HighTower Treasury reasonably believes that the Services or any component thereof could infringe any third-party Intellectual Property Rights, HighTower Treasury may, at its sole option and expense, use commercially reasonable efforts to: (a) modify or replace the Services, or any component or part thereof, to make it non-infringing; or (b) procure the right for Customer to continue Use. If HighTower Treasury determines that neither alternative is commercially practicable, HighTower Treasury may terminate this Agreement, in its entirety or with respect to the affected component, by providing written notice to Customer. The rights and remedies set forth in this Section constitute Customer's sole and exclusive remedy for any infringement or misappropriation of Intellectual Property Rights in connection with the Services.

**13.5** Indemnification Procedures. The Party seeking indemnity (the "**Indemnified Party**") will notify the other Party (the "**Indemnifying Party**") of the Action for which indemnity is being sought no later than thirty (30) days after becoming aware of facts or circumstances that could reasonably give rise to the Action, and will reasonably cooperate with the Indemnifying Party in the defense and potential settlement thereof. The Indemnifying Party will have the sole right to conduct the defense of any Action for which the Indemnifying Party is responsible hereunder, provided that the Indemnifying Party may not settle any Action without the Indemnified Party's prior written approval (unless the settlement is for a monetary amount, unconditionally releases the Indemnified Party from all liability without prejudice, does not require any admission by the Indemnified Party, and does not place restrictions upon the Indemnified Party's business, products, or services). The Indemnified Party may participate in the defense or settlement of any such Action at its own expense and with its own choice of counsel. If the Indemnifying Party refuses to fulfill its obligation of defense, the Indemnified Party may defend itself and seek reimbursement from the Indemnifying Party.

## 14. DISCLAIMER AND LIMITATION OF LIABILITY.

**14.1** DISCLAIMER OF WARRANTIES. THE SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, HIGHTOWER TREASURY EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT, AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. CUSTOMER UNDERSTANDS AND EXPRESSLY ACCEPTS THAT IT HAS NOT RELIED ON ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR WARRANTIES MADE BY HIGHTOWER TREASURY OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS, ADVISORS, OR OTHER AGENTS OUTSIDE OF THIS AGREEMENT, INCLUDING CONVERSATIONS OF ANY KIND, WHETHER THROUGH ORAL OR ELECTRONIC COMMUNICATION, OR ANY WHITEPAPER RELATING TO ANY FUNDS. THE SOLE RESPONSIBILITY OF HIGHTOWER TREASURY IS TO ALLOCATE AND DELIVER THE RATE IDENTIFIED HEREIN OR IN WRITING TO CUSTOMER. WITHOUT LIMITING THE FOREGOING, HIGHTOWER TREASURY DISCLAIMS ALL WARRANTIES THAT ANY OF ITS PRODUCTS, TECHNOLOGY, OR SERVICES WILL MEET THE REQUIREMENTS OF THIS AGREEMENT, OR THAT THE RECEIPT, USE, OR OPERATION THEREOF WILL BE UNINTERRUPTED OR ERROR-FREE.

**14.2** EXCLUSION OF DAMAGES. EXCEPT FOR INFRINGEMENT BY ONE PARTY OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, FRAUD, WILLFUL MISCONDUCT, OR BREACH OF CONFIDENTIALITY OR PAYMENT OBLIGATIONS HEREUNDER, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR FOR ANY BUSINESS INTERRUPTION, LOSS OF INCOME, OTHER ECONOMIC LOSS, OR THE COST OF COVER OR SUBSTITUTE SERVICES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR HIGHTOWER TREASURY'S INTELLECTUAL PROPERTY RIGHTS, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON CONTRACT, TORT, OR

OTHERWISE, AND WHETHER OR NOT SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.

**14.3** <u>THIRD-PARTY SERVICES</u>. CERTAIN FEATURES AND FUNCTIONALITIES WITHIN THE SERVICES MAY ALLOW CUSTOMER TO ACCESS OR USE THIRD-PARTY WEBSITES, SERVICES, PRODUCTS, AND CONTENT THAT ARE NOT OWNED OR CONTROLLED BY HIGHTOWER TREASURY ("THIRD-PARTY SERVICES"). HIGHTOWER TREASURY ASSUMES NO RESPONSIBILITY FOR ANY CONTENT, POLICIES, ERRORS, COMPATIBILITY ISSUES, DAMAGES, OR LOSSES RELATED TO OR CAUSED IN WHOLE OR IN PART BY CUSTOMER'S USE OF OR RELIANCE ON THIRD-PARTY SERVICES.

**14.4** <u>LIMITATION OF LIABILITY</u>. IN NO EVENT WILL HIGHTOWER TREASURY'S TOTAL LIABILITY TO CUSTOMER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE SUM TOTAL OF THE AMOUNT OF THE FUNDS DUE TO CUSTOMER PURSUANT TO THIS AGREEMENT, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY ON WHICH THE ACTION IS BASED, AND WHETHER OR NOT HIGHTOWER TREASURY WAS ADVISED OF THE POSSIBILITY OF CUSTOMER'S DAMAGES OR LOSSES.

**14.5** <u>BASIS OF THE BARGAIN</u>. THE PARTIES HEREBY ACKNOWLEDGE AND AGREE THAT THE LIMITATIONS OF LIABILITY IN THIS SECTION ARE AN ESSENTIAL PART OF THE BASIS OF THE BARGAIN BETWEEN HIGHTOWER TREASURY AND CUSTOMER, AND WILL APPLY EVEN IF THE REMEDIES AVAILABLE HEREUNDER ARE FOUND TO FAIL THEIR ESSENTIAL PURPOSE.

## 15. MISCELLANEOUS.

**15.1** <u>Injunctive Relief</u>. The Parties acknowledge that the breach or threatened breach of the confidentiality obligations herein, or any infringement, violation, or misappropriation of either Party's Intellectual Property Rights by the other Party, would cause irreparable harm to the non-breaching Party, the extent of which would be difficult to ascertain. Accordingly, in addition to any other remedies to which a Party may be legally entitled, a Party may seek immediate injunctive relief in the event of a threat of irreparable harm.

**15.2** <u>Publicity</u>. Neither Party, in its capacity as owner or licensor ("**Licensor**") of certain names, trademarks, service marks or logos (**"Marks"**), may use the Marks of the party without the Licensor's prior written approval and subject to any marketing guidelines provided by the Licensor to the Marks user upon such written approval. Any use by Marks User of Licensor's Marks, and all goodwill associated therewith, including any rights in trade, shall inure to the benefit of said Licensor. Upon expiration or termination of this Agreement, Marks User must immediately discontinue use of Licensor's Marks. Customer further permits HighTower Treasury to distribute, publish, promote, and market Aggregate Data created using Customer Materials in accordance with this Agreement.

**15.3** <u>Transferability and Assignment</u>. Neither Party may transfer, assign, or delegate this Agreement or any of its rights or duties hereunder, including access to or any benefits of the Treasury Account, directly, indirectly, by operation of law, or otherwise, without the written consent of the other Party, and any purported transfer, assignment, or delegation without such consent will be void. Notwithstanding the foregoing, HighTower Treasury may assign or transfer this Agreement to a successor to all or substantially all of its business or assets to which this Agreement relates, whether by merger, acquisition, reorganization, sale, or other transfer of equity or assets, or other similar Transaction. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties and their permitted successors and assigns.

**15.4** <u>Waiver and Amendment</u>. Except as otherwise provided, no modification, waiver, or amendment of any provision of this Agreement will be effective unless expressed in writing and signed by both Parties. No delay or failure by either Party in exercising any right, power, or remedy hereunder will operate as a waiver of any such right, power, or remedy. The waiver of a particular obligation in one

circumstance will not prevent either Party from subsequently requiring compliance with such obligation in the future.

**15.5** Subcontracting. HighTower Treasury may use subcontractors and other third-party providers ("**Subcontractors**") in connection with the performance of its own obligations hereunder as it deems appropriate, provided that HighTower Treasury will remain responsible for the performance of each such Subcontractor. HighTower Treasury will use commercially reasonable efforts to guard against any damages or issues arising in connection with Subcontractors, but will not be liable for the acts or omissions of such Subcontractors except to the extent that such damages or issues are caused directly by the gross negligence or willful misconduct of HighTower Treasury.

**15.6** Export Regulation. Customer will comply with all applicable federal laws, regulations, and rules that prohibit or restrict the export of the Services, or any Customer Materials, outside of the United States.

**15.7** Choice of Law. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any principles of conflict of laws that would lead to the application of the laws of another jurisdiction. The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply.

**15.8** Dispute Resolution. In case of a dispute between the Parties relating to or arising out of this Agreement, the Parties will first attempt to resolve the dispute personally and in good faith. If these personal attempts at resolution fail, the Parties will submit the dispute to binding arbitration conducted by a single arbitrator in San Francisco, California pursuant to the California Arbitration Act and the Rules of the American Arbitration Association ("**AAA**"). The arbitrator will have no authority to add Parties, vary the provisions of this Agreement, award punitive damages, or certify a class. The Parties will share the cost of the arbitration equally, and each will be responsible for their own attorneys' fees and costs. The Parties expressly waive any rights they may have to a jury trial for any dispute relating to or arising out of this agreement. Judgment upon the award rendered by the arbitrator may be entered in any court having appropriate jurisdiction.

**15.9** Electronic Communications. Customer consents to receive all communications, terms, disclosures, notices, demands, requests, and statements ("**Communications**") from HighTower Treasury electronically and confirms that it can access, receive, and retain such Communications. HighTower Treasury will provide Communications by emailing them to Customer at the email address included in this Section, or by another method specified by Customer in writing. Because the Services require delivery of Communications electronically, HighTower Treasury must suspend the Services if Customer withdraws such consent.

**15.10** Addresses and Methods of Giving Notice. Any Communication provided or permitted to be given hereunder must be in writing. Communications will have been deemed to have been properly given, unless explicitly stated otherwise, if sent to the physical or email address for each Party listed below by: (a) Federal Express or other comparable overnight courier with signature required; (b) registered or certified mail, postage prepaid, return receipt requested; or (c) electronic mail. All Communications will be deemed given and received seven (7) days after being deposited in the mail, two (2) business days after being deposited with an overnight carrier, or one (1) business day after being sent via electronic mail.

**To HighTower Treasury:**
600 1st Ave, Suite 102-1080
Seattle, WA 98104
support@hightowertreasury.com

**To Customer:**
_____
_____
_____

**15.11** Independent Contractors. The Parties are independent contractors with respect to each other. Each Party is not and will not be deemed an employee, agent, partner, joint venturer, franchisee, or legal representative of the other for any purpose, and will not have any right, power, or authority to create any obligation or responsibility on behalf of the other, unless otherwise set forth in an Order Form.

**15.12** <u>No Third-Party Beneficiaries</u>. Except with respect to Partner Financial Institutions, nothing express or implied herein is intended to confer nor will confer any rights, remedies, obligations, or liabilities whatsoever upon any person other than the Parties and their respective permitted successors and assigns.

**15.13** <u>Severability</u>. If any provision herein is held to be contrary to law or unenforceable, such provision will be modified and interpreted to best accomplish the objectives of the original provision to the fullest extent allowed by law, and the remaining provisions herein will remain in full force and effect.

**15.14** <u>Force Majeure</u>. Except with respect to obligations to make payments hereunder, neither Party will be deemed in default hereunder, nor will it hold the other Party responsible for, any cessation, interruption, or delay in the performance of its obligations hereunder due to causes beyond its reasonable control, including: earthquake, flood, fire, storm, pandemic, epidemic, or other natural disaster, act of God, labor controversy or threat thereof, civil disturbance or commotion, disruption of the public markets, war or armed conflict, or the inability to obtain sufficient material, supplies, labor, transportation, power, or other essential commodity or service required in the conduct of its business, including internet access, or any change in or the adoption of any law, ordinance, rule, regulation, order, judgment, or decree.

**15.15** <u>Headings and Construction</u>. The titles, captions, and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement. The word 'including' means including without limitation, and the words 'herein', 'hereby', 'hereto', and 'hereunder' refer to this Agreement as a whole.

**15.16** <u>Inconsistencies or Conflicts</u>. In the event of inconsistencies or conflicts between this Agreement and any Additional Terms or exhibit hereunder, the terms of this Agreement will control, unless any Additional Term or exhibit expressly states that it supersedes this Agreement.

**15.17** <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one instrument. This Agreement may be executed and delivered in a ".pdf" file by email or by another electronic format, such as the HelloSign platform. A signature delivered by electronic means will be deemed an original.

**15.18** <u>Entire Agreement</u>. This Agreement, including all Additional Terms and exhibits, constitutes the final, complete, exclusive agreement between the Parties with respect to the subject matter hereof, and supersedes any prior or contemporaneous agreement, either written or oral.

**[Page Intentionally Blank]**

*     *     *

IN WITNESS WHEREOF, this Agreement has been signed and executed as of the Effective Date by and on behalf of the Parties through their duly authorized officers or agents:

**HIGHTOWER TREASURY CORP.**

By: _____

Name: Adm Brary

Title: CEO

Date: 3/31/22

Commerce Fabric Inc.

By: _____

Name: Nevin Shetty

Title: CFO

Date: 3/31/22

USA_00000177

# April 2022 Account Statement

Fabric Inc
113 Cherry St, PMB66768
Seattle, 98104, Seattle



**HighTower**
TREASURY

## Your Variable Yield Corporate Savings Account

**Fabric Inc**
Statement from April 1, 2022 to April 30, 2022
Account #:          7556

## Account Summary

| | |
|---|---|
| Beginning balance on April 1, 2022 | $0.00 |
| Deposit Transfers | $35,000,100.00 |
| Interest Earned | $120,808.85 |
| Withdrawal Transfers | $0.00 |
| **Ending balance on April 30, 2022** | **$35,120,908.85** |

## We thank you for your business

For customer support questions please contact us at
support@hightowertreasury.com or call us at 1 (888) 296-7880.

USA_00000203

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-144
Admitted:_____

2/3/22, 9:32 AM

Sent you an update and a few things to look at on slack. Need your input on revised logo options and confirm we are good with font/colors that we updated a bit.

2/3/22, 4:41 PM

Closing date is 2/24. We need the site live by then in order to capture maximum value

Are you referring to just the Site or both the site and functioning MVP?

Functioning MVP

You can do it!



U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-150A
Admitted:_____

You keeping an eye on ust?

5/7/22, 9:23 PM

Yep

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-150B
Admitted:_____

Can you do a 6am call with the lawyer
tomorrow morning?

Any way we can do 7am? If not, I will
make 6am work

8:30am works best for me but if you
want 6am, your call

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-150C
Admitted:_____

5/13/22, 7:58 AM

Call me when you can. Notifying Fabric today needs to be our highest priority.

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-150D
Admitted:_____

**February 2022 Account Statement**

HighTower

Company Name
Company Address Line 1
Company Address Line 2
Company City, State, Zip State

# Your Variable Yield Corporate Savings Account

Statement for February 1, 2022 to February 28, 2022

Account #: 123456789126

**Company Name**

## Account Summary

| | |
|---|---|
| Beginning balance on February 1, 2022 | $100,250.00 |
| Deposit Transfers | $100,000.00 |
| Interest Earned | $20,000.00 |
| Withdrawal Transfers | $10,000.00 |
| **Ending balance on February 28, 2022** | **$200,260.00** |

| We thank you for your business | As your business needs evolve, we are hear to listen. Please contact us at accountservices@hightowertreasury.com for any recommendations on how we can improve our service for your business.<br><br>For customer support questions, please contact us at support@hightowertreasury.com or call us at 555-555-5555. |
|---|---|

USA_00008251

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-153
Admitted:_____

**HIGHTOWER TREASURY**   Dashboard | Deposit / Withdraw                    Contact Us   Account Settings   Log Out

## Company Name LLC

| Business Accounts | Current Balance |
|---|---|
| **Variable Yield Savings Account** ❶<br>Account Number: 123456789126   View Account Details > | **$0.00** |
| **Fixed Yield Savings Account** ❶<br>Account Number: 123456789129   View Account Details > | **$0.00** |
| **Custom Yield Savings Account** ❶ | Email sales@hightowertreasury.com to learn<br>more about Custom Yield Accounts |

USA_00008298

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-154
Admitted:_____

**HOME PAGE**

High Yield Corporate Savings Account

Powered by a diversified set of decentralized interest-rate protocols, we cut out all middlemen to offer your business the highest APYs

[Get Started]

---------------------------------------------------------

We bring you DeFi savings in a 100% USD denominated account

- Fully Liquid
- Institutional Grade
- High Yield

---------------------------------------------------------

APY Comparison

0.15% Average Treasury Program Yield
1.02% Average Two Year Treasury Yield
Up to 9% Average Yield through Hightower Treasury (Variable)

---------------------------------------------------------

Simple, Smart & Secure

Zero Fees & Zero Volatility

Lorem ipsum dolor sit amet, consectetur adipisicing elit, sed do eiusmod tempor incididunt ut labore et dolore magna aliqua. Ut enim ad minim veniam, quis nostrud exercitation ullamco laboris nisi ut aliquip ex ea commodo consequat. Duis aute irure dolor in reprehenderit in voluptate velit esse cillum dolore eu fugiat nulla pariatur.

Auditable & Secure

Security is the highest priority at HighTower Treasury. We have implemented policies and procedures to ensure the safety and dependability of the platform. In addition to this, All the DeFi protocols that HighTower Treasury utilizes have been audited by well-respected auditors in the industry.

24/7 Support

USA_00008334

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-155
Admitted:_____

Lorem ipsum dolor sit amet, consectetur adipisicing elit, sed do eiusmod tempor incididunt ut labore et dolore magna aliqua. Ut enim ad minim veniam, quis nostrud exercitation ullamco laboris nisi ut aliquip ex ea commodo consequat. Duis aute irure dolor in reprehenderit in voluptate velit esse cillum dolore eu fugiat nulla pariatur.

-----------------------------------------------------------

Opening an account is easy.

Sign up, fund your account, and start earning yield now.

[Sign Up]

## ABOUT PAGE

As former CEO's, CFOs and CTOs, we were always searching for ways to maximize every dollar in our businesses. Regardless of the size of the business, earning interest on idle cash that we can reinvest into the business has simply been a dream in a low interest rate world.

We have spoken with every major treasury program offered today – BofA, JPM, and SVB to name a few. In those programs, a company can earn between 0.10% - 0.20% for a fully liquid program and earn between 0.15% - 0.40% if you lock your company's money up for at least 1 year.

By employing a diversified set of decentralized interest-rate protocols, HighTower Treasury cuts out all middlemen to offer your business the highest APYs in the market. We help unlock the power of your balance sheet.

---------------------------------------------

FOUNDING TEAM

Ross Dzikovsky

Ross has over 13 years of experience in the IT industry with a strong background in Decentralized Finance, Software Development, User Experience Design, Product Management and Business Analytics. Ross oversees our team of 20 engineers and has led the development of several enterprise platforms for Fortune 50 companies.

Adam Brazg

Adam brings 10 years of experience in finance, digital strategy, design, marketing and product management. He has overseen and led digital innovation projects for companies such as PwC, Lockheed Martin and OfferUp.

Bohdan Protsiuk

Bohdan has over 11 years of experience working as a software architect and lead engineer. He is experienced in building complex web applications using microservices architecture. Bohdan strongly embraces flexibility when it comes to technologies in an effort to bring more leeway for innovative practices to the products he develops.

**CAREERS PAGE**

WORK AT HIGHTOWER

Our core philosophy is ownership. We always value people over process. Our culture has been instrumental to our success and has helped us attract and retain stunning colleagues, making work here more satisfying.

------------------------------------------------

CURRENT OPENINGS

[You can design the JD's like you did on Bilberrry site, but instead of having the form to apply, we will just add some text to the bottom of the JD that says "email your CV and Cover Letter to jobs@hightower.com]

------------------------------------------------

**6% FULLY LIQUID CORP SAVINGS ACCOUNT PAGE**

HighTower Fully Liquid Corp Savings Account

- Up to 6% APY
- Fully Liquid
- Fully Insured
- Zero Fees

------------------------------------------------

The HighTower Variable Yield Corporate Savings account is fully liquid and fully insured with zero fees. The interest rate is variable and subject to change. Our trailing 6-month trailing average is 6% APY, accrued and earned daily. Interest will start accruing in your account once the deposit posts (usually 24-48 business hours after you submit the wire).

—————————————————————————————

You can put this module as the CTA at the bottom of the page

**9% HIGH YIELD CORP SAVINGS ACCOUNT PAGE**

HighTower High Yield Corp Savings Account

- Up to 9% APY
- 12 month lock up period
- Fully Insured
- Zero Fees

—————————————————————————————

The HighTower Fixed Yield Corporate Savings account is subject to a 12 month lock up and fully insured with zero fees. The interest rate is fixed for the length of your term. Our trailing 6-month trailing average is 9% APY, accrued and earned daily. Interest will start accruing in your account once the deposit posts (usually 24-48 business hours after you submit the wire). The 12 months lock up duration also begins once the deposit posts into your account.

—————————————————————————————

You can put this module as the CTA at the bottom of the page

### HIGHTOWER TREASURY CORP.

#### ACTION BY WRITTEN CONSENT OF DIRECTORS

#### IN LIEU OF ORGANIZATIONAL MEETING OF DIRECTORS

#### FEBRUARY 15, 2022

The undersigned, being all of the directors of HighTower Treasury Corp., a Delaware corporation, (the "**Corporation**"), pursuant to General Corporation Law of the State of Delaware, Title 8 § 141, does hereby consent to the adoption of the following resolutions and agree that said resolutions shall have the same force and effect as if duly adopted at a meeting of the directors held for the purpose:

#### Ratification of Acts of Incorporator

RESOLVED:    That all of the acts of the Incorporator are ratified, approved and adopted as duly authorized acts of this Corporation.

#### Officers

RESOLVED:    That the following persons are elected to the office or offices set forth opposite their respective names to serve in accordance with the By-laws of the Corporation:

| Office | Name |
|---|---|
| President | Nevin Shetty |
| Secretary | Adam Brazg |
| Treasurer | Nevin Shetty |

#### Stock Certificate

RESOLVED:    That the stock certificate representing shares of this Corporation's Common Stock in the form submitted to the directors is adopted and approved.

#### Stock Issuance

WHEREAS, this Corporation has been converted from a Delaware limited liability Corporation into a Delaware corporation, pursuant to a certain Conversion Agreement, it is hereby,

RESOLVED:    This Corporation has been authorized issue to the following persons, Ten Million (10,000,000) shares of its authorized and unissued Common Stock, with the intention that such shares qualify as "Section 1244 Stock" under Section 1244 of the Internal Revenue Code (the amount to be received by this Corporation for stock in this offering and any previous offering being less than $1,000,000, as measured under Section 1244); that upon consummation of the conversion, the officers are authorized and directed to issue and deliver to such stockholder a stock certificate for such shares, which shares shall be fully paid and nonassessable; and

HighTower Treasury Corp.
Organizational Consent of Directors

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-161
Admitted:_____

that, upon issuance of such shares, an amount equal to their aggregate par value shall be credited to this Corporation's account, and the remainder of the consideration shall be credited to its additional paid-in capital account:

| Purchaser | Number of Shares |
|---|---|
| Nevin Shetty | 3,300,000 |
| Adam Brazg | 6,700,000 |

### Foreign Qualifications

RESOLVED:   That this Corporation qualify to conduct business as a foreign corporation in any other state as the Authorized Officers (defined below) of the Corporation shall deem appropriate at any time; and that the resolution such state(s) requires for qualification are adopted in the form submitted to the Board of Directors to the same extent as if set forth in full in this resolution.

### Bank Resolutions

RESOLVED:   That the form of resolutions for depositories designated by the president, treasurer or secretary of the Corporation for opening checking, deposit or similar accounts and safety deposit boxes for the Corporation and for authorizing the borrowing of funds for the Corporation are adopted to the same extent as if set forth in full in this resolution, and the secretary or assistant secretary may certify that such resolutions were duly adopted by the Board of Directors of the Corporation.

### Filing with Corporate Records

RESOLVED:   That the Secretary is hereby authorized and directed to file with the records of this Corporation of each of the agreements, instruments, certificates and documents referred to in the preceding Resolutions including without limitation the stock certificate, and banking resolutions.

### General Authorization

RESOLVED:   That the President and Secretary (the "**Authorized Officers**") of the Corporation be, and hereby are, authorized and empowered, each of them acting individually, to take all actions necessary or appropriate to authorize and qualify the Corporation to transact business in any other jurisdiction where such authorization or qualification is required and to adopt any resolutions which may be required by such jurisdiction as evidenced in a certificate executed by the secretary of the Corporation.

RESOLVED:   That the Authorized Officers of the Corporation be, and each of them individually hereby is, authorized and empowered, (i) to prepare or cause to be prepared, execute, seal and deliver or cause to be delivered, in the name and on behalf of the Corporation, any and all documents, agreements and instruments to effectuate any of the foregoing resolutions or any of the transactions contemplated thereby, all with such changes therein as any such Authorized Officer may deem necessary or

desirable, and (ii) to take such action, or to cause others to take such action, in the name and on behalf of the Corporation, as may in the judgment of any such officer so acting be necessary or appropriate in connection with, or in furtherance of, any of the foregoing resolutions or any of the transactions contemplated thereby, the execution and delivery of any such document, agreement or instrument or the taking of any such action being conclusive evidence of such officer's authority hereunder to so act.

RESOLVED: To ratify, confirm and approve all actions taken or to be taken by the officers of the Corporation in connection with any and all of the transactions referred to in or contemplated by the foregoing resolutions.

RESOLVED: To direct that this Consent be filed with the records of meetings of the directors of the Corporation.

*[Remainder of page left intentionally blank]*

USA_00008441

G-161-003

This consent in lieu of organizational meeting of directors shall be filed with the minutes of the meeting of directors of this Corporation and shall be treated for all purposes as resolutions taken at a meeting.

_____
Nevin Shetty

_____
Adam Brazg

**Clear Form**



**WELLS FARGO**

# Authorization for Information and Certificate of Authority

### In connection with a Business Account Application

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

### Business Account Applicant

Legal Name of Business Entity (Include DBA name if applicable)
**HIGHTOWER TREASURY CORP.**

### Section 1: Authorization for Information in Connection with a Business Account Application

Signature Capture – Owners/Key Individuals with control (i.e., authority or influence) over the entity's structure, policies, and philosophies. By signing this form, I authorize Wells Fargo Bank, N.A. ("the Bank") to obtain verifications and reports from time to time, such as credit bureau reports and account status reports on me as an individual, in connection with the business account application for the above-named business and any other account applications by this business. I understand the Bank requests this information for legitimate business reasons including reducing fraudulent accounts and preventing access to financial information and accounts by unauthorized persons. Should the information obtained from any such report cause the Bank to deny the account application for the business, I also authorize the Bank to communicate, either explicitly or implicitly, to any co-applicant and to any co-owner, director, officer, or employee of the business that the denial was based in whole or in part on such information. I also authorize the Bank to use such information and to share it with its affiliates in order to determine whether the business is qualified for other products and services offered by the Bank and its affiliates.

| Print Full Legal Name of Owner/Key Individual (1) **Nevin S Shetty** | | Owner 1 Percentage of Ownership **33.00** |
|---|---|---|
| Position/Title **CFO** | Phone Number **2068537300** | Social Security Number (SSN) |
| Signature *Nevin S Shetty* | | Date Signed (MM/DD/YYYY) 03/18/2022 |
| Print Full Legal Name of Owner/Key Individual (2) **Adam D Brazg** | | Owner 2 Percentage of Ownership **67.00** |
| Position/Title **CEO** | Phone Number **2068187436** | Social Security Number (SSN) |
| Signature *Adam D Brazg* | | Date Signed (MM/DD/YYYY) 03/17/2022 |
| Print Full Legal Name of Owner/Key Individual (3) | | Owner 3 Percentage of Ownership |
| Position/Title **Select one** | Phone Number | Social Security Number (SSN) |
| Signature | | Date Signed (MM/DD/YYYY) |
| Print Full Legal Name of Owner/Key Individual (4) | | Owner 4 Percentage of Ownership |
| Position/Title **Select one** | Phone Number | Social Security Number (SSN) |
| Signature | | Date Signed (MM/DD/YYYY) |

USA_00009523

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-170
Admitted:_____

## Section 2: Individual owners with 25% or more ownership who do not have authority and control to manage the business (Note: Sole Proprietors do not complete this section)

| Print Full Legal Name of Individual Owner 1 | Social Security Number (SSN) | Position/Title Select one |
|---|---|---|
| Phone Number | Owner 1 Percentage of Ownership | |

| Print Full Legal Name of Individual Owner 2 | Social Security Number (SSN) | Position/Title Select one |
|---|---|---|
| Phone Number | Owner 2 Percentage of Ownership | |

## Section 3: Non-individual owners with 25% or more ownership
## (Note: Sole Proprietors do not complete this section)

| Print Full Legal Name of the Non-Individual Owner 1 | | Tax Identification Number (TIN) | Authority and control ◯ Yes ◯ No | % of Ownership | | Phone Number |
|---|---|---|---|---|---|---|
| Entity type Select one | Country of Registration | State of Registration | Physical Address | | | |

| Print Full Legal Name of the Non-Individual Owner 2 | | Tax Identification Number (TIN) | Authority and control ◯ Yes ◯ No | % of Ownership | | Phone Number |
|---|---|---|---|---|---|---|
| Entity type Select one | Country of Registration | State of Registration | Physical Address | | | |

## Section 4: Certificate of Authority

**Each person who signs below certifies that:**

A. The use of any Bank deposit account, product or service by the customer of the Bank for which this Certificate of Authority is issued (the "Customer") will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.

B. Each person who signs at the end of this Section 4, or whose name and specimen signature appear in Section 6, below, is authorized on such terms as the Bank may require to:

(1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

(2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Authorization for Information and Certificate of Authority or from accounts that the customer opens after the date of this Authorization for Information and Certificate of Authority (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

(3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

(4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in the Customer's business account application is correct and complete, each person who signs at the end of this Section 4 and each person whose name appears in Section 6, below, holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate or granted each person who signs at the end of this Section 4 the authority to do so on the Customer's behalf by:

(1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

(2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

(3) the signature of the Customer, if the Customer is a sole proprietor.

BBG6185 (Rev 08 – 10/21)

Page 2 of 4

**Required Signature(s): At least one individual owner, partner, or key executive with authority and control over the business must sign. For jointly owned sole proprietorships, both owners must sign.**

| Signature 1 | Print Full Legal Name | Title/Position | Date (MM/DD/YYYY) |
|---|---|---|---|
| *DocuSigned by:* Nevin S Shetty | **Nevin S Shetty** | **CFO** | 03/18/2022 |
| Signature 2 | Print Full Legal Name | Title/Position | Date (MM/DD/YYYY) |

## Section 5: Substitute Form W-9, Request for Taxpayer Identification Number and Certification

**Taxpayer Identification Number:** Enter either the Employer Identification Number or the Social Security Number that the business named above will use for IRS Tax Identification purposes. **Do Not Enter Both Identification Numbers.**

| EIN: | | OR | SSN: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Select the appropriate option for federal tax classification (required):

○ Individual/sole proprietor or single-member LLC  ● C Corporation  ○ S Corporation  ○ Partnership  ○ Trust/Estate

○ Limited Liability Company. Enter the tax classification (C=C Corporation, S=S Corporation, P=Partnership) ▶ _____

**Note:** For a single-member LLC that is disregarded, do not check LLC; select the appropriate option above for the tax classification of the single-member owner.

○ Other _____

**Certification:** Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (as defined in instructions), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct. (Does not apply to accounts within the U.S.)

**Certification Instructions:** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. For help with this Section 5, refer to the IRS Form W-9 instructions at the IRS website (www.irs.gov).

**Note:** The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| Signature of U.S. Person | Date (MM/DD/YYYY) |
|---|---|
| *DocuSigned by:* Nevin S Shetty | 03/18/2022 |

## Section 6: All Authorized Signers on the Account

### Section 6a: Individuals included in Section 1 or 2 above who will also be an Authorized Signer on the account complete the following information

| Print Full Legal Name (1) | Signature | Date (MM/DD/YYYY) |
|---|---|---|
| **Nevin S Shetty** | *DocuSigned by:* Nevin S Shetty | 03/18/2022 |
| Print Full Legal Name (2) **Adam D Brazg** | Signature *DocuSigned by:* Adam D Brazg | Date (MM/DD/YYYY) 03/17/2022 |
| Print Full Legal Name (3) | Signature | Date (MM/DD/YYYY) |
| Print Full Legal Name (4) | Signature | Date (MM/DD/YYYY) |

BBG6185 (Rev 08 – 10/21)

USA_00009525
G-170-003

## Section 6b: Additional Authorized Signers who are not included in Section 1 or 2 above complete the following information

| Print Full Legal Name (1) | Signature | | | Date (MM/DD/YYYY) |
|---|---|---|---|---|
| Physical Address | | Phone Number | Email Address | |

| Print Full Legal Name (2) | Signature | | | Date (MM/DD/YYYY) |
|---|---|---|---|---|
| Physical Address | | Phone Number | Email Address | |

## Bank Use Only

| Account Number(s) | Date opened (MM/DD/YYYY) |
|---|---|
| | |

USA_00009526
G-170-004

Clear Form



# Certification Regarding Beneficial Owners of Legal Entity Customers

## Bank Use Only

| Bank Name | | Branch Name | |
|---|---|---|---|
| Banker Name | | Officer/Portfolio Number | Date (MM/DD/YYYY) |
| Banker Phone | Branch Number | Banker AU | Banker MAC |
| Enterprise Customer Number (ECN) | | Account Number | |

## I. General Instructions

**What is this form?**

To help the government fight financial crime, federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who ultimately own or control a legal entity (i.e., the beneficial owners) helps law enforcement investigate and prosecute these crimes.

**Who has to complete this form?**

This form must be completed by the person opening a new account or maintaining business relationships on behalf of a legal entity with any of the following U.S. financial institutions: (i) a bank or credit union; (ii) a broker or dealer in securities; (iii) a mutual fund; (iv) a futures commission merchant; or (v) an introducing broker in commodities. For the purposes of this form, a legal entity includes a corporation, limited liability company, partnership, and any other similar business entity formed in the United States or a foreign country.

**What information do I have to provide?**

This form requires you to provide the name, address, date of birth and social security number (or passport number or other similar information, in the case of non-U.S. persons) for the following beneficial owners:

(i) Each individual, if any, who owns, directly or indirectly, 25 percent or more of the equity interests of the legal entity customer (e.g., each natural person that owns 25 percent or more of the shares of a corporation); **and**

(ii) An individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President or Treasurer).

The financial institution may also ask to see a copy of a driver's license or other identifying document for each beneficial owner listed on this form.

## II. Certification of Beneficial Owner(s)

**Persons opening an account or maintaining a business relationship on behalf of a legal entity must provide the following information:**

**Account open/maintenance Information**

**Full Legal Name and title of person representing the legal entity customer and opening the account or maintaining the business relationship**

| Full Legal Name | Title |
|---|---|
| **Nevin S Shetty** | ○ CEO  ◉ CFO  ○ COO<br>○ President  ○ Vice President  ○ Treasurer<br>○ General Manager  ○ General Partner  ○ Managing Member<br>○ Managing Partner  ○ Officer/Manager |

**Manual Submission Instructions:**
Route completed and signed form to
Deposit Product Support Services.
*Scanner Enabled Branches* should scan.
BBG6784-A (Rev 05 – 06/21)



F O O 1 - 0 0 0 0 B B G 6 7 8 4 A - 0 1

USA_00009527
G-170-005

**Full Legal Entity Name and Street Address for which the account is being opened/maintained.** *(P.O. Box is not permitted)*

| Full Legal Entity Name | | | |
|---|---|---|---|
| **HIGHTOWER TREASURY CORP.** | | | |

| Street Address | City | State | ZIP/Postal Code |
|---|---|---|---|
| | **Mercer Island** | **WA** | **98040** |

The following information for each individual owner, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the legal entity listed above. If no individual meets this definition, please check "Beneficial Owner Not Applicable" below and skip this section.
**Note:** When the entity is owned by a Trust, the individual trustee must be listed in the owner section.

☐ **Beneficial Owner Not Applicable**

- For a person with a Social Security Number (SSN) or Individual Taxpayer Identification Number (ITIN), provide the (SSN/ITIN) and leave Primary ID Type, Description and ST/Ctry/Prov blank.

- For a non-U.S. person without a (SSN/ITIN), provide a Passport Number and Country of Issuance. In lieu of a passport, non-U.S. persons may also provide a U.S. government-issued Alien ID or other foreign government-issued documents evidencing nationality or residence and bearing a photograph or similar safeguard.

## Owner 1 Information:    33.00% of ownership

| Full Legal Name | Date of Birth (MM/DD/YYYY) | | |
|---|---|---|---|
| **Nevin S Shetty** | /1984 | | |

| Street Address | Address Line 2 | | |
|---|---|---|---|
| | | | |

| Address Line 3 | City | State | ZIP/Postal Code |
|---|---|---|---|
| | **Mercer Island** | **WA** | |

| Country | TIN Type | | |
|---|---|---|---|
| **US** | ◉ SSN  ○ ITIN  Number | | |

| Primary ID Type | Primary ID Description | Primary ID State/Country/Province |
|---|---|---|
| | | |

| Enterprise Customer Number (ECN) (For Bank Use Only) |
|---|
| |

## Owner 2 Information:    67.00% of ownership

| Full Legal Name | Date of Birth (MM/DD/YYYY) | | |
|---|---|---|---|
| **Adam D Brazg** | | | |

| Street Address | Address Line 2 | | |
|---|---|---|---|
| | | | |

| Address Line 3 | City | State | ZIP/Postal Code |
|---|---|---|---|
| | **Seattle** | **WA** | |

| Country | TIN Type | | |
|---|---|---|---|
| **US** | ◉ SSN  ○ ITIN  Number | | |

| Primary ID Type | Primary ID Description | Primary ID State/Country/Province |
|---|---|---|
| | | |

| Enterprise Customer Number (ECN) (For Bank Use Only) |
|---|
| |

**Manual Submission Instructions:**
Route completed and signed form to
Deposit Product Support Services.
*Scanner Enabled Branches should scan.*
BBG6784-A (Rev 05 – 06/21)



F O O 1 - 0 0 0 0 B B G 6 7 8 4 A - 0 2

USA_00009528
G-170-006

## Owner 3 Information: % of ownership

| Full Legal Name | | Date of Birth (MM/DD/YYYY) | | |
|---|---|---|---|---|
| Street Address | | Address Line 2 | | |
| Address Line 3 | | City | State | ZIP/Postal Code |
| Country | | TIN Type ○ SSN ○ ITIN Number | | |
| Primary ID Type | Primary ID Description | Primary ID State/Country/Province | | |
| Enterprise Customer Number (ECN) (For Bank Use Only) | | | | |

## Owner 4 Information: % of ownership

| Full Legal Name | | Date of Birth (MM/DD/YYYY) | | |
|---|---|---|---|---|
| Street Address | | Address Line 2 | | |
| Address Line 3 | | City | State | ZIP/Postal Code |
| Country | | TIN Type ○ SSN ○ ITIN Number | | |
| Primary ID Type | Primary ID Description | Primary ID State/Country/Province | | |
| Enterprise Customer Number (ECN) (For Bank Use Only) | | | | |

**The following information for one individual with significant responsibility for managing the legal entity listed above, such as:**

- An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer); or

- Any other individual who regularly performs similar functions.

(If appropriate, an individual listed in the Individual Owner Section above may also be listed in the following Individual with Control section).

- For a person with a Social Security Number (SSN) or Individual Taxpayer Identification Number (ITIN), provide the SSN/ITIN and leave Primary ID Type, Description and State/Country/Province blank.

- For a non-U.S. person without a SSN/ITIN, provide a Passport Number and Country of Issuance. In lieu of a passport, non-U.S. persons may also provide a U.S. government-issued Alien ID or other foreign government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

**Manual Submission Instructions:**
Route completed and signed form to
Deposit Product Support Services.
*Scanner Enabled Branches* should scan.
BBG6784-A (Rev 05 – 06/21)



F O O 1 - 0 0 0 0 B B G 6 7 8 4 A - 0 3

USA_00009529
G-170-007

## Individual with Control Information

| Full Legal Name of Individual with Control **Nevin S Shetty** | Title ◯ CEO  ◉ CFO  ◯ COO |
|---|---|
| | ◯ President  ◯ Vice President  ◯ Treasurer |
| Date of Birth (MM/DD/YYYY) /1984 | ◯ General Manager  ◯ General Partner  ◯ Managing Member |
| | ◯ Managing Partner  ◯ Officer/Manager |

| Street Address | Address Line 2 | | |
|---|---|---|---|
| Address Line 3 | City **Mercer Island** | State **WA** | ZIP/Postal Code |
| Country **US** | TIN Type  ◉ SSN  ◯ ITIN  Number | | |
| Primary ID Type | Primary ID Description | Primary ID State/Country/Province | |
| Enterprise Customer Number (ECN) (For Bank Use Only) | | | |

## Certified/Agreed To

I, **Nevin S Shetty** _____, hereby certify,
Full Legal Name of Person Opening Account
**to the best of my knowledge, that the information provided above is complete and correct.**

Signature

DocuSigned by:

*Nevin S Shetty*
D7774A3CC56C45C...

Date (MM/DD/YYYY)

03/18/2022

**Manual Submission Instructions:**
Route completed and signed form to
Deposit Product Support Services.
*Scanner Enabled Branches* should scan.
BBG6784-A (Rev 05 – 06/21)


F O 0 1 - 0 0 0 0 B B G 6 7 8 4 A - 0 4

Page 4 of 4
Wells Fargo Confidential

USA_00009530
G-170-008

| FORM D | | |
|---|---|---|
| **Notice of Exempt Offering of Securities** | | |

**OMB APPROVAL**

OMB Number: 3235-0076

Estimated Average burden hours per response: 4.0

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C.

## 1. Issuer's Identity

CIK (Filer ID Number)

| 5612 |
|---|

Name of Issuer

| **HighTower Treasury Corp** |
|---|

Jurisdiction of Incorporation/Organization

| **DELAWARE** |
|---|

Previous Name(s)    ☑ None

**Year of Incorporation/Organization**

○ Over Five Years Ago

◉ Within Last Five Years (Specify Year)    | 2022 |

○ Yet to Be Formed

Entity Type

◉ Corporation

○ Limited Partnership

○ Limited Liability Company

○ General Partnership

○ Business Trust

○ Other

## 2. Principal Place of Business and Contact Information

Name of Issuer

| **HighTower Treasury Corp** |
|---|

Street Address 1

| **600 1ST AVE** |
|---|

Street Address 2

| **SUITE 102-1080** |
|---|

| City | State/Province/Country | ZIP/Postal Code | Phone No. of Issuer |
|---|---|---|---|
| **SEATTLE** | **WASHINGTON** | **98104** | **888-296-7880** |

USA_00009532

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-171
Admitted:_____

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| **Brazg** | **Adam** | |

| Street Address 1 | Street Address 2 |
|---|---|
| **600 1st Ave** | **Suite 102-1080** |

| City | State/Province/Country | ZIP/Postal Code |
|---|---|---|
| **Seattle** | **WASHINGTON** | **98104** |

| **Relationship:** | ☑ Executive Officer | ☐ Director | ☐ Promoter |
|---|---|---|---|

Clarification of Response (If Necessary)

USA_00009533
G-171-002

## 4. Industry Group

○ Agriculture

**Banking & Financial Services**

○ Commercial Banking

○ Insurance

○ Investing

○ Investment Banking

○ Pooled Investment Fund

◉ Other Banking & Financial Services

○ Business Services

**Energy**

○ Coal Mining

○ Electric Utilities

○ Energy Conservation

○ Environmental Services

○ Oil & Gas

○ Other Energy

**Health Care**

○ Biotechnology

○ Health Insurance

○ Hospitals & Physicians

○ Pharmaceuticals

○ Other Health Care

○ Manufacturing

**Real Estate**

○ Commercial

○ Construction

○ REITS & Finance

○ Residential

○ Other Real Estate

○ Retailing

○ Restaurants

**Technology**

○ Computers

○ Telecommunications

○ Other Technology

**Travel**

○ Airlines & Airports

○ Lodging & Conventions

○ Tourism & Travel Services

○ Other Travel

○ Other

## 5. Issuer Size

**Revenue Range**

○ No Revenues

○ $1 - $1,000,000

○ $1,000,001 - $5,000,000

○ $5,000,001 - $25,000,000

○ $25,000,001 - $100,000,000

○ Over $100,000,000

◉ Decline to Disclose

○ Not Applicable

**Aggregate Net Asset Value Range**

○ No Aggregate Net Asset Value

○ $1 - $5,000,000

○ $5,000,001 - $25,000,000

○ $25,000,001 - $50,000,000

○ $50,000,001 - $100,000,000

○ Over $100,000,000

○ Decline to Disclose

○ Not Applicable

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☑ Rule 506(b)

☐ Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Investment Company Act Section 3(c)

## 7. Type of Filing

☑ New Notice    Date of First Sale    2022-04-04    ☐ First Sale Yet to Occur

☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?    ⦿ Yes    ◯ No

## 9. Type(s) of Securities Offered (select all that apply)

☐ Pooled Investment Fund Interests     ☐ Equity

☐ Tenant-in-Common Securities     ☑ Debt

☐ Mineral Property Securities     ☐ Option, Warrant or Other Right to Acquire Another Security

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security     ☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?     ☐ Yes   ☉ No

Clarification of Response (if Necessary)

## 11. Minimum Investment

Minimum investment accepted from any outside investor     $ | 0 | USD

## 12. Sales Compensation

Recipient

Recipient CRD Number    ☐ None

(Associated) Broker or Dealer    ☐ None

(Associated) Broker or Dealer CRD Number    ☐ None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation    ☐ All States

USA_00009537

## 13. Offering and Sales Amounts

| | | | |
|---|---|---|---|
| **Total Offering Amount** | $ | USD | ☑ Indefinite |
| **Total Amount Sold** | $ 100000 | USD | |
| **Total Remaining to be Sold** | $ | USD | ☑ Indefinite |

**Clarification of Response (if Necessary)**

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors,
Number of such non-accredited investors who already have invested in the offering

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:   `1`

## 15. Sales Commissions & Finders' Fees Expenses

Provide separately the amounts of sales commissions and finders' fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $ `0`   USD   ☑ Estimate

Finders' Fees $ `0`   USD   ☑ Estimate

**Clarification of Response (if Necessary)**

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$ `0`   USD   ☑ Estimate

**Clarification of Response (if Necessary)**

## Signature and Submission

Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.

**Terms of Submission**

**In submitting this notice, each Issuer named above is:**

- **Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, the information furnished to offerees.**
- **Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the Issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.**
- **Certifying that, if the Issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).**

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| **HighTower Treasury Corp** | **Adam Brazg** | **Adam Brazg** | **CEO** | **2022-05-02** |

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "HIGHTOWER TREASURY CORP." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FOURTEENTH DAY OF FEBRUARY, A.D. 2022.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "HIGHTOWER TREASURY CORP." WAS INCORPORATED ON THE NINTH DAY OF FEBRUARY, A.D. 2022.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL FRANCHISE TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

6608439  8300

SR# 20220493044

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202650909

Date: 02-14-22

USA_00009740

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-174
Admitted:_____

# STATE OF DELAWARE
# CERTIFICATE OF INCORPORATION
# A STOCK CORPORATION

The undersigned Incorporator, desiring to form a corporation under pursuant to the
General Corporation Law of the State of Delaware, hereby certifies as follows:

1.    The name of the Corporation is  HighTower Treasury Corp.

2.    The Registered Office of the corporation in the State of Delaware is located at
611 South DuPont Highway Suite 102                                                        (street),
in the City of Dover                                              , County of Kent
Zip Code 19901                          . The name of the Registered Agent at such address upon
whom process against this corporation may be served is ZenBusiness Inc.

3.    The purpose of the corporation is to engage in any lawful act or activity for which
corporations may be organized under the General Corporation Law of Delaware.

4.    The total amount of stock this corporation is authorized to issue is
10000000                          shares (number of authorized shares) with a par value of
$ 0.0000100000          per share.

5.    The name and mailing address of the incorporator are as follows:

Name Nevin Shetty
Mailing Address 600 1st Avenue  Suite 102-1080
          Seattle, WA                                          Zip Code 98104

By: /s/ Nevin Shetty
          Incorporator

Name: Nevin Shetty
          Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered  03:22 PM 02/09/2022
FILED  03:22 PM 02/09/2022
SR 20220439867 - File Number 6608439



USA_00013226

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-181
Admitted:_____

USA_00013227
G-181-002

## MEOW TECHNOLOGIES INC.

### NON-DISCLOSURE AGREEMENT

This Non-disclosure Agreement (this "*Agreement*"), effective March 10, 2022 ("*Effective Date*"), entered into by and between meow Technologies Inc., a Delaware corporation having offices at 361 Jefferson Ave. Apt. 4, Miami Beach, FL 33139 ("*Company*") and Commerce Fabric Inc., a Delaware corporation Company, having offices at 113 Cherry St, PMB 66768, Seattle, WA 98104 ("*Recipient*") (each herein referred to individually as a "*Party*," or collectively as the "*Parties*"). In consideration of the covenants and conditions contained herein, the Parties hereby agree to the following:

### 1.    PURPOSE

The Parties wish to explore a business opportunity of mutual interest (the "*Opportunity*"), and in connection with the Opportunity, Company has disclosed, and may further disclose to Recipient certain confidential technical and business information that Company desires Recipient to treat as confidential.

### 2.    CONFIDENTIAL INFORMATION

(a)    *Definition*. "*Confidential Information*" means any information (including any and all combinations of individual items of information) disclosed by Company to Recipient, including any information disclosed prior to the Effective Date, either directly or indirectly in writing, orally or by inspection of tangible objects (including, without limitation, research, product plans, products, services, equipment, customers, markets, software, inventions, discoveries, ideas, processes, designs, drawings, hardware, formulations, specifications, product configuration information, marketing and finance documents, prototypes, samples, data sets, and equipment), whether or not designated as "confidential" at the time of disclosure. Confidential Information may also include information of a third party that is in Company's possession and is disclosed to Recipient under this Agreement.

(b)    *Exceptions*. Confidential Information shall not, however, include any information that Recipient can establish: (i) was publicly known or made generally available without a duty of confidentiality prior to the time of disclosure to Recipient by Company; (ii) becomes publicly known or made generally available without a duty of confidentiality after disclosure to Recipient by Company through no action or inaction of Recipient; or (iii) is in the rightful possession of Recipient without confidentiality obligations at the time of disclosure by Company to Recipient as shown by Recipient's then-contemporaneous written files and records kept in the ordinary course of business; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception.

(c)    *Compelled Disclosure*. If Recipient becomes legally compelled to disclose any Confidential Information, other than pursuant to a confidentiality agreement, Recipient will provide Company prompt written notice of such disclosure and will assist Company in seeking a protective order or another appropriate remedy. If Company waives Recipient's compliance with this Agreement or fails to obtain a protective order or other appropriate remedy, Recipient will furnish only that portion of the Confidential Information that is legally required to be disclosed; provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such legally compelled disclosure.

### 3.    NON-USE AND NON-DISCLOSURE

Recipient shall not use any Confidential Information for any purpose except to evaluate and engage in discussions concerning the Opportunity. Recipient shall not disclose any Confidential Information or

MEOW000001
CONFIDENTIAL

permit any Confidential Information to be disclosed, either directly or indirectly, to any third party without Company's prior written consent. Recipient shall not disclose Confidential Information or permit the disclosure of Confidential Information to its employees, except that Recipient may disclose Confidential Information to those employees of Recipient who are required to have the information in order for Recipient to evaluate or engage in discussions concerning the Opportunity; provided that such employee has signed a non-use and non-disclosure agreement in content at least as protective as the provisions hereof, prior to any disclosure of Confidential Information to such employee. Recipient shall not reverse engineer, disassemble, or decompile any prototypes, software, samples, or other tangible objects that embody the Confidential Information.

## 4. MAINTENANCE OF CONFIDENTIALITY

Recipient shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information. Without limiting the foregoing, Recipient shall take at least those measures it employs to protect its own most highly confidential information. Recipient shall not make any copies of the Confidential Information unless the same are previously approved in writing by Company. Recipient shall reproduce Company's proprietary rights notices on any such authorized copies, in the same manner in which such notices were set forth in or on the original. Recipient shall immediately notify Company of any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of Confidential Information.

## 5. NO OBLIGATION

Nothing in this Agreement shall obligate either Party to proceed with any transaction between them, and each Party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the Opportunity. Nothing in this Agreement shall be construed to restrict Company's use or disclosure of its own Confidential Information.

## 6. NO WARRANTY

ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS." COMPANY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING THE ACCURACY, COMPLETENESS OR PERFORMANCE OF ANY CONFIDENTIAL INFORMATION, OR WITH RESPECT TO NON-INFRINGEMENT OR OTHER VIOLATION OF ANY INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY OR OF RECIPIENT.

## 7. RETURN OF MATERIALS

All documents and other tangible objects containing or representing Confidential Information and all copies or extracts thereof or notes derived therefrom that are in the possession or control of Recipient shall be and remain the property of Company and shall be promptly returned to Company or destroyed (with proof of such destruction), each upon Company's request.

## 8. NO LICENSE

Nothing in this Agreement is intended to grant any rights to Recipient under any intellectual property right of Company, nor shall this Agreement grant Recipient any rights in or to the Confidential Information except as expressly set forth in this Agreement.

MEOW000002
CONFIDENTIAL

USA_00013229
G-181-004

## 9.    TERM

The obligations of Recipient under this Agreement shall survive until the earlier of:

(a)    *such time as all Confidential Information disclosed hereunder becomes publicly known or made generally available through no action or inaction of Recipient;* and

(b)    *March 10, 2024*

## 10.    REMEDIES

Recipient agrees that any violation or threatened violation of this Agreement will cause irreparable injury to Company, entitling Company to obtain injunctive relief in addition to all legal remedies without showing or proving any actual damage and without any bond being required to be posted.

## 11.    RECIPIENT INFORMATION

Company does not wish to receive any confidential information from Recipient, and Company assumes no obligation, either expressed or implied, with respect to any information disclosed by Recipient to Company.

Any ideas, suggestions, guidance or other information disclosed by Recipient related to the Opportunity offered by the Company, and any intellectual property rights relating to the foregoing shall be collectively deemed "*Feedback*." Recipient agrees to grant and hereby grants to Company a non-exclusive, perpetual, irrevocable, royalty free, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform and otherwise exploit such Feedback without restriction.

## 12.    MISCELLANEOUS

This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns; except that Recipient may not assign or otherwise transfer this Agreement, by operation of law or otherwise, (including by merger, reorganization, consolidation, change of control, or sale of all or substantially all of Recipient's assets to which this Agreement pertains), without written consent of Company. Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void. This Agreement will be interpreted and construed in accordance with the laws of the State of California, without regard to conflict of law principles. Recipient hereby represents and warrants that the persons executing this Agreement on its behalf have express authority to do so, and, in so doing, to bind Recipient thereto. This Agreement contains the entire agreement between the Parties with respect to the Opportunity and supersedes all prior written and oral agreements between the Parties regarding the Opportunity. If a court or other body of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect. No provision of this Agreement may be waived except by a writing executed by the Party against whom the waiver is to be effective. A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor prevent the Party from enforcing any other provision of this Agreement. No provision of this Agreement may be amended or otherwise modified except by a writing signed by the Parties to this Agreement. The Parties may execute this Agreement in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by facsimile transmission, and facsimile copies of executed signature pages shall be binding as originals.

3

MEOW000003
CONFIDENTIAL

USA_00013230
G-181-005

IN WITNESS WHEREOF, the Parties by their duly authorized representatives have executed this Agreement as of the Effective Date.

**MEOW TECHNOLOGIES INC.**

By: _____

Name: Brandon Arvanaghi

Title: Chief Executive Officer

**COMMERCE FABRIC INC.**

By: _____

Name Nevin Shetty

Title: Chief Financial Officer

4

MEOW000004
CONFIDENTIAL

 **meow**

Brandon Arvanaghi <brandon@meow.co>

## Fwd: [External] Meow <> Fabric
1 message

**Cyrus Shirazi** <cyrus@meow.co>
To: Brandon Arvanaghi <brandon@meow.co>

Thu, Mar 10, 2022 at 1:03 PM

---------- Forwarded message ----------
From: **Cyrus Shirazi** <cyrus@meow.co>
Date: Thu, Mar 10, 2022 at 11:15 AM
Subject: Re: [External] Meow <> Fabric
To: Nevin Shetty <nevin@fabric.inc>

Yes, we can do that. Please see attached.

On Thu, Mar 10, 2022 at 10:45 AM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Cyrus,

Thanks. We can't agree to an uncapped term. Can you put 24 months?

Best,

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**::: fabric**

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for
reinventing retail and e-commerce.

On Thu, Mar 10, 2022 at 10:01 AM Cyrus Shirazi <cyrus@meow.co> wrote:
Excellent! Word doc version of our NDA is attached. If you can populate the yellow highlighted areas and send it
back, that would be great - so I can then send it via DocuSign for signatures.

Thanks!

On Thu, Mar 10, 2022 at 9:04 AM Nevin Shetty <nevin@fabric.inc> wrote:
Yep.

Best,

**Nevin Shetty**

MEOW000005
CONFIDENTIAL

USA_00013232
G-181-007

Chief Financial Officer
M: 206 853 7300

∷∷ fabric

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

On Thu, Mar 10, 2022 at 8:56 AM Cyrus Shirazi <cyrus@meow.co> wrote:
Hey Nevin,

Happy to but going to need to get an NDA in place first. That work?

On Thu, Mar 10, 2022 at 8:54 AM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Cyrus,

I hope you are well. Can you send me the PPM?

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

∷∷ fabric

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

On Thu, Mar 3, 2022 at 5:03 PM Cyrus Shirazi <cyrus@meow.co> wrote:
Hi Nevin,

Great to chat with you just now!

Following up to share our 1-pager, our Deck and our Treasury Management Policy documentation (files attached).

Also, here is my calendar link if you'd like to schedule a follow up call: https://meetings.hubspot.com/cshirazi

If any questions come up that I can help answer, please let me know!

Best,
Cyrus
P.S. Sharing a little more about us below:

MEOW000006
CONFIDENTIAL

USA_00013233
G-181-008

*"The demand for a high-yield account existed well before we built it. Businesses were fed up with the 0% returns they got from their savings accounts. Money market accounts generated less than 1% APY and required lockups.*

*Enter Meow: a way for businesses to earn up to 4% APY on their idle capital, without lockups. Businesses realized 4% yields could make meaningful changes to their roadmap; it could pay their marketing budget, or it could pay for several engineers. These are just some of the reasons that Meow is a no-brainer for corporates looking to put their resources to work.*

*The Meow team came from the ground floor of a regulated, compliant, security-first exchange in Gemini. We're uniquely positioned to deliver this enterprise-grade product."* - Brandon Arvanaghi (CEO of Meow)

--
Cyrus Shirazi
Meow | Director of GTM

--
Cyrus Shirazi
Meow | Director of GTM

--
Cyrus Shirazi
Meow | Director of GTM

--
Cyrus Shirazi
Meow | Director of GTM

📄 **Meow - Form of Nondisclosure Agreement_24mos.docx**
13K

MEOW000007
CONFIDENTIAL

USA_00013234
G-181-009

**meow**

Brandon Arvanaghi <brandon@meow.co>

## Fwd: [External] Re: Cyrus <> Nevin
1 message

**Cyrus Shirazi** <cyrus@meow.co>
To: Brandon Arvanaghi <brandon@meow.co>

Mon, Apr 11, 2022 at 9:47 AM

---------- Forwarded message ----------
From: **Cyrus Shirazi** <cyrus@meow.co>
Date: Thu, Mar 10, 2022 at 12:58 PM
Subject: Fwd: [External] Re: Cyrus <> Nevin
To: Brandon Arvanaghi <brandon@meow.co>

---------- Forwarded message ----------
From: **Nevin Shetty** <nevin@fabric.inc>
Date: Thu, Mar 10, 2022 at 12:54 PM
Subject: Re: [External] Re: Cyrus <> Nevin
To: Cyrus Shirazi <cyrus@meow.co>

Can you send me the purchase agreement and any other materials? I need to draft an internal memo and socialize internally - probably 3-4 months.

Best,


**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

**::: fabric**

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.


On Thu, Mar 10, 2022 at 12:51 PM Cyrus Shirazi <cyrus@meow.co> wrote:
Counter signed version attached as well as our PPM. Are we still on the 3 month timeline here?

On Thu, Mar 10, 2022 at 11:44 AM Nevin Shetty <nevin@fabric.inc> wrote:
Hi Cryus, see attached for executed version. Please send me the counter signed version and all the materials we spoke about.

Best,

MEOW000008
CONFIDENTIAL

USA_00013235
G-181-010

**Nevin Shetty**
Chief Financial Officer
M: 206 853 7300

::: fabric

**Fabric News:**
Fabric in Bloomberg
Fabric in TechCrunch
Fabric in Forbes
Fabric in Geekwire
Fabric in Crunchbase

**Fabric is a recognized leader** in CB Insights' Inaugural Retail Tech 100 list for reinventing retail and e-commerce.

On Tue, Mar 1, 2022 at 6:10 PM Cyrus Shirazi <cyrus@meow.co> wrote:
Everett, thanks for the intro -- bcc to spare your inbox!

Nevin, great to meet you! Would love to find time to connect -- please feel free to schedule time with me here: https://meetings.hubspot.com/cshirazi

Looking forward to it!

Best,

On Tue, Mar 1, 2022 at 5:54 PM Everett Cook <everett@rho.co> wrote:
Cyrus,

Nevin is a Rho client and was interested in learning more about Meow. Hopefully you can find time to connect.

Best,
Everett

# Rho

**Everett Cook / CEO /**

| **Find us at** | **Support available 8am-8pm, M-F, 9am-6pm Sa-Su** |
| --- | --- |
| 100 Crosby Street | Telephone: 855-7-GETRHO |
| New York, NY 10012 | Email: bank@rho.co |

Get fee-free corporate cards, banking, payments, and complimentary AP for your entire team. Plus earn up to 1.75% unlimited cash back, Sign up today @ rho.co.

Latest Press: Tech Crunch | Join the Rho Team at Rho Careers

---

*Do not transmit sensitive information via email. No SSN's, account numbers or photo ID's. No one at Rho will ever ask you for your password or for authentication codes for your account.*

*Rho is not a bank. Rho is a financial technology company that partners with FDIC-insured banks to deliver banking products and services.*

--
Cyrus Shirazi
Meow | Director of GTM

--
Cyrus Shirazi

MEOW000009
CONFIDENTIAL

USA_00013236
G-181-011

| Meow | Director of GTM

--
Cyrus Shirazi
Meow | Director of GTM

--
Cyrus Shirazi
Meow | Director of GTM

MEOW000010
CONFIDENTIAL

USA_00013237
G-181-012

# SECURITIES AND EXCHANGE COMMISSION

# FORM D

Official notice of an offering of securities that is made without registration under the Securities Act in reliance on an exemption provided by Regulation D and Section 4(6) under the Act.

Filing Date: **2022-05-02**
**SEC Accession No.**

(HTML Version on secdatabase.com)

## FILER

**HighTower Treasury Corp**

CIK:        | IRS No.: **000000000** | State of Incorp.:**DE** | Fiscal Year End: **1231**
Type: **D** | Act: **33** | File No.: **021-444063** | Film No.: **22881061**

Mailing Address
*600 1ST AVE*
*SUITE 102-1080*
*SEATTLE WA 98104*

Business Address
*600 1ST AVE*
*SUITE 102-1080*
*SEATTLE WA 98104*
*646-833-8084*

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

USA_00000516

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-185
Admitted:_____

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Expires: | June 30, 2012 |
| Estimated average burden hours per response: | 4.00 |

| **1. Issuer's Identity** | | | | |
|---|---|---|---|---|
| CIK (Filer ID Number) | Previous Name(s) ☒ None | | Entity Type | |

☒Corporation

Name of Issuer

HighTower Treasury Corp

☐ Limited Partnership

Jurisdiction of Incorporation/ Organization

☐ Limited Liability Company

DELAWARE

☐ General Partnership

Year of Incorporation/Organization

☐ Business Trust

☐ Over Five Years Ago

☐Other

☒ Within Last Five Years (Specify Year) 2022

☐ Yet to Be Formed

| **2. Principal Place of Business and Contact Information** | | | |
|---|---|---|---|
| Name of Issuer | | | |
| HighTower Treasury Corp | | | |
| Street Address 1 | | Street Address 2 | |
| 600 1ST AVE | | SUITE 102-1080 | |
| City | State/Province/Country | ZIP/Postal Code | Phone No. of Issuer |
| SEATTLE | WASHINGTON | 98104 | 888-296-7880 |

| **3. Related Persons** | | | |
|---|---|---|---|
| Last Name | First Name | | Middle Name |
| Brazg | Adam | | |
| Street Address 1 | Street Address 2 | | |
| 600 1st Ave | Suite 102-1080 | | |
| City | State/Province/Country | | ZIP/Postal Code |
| Seattle | WASHINGTON | | 98104 |

Relationship: ☒ Executive Officer ☐ Director ☐ Promoter

Clarification of Response (if Necessary)

| **4. Industry Group** |
|---|

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

☐ Agriculture

Banking & Financial Services

  ☐ Commercial Banking

  ☐ Insurance

  ☐ Investing

  ☐ Investment Banking

  ☐ Pooled Investment Fund

  ☒ Other Banking & Financial Services

☐ Business Services

Energy

  ☐ Coal Mining

  ☐ Electric Utilities

  ☐ Energy Conservation

  ☐ Environmental Services

  ☐ Oil & Gas

  ☐ Other Energy

Health Care

  ☐ Biotechnology

  ☐ Health Insurance

  ☐ Hospitals & Physicians

  ☐ Pharmaceuticals

  ☐ Other Health Care

☐ Manufacturing

Real Estate

  ☐ Commercial

  ☐ Construction

  ☐ REITS & Finance

  ☐ Residential

  ☐ Other Real Estate

☐ Retailing

☐ Restaurants

Technology

  ☐ Computers

  ☐ Telecommunications

  ☐ Other Technology

Travel

  ☐ Airlines & Airports

  ☐ Lodging & Conventions

  ☐ Tourism & Travel Services

  ☐ Other Travel

☐ Other

## 5. Issuer Size

### Revenue Range

☐ No Revenues

  $1 - $1,000,000

☐ $1,000,001 - $5,000,000

☐ $5,000,001 - $25,000,000

☐ $25,000,001 - $100,000,000

☐ Over $100,000,000

☒ Decline to Disclose

☐ Not Applicable

### Aggregate Net Asset Value Range

☐ No Aggregate Net Asset Value

☐ $1 - $5,000,000

☐ $5,000,001 - $25,000,000

☐ $25,000,001 - $50,000,000

☐ $50,000,001 - $100,000,000

☐ Over $100,000,000

☐ Decline to Disclose

☐ Not Applicable

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))    ☐ Rule 505

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☐ Rule 506

☐ Securities Act Section 4(6)

☐ Investment Company Act Section 3(c)

  ☐ Section 3(c)(1)    ☐ Section 3(c)(9)

  ☐ Section 3(c)(2)    ☐ Section 3(c)(10)

  ☐ Section 3(c)(3)    ☐ Section 3(c)(11)

  ☐ Section 3(c)(4)    ☐ Section 3(c)(12)

  ☐ Section 3(c)(5)    ☐ Section 3(c)(13)

  ☐ Section 3(c)(6)    ☐ Section 3(c)(14)

  ☐ Section 3(c)(7)

## 7. Type of Filing

☒ New Notice Date of First Sale  2022-04-04  ☐ First Sale Yet to Occur

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? ☒ Yes ☐ No

## 9. Type(s) of Securities Offered (select all that apply)

☐ Pooled Investment Fund Interests                    ☐ Equity

☐ Tenant-in-Common Securities                         ☒ Debt

☐ Mineral Property Securities                         ☐ Option, Warrant or Other Right to Acquire Another Security

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security                         ☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?                         ☐ Yes ☒ No

Clarification of Response (if Necessary)

## 11. Minimum Investment

Minimum investment accepted from any outside investor $  0 USD

## 12. Sales Compensation

| Recipient | Recipient CRD Number ☐ None | |
|---|---|---|
| (Associated) Broker or Dealer ☐ None | (Associated) Broker or Dealer CRD Number | ☐ None |
| Street Address 1 | Street Address 2 | |
| City | State/Province/Country | ZIP/Postal Code |
| State(s) of Solicitation (select all that apply) Check "All States" or check individual States | ☐ All States | ☐ Foreign/non-US |

## 13. Offering and Sales Amounts

Total Offering Amount    $              USD or ☒ Indefinite
Total Amount Sold    $ 100,000 USD
Total Remaining to be Sold $              USD or ☒ Indefinite

Clarification of Response (if Necessary)

## 14. Investors

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors,
Number of such non-accredited investors who already have invested in the offering

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: [1]

## 15. Sales Commissions & Finders' Fees Expenses

Provide separately the amounts of sales commissions and finders' fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $ 0 USD ☒ Estimate

Finders' Fees        $ 0 USD ☒ Estimate

Clarification of Response (if Necessary)

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$ 0 USD ☒ Estimate

Clarification of Response (if Necessary)

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

### Terms of Submission

In submitting this notice, each Issuer named above is:
- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, the information furnished to offerees.
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the Issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that the Issuer is not disqualified from relying on any Regulation D exemption it has identified in Item 6 above for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.
For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| HighTower Treasury Corp | Adam Brazg | Adam Brazg | CEO | 2022-05-02 |

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

USA_00000521
G-185-006

HTT

USA_00000896

## Wire Transfer Outgoing Request

# CHASE ⬡

### Wire Transfer Sender Information

| Sender Name: | | | | | |
|---|---|---|---|---|---|
| Nevin Shetty | | | | | |
| Account Name:<br>COMMERCE FABRIC, INC. | | Street Address:<br>113 CHERRY ST<br>PMB 66768 | | | |
| City:<br>SEATTLE | State:<br>WA | Zip:<br>98104-2205 | Country:<br>USA | | Daytime Phone:<br>206-853-7800 |
| Primary ID Type:<br>Driver's License | ID Issuer:<br>WA | ID Number: | | ID Issue Date:<br>12/24/2020 | ID Exp:<br>02/10/2027 |
| Secondary ID Type:<br>Chase or Bank Issued Credit/Debit Card | ID Issuer:<br>BECU | ID Number:<br>XXXXXXXXXXX1740 | | ID Issue Date: | ID Exp:<br>08/30/2024 |
| Comments: | | | | | |

### Wire Transfer Information

| Request Date:<br>04/04/2022 | Request time:<br>02:14:03PA Eastern time | Effective date:<br>04/04/2022 | Wire Type:<br>Domestic |
|---|---|---|---|
| Debit Account #:<br>XXXXX9944 | Debit Account Type:<br>PLAT BUS CHECKING | Wire Amount (US dollars):<br>$14,500,000.00 | |
| Qualifying Account #: | Qualifying Account Type: | Source of funds:<br>Checking | Wire Fee:<br>Refer to Account Agreement for Pricing |
| Currency type to be sent<br>US Dollars | Exchange rate:<br>N/A | Foreign currency amount:<br>N/A | Amount to Collect (USD):<br>$14,500,000.00 |
| FX Contract Number: | | | |

### Recipient Account Information

| Account Name: | | | | |
|---|---|---|---|---|
| Circle Internet Financial INC | | | | |
| Street Address: | Account Number:<br>7427 | | | |
| | City: | State: | Zip: | Country: |
| Text to Recipient:<br>Reference ID: CIR36EMG38 | | | | |

### Receiving Bank Information

| Bank Name: | | | | |
|---|---|---|---|---|
| Silvergate Bank | | | | |
| Street Address:<br>128 N Broadway | Bank ABA/SWIFT Code:<br>322286803 | | | |
| | City:<br>Escondido | State:<br>CA | Zip:<br>92025-2714 | Country:<br>USA |
| Intermediary Bank Name: | | | | |
| Street Address: | Intermediary Bank ABA: | | | |
| | City: | State: | Zip: | Country: |
| Text to Receiving Bank:<br>Reference ID: CIR36EMG38 | | | | |

USA_00000897<br>G-186-056

## Wire Transfer Agreement

### 1. Service.
The terms and provisions in this Wire Transfer Agreement ("Agreement") describe our wire transfer service, including what you can expect from us (JPMorgan Chase Bank, N.A.) and the security procedures we will take when you send a wire transfer.
If there is a conflict between any section of your Deposit Account Agreement and this Agreement, the provisions of this Agreement will apply.

The following types of wire transfers, when completed by a branch banker or by a Chase Private Client telephone banker, are governed by this Agreement:

- **Domestic Wire Transfer:** A wire transfer sent to a bank within the U.S., including its territories.
- **International Wire Transfer:** A wire transfer sent in either U.S. or foreign currencies, including using our Chase Global Transfer service, to a bank outside the U.S.
  - **Consumer International Wire Transfer:** A wire transfer that is sent by a natural person in the United States to transfer funds to a beneficiary in a foreign country for personal, family, or household purposes.

By providing your signature as authorization, as part of our security procedures, you agree to these terms and conditions and authorize us to provide you Domestic Wire Transfers or International Wire Transfers. Wire transfers, when completed using our Online Services or Mobile Services, are governed by a separate agreement.

### 2. Security Procedures.
These security procedures are only to help prevent unauthorized access to your account. All wire transfer requests go through an internal review, and we may need to contact you to verify information about your wire transfer. We may impose stricter security procedures for any particular wire transfer you make, but we have no obligation to do so. If we choose to impose stricter security procedures, we will not be liable to you for any delays or losses, and we will not be obligated to impose such security procedures in the future.

#### (a) For Chase Branch Wire Transfers Only:
When you request a wire transfer in a branch you will be required to provide your signature as authorization for each wire transfer and show valid identification. You acknowledge these security procedures used for wire requests you make in a branch are a commercially reasonable method of verifying your branch wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.

#### (b) For Chase Private Client Customers Only:
Only Chase Private Client telephone bankers can complete your wire transfer request using this service. To request wire transfers, you must provide your signature as authorization and maintain an active Chase Private Client Checking or Savings account. On the authorization form you can place a dollar limit on the wire transfers you request.

- You may request a wire transfer by telephone, and you agree that we will confirm your request by using any of the following security procedures, at our discretion:
  - Confirming certain personal information about you
  - Contacting you, another account holder or someone else you have listed on the authorization form.
- You may request a wire transfer by email, and you agree that we will confirm your request by contacting you or another account holder.
- We may call you at any phone number we have for you in our records or to the phone numbers provided on the authorization form.

- You acknowledge that we offer wire transfer services in person at our branches, or online which provide a higher level of security for your accounts, and you can use these options instead. You acknowledge the respective security procedures above for wire transfers are a commercially reasonable method of verifying your wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.

- If you do not specify the account from which to subtract the funds, we can subtract the amount of the wire transfer from any account you designated on the authorization form.

### 3. Processing, Canceling, Delays and Notifications of Wire Transfers.
**(a) Processing:** We'll start processing your wire transfer the same business day if we receive it and complete our security procedures before the cutoff times we establish. In order to complete our processing before the cutoff times we establish, we need to finish any secondary internal reviews and you must have available funds in the deposit account you designated in your Instructions.
**(b) Canceling:** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please see the section *Consumer International Wire Transfers* for more information on canceling Consumer International Wire Transfers. For all other wire transfers, once you have submitted a wire transfer for the current business day, you cannot cancel it after we've begun processing, but you may request us to attempt to return the funds to you. If the recipient's bank agrees, your funds may be returned to you, but likely not the full amount that was originally sent. We will not automatically cancel your wire transfer due to the transfer being delayed by more than five business days; if we do cancel your wire transfer we'll notify you.
**(c) Modifying:** Once a wire transfer has begun processing, we will not be able to change any type of wire transfer requests unless the recipient's bank agrees. If the recipient's bank declines to change the wire transfer request, you will be responsible for the transfer you initially requested.
**(d) Internal Review:** During our internal review, we may subtract funds from your account or place a hold on your account and it may result in processing delays. Once we have released the wire transfer, the recipient's bank may delay credit to the recipient due to their own internal review processes.
**(e) Notifications:** We will send you an email notification on the status of your wire transfer, it will be sent to an email address you have provided. We may also notify you verbally of the status of your wire transfer, but we are not required to do so. If you do not have an email address on file, if the email is returned undeliverable, or we are unable to send an email due to system failures or outages beyond our reasonable control, it is your responsibility to monitor your account for the status of your wire transfer. You may contact us for the status of your wire transfer. These notification methods are deemed to be commercially reasonable. Any other information we may provide upon successfully scheduling a wire transfer is only an indication that we've received your request and not an indication that we've accepted your wire transfer.

### 4. Identifying Number.
We or any other bank involved in the wire transfer will complete your wire transfer request using the account number or bank identification number you provide, even if the numbers do not match the recipient's or bank's name. *If you provided us an incorrect account number for the recipient or an incorrect routing or identification number for the recipient's bank, you could lose the amount of the transfer.*

USA_00000898
G-186-057

## Wire Transfer Agreement - continued

### 5. Future Dated Wire Transfers.

You may request a future dated (one -time) domestic wire transfer, up to 10 business days from the current business day's cutoff time. You cannot cancel a future dated wire transfer once it has been requested.

### 6. Foreign Exchange Transfer.

It is our discretion in which foreign currencies we will send wire transfers, and these can change at any time. If you send a wire transfer in a foreign currency, you authorize us to subtract the amount from your account at the exchange rate we offered at the time you requested it. The foreign exchange rates we use are determined by us in our sole discretion.

The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

If your initial request is returned, cancelled or changed, and if you request a new wire transfer, the current exchange rate at the time of the new transaction will apply. If the funds are returned or payment cannot be made for any reason, we will not be liable for more than the amount of the wire transfer at our exchange rate at the time we return the funds to you, less charges taken by any other bank involved in the wire transfer. However, if you requested a Consumer International Wire Transfer additional rights may apply. If you cancel a funds transfer request, other than a cancellation of a Consumer International Wire Transfer within 30 minutes after you authorized us to send it, and it causes a loss or cost to us, we may subtract funds from your account to cover these losses.

If the wire transfer is not in the currency of the recipient's account, the recipient's bank or another processing bank may reject the wire transfer or convert it. If converted, you agree the wire transfer may be converted to a different currency at their exchange rate and may subtract additional fees.

### 7. Fees and Payment Route.

We may charge a fee when you use this service based on your account agreement or fee schedule in effect when the wire is sent from your account, or for business accounts, based on the terms in effect when your next available account analysis is performed. We may use any funds transfer system we believe reasonable to complete your request, regardless of any instructions you might give us. If we also are the recipient's bank, we may complete your request using an internal transfer. You are responsible for all fees and taxes, including our fees and any fees charged by other funds transfer systems or banks involved in the transfer.

### 8. Wire Transfer System Rules and Laws.

The use of this service is subject to all applicable U.S. federal and state laws, regulations, rules and wire transfer arrangements, including the respective state's Uniform Commercial Code Article 4A, as may be applicable, which, in the event of a conflict with this Agreement, will govern. All of your wire transfers must comply with U.S. laws, including the regulations and economic sanctions administered by the U.S. Treasury Department's Office of Foreign Asset Control and other applicable laws.

If you make a Consumer International Wire Transfer, it is also subject to additional federal laws and regulations.

### 9. Indemnification.

You will indemnify us for all claims, expenses, liabilities, and losses (including reasonable legal fees) if you or a third party makes a claim against us for any of our actions or services in this Agreement, unless they prove gross negligence or willful misconduct. You understand this section will survive even if you close your account or this Agreement is terminated.

### 10. Failure to Perform; Limitation of Liability.

We are only responsible for performing the services specified in this Agreement. Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under UCC 4A or, to the extent applicable Regulation E, subpart B. Except as required by Regulation E, subpart B, as applicable, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Any provision of this Agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care.

### 11. Changes to the Agreement.

We may change the terms of this Agreement, including fees and features of this service, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

We may direct you to a branch or to your Chase Private Client banker for the content of any changes or the revised Agreement unless the law requires a different method. Your use of this service after we have made such changes available will be considered your agreement to the change.

### 12. Contact Us in the Event of an Error.

We will not be responsible for any delays in payment or additional fees caused by your failure to promptly notify us. You will exercise ordinary care to determine whether a wire transfer request we accepted and subtracted from your account was either in error or not authorized. Except for any Consumer International Wire Transfer, in the event of an error or unauthorized wire transfer, you agree to notify us within 30 days after we mail a statement reflecting the transfer or otherwise make such a statement available (for example, paperless statements). You agree that we are entitled to retain payment for a wire transfer unless you notify us within this 30-day period. For additional terms governing Consumer International Wire Transfers, please see the section *Consumer International Wire Transfers*.

### 13. Consumer International Wire Transfers.

**(a)** This section contains additional terms applicable only to Consumer International Wire Transfers. This section does not apply to any wire transfer request for delivery to a beneficiary in the United States, to any wire transfer request initiated by a non-consumer, or to any wire transfer request initiated by a consumer for any non-personal, non-family, or non-household purposes. In the event of a conflict between a provision in this section and a provision in the rest of this Agreement, or in the agreement governing your funding account, the provision in this section will control with respect to Consumer International Wire Transfers.

USA_00000899

G-186-058

## Wire Transfer Agreement - continued

**(b)** Prior to sending a Consumer International Wire Transfer, we will provide you with certain important disclosures regarding your transaction including, to the extent applicable: the amount that will be transferred to the beneficiary, the amount and description of any fees and taxes imposed by us, the total amount of the transaction, the exchange rate to be used if applicable, the amount of currency to be transferred, the amount and description of any fees imposed by intermediaries or our agents, and the amount that will be received by the beneficiary. In addition to the items above you will also be provided the date the funds are to be made available to the beneficiary, error resolution and cancellation right information and other disclosures. This will be provided either at the time you authorize the wire transfer or on a receipt provided after you've authorized your transaction.

**(c)** Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under Regulation E, subpart B or, to the extent applicable, UCC 4A. Except as required by Regulation E, subpart B, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**(d)** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please refer to the disclosure we provided to you at the time you authorized the Consumer International Wire Transfer on how to cancel.

**(e)** If you think there has been an error or problem with your Consumer International Wire Transfer, call us at 1-888-434-3030, visit a Chase branch, or send an account inquiry via Secure Message Center on chase.com.

You must contact us within 180 days of the date we disclosed to you that funds would be made available to the recipient. When you do, please tell us:

· Your name and address;

· The error or problem with the transfer, and why you believe it is an error or problem;

· The name of the recipient, and if you know it, their telephone number or address;

· The dollar amount of the transfer; or

· The confirmation code or number of the transaction

We will determine whether an error occurred within 90 days after you contact us and we will correct any error promptly. We will tell you the results within three business days after completing our investigation and will advise you of any remedies that may be available to you. If no response is received, we will refund your account for the applicable remedies. If we decide that there was no error, we will send you a written explanation. You may ask for copies of any documents we used in our investigation.

By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.

Recipient Bank's Identifier (ABA/SWIFT): 322286803 _____     Recipient's Account Number: _____ 7427 _____

Sender's Signature: _____     Date: _____

Email Address: nevin@fabric.inc

Transaction Number (Contact ID): 964747070200001 _____

The Email Address and Transaction Number provided will be used for communication purposes.

USA_00000900

G-186-059

**Branch / Department Information**

Initiated by: LINH VU _____ Initiating Branch: Mercer Island - 74(Phone: 614-248-5800 _____ Request Time: 02:14:03PM

Wire Transfer: ☐Approved    ☐Declined    Approved/Declined by (Print): _____

Approved/Declined by (Signature): _____    Date: _____

Decline Reason: _____    Comments: _____

Approving Manager (wire amount over limit)_____

Method of Approval (attach required supporting documentation)    ☐Phone call ☐Email ☐Other (explain)_____

Wire Tracking Information
FX Contract Number (if applicable) _____

USA_00000901
G-186-060

## Wire Transfer Outgoing Request

**CHASE ○**

### Wire Transfer Sender Information

| Sender Name: | | | | |
|---|---|---|---|---|
| Nevin Shetty | | | | |

| Account Name:<br>COMMERCE FABRIC, INC. | | Street Address:<br>113 CHERRY ST<br>PMB 66768 | | |
|---|---|---|---|---|
| City:<br>SEATTLE | State:<br>WA | Zip:<br>98104-2205 | Country:<br>USA | Daytime Phone:<br>206-853-7330 |
| Primary ID Type:<br>Driver's License | ID Issuer:<br>WA | ID Number: | ID Issue Date:<br>12/24/2020 | ID Exp.<br>02/10/2027 |
| Secondary ID Type:<br>Chase or Bank Issued Credit/Debit Card | ID Issuer:<br>BECU | ID Number:<br>XXXXXXXXXXXX1740 | ID Issue Date: | ID Exp.<br>08/30/2024 |
| Comments: | | | | |

### Wire Transfer Information

| Request Date:<br>04/12/2022 | Request time:<br>02:15:14PM Eastern time | Effective date:<br>04/12/2022 | Wire Type:<br>Domestic |
|---|---|---|---|
| Debit Account #:<br>XXXXX9944 | Debit Account Type:<br>PLAT BUS CHECKING | Wire Amount (US dollars):<br>$15,100,000.00 | |
| Qualifying Account #: | Qualifying Account Type: | Source of funds:<br>Checking | Wire Fee:<br>Refer to Account Agreement for Pricing |
| Currency type to be sent:<br>US Dollars | Exchange rate:<br>N/A | Foreign currency amount:<br>N/A | Amount to Collect (USD):<br>$15,100,000.00 |
| FX Contract Number: | | | |

### Recipient Account Information

| Account Name: | | | | |
|---|---|---|---|---|
| CIRCLE INTERNET FINANCIAL INC | | | | |

| Street Address: | Account Number:<br>7427 | | | |
|---|---|---|---|---|
| | City: | State: | Zip: | Country. |

Text to Recipient:
Reference ID: CIR36EMG38

### Receiving Bank Information

| Bank Name: | | | | |
|---|---|---|---|---|
| Silvergate Bank | | | | |

| Street Address:<br>128 N Broadway | Bank ABA/SWIFT Code:<br>322286803 | | | |
|---|---|---|---|---|
| | City:<br>Escondido | State:<br>CA | Zip:<br>92025-2714 | Country<br>USA |

| Intermediary Bank Name: | | | | |
|---|---|---|---|---|

| Street Address: | Intermediary Bank ABA: | | | |
|---|---|---|---|---|
| | City: | State. | Zip. | Country |

Text to Receiving Bank:
Reference ID: CIR36EMG38

USA_00000902<br>G-186-061

## Wire Transfer Agreement

**1. Service.**
The terms and provisions in this Wire Transfer Agreement ("Agreement") describe our wire transfer service, including what you can expect from us (JPMorgan Chase Bank, N.A.) and the security procedures we will take when you send a wire transfer.
If there is a conflict between any section of your Deposit Account Agreement and this Agreement, the provisions of this Agreement will apply.

The following types of wire transfers, when completed by a branch banker or by a Chase Private Client telephone banker, are governed by this Agreement:

- **Domestic Wire Transfer:** A wire transfer sent to a bank within the U.S., including its territories.
- **International Wire Transfer:** A wire transfer sent in either U.S. or foreign currencies, including using our Chase Global Transfer service, to a bank outside the U.S.
  - **Consumer International Wire Transfer:** A wire transfer that is sent by a natural person in the United States to transfer funds to a beneficiary in a foreign country for personal, family, or household purposes.

By providing your signature as authorization, as part of our security procedures, you agree to these terms and conditions and authorize us to provide you Domestic Wire Transfers or International Wire Transfers. Wire transfers, when completed using our Online Services or Mobile Services, are governed by a separate agreement.

**2. Security Procedures.**
These security procedures are only to help prevent unauthorized access to your account. All wire transfer requests go through an internal review, and we may need to contact you to verify information about your wire transfer. We may impose stricter security procedures for your particular wire transfer you make, but we have no obligation to do so. If we choose to impose stricter security procedures, we will not be liable to you for any delays or losses, and we will not be obligated to impose such security procedures in the future.

**(a) For Chase Branch Wire Transfers Only:**
When you request a wire transfer in a branch you will be required to provide your signature as authorization for each wire transfer and show valid identification. You acknowledge these security procedures used for wire requests you make in a branch are a commercially reasonable method of verifying your branch wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.

**(b) For Chase Private Client Customers Only:**
Only Chase Private Client telephone bankers can complete your wire transfer request using this service. To request wire transfers, you must provide your signature as authorization and maintain an active Chase Private Client Checking or Savings account. On the authorization form you can place a dollar limit on the wire transfers you request.

- You may request a wire transfer by telephone, and you agree that we will confirm your request by using any of the following security procedures, at our discretion:
  - Confirming certain personal information about you
  - Contacting you, another account holder or someone else you have listed on the authorization form.
- You may request a wire transfer by email, and you agree that we will confirm your request by contacting you or another account holder.
- We may call you at any phone number we have for you in our records or to the phone numbers provided on the authorization form.

- You acknowledge that we offer wire transfer services in person at our branches, or online which provide a higher level of security for your accounts, and you can use these options instead. You acknowledge the respective security procedures above for wire transfers are a commercially reasonable method of verifying your wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.
- If you do not specify the account from which to subtract the funds, we can subtract the amount of the wire transfer from any account you designated on the authorization form.

**3. Processing, Canceling, Delays and Notifications of Wire Transfers.**

**(a) Processing:** We'll start processing your wire transfer the same business day if we receive it and complete our security procedures before the cutoff times we establish. In order to complete our processing before the cutoff times we establish, we need to finish any secondary internal reviews and you must have available funds in the deposit account you designated in your Instructions.

**(b) Canceling:** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please see the section *Consumer International Wire Transfers* for more information on canceling Consumer International Wire Transfers. For all other wire transfers, once you have submitted a wire transfer for the current business day, you cannot cancel it after we've begun processing, but you may request us to attempt to return the funds to you. If the recipient's bank agrees, your funds may be returned to you, but likely not the full amount that was originally sent. We will not automatically cancel your wire transfer due to the transfer being delayed by more than five business days; if we do cancel your wire transfer we'll notify you.

**(c) Modifying:** Once a wire transfer has begun processing, we will not be able to change any type of wire transfer requests unless the recipient's bank agrees. If the recipient's bank declines to change the wire transfer request, you will be responsible for the transfer you initially requested.

**(d) Internal Review:** During our internal review, we may subtract funds from your account or place a hold on your account and it may result in processing delays. Once we have released the wire transfer, the recipient's bank may delay credit to the recipient due to their own internal review processes.

**(e) Notifications:** We will send you an email notification on the status of your wire transfer, it will be sent to an email address you have provided. We may also notify you verbally of the status of your wire transfer, but we are not required to do so. If you do not have an email address on file, if the email is returned undeliverable, or we are unable to send an email due to system failures or outages beyond our reasonable control, it is your responsibility to monitor your account for the status of your wire transfer. You may contact us for the status of your wire transfer. These notification methods are deemed to be commercially reasonable. Any other information we may provide upon successfully scheduling a wire transfer is only an indication that we've received your request and not an indication that we've accepted your wire transfer.

**4. Identifying Number.**
We or any other bank involved in the wire transfer will complete your wire transfer request using the account number or bank identification number you provide, even if the numbers do not match the recipient's or bank's name. *If you provided us an incorrect account number for the recipient or an incorrect routing or identification number for the recipient's bank, you could lose the amount of the transfer.*

USA_00000903

G-186-062

## Wire Transfer Agreement - continued

**5. Future Dated Wire Transfers.**
You may request a future dated (one -time) domestic wire transfer, up to 10 business days from the current business day's cutoff time. You cannot cancel a future dated wire transfer once it has been requested.

**6. Foreign Exchange Transfer.**
It is our discretion in which foreign currencies we will send wire transfers, and these can change at any time. If you send a wire transfer in a foreign currency, you authorize us to subtract the amount from your account at the exchange rate we offered at the time you requested it. The foreign exchange rates we use are determined by us in our sole discretion.

The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

If your initial request is returned, cancelled or changed, and if you request a new wire transfer, the current exchange rate at the time of the new transaction will apply. If the funds are returned or payment cannot be made for any reason, we will not be liable for more than the amount of the wire transfer at our exchange rate at the time we return the funds to you, less charges taken by any other bank involved in the wire transfer. However, if you requested a Consumer International Wire Transfer additional rights may apply. If you cancel a funds transfer request, other than a cancellation of a Consumer International Wire Transfer within 30 minutes after you authorized us to send it, and it causes a loss or cost to us, we may subtract funds from your account to cover these losses.

If the wire transfer is not in the currency of the recipient's account, the recipient's bank or another processing bank may reject the wire transfer or convert it. If converted, you agree the wire transfer may be converted to a different currency at their exchange rate and may subtract additional fees.

**7. Fees and Payment Route.**
We may charge a fee when you use this service based on your account agreement or fee schedule in effect when the wire is sent from your account, or for business accounts, based on the terms in effect when your next available account analysis is performed. We may use any funds transfer system we believe reasonable to complete your request, regardless of any instructions you might give us. If we also are the recipient's bank, we may complete your request using an internal transfer. You are responsible for all fees and taxes, including our fees and any fees charged by other funds transfer systems or banks involved in the transfer.

**8. Wire Transfer System Rules and Laws.**
The use of this service is subject to all applicable U.S. federal and state laws, regulations, rules and wire transfer arrangements, including the respective state's Uniform Commercial Code Article 4A, as may be applicable, which, in the event of a conflict with this Agreement, will govern. All of your wire transfers must comply with U.S. laws, including the regulations and economic sanctions administered by the U.S. Treasury Department's Office of Foreign Asset Control and other applicable laws.

If you make a Consumer International Wire Transfer, it is also subject to additional federal laws and regulations.

**9. Indemnification.**
You will indemnify us for all claims, expenses, liabilities, and losses (including reasonable legal fees) if you or a third party makes a claim against us for any of our actions or services in this Agreement, unless they prove gross negligence or willful misconduct. You understand this section will survive even if you close your account or this Agreement is terminated.

**10. Failure to Perform; Limitation of Liability.**
We are only responsible for performing the services specified in this Agreement. Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under UCC 4A or, to the extent applicable Regulation E, subpart B. Except as required by Regulation E, subpart B, as applicable, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Any provision of this Agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care.

**11. Changes to the Agreement.**
We may change the terms of this Agreement, including fees and features of this service, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

We may direct you to a branch or to your Chase Private Client banker for the content of any changes or the revised Agreement unless the law requires a different method. Your use of this service after we have made such changes available will be considered your agreement to the change.

**12. Contact Us in the Event of an Error.**
We will not be responsible for any delays in payment or additional fees caused by your failure to promptly notify us. You will exercise ordinary care to determine whether a wire transfer request we accepted and subtracted from your account was either in error or not authorized. Except for any Consumer International Wire Transfer, in the event of an error or unauthorized wire transfer, you agree to notify us within 30 days after we mail a statement reflecting the transfer or otherwise make such a statement available (for example, paperless statements). You agree that we are entitled to retain payment for a wire transfer unless you notify us within this 30-day period. For additional terms governing Consumer International Wire Transfers, please see the section *Consumer International Wire Transfers*.

**13. Consumer International Wire Transfers.**
**(a)** This section contains additional terms applicable only to Consumer International Wire Transfers. This section does not apply to any wire transfer request for delivery to a beneficiary in the United States, to any wire transfer request initiated by a non-consumer, or to any wire transfer request initiated by a consumer for any non-personal, non-family, or non-household purposes. In the event of a conflict between a provision in this section and a provision in the rest of this Agreement, or in the agreement governing your funding account, the provision in this section will control with respect to Consumer International Wire Transfers.

USA_00000904
G-186-063

## Wire Transfer Agreement - continued

**(b)** Prior to sending a Consumer International Wire Transfer, we will provide you with certain important disclosures regarding your transaction including, to the extent applicable: the amount that will be transferred to the beneficiary, the amount and description of any fees and taxes imposed by us, the total amount of the transaction, the exchange rate to be used if applicable, the amount of currency to be transferred, the amount and description of any fees imposed by intermediaries or our agents, and the amount that will be received by the beneficiary. In addition to the items above you will also be provided the date the funds are to be made available to the beneficiary, error resolution and cancellation right information and other disclosures. This will be provided either at the time you authorize the wire transfer or on a receipt provided after you've authorized your transaction.

**(c)** Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under Regulation E, subpart B or, to the extent applicable, UCC 4A. Except as required by Regulation E, subpart B, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**(d)** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please refer to the disclosure we provided to you at the time you authorized the Consumer International Wire Transfer on how to cancel.

**(e)** If you think there has been an error or problem with your Consumer International Wire Transfer, call us at 1-888-434-3030, visit a Chase branch, or send an account inquiry via Secure Message Center on chase.com.

You must contact us within 180 days of the date we disclosed to you that funds would be made available to the recipient. When you do, please tell us:

· Your name and address;

· The error or problem with the transfer, and why you believe it is an error or problem;

· The name of the recipient, and if you know it, their telephone number or address;

· The dollar amount of the transfer; or

· The confirmation code or number of the transaction

We will determine whether an error occurred within 90 days after you contact us and we will correct any error promptly. We will tell you the results within three business days after completing our investigation and will advise you of any remedies that may be available to you. If no response is received, we will refund your account for the applicable remedies. If we decide that there was no error, we will send you a written explanation. You may ask for copies of any documents we used in our investigation.

By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.

Recipient Bank's Identifier (ABA/SWIFT): 322286803 _____ Recipient's Account Number: 5090007427 _____

Sender's Signature: _____     Date: _____

Email Address: nevin@fabric.inc

Transaction Number (Contact ID): 444744968060001 _____

The Email Address and Transaction Number provided will be used for communication purposes.

USA_00000905
G-186-064

**Branch / Department Information**

Initiated by: LINH VU _____ Initiating Branch: Mercer Island - 74(Phone: 614-248-5800 ___ Request Time: 02:15:14PM

Wire Transfer:  ☐ Approved  ☐ Declined   Approved/Declined by (Print): _____

Approved/Declined by (Signature): _____ Date: _____

Decline Reason: _____ Comments: _____

Approving Manager (wire amount over limit) _____

Method of Approval (attach required supporting documentation)  ☐ Phone call  ☐ Email  ☐ Other (explain) _____

Wire Tracking Information

Fx Contract Number (if applicable) _____

USA_00000906

G-186-065

## Wire Transfer Outgoing Request

**CHASE 🖒**

### Wire Transfer Sender Information

| Sender Name: | | | | | |
|---|---|---|---|---|---|
| Nevin Shetty | | | | | |

| Account Name: COMMERCE FABRIC, INC. | | Street Address: 113 CHERRY ST PMB 66768 | | | |
|---|---|---|---|---|---|

| City: SEATTLE | State: WA | Zip: 98104-2205 | Country: USA | | Daytime Phone: 206-853-7300 |
|---|---|---|---|---|---|
| Primary ID Type: Driver's License | ID Issuer: WA | ID Number: | | ID Issue Date: 12/24/2020 | ID Exp: 02/10/2027 |
| Secondary ID Type: Chase or Bank Issued Credit/Debit Card | ID Issuer: BECU | ID Number: XXXXXXXXXXX1740 | | ID Issue Date: | ID Exp: 08/30/2024 |

| Comments: |
|---|
| |

### Wire Transfer Information

| Request Date: 04/05/2022 | Request time: 12:12:12PM Eastern time | Effective date: 04/05/2022 | Wire Type: Domestic |
|---|---|---|---|
| Debit Account #: XXXXX9944 | Debit Account Type: PLAT BUS CHECKING | Wire Amount (US dollars): $5,400,000.00 | |
| Qualifying Account #: | Qualifying Account Type: | Source of funds: Checking | Wire Fee: Refer to Account Agreement for Pricing |
| Currency type to be sent: US Dollars | Exchange rate: N/A | Foreign currency amount: N/A | Amount to Collect (USD): $5,400,000.00 |
| FX Contract Number: | | | |

### Recipient Account Information

| Account Name: | | | | |
|---|---|---|---|---|
| Circle Internet Financial INC | | | | |

| Street Address: | Account Number: 7427 | | | |
|---|---|---|---|---|
| | City: | State: | Zip: | Country: |

| Text to Recipient: |
|---|
| Reference ID: CIR36EMG38 |

### Receiving Bank Information

| Bank Name: | | | | |
|---|---|---|---|---|
| Silvergate Bank | | | | |

| Street Address: 128 N Broadway | Bank ABA/SWIFT Code: 322286803 | | | |
|---|---|---|---|---|
| | City: Escondido | State: CA | Zip: 92025-2714 | Country: USA |

| Intermediary Bank Name: |
|---|
| |

| Street Address: | Intermediary Bank ABA: | | | |
|---|---|---|---|---|
| | City: | State: | Zip: | Country: |

| Text to Receiving Bank: |
|---|
| Reference ID: CIR36EMG38 |

USA_00000907
G-186-066

## Wire Transfer Agreement

### 1. Service.

The terms and provisions in this Wire Transfer Agreement ("Agreement") describe our wire transfer service, including what you can expect from us (JPMorgan Chase Bank, N.A.) and the security procedures we will take when you send a wire transfer. If there is a conflict between any section of your Deposit Account Agreement and this Agreement, the provisions of this Agreement will apply.

The following types of wire transfers, when completed by a branch banker or by a Chase Private Client telephone banker, are governed by this Agreement:

- **Domestic Wire Transfer:** A wire transfer sent to a bank within the U.S., including its territories.
- **International Wire Transfer:** A wire transfer sent in either U.S. or foreign currencies, including using our Chase Global Transfer service, to a bank outside the U.S.
  - **Consumer International Wire Transfer:** A wire transfer that is sent by a natural person in the United States to transfer funds to a beneficiary in a foreign country for personal, family, or household purposes.

By providing your signature as authorization, as part of our security procedures, you agree to these terms and conditions and authorize us to provide you Domestic Wire Transfers or International Wire Transfers. Wire transfers, when completed using our Online Services or Mobile Services, are governed by a separate agreement.

### 2. Security Procedures.

These security procedures are only to help prevent unauthorized access to your account. All wire transfer requests go through an internal review, and we may need to contact you to verify information about your wire transfer. We may impose stricter security procedures for any particular wire transfer you make, but we have no obligation to do so. If we choose to impose stricter security procedures, we will not be liable to you for any delays or losses, and we will not be obligated to impose such security procedures in the future.

#### (a) For Chase Branch Wire Transfers Only:

When you request a wire transfer in a branch you will be required to provide your signature as authorization for each wire transfer and show valid identification. You acknowledge these security procedures used for wire requests you make in a branch are a commercially reasonable method of verifying your branch wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.

#### (b) For Chase Private Client Customers Only:

Only Chase Private Client telephone bankers can complete your wire transfer request using this service. To request wire transfers, you must provide your signature as authorization and maintain an active Chase Private Client Checking or Savings account. On the authorization form you can place a dollar limit on the wire transfers you request.

- You may request a wire transfer by telephone, and you agree that we will confirm your request by using any of the following security procedures, at our discretion:
  - Confirming certain personal information about you
  - Contacting you, another account holder or someone else you have listed on the authorization form.
- You may request a wire transfer by email, and you agree that we will confirm your request by contacting you or another account holder.
- We may call you at any phone number we have for you in our records or to the phone numbers provided on the authorization form.

- You acknowledge that we offer wire transfer services in person at our branches, or online which provide a higher level of security for your accounts, and you can use these options instead. You acknowledge the respective security procedures above for wire transfers are a commercially reasonable method of verifying your wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.
- If you do not specify the account from which to subtract the funds, we can subtract the amount of the wire transfer from any account you designated on the authorization form.

### 3. Processing, Canceling, Delays and Notifications of Wire Transfers.

**(a) Processing:** We'll start processing your wire transfer the same business day if we receive it and complete our security procedures before the cutoff times we establish. In order to complete our processing before the cutoff times we establish, we need to finish any secondary internal reviews and you must have available funds in the deposit account you designated in your Instructions.

**(b) Canceling:** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please see the section *Consumer International Wire Transfers* for more information on canceling Consumer International Wire Transfers. For all other wire transfers, once you have submitted a wire transfer for the current business day, you cannot cancel it after we've begun processing, but you may request us to attempt to return the funds to you. If the recipient's bank agrees, your funds may be returned to you, but likely not the full amount that was originally sent. We will not automatically cancel your wire transfer due to the transfer being delayed by more than five business days; if we do cancel your wire transfer we'll notify you.

**(c) Modifying:** Once a wire transfer has begun processing, we will not be able to change any type of wire transfer requests unless the recipient's bank agrees. If the recipient's bank declines to change the wire transfer request, you will be responsible for the transfer you initially requested.

**(d) Internal Review:** During our internal review, we may subtract funds from your account or place a hold on your account and it may result in processing delays. Once we have released the wire transfer, the recipient's bank may delay credit to the recipient due to their own internal review processes.

**(e) Notifications:** We will send you an email notification on the status of your wire transfer, it will be sent to an email address you have provided. We may also notify you verbally of the status of your wire transfer, but we are not required to do so. If you do not have an email address on file, if the email is returned undeliverable, or we are unable to send an email due to system failures or outages beyond your reasonable control, it is your responsibility to monitor your account for the status of your wire transfer. You may contact us for the status of your wire transfer. These notification methods are deemed to be commercially reasonable. Any other information we may provide upon successfully scheduling a wire transfer is only an indication that we've received your request and not an indication that we've accepted your wire transfer.

### 4. Identifying Number.

We or any other bank involved in the wire transfer will complete your wire transfer request using the account number or bank identification number you provide, even if the numbers do not match the recipient's or bank's name. *If you provided us an incorrect account number for the recipient or an incorrect routing or identification number for the recipient's bank, you could lose the amount of the transfer.*

USA_00000908

G-186-067

## Wire Transfer Agreement - continued

### 5. Future Dated Wire Transfers.
You may request a future dated (one -time) domestic wire transfer, up to 10 business days from the current business day's cutoff time. You cannot cancel a future dated wire transfer once it has been requested.

### 6. Foreign Exchange Transfer.
It is our discretion in which foreign currencies we will send wire transfers, and these can change at any time. If you send a wire transfer in a foreign currency, you authorize us to subtract the amount from your account at the exchange rate we offered at the time you requested it. The foreign exchange rates we use are determined by us in our sole discretion.

The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

If your initial request is returned, cancelled or changed, and if you request a new wire transfer, the current exchange rate at the time of the new transaction will apply. If the funds are returned or payment cannot be made for any reason, we will not be liable for more than the amount of the wire transfer at our exchange rate at the time we return the funds to you, less charges taken by any other bank involved in the wire transfer. However, if you requested a Consumer International Wire Transfer additional rights may apply. If you cancel a funds transfer request, other than a cancellation of a Consumer International Wire Transfer within 30 minutes after you authorized us to send it, and it causes a loss or cost to us, we may subtract funds from your account to cover these losses.

If the wire transfer is not in the currency of the recipient's account, the recipient's bank or another processing bank may reject the wire transfer or convert it. If converted, you agree the wire transfer may be converted to a different currency at their exchange rate and may subtract additional fees.

### 7. Fees and Payment Route.
We may charge a fee when you use this service based on your account agreement or fee schedule in effect when the wire is sent from your account, or for business accounts, based on the terms in effect when your next available account analysis is performed. We may use any funds transfer system we believe reasonable to complete your request, regardless of any instructions you might give us. If we also are the recipient's bank, we may complete your request using an internal transfer. You are responsible for all fees and taxes, including our fees and any fees charged by other funds transfer systems or banks involved in the transfer.

### 8. Wire Transfer System Rules and Laws.
The use of this service is subject to all applicable U.S. federal and state laws, regulations, rules and wire transfer arrangements, including the respective state's Uniform Commercial Code Article 4A, as may be applicable, which, in the event of a conflict with this Agreement, will govern. All of your wire transfers must comply with U.S. laws, including the regulations and economic sanctions administered by the U.S. Treasury Department's Office of Foreign Asset Control and other applicable laws.

If you make a Consumer International Wire Transfer, it is also subject to additional federal laws and regulations.

### 9. Indemnification.
You will indemnify us for all claims, expenses, liabilities, and losses (including reasonable legal fees) if you or a third party makes a claim against us for any of our actions or services in this Agreement, unless they prove gross negligence or willful misconduct. You understand this section will survive even if you close your account or this Agreement is terminated.

### 10. Failure to Perform; Limitation of Liability.
We are only responsible for performing the services specified in this Agreement. Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under UCC 4A or, to the extent applicable Regulation E, subpart B. Except as required by Regulation E, subpart B, as applicable, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Any provision of this Agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care.

### 11. Changes to the Agreement.
We may change the terms of this Agreement, including fees and features of this service, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

We may direct you to a branch or to your Chase Private Client banker for the content of any changes or the revised Agreement unless the law requires a different method. Your use of this service after we have made such changes available will be considered your agreement to the change.

### 12. Contact Us in the Event of an Error.
We will not be responsible for any delays in payment or additional fees caused by your failure to promptly notify us. You will exercise ordinary care to determine whether a wire transfer request we accepted and subtracted from your account was either in error or not authorized. Except for any Consumer International Wire Transfer, in the event of an error or unauthorized wire transfer, you agree to notify us within 30 days after we mail a statement reflecting the transfer or otherwise make such a statement available (for example, paperless statements). You agree that we are entitled to retain payment for a wire transfer unless you notify us within this 30-day period. For additional terms governing Consumer International Wire Transfers, please see the section *Consumer International Wire Transfers*.

### 13. Consumer International Wire Transfers.
**(a)** This section contains additional terms applicable only to Consumer International Wire Transfers. This section does not apply to any wire transfer request for delivery to a beneficiary in the United States, to any wire transfer request initiated by a non-consumer, or to any wire transfer request initiated by a consumer for any non-personal, non-family, or non-household purposes. In the event of a conflict between a provision in this section and a provision in the rest of this Agreement, or in the agreement governing your funding account, the provision in this section will control with respect to Consumer International Wire Transfers.

USA_00000909

G-186-068

## Wire Transfer Agreement - continued

**(b)** Prior to sending a Consumer International Wire Transfer, we will provide you with certain important disclosures regarding your transaction including, to the extent applicable: the amount that will be transferred to the beneficiary, the amount and description of any fees and taxes imposed by us, the total amount of the transaction, the exchange rate to be used if applicable, the amount of currency to be transferred, the amount and description of any fees imposed by intermediaries or our agents, and the amount that will be received by the beneficiary. In addition to the items above you will also be provided the date the funds are to be made available to the beneficiary, error resolution and cancellation right information and other disclosures. This will be provided either at the time you authorize the wire transfer or on a receipt provided after you've authorized your transaction.

**(c)** Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under Regulation E, subpart B or, to the extent applicable, UCC 4A. Except as required by Regulation E, subpart B, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**(d)** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please refer to the disclosure we provided to you at the time you authorized the Consumer International Wire Transfer on how to cancel.

**(e)** If you think there has been an error or problem with your Consumer International Wire Transfer, call us at 1-888-434-3030, visit a Chase branch, or send an account inquiry via Secure Message Center on chase.com.

You must contact us within 180 days of the date we disclosed to you that funds would be made available to the recipient. When you do, please tell us:

• Your name and address;

• The error or problem with the transfer, and why you believe it is an error or problem;

• The name of the recipient, and if you know it, their telephone number or address;

• The dollar amount of the transfer; or

• The confirmation code or number of the transaction

We will determine whether an error occurred within 90 days after you contact us and we will correct any error promptly. We will tell you the results within three business days after completing our investigation and will advise you of any remedies that may be available to you. If no response is received, we will refund your account for the applicable remedies. If we decide that there was no error, we will send you a written explanation. You may ask for copies of any documents we used in our investigation.

---

By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.

Recipient Bank's Identifier (ABA/SWIFT): 322286803                    Recipient's Account Number: 5090007427

Sender's Signature: _____                    Date: _____

Email Address: nevin@fabric.inc

Transaction Number (Contact ID): 734748372560001

The Email Address and Transaction Number provided will be used for communication purposes.

USA_00000910

G-186-069

**Branch / Department Information**

Initiated by: LINH VU _____ Initiating Branch: Mercer Island - 74(Phone: 614-248-5800 _____ Request Time: 12:12:12PM

Wire Transfer:  ☐ Approved   ☐ Declined    Approved/Declined by (Print): _____

Approved/Declined by (Signature): _____ Date: _____

Decline Reason: _____ Comments: _____

Approving Manager (wire amount over limit) _____

Method of Approval (attach required supporting documentation)  ☐ Phone call  ☐ Email  ☐ Other (explain) _____

Wire Tracking Information
FX Contract Number (if applicable) _____

N15220-CS WTA (03/2022)                                    Page 5 of 5

USA_00000911
G-186-070

## Beneficiary bank account details

This information will be required by your bank to complete the wire transfer.

Beneficiary name

CIRCLE INTERNET FINANCIAL INC

Beneficiary account no.

7427

Beneficiary address

99 HIGH STREET BOSTON MA 02110

Routing number

322286803

Bank name

SILVERGATE BANK

SWIFT/BIC Code (if required by bank)

SIVGUS66

Reference ID for memo ✖

CIR36EMG38

⚠ **Important:** Please include the **reference ID** in the memo section of your bank's wire transfer form.

I added the correct reference ID in my wire

USA_00000923
G-186-082

**BANK OF AMERICA** 🏦                              **Funds Transfer Request Authorization**

### Customer Information

| | | | |
|---|---|---|---|
| **Name:** | NEVIN SHETTY | **Address:** | |
| **Phone:** | (206)853-7300 | | MERCER ISLAND |
| | | | WA 98040-4906  US |

### Account Information

| | |
|---|---|
| **Account:** | BUS_2569 |
| **Account Title:** | CHRONO FUND ONE LP |
| **Requester Name:** | NEVIN S SHETTY |

### Wire Information

| | | | |
|---|---|---|---|
| **Wire Type:** | DOMESTIC | **Wire Date:** | 04/13/2022 |
| **Country:** | US | **Wire Amount (USD):** | 2,500,000.00 |
| **Currency of Recipient Account:** | USD | | |
| **Source:** | IN PERSON | | |
| **ID Verification/Type:** | U.S. DRIVER'S LICENSE (WITH OR WITH | | |
| **ID Verification/Type:** | BANK OF AMERICA DEBIT CARD, ATM CAR | **Wire Fee:** | 30.00 |

### Recipient Information

| | | | |
|---|---|---|---|
| **Recipient Name:** | CIRCLE INTERNET FINANCIAL INC | **Bank Name:** | SILVERGATE BANK |
| **Account Number Type:** | ACCOUNT NUMBER | **Bank ID:** | 322286803 |
| **Account Number:** | 7427 | **Address:** | 4250 EXECUTIVE SQUARE, STE 300 |
| **Address:** | BOSTON | | LA JOLLA |
| | MASSACHUSETTS 02110 US | | CA 92037 US |
| **Information about payment:** | | | |
| Purpose of Payment: | | Additional Phone Advice: | |
| Additional Reference Information: | CIR33NQ56V | Additional Bank Instructions: | |

### Customer Approval

I authorize Bank of America to transfer my funds as set forth in the instructions herein (including debiting my account if applicable), and agree that such transfer of funds is subject to this Funds Transfer Agreement (see disclosure pages of this form) and applicable fees. If this is a foreign currency wire transfer, I accept the conversion rate provided by Bank of America at the time the wire is sent. Exchange rates are determined by Bank of America, N.A. in our sole discretion. You may be able to get a better exchange rate if you handle this transaction online instead of in the financial center. Please see the Funds Transfer Agreement for further information regarding our exchange rates. For a Consumer International wire: We rely on you, the customer, to inform us of the currency of the receiving account (denoted under 'Currency of Recipient Account') so that we may disclose the exchange rate for conversion in the wire process. If you chose to send USD rather than the foreign currency of the receiving account, we will honor your choice, however, we will not be able to provide exchange rate information. Additionally, so that we may provide required disclosures, you must remain in the financial center until we provide you the Remittance Transfer Receipt (RTR). If you leave prior to receiving the RTR, we will cancel the international remittance transfer.

Customer Signature _____      Date of Request _____/_____/_____

| **IMPORTANT: FOR EACH WIRE Indicate Method of Signature Verification: (must complete one of the below)** | | | | |
|---|---|---|---|---|
| **Not Applicable** (check box if no signature verification is required) | **Signature Card** (check box if signature card was reviewed) | **Business Resolution** (check box if business resolution was reviewed) | **Posted Check#** (reference PRO for date guidelines) (complete field below) | **Leader Exception Granted** (leader must place their initials or signature in box below) |
| ☐ | ☐ | ☐ | Check # | Exception Reason: _____ |

| For Bank Use Only: Financial Center Information | | | | |
|---|---|---|---|---|
| Financial Center Name | MERCER ISLAND BANKING CENTER | | Date: | April 13, 2022 |
| Company #/Cost Center #: | 00353 0042705 | | Phone #: | 206-268-5960 |
| Initiating Associate Name: | ISLAS CRUZ, DAVID | | Remittance ID #: | AMNLVS2VW |

LGLDEPREG BACBCC

## Short Message Report

| Conversations: 1 | Participants: 4 |
|---|---|
| Total Messages: 9 | Date Range: 4/4/2022 |

## Outline of Conversations

 **D01QL6KTHJ9** · 9 messages on 4/4/2022 · Alice Leung (alice@fabric.inc) · e3b0c442 · hangouts · nevinshetty (nevin@fabric.inc)

CF0000010

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-188
Admitted:_____

**Messages in chronological order** (times are shown in GMT -07:00)

---

### D01QL6KTHJ9

N  **nevinshetty (nevin@fabric.inc)**                                      4/4/2022, 4:25 PM
Were you able to log into HighTower Treasury? You should have received an email to create a login

N  **nevinshetty (nevin@fabric.inc)**                                      4/4/2022, 4:25 PM
I moved money from Chase there

N  **nevinshetty (nevin@fabric.inc)**                                      4/4/2022, 4:26 PM



*Image: image.png (98 KB)*

A  **Alice Leung (alice@fabric.inc)**                                      4/4/2022, 4:33 PM
Yes, I can log into HighTower

N  **nevinshetty (nevin@fabric.inc)**                                      4/4/2022, 4:34 PM
Ok great

N  **nevinshetty (nevin@fabric.inc)**                                      4/4/2022, 4:35 PM
I will send you SVB credentials when I get them tomorrow or Wednesday

N  **nevinshetty (nevin@fabric.inc)**                                      4/4/2022, 4:35 PM
Haven't moved money yet but will be later this week

A  **Alice Leung (alice@fabric.inc)**                                      4/4/2022, 4:35 PM
ok, thank you!

A  **Alice Leung (alice@fabric.inc)**                                      4/4/2022, 4:35 PM
ok

**CF0000011**

G-188-002

## Short Message Report

| Conversations: 1 | Participants: 2 |
|---|---|
| Total Messages: 5 | Date Range: 3/30/2022 |

## Outline of Conversations

 **D01QM2YGD0D** · 5 messages on 3/30/2022 · Ryan Bartley (ryan@fabric.inc) · nevinshetty (nevin@fabric.inc)

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-193
Admitted:_____

**Messages in chronological order** (times are shown in GMT -07:00)

| | |
|---|---|
| **D01QM2YGD0D** | |

| N | nevinshetty (nevin@fabric.inc) | 3/30/2022, 11:46 AM |
|---|---|---|
| | Hi Ryan, can you call <tel:8176764762\|817-676-4762> for the Chase thing? | |

| N | nevinshetty (nevin@fabric.inc) | 3/30/2022, 1:54 PM |
|---|---|---|
| | Chase Checking:      9944 | |

| N | nevinshetty (nevin@fabric.inc) | 3/30/2022, 1:56 PM |
|---|---|---|
| | The counter party is UKG | |

| R | Ryan Bartley (ryan@fabric.inc) | 3/30/2022, 2:00 PM |
|---|---|---|
| | All done, "Jackie will submit to operations" | |

| N | nevinshetty (nevin@fabric.inc) | 3/30/2022, 2:01 PM |
|---|---|---|
| | Great. Thanks. | |

**CONFIDENTIAL**

## Short Message Report

| Conversations: 1 | Participants: 4 |
|---|---|
| Total Messages: 2 | Date Range: 5/11/2022 |

## Outline of Conversations

 **D030BQNPW20** · 2 messages on 5/11/2022 · Let's meet here · Stacy Saal (stacy@fabric.inc) · meets · nevinshetty (nevin@fabric.inc)

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-195
Admitted:_____

**Messages in chronological order** (times are shown in GMT -07:00)

| | |
|---|---|
| ⊞ | **D030BQNPW20** |

| | |
|---|---|
| S | Stacy Saal (stacy@fabric.inc) | 5/11/2022, 2:04 PM |

Can we connect on your plan?  Have you communicated your departure to anyone on your team?

| | |
|---|---|
| ⊞ | nevinshetty (nevin@fabric.inc) | 5/11/2022, 2:32 PM |

I have not communicated yet – that would send alarm bells. The team is stressed as it is. Yes lets chat on plan. I am at the tail end of Secondary and Paypal work. I will have a concrete plan on Friday during our 1:1.

**CONFIDENTIAL**

## Short Message Report

| Conversations: 1 | Participants: 15 |
|---|---|
| Total Messages: 3 | Date Range: 4/1/2022 |

## Outline of Conversations

 **finance-team** · 3 messages on 4/1/2022 · Aastha Bhatia (aastha.bhatia@fabric.inc) · Alice Leung (alice@fabric.inc) · Amy Lovdahl (amy.lovdahl@fabric.inc) · Ella Evans (ella.evans@fabric.inc) · Eric Chan (eric.chan@fabric.inc) · Kat Bruno (katherine.bruno@fabric.inc) · Kye Seo Hwang (kyeseo.hwang@fabric.inc) · Lucy Harrington (lucy.harrington@fabric.inc) · Marie Chu (marie.chu@fabric.inc) · Raman Bindlish (raman.bindlish@fabric.inc) · Tom Spence (tom.spence@fabric.inc) · Wesley Pua (wesley@fabric.inc) · hangouts · meets · nevinshetty (nevin@fabric.inc)

**CF0003216**

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-196
Admitted:_____

**Messages in chronological order** (times are shown in GMT -07:00)

---

**finance-team**

N   **nevinshetty (nevin@fabric.inc)**                                  4/1/2022, 9:35 AM

<@Alice Leung> can you set up a $10M wire from Rho to our Chase? apparently that is the wire limit and I want to make sure some money transfers today

A   **Alice Leung (alice@fabric.inc)**                                  4/1/2022, 9:41 AM

Done! Please approve in Rho.

A   **Alice Leung (alice@fabric.inc)**                                  4/1/2022, 9:41 AM

| Payee | Commerce Fabric, Inc. | Phone Number | +1-206-453-7700 |
| Routing Number | ****0021 | Email | finance@fabric.inc |
| Account Number | ****1644 | To Be Executed | Immediately |
| Account Type | Checking | Estimated Arrival | April 10, 2022 |
| Amount | $10,000,000.00 | Frequency | One Time Only |
| Payee Address | 111 Cherry St., PMB 0U56... | Reference/Memo | Fund transfer from Rho to ... |

*Image: image.png (38 KB)*

 **February 28th, 2022**

Another competitor to emulate and surpass - https://compoundtreasury.com/

 compoundtreasury.com

**Compound Treasury**

Compound Treasury gives quick and secure access to 4.00% APR on USD balances, paid daily. (29 kB) ▾



U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197A
Admitted:_____

 **Adam Brazg** 8:59 AM
I am going to make a 50k wire today to HT Circle account for Blueberry Deposit. Got swamped last week.

 **nevin.shetty** 9:04 AM
cool

 **nevin.shetty** 9:21 AM
Wait

Can you wait until mid week?

 **Adam Brazg** 9:22 AM
yeah, i can.

 **nevin.shetty** 9:23 AM
Eth and SOL networks are super congested / having issued from the weekend BoredApes auction

 👍 1   ☺

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197B
Admitted:_____

 **nevin.shetty** ˅

 **Adam Brazg** 11:36 AM          May 9th, 2022 ˅
UST man...

 **Adam Brazg** 3:31 PM
want to sync?

 **nevin.shetty** 3:31 PM
yes

5 min

 **Adam Brazg** 3:31 PM
lemme know when you are ready

 **nevin.shetty** 3:37 PM
ready

 **Zoom** APP  3:37 PM
Call ▾

> ▣ **Zoom meeting started by adambrazg**
> Ended at 4:55 PM - Lasted 1 day

Meeting ID: 892-0177-3313

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197C
Admitted:_____

Yeah, fingers crossed

**Adam Brazg**  7:40 AM
Can we chat today about different scenario outcomes here? This is clearly a big deal that we need to be prepared to handle.

**nevin.shetty**  7:49 AM
9:30am?

**Adam Brazg**  7:50 AM
Ya

**Adam Brazg**  8:04 AM
Do we temporarily get out of anchor? And just hold ust?

**nevin.shetty**  8:08 AM
I am open to it but I dont think so. If we move from aUST to UST I am unclear if are we getting a 50% discount on UST or if we crystalize a 50% loss. (edited)

**Adam Brazg**  8:10 AM
Ok

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197D
Admitted:_____

**Adam Brazg** 9:00 AM
Be on in a second

**Adam Brazg** 10:45 AM
Let me know if you have a minutet his afternooon to discuss what you sent me.

**nevin.shetty** 10:49 AM
can you chat in 10 min?

**Adam Brazg** 10:49 AM
yeah

let me know when you are ready

**nevin.shetty** 10:49 AM
cool. When I wrap this call - will let you know

 👍 1   😄

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197E
Admitted:_____

**nevin.shetty** ˅



**Y!** finance.yahoo.com

**GAM Holding Could be Terra's White Knight**    May 12th, 2022 ˅

Leading Asset Manager Could Bail Out UST in Deal Worth BillionsZURICH, SWITZERLAND / ACCESSWIRE / May 12, 2022 / Leading asset manager GAM Holding AGis pleased to announce that it is negotiating with Terraform Labs (Terra) to help support its Luna stablecoin (UST). GAM is expected to invest between $2 billion and $3 billion to absorb excess supply of UST during its current selloff.



**nevin.shetty**  4:38 PM

I read that as well. I dont think its credible. Look at the last 2 sentences

4:38  Why would the article invite people to inquiry about the negotiation



**Adam Brazg**  4:39 PM

ughh, yah.



**nevin.shetty**  4:39 PM

That said, There is 5bn of UST circulating. I think they can raise that money. Hoping for a miracle



**nevin.shetty** 3:53 PM
I need to you call Wells Fargo today
Wells Fargo New Application Dept
877 673 0203
Ext 30124 (the rep is Lordis)
Application Number: 1053182

You need to verify your ID over the phone to open the bank account.

If she asks, we are a treasury consulting platform (not a money services business)

Legally, instead of being a Money services business, we can have the client sign a deposit agreement that treats it as an unregistered debt security - I am working on that framework now

**Adam Brazg** 3:54 PM
Okay, sounds good. I will call them in 5 min.

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197G
Admitted:_____

**Adam Brazg** 5:40 PM  April 29th, 2022
Total hard costs (salaries+10% overhead, not bilberrry rates) for resources who have been working on HT (not including me or Ross) from inception to 4/29 has been about $35,000.

**nevin.shetty** 9:32 PM
Awesome. Even if this lasts only a month - this is amazing ROI investment. Can you draw up an invoice from Bilberry to HTT dated May 15th for $35K. I will make the first withdrawal in early May. Have you registered for the Alice app? I just made my first test withdrawal (from Anchor to Alice and then to my BofA account). Going to be a great flow of funds for us.

**Adam Brazg** 9:52 PM
i have registered. that is great that you can go straight from anchor to Bofa. and yeah, i can draw up an invoice and send it over this week.

**nevin.shetty** 9:53 PM
👍

**Adam Brazg** 9:55 PM
How are returns looking for month 1?

**nevin.shetty** 9:58 PM
In line. Will run the official calcs at month end

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197H
Admitted:_____



Going to move to Anchor - 2.5M (which I moved out of Friktion) is 6K a week of net revenue (edited)

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-197I
Admitted:_____

**Bohdan Protsiuk, Olga Kyivska, nevin....** 
4 members

### Apr 29th, 2022

**Olga Kyivska** 6:03 AM
@adambrazg @nevin.shetty APY
changes are delivered to **PROD**
Now end-users in their accounts
can see current APY, instead of
interest rate --> Current APY is
higher than interest rate



**Olga Kyivska** 6:09 AM
You can change APY/Rate via admin
panel.
**Important:**
- Daily interest rate calculation
starts at **00:15 EST**
- Interest Rate update starts at
**00:45 EST**

So, in case you want to update
interest rate/apy and set date for
new rate as April 30th, **first
calculation with new rate will be on
May 1st.**

 **Adam Brazg** 7:40 AM
Thanks you Olga and bohdan!

 **nevin.shetty** 11:38 AM
 This is great - thank you!

One question, for Custom rates? Do
I need to change the rate for each
custom account?

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-198A
Admitted:_____



When I click into each one, it brings me to the same page.



 **Adam Brazg** 11:42 AM

Cutom Rates need to be changed for each account. they are custom to the specific account. @Olga Kyivska is this functionality implemented for us to manage the custom rate updates for each account?

 **nevin.shetty** 11:43 AM

Try updating for both accounts Adam to 20% - it doesn't work

it's seems to be uniform for both accounts

 **Olga Kyivska** 11:44 AM

For now functionality is working for Fixed and Variable accounts. If we need to update for Custom accounts, this is something that @bohdan.protsiuk can do per you request

 **Adam Brazg** 11:45 AM
Got it. @nevin.shetty what do you
want the custom rates to be?
@bohdan.protsiuk can update them
from the code if you provide the
numbers. Admin panel functionality
for that is not yet complete.

 **nevin.shetty** 11:46 AM
update them both to 20% display
APY

 1 reply

 **Olga Kyivska** 11:49 AM
these two right?



 **Bohdan Protsiuk** 11:52 AM
@nevin.shetty I'll update them in
two hours

 1    😄

## Apr 12th, 2022



**nevin.shetty** 10:49 PM
Boom Just moved $15M to Terra. We now have $14M on Anchor earning $226K of interest per month



 

It needs to be market hours to deploy on Aperture - I will deploy in the morning

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-199A
Admitted:_____

 **nevin.shetty**                                    

# Mar 3rd, 2022

 **nevin.shetty** 2:02 PM
Just had a call with Meow. They have 8 people, managing close to $80M



Is the homepage visual close? Can I see it / show it to others?

 **Adam Brazg** 2:04 PM
We should have it ready by Thursday. Can send you final designs tmrw

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-200A
Admitted:_____

 **nevin.shetty**

**Apr 11th, 2022**

 **nevin.shetty** 8:45 AM
Are you back in Seattle?

 **Adam Brazg** 8:45 AM
No, on Wednesday I am.

I am available though

Saw your deposit agreement email.
Not a prob

 **nevin.shetty** 8:46 AM
Can you sync quickly?

 **Adam Brazg** 8:50 AM
Ya. Five min I can calll you.

 **nevin.shetty** 8:50 AM
cool

 **nevin.shetty** 10:57 AM
I am about to send the email to you
and Nat. Please follow up quickly
with the email and the DACA

 **Adam Brazg** 10:57 AM
Yeah, but it should be like an hour
later right? The docs are prefilled
with their info.

 **nevin.shetty** 10:57 AM
do 20 min

 **Adam Brazg** 10:57 AM
okay

 **Adam Brazg** 11:33 AM
I am sending both the PDF version
and word doc version to Nat, right?

 **nevin.shetty** 11:34 AM
send both - in case they need to
redline

**Adam Brazg** 11:34 AM
k, sending now

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-200B
Admitted:_____

 **Adam Brazg** 12:13 PM

Nevin, on the compound treasury sign up flow, what was the one question that we did not need to include?

 **nevin.shetty** 12:13 PM
get a letter from a CPA

 👍 1 😃⁺

**nevin.shetty** 2:27 PM
can you chat?

 **Adam Brazg** 3:01 PM

We need to manually enable the custom accounts on back end for chrono and blueberry. What interest rates should we set them at? Also, on a seperate note might be worthwhile for you to do a quick audit of the fabric interest calculations showing in HT

 **nevin.shetty** 3:07 PM
Convert both these accounts to custom and start at 23%



Then I can adjust up and down based on the actual rates with some buffer

 **Adam Brazg** 3:08 PM
Sounds good

We won't convert those accounts, we will enable the custom accounts and then need to sort out doing a deposit

**nevin.shetty** 3:11 PM
Ok can you enable them tomorrow?

**Adam Brazg** 3:11 PM
Yes

**nevin.shetty** 3:11 PM
sweet

### Apr 12th, 2022

**nevin.shetty** 8:17 AM
In the DACA, make sure to remove the date in the signature block and let that be entered via docusign

also ask Nat who he wants the docusign going to

**Adam Brazg** 8:18 AM
Sounds good

Great, I am on a call. I will respond right after.

**Adam Brazg** 9:16 AM
you got a second?

question about the daca

Dates have been removed here:

The parties have signed this agreement as of the Effective Date

Lender: Stifel Bank

Name:
Title:
Date:

Borrower: Commerce Fabric, Inc.

Name: Nevin Shetty
Title: CFO
Date:

Company: HighTower Treasury Corp.

Name: Adam Brazg
Title: CEO
Date:

Do i need to change anything here?



nevin.shetty 9:21 AM
nope

nevin.shetty 9:21 AM
leave as 0

3 replies

Adam Brazg 9:21 AM
what about here:

Just confirm this is the right thing to
send back to Nat (including file
name).



**DACA Springing - HighTowe...**
153 KB PDF



**DACA Springing - HighTower...**
42 KB Word Document



**nevin.shetty** 9:25 AM

yep - all looks good

sorry, update the fee on the one page to zero

and leave appendix A as is

They technically will serve appendix A to Hightower if they every take over the account. So it's just a template



**Adam Brazg** 9:29 AM

Nevin, I am sending this:

All redlines are accepted. Thanks Nat and Nevin. Attached is an executable version.

Regards,

Adam



DACA Springing - HighTowe...
153 KB PDF



**nevin.shetty** 9:30 AM

Perfecto

  



**Adam Brazg** 9:33 AM

Did you see the Bank Prov email?

 1 reply



**Adam Brazg** 11:17 AM

Custom yield account is now enabled for chrono and blueberry



**nevin.shetty** 11:20 AM

Nice!

At the bank now moving Fabric funds



**Adam Brazg** 11:21 AM

**Adam Brazg** 2:31 PM

I'm signing the docusign for stifel

**Adam Brazg** 2:38 PM

confirm we are all good on that and
i will sign.

**nevin.shetty** 3:03 PM

Yep I signed

We are good

**May 5th, 2022**

 **nevin.shetty** 10:19 AM
You use BofA for Bilberry right?

 **Adam Brazg** 10:19 AM
yes

 **nevin.shetty** 10:20 AM
Do you use bofA for your personal account?

 **Adam Brazg** 10:20 AM
yes

 **nevin.shetty** 10:23 AM
Can you log into mercury and connect your PERSONAL account? I just did mine. Let me know if you can see if when you log in



 **Adam Brazg** 10:23 AM
yeah, will do it right after i get off this call

 **nevin.shetty** 10:24 AM
cool. Please contribute $6,700, I will contribute $3,300

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-200C
Admitted:_____



**nevin.shetty** 10:36 AM

Just on Anchor we have earned
$303K of interest and we owe
$170K = $133K of revenue in 1
month

| | | | |
|---|---|---|---|
| $26,524,002 | Current Bal | | |
| $303,623 | Interest Ea | | |
| $4,818,366 | Annualized | | |
| 18.17% | Implied Yie | | |

Let's reskin the front end to be
super slick. This is too valuable not
to. We just need a couple of more
customers...

 1   

 **nevin.shetty** 

## May 7th, 2022

 **Adam Brazg** 6:48 PM
A lot of depositors and borrowers leaving anchor today

**Adam Brazg** 6:54 PM
UST is trading slightly below 1 which is think is spooking people

 **nevin.shetty** 8:24 PM
I have been reading about it today. I am not worried. I think most of the drawdown is related to people being liquidated on their loops / levered positions.

The peg has seen much worse, and there any many more arbitragers today than previously.



U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-200D
Admitted:_____



U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-207
Admitted:_____



# Partial Flow of Funds Related to HighTower Treasury Circle Account

Commerce Fabric Inc
JPMC x9944

Other Bank Accounts:
- Chrono Fund One LP
- Blueberry Technologies LLC
- HighTower Treasury

$35,000,100
4/1/2022 - 4/12/2022

$2,551,100
3/4/2022 - 5/6/2022

HighTower Treasury
Circle Account

2,541,514.45 USDC
5/6/2022 at 16:43 UTC

2,591,514.45 USDC
5/6/2022 at 16:46 UTC

2,549,900 USDC
5/6/2022 at 23:13 UTC

40,051,200 USDC
3/4/2022 - 5/7/2022

TEdbN6

Dnz2w5

37,320,372 UST
4/4/2022 - 5/7/2022

terra1w2wy8

28,770,796.34 UST
4/4/2022 - 5/7/2022

8,550,000 UST
4/13/2022

Anchor Protocol

Mirrored Investments

UST de-peg from USD

29,201,916.17 UST
5/15/2022

8,771,553.24 UST
5/16/2022

terra1w2wy8

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-208
Admitted:_____

# Summary of aUST Valuation

*between 5/5/2022 - 5/13/2022*

| Date | aUST / USD (Closing Price) | Balance of aUST | aUST (Equivalent USD) |
|---|---|---|---|
| 5/5/2022 | $1.2483 | 21,287,209.81 | $26,573,313.61 |
| 5/6/2022 | $1.2523 | 23,332,894.78 | $29,219,037.48 |
| 5/7/2022 | $1.2460 | 23,332,894.78 | $29,072,530.23 |
| 5/8/2022 | $1.2412 | 23,332,894.78 | $28,961,208.99 |
| 5/9/2022 | $1.0495 | 23,332,894.78 | $24,487,756.41 |
| 5/10/2022 | $1.0153 | 23,332,894.78 | $23,688,978.09 |
| 5/11/2022 | $1.0169 | 23,332,894.78 | $23,726,754.04 |
| 5/12/2022 | $0.5171 | 23,332,894.78 | $12,065,603.22 |
| 5/13/2022 | $0.1819 | 23,332,894.78 | $4,244,906.88 |

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-209
Admitted:_____

# Summary of
# Mirror Protocol Transfers

| ID | Mirror Protocol Asset | Associated Underlying Asset | 4/13/2022 Amount (USTC) |
|---|---|---|---|
| 1 | mAAPL | Apple Inc. | 450,000 |
| 2 | mABNB | Airbnb, Inc. | 450,000 |
| 3 | mAMD | Advanced Micro Devices, Inc. | 450,000 |
| 4 | mDIS | The Walt Disney Company | 450,000 |
| 5 | mDOT | Polkadot | 450,000 |
| 6 | mETH | Ethereum | 450,000 |
| 7 | mFB | ProShares S&P 500 Dynamic Daily Buffer ETF | 450,000 |
| 8 | mGLXY | Galaxy Digital | 450,000 |
| 9 | mJNJ | Johnson & Johnson | 450,000 |
| 10 | mGS | The Goldman Sachs Group, Inc. | 450,000 |
| 11 | mKO | The Coca-Cola Company | 450,000 |
| 12 | mMSFT | Microsoft Corporation | 450,000 |
| 13 | mNFLX | Netflix, Inc. | 450,000 |
| 14 | mNKE | Nike, Inc. | 450,000 |
| 15 | mNVDA | NVIDIA Corporation | 450,000 |
| 16 | mPYPL | PayPal Holdings, Inc. | 450,000 |
| 17 | mSBUX | Starbucks Corporation | 450,000 |
| 18 | mSPY | SPDR S&P 500 ETF | 450,000 |
| 19 | mTWTR | Twitter, Inc. | 450,000 |
| | | **Total** | **8,550,000** |

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-211
Admitted:_____

| | User Id | User Email | User Status ∧ | Invite Sent | User Updated |
|---|---|---|---|---|---|
| 1 | 9103ec4f-a9d9-42ce-89f5-5be330b4e16f | bilberrytest00@gmail.com | ACTIVE | 31/03/2022 | 31/03/2022 |
| 2 | e3cbd43a-003d-434d-a023-8cac92ef3099 | alice@fabric.inc | ACTIVE | 01/04/2022 | 01/04/2022 |
| 3 | 3dfe9ca0-af24-460c-9bfc-b9fe28ee9c81 | lucy.harrington@fabric.inc | ACTIVE | 01/04/2022 | 04/04/2022 |
| 4 | d5c868f0-3563-4ed3-858a-83acabd2cee5 | treasury@sudrania.com | ACTIVE | 18/04/2022 | 19/04/2022 |
| 5 | 5a019811-6518-47fd-9ae2-5827b1fe557c | sonia.sisodia@sudrania.com | ACTIVE | 18/04/2022 | 18/04/2022 |
| 6 | 60d7f70e-35f3-42b4-9b0e-7c345cdeedbe | stacy@fabric.inc | ACTIVE | 13/05/2022 | 13/05/2022 |
| 7 | dbdca61b-ee3a-40c0-9661-bc6559c6ec59 | olga@bilberrry.com | ACTIVE | | 04/04/2022 |
| 8 | 35699df5-6c1f-41fd-9650-53ffb13f53b6 | igor+1@bilberrry.com | ACTIVE | | 01/04/2022 |
| 9 | 2bc73add-3ba0-4f95-b8f6-d03b5c350046 | ross@bilberrry.com | ACTIVE | | 31/03/2022 |
| 10 | ab09d78a-b351-4f95-8be0-05cdf7c48fe4 | igor@bilberrry.com | ACTIVE | | 01/04/2022 |
| 11 | bc7094dd-8118-4fbd-99fc-5864661eec0b | nevin@chronocapital.io | ACTIVE | | 31/03/2022 |
| 12 | 044d6966-bef6-4069-89f9-cbb04ad02172 | adam@bilberrry.com | ACTIVE | | 31/03/2022 |
| 13 | 59527d09-8913-44b2-a60b-e94608f050ae | olga+1@bilberrry.com | ACTIVE | | 01/04/2022 |
| 14 | 26ddc3dd-85c3-4695-9e0d-53e63b8f934f | nevin@fabric.inc | ACTIVE | | 31/03/2022 |
| 15 | 66f18bc9-304b-44b1-9ae2-78ac81d414e4 | eric.chan@fabric.inc | INVITED | 01/04/2022 | 01/04/2022 |
| 16 | 4da3c100-46a9-4370-b1ab-6b340d74875b | manish.gupta2@sudrania.com | INVITED | 18/04/2022 | 18/04/2022 |
| 17 | b1b4413c-267c-4675-8f1a-86834ba332d7 | manish.jain@sudrania.com | INVITED | 18/04/2022 | 18/04/2022 |
| 18 | 8e2b4477-8532-4164-8fbe-3e6f33facae1 | nevin@hightowertreasury.com | PENDING | | 16/05/2022 |
| 19 | 7f6b889c-2ab9-488e-a4f3-352e4ee732d4 | igor+testcompany@bilberrry.com | PENDING | | 08/04/2022 |
| 20 | 3ae96efc-d2a7-4a68-ad85-79e3f331ffbb | adam@hightowertreasury.com | PENDING | | 30/03/2022 |
| 21 | 9ac36be2-96da-4c19-b0b0-0013fc8c6720 | bohdan.protsiuk@gmail.com | PENDING | | 25/04/2022 |

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-212
Admitted:_____



Commerce Fabric, Inc
Instructions for Filing
Form 8879-Corp
IRS e-file Signature Authorization for Form 1120
for the year ended December 31, 2022

The original form should be signed (using full name and title) and dated by an authorized officer of the
corporation.

The signed form should be returned on or before October 16, 2023 to:

KPMG LLP
1601 Market Street
Philadelphia, PA 19103-2499

Although there is no tax for the current year, estimated tax payments may be required in order to avoid
an underpayment penalty next year.

Do NOT separately file Form 1120 with the Internal Revenue Service. Doing so will delay the
processing of your return.

We must receive your signed form before we can electronically transmit your return. The Internal
Revenue Service will notify us when your return is accepted. Your return is not considered filed until
the Internal Revenue Service confirms their acceptance.

**CONFIDENTIAL**

**CF0002547**

U.S. v. Shetty
CR23-084 TL
Government's Exhibit No. G-214
Admitted:_____

# Unresponsive

CF0002548

G-214-002

# Unresponsive

CONFIDENTIAL

| Form **1120** | **U.S. Corporation Income Tax Return** | OMB No. 1545-0123 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | For calendar year 2022 or tax year beginning _____, ending _____ <br> Go to *www.irs.gov/Form1120* for instructions and the latest information. | **2022** |

**A Check if:**
1a Consolidated return (attach Form 851) .
b Life/nonlife consolidated return . .
2 Personal holding co. (attach Sch. PH) . .
3 Personal service corp. (see instructions) . .
4 Schedule M-3 attached . . . . X

TYPE OR PRINT

Name  Commerce Fabric, Inc

Number, street, and room or suite no. If a P.O. box, see instructions.  113 Cherry St PMB 66768

City or town, state or province, country, and ZIP or foreign postal code  SEATTLE, WA 98104

**B Employer identification number**

**C Date incorporated**  02/15/2018

**Unresponsive**

**E** Check if:    (1) ☐ Initial return    (2) ☐ Final return    (3) ☐ Name change    (4) ☐ Address change

**Income**

| | | | |
|---|---|---|---|
| 1 a | Gross receipts or sales . . . . . . . . . . . . . . . . . . . | | |
| b | Returns and allowances . . . . . . . . . . . . . . . . . | | |
| c | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . | | |
| 2 | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . | | |
| 3 | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . | **Unresponsive** | |
| 4 | Dividends and inclusions (Schedule C, line 23) . . . . . . . . . | | |
| 5 | Interest . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| 6 | Gross rents . . . . . . . . . . . . . . . . . . . . . . . | | |
| 7 | Gross royalties . . . . . . . . . . . . . . . . . . . . . | | |
| 8 | Capital gain net income (attach Schedule D (Form 1120)) . . . . . | | |
| 9 | Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . . . . . . . | 9 | -33,878,016. |
| 10 | Other income (see instructions - attach statement) . . . . . . . . . . . . . . . . . . . . . . . . | 10 | |
| 11 | **Total income.** Add lines 3 through 10 . . . . . . . . . . . . . | | |

**Deductions** (See instructions for limitations on deductions.)

| | | |
|---|---|---|
| 12 | Compensation of officers (see instructions - attach Form 1125-E) . . . . . . . . . . . . . . . . . | |
| 13 | Salaries and wages (less employment credits) . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 14 | Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 15 | Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 16 | Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 17 | Taxes and licenses . . . . . . . . . . . . . . . . . . . . . . See. Statement. 1. | |
| 18 | Interest (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 19 | Charitable contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 20 | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) . | |
| 21 | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 22 | Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 23 | Pension, profit-sharing, etc., plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 24 | Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **Unresponsive** |
| 25 | Reserved for future use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 26 | Other deductions (attach statement) . . . . . . . . . . . . . . . See. Statement. 2. | |
| 27 | **Total deductions.** Add lines 12 through 26 . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 . . . . . . | |
| 29a | Net operating loss deduction (see instructions) . . . . . . . . . | 29a | NON☐ |
| b | Special deductions (Schedule C, line 24) . . . . . . . . . . . . | 29b | |
| c | Add lines 29a and 29b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

**Tax, Refundable Credits, and Payments**

| | | |
|---|---|---|
| 30 | **Taxable income.** Subtract line 29c from line 28. See instructions . . . . . . . . . . . . . . . . . | |
| 31 | Total tax (Schedule J, Part I, line 11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 32 | Reserved for future use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 33 | Total payments and credits (Schedule J, Part III, line 23) . . . . . . . . . . . . . . . . . . . . | |
| 34 | Estimated tax penalty. See instructions. Check if Form 2220 is attached . . . . . . . . . . . . ☐ | |
| 35 | **Amount owed.** If line 33 is smaller than the total of lines 31 and 34, enter amount owed . . . . . . | |
| 36 | **Overpayment.** If line 33 is larger than the total of lines 31 and 34, enter amount overpaid . . . . . . | |
| 37 | Enter amount from line 36 you want: **Credited to 2023 estimated tax** _____ **Refunded** _____ | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer  Wesley Pua    Date 10/16/2023    Title CFO

May the IRS discuss this return with the preparer shown below? See instructions.  X Yes   ☐ No

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Print/Type preparer's name  Keri Miller | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
| Firm's name  KPMG LLP | | | Firm's EIN | |
| Firm's address  1601 Market Street   Philadelphia, PA 19103-2499 | | | Phone no.  267-256-7000 | |

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120** (2022)

JSA
2C1110 1.000

0005B7    JN1J    10/16/2023 12:05:19 V22-7.2F

8

**CONFIDENTIAL**

CF0002550

G-214-004

# Unresponsive

# Unresponsive

CF0002552

G-214-006

# Unresponsive

CONFIDENTIAL

CF0002553

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CF0002557

G-214-011

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CF0002561

G-214-015

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

| Form **4797** | **Sales of Business Property**<br>(Also Involuntary Conversions and Recapture Amounts<br>Under Sections 179 and 280F(b)(2)) | OMB No. 1545-0184 |
|---|---|---|
| | | **2022** |
| Department of the Treasury<br>Internal Revenue Service | **Attach to your tax return.**<br>Go to *www.irs.gov/Form4797* for instructions and the latest information. | Attachment<br>Sequence No. **27** |

| Name(s) shown on return | Identifying number |
|---|---|
| Commerce Fabric, Inc | |

**1a** Enter the gross proceeds from sales or exchanges reported to you for 2022 on Form(s) 1099-B or 1099-S (or
substitute statement) that you are including on line 2, 10, or 20. See instructions . . . . . . . . . . . . . . . . . . | **1a** |

**b** Enter the total amount of gain that you are including on lines 2, 10, and 24 due to the partial dispositions of
MACRS assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1b** |

**c** Enter the total amount of loss that you are including on lines 2 and 10 due to the partial dispositions of MACRS
assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1c** |

**Part I**   **Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft - Most Property Held More Than 1 Year** (see instructions)

| **2** (a) Description<br>of property | (b) Date acquired<br>(mo., day, yr.) | (c) Date sold<br>(mo., day, yr.) | (d) Gross<br>sales price | (e) Depreciation<br>allowed or<br>allowable since<br>acquisition | (f) Cost or other<br>basis, plus<br>improvements and<br>expense of sale | (g) Gain or (loss)<br>Subtract (f) from the<br>sum of (d) and (e) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| **3** Gain, if any, from Form 4684, line 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | |
| **4** Section 1231 gain from installment sales from Form 6252, line 26 or 37 . . . . . . . . . . . . . . . . . . | **4** | |
| **5** Section 1231 gain or (loss) from like-kind exchanges from Form 8824 . . . . . . . . . . . . . . . . . . . | **5** | |
| **6** Gain, if any, from line 32, from other than casualty or theft . . . . . . . . . . . . . . . . . . . . . . . | **6** | |
| **7** Combine lines 2 through 6. Enter the gain or (loss) here and on the appropriate line as follows . . . . . . . . . . . | **7** | |

**Partnerships and S corporations.** Report the gain or (loss) following the instructions for Form 1065, Schedule K, line 10, or Form 1120-S, Schedule K, line 9. Skip lines 8, 9, 11, and 12 below.

**Individuals, partners, S corporation shareholders, and all others.** If line 7 is zero or a loss, enter the amount from line 7 on line 11 below and skip lines 8 and 9. If line 7 is a gain and you didn't have any prior year section 1231 losses, or they were recaptured in an earlier year, enter the gain from line 7 as a long-term capital gain on the Schedule D filed with your return and skip lines 8, 9, 11, and 12 below.

| | | |
|---|---|---|
| **8** Nonrecaptured net section 1231 losses from prior years. See instructions . . . . . . . . . . . . . . . . . . | **8** | |
| **9** Subtract line 8 from line 7. If zero or less, enter -0-. If line 9 is zero, enter the gain from line 7 on line 12 below. If line 9 is more than zero, enter the amount from line 8 on line 12 below and enter the gain from line 9 as a long-term capital gain on the Schedule D filed with your return. See instructions . . . . . . . . . . . . . . . . . . . . | **9** | |

**Part II**   **Ordinary Gains and Losses** (see instructions)

**10** Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less):

| Stmt 10 | | | | | | -53,878,016. |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| **11** Loss, if any, from line 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | ( ) |
| **12** Gain, if any, from line 7 or amount from line 8, if applicable. . . . . . . . . . . . . . . . . . . . . . . . | **12** | |
| **13** Gain, if any, from line 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | |
| **14** Net gain or (loss) from Form 4684, lines 31 and 38a. . . . . . . . . . . . . . . . . . . . . . . . . . . | **14** | |
| **15** Ordinary gain from installment sales from Form 6252, line 25 or 36 . . . . . . . . . . . . . . . . . . . . | **15** | |
| **16** Ordinary gain or (loss) from like-kind exchanges from Form 8824 . . . . . . . . . . . . . . . . . . . . . | **16** | |
| **17** Combine lines 10 through 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **17** | -53,878,016. |

**18** For all except individual returns, enter the amount from line 17 on the appropriate line of your return and skip lines
a and b below. For individual returns, complete lines a and b below.

**a** If the loss on line 11 includes a loss from Form 4684, line 35, column (b)(ii), enter that part of the loss here. Enter the
loss from income-producing property on Schedule A (Form 1040), line 16. (Do not include any loss on property used as
an employee.) Identify as from "Form 4797, line 18a." See instructions . . . . . . . . . . . . . . . . . . . | **18a** |

**b** Redetermine the gain or (loss) on line 17 excluding the loss, if any, on line 18a. Enter here and on Schedule 1
(Form 1040), Part I, line 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **18b** |

**For Paperwork Reduction Act Notice, see separate instructions.**                                Form **4797** (2022)

JSA
2X2610 1.000
000587 JN1J 10/16/2023 12:05:19 V22-7.2F

22

CONFIDENTIAL

CF0002564

G-214-018

Form 4797 (2022)   Page **2**

| **Part III** | **Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255** (see instructions) |
|---|---|

| | 19   (a) Description of section 1245, 1250, 1252, 1254, or 1255 property: | **(b) Date acquired** (mo., day, yr.) | **(c) Date sold** (mo., day, yr.) |
|---|---|---|---|
| **A** | | | |
| **B** | | | |
| **C** | | | |
| **D** | | | |

| These columns relate to the properties on lines 19A through 19D. | | **Property A** | **Property B** | **Property C** | **Property D** |
|---|---|---|---|---|---|
| 20 | Gross sales price (Note: *See line 1 before completing.*) | 20 | | | | |
| 21 | Cost or other basis plus expense of sale . . . . . . | 21 | | | | |
| 22 | Depreciation (or depletion) allowed or allowable . . . | 22 | | | | |
| 23 | Adjusted basis. Subtract line 22 from line 21 . . . . | 23 | | | | |
| 24 | Total gain. Subtract line 23 from line 20 . . . . . . | 24 | | | | |
| 25 | **If section 1245 property:** | | | | | |
| | a Depreciation allowed or allowable from line 22 . . . | 25a | | | | |
| | b Enter the **smaller** of line 24 or 25a. . . . . . . . . | 25b | | | | |
| 26 | **If section 1250 property:** If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| | a Additional depreciation after 1975. See instructions . | 26a | | | | |
| | b Applicable percentage multiplied by the **smaller** of line 24 or line 26a. See instructions . . . . . . . . | 26b | | | | |
| | c Subtract line 26a from line 24. If residential rental property or line 24 isn't more than line 26a, skip lines 26d and 26e . | 26c | | | | |
| | d Additional depreciation after 1969 and before 1976 . | 26d | | | | |
| | e Enter the **smaller** of line 26c or 26d . . . . . . . . | 26e | | | | |
| | f Section 291 amount (corporations only) . . . . . . . | 26f | | | | |
| | g Add lines 26b, 26e, and 26f . . . . . . . . . . . . | 26g | | | | |
| 27 | **If section 1252 property:** Skip this section if you didn't dispose of farmland or if this form is being completed for a partnership. | | | | | |
| | a Soil, water, and land clearing expenses . . . . . . | 27a | | | | |
| | b Line 27a multiplied by applicable percentage. See instructions. | 27b | | | | |
| | c Enter the **smaller** of line 24 or 27b . . . . . . . . | 27c | | | | |
| 28 | **If section 1254 property:** | | | | | |
| | a Intangible drilling and development costs, expenditures for development of mines and other natural deposits, mining exploration costs, and depletion. See instructions . . | 28a | | | | |
| | b Enter the **smaller** of line 24 or 28a . . . . . . . . | 28b | | | | |
| 29 | **If section 1255 property:** | | | | | |
| | a Applicable percentage of payments excluded from income under section 126. See instructions . . . . | 29a | | | | |
| | b Enter the **smaller** of line 24 or 29a. See instructions . | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| | | | |
|---|---|---|---|
| 30 | Total gains for all properties. Add property columns A through D, line 24 . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 | |
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 . . . . . . . . . . . . | 31 | |
| 32 | Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 33. Enter the portion from other than casualty or theft on Form 4797, line 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 | |

| **Part IV** | **Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less** (see instructions) |
|---|---|

| | | | **(a) Section 179** | **(b) Section 280F(b)(2)** |
|---|---|---|---|---|
| 33 | Section 179 expense deduction or depreciation allowable in prior years . . . . . . . . . . . . . | 33 | | |
| 34 | Recomputed depreciation. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report . . . . . | 35 | | |

Form **4797** (2022)

JSA
2X2620 1.000
000587  JN10  10/16/2023 12:05:19 V22-7.2F

23

**CONFIDENTIAL**

CF0002565

G-214-019

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

CF0002568

G-214-022

# Unresponsive

CF0002569

G-214-023

# Unresponsive

CF0002570

G-214-024

# Unresponsive

CONFIDENTIAL

CF0002571

G-214-025

# Unresponsive

CF0002572

G-214-026

# Unresponsive

CF0002573

G-214-027

# Unresponsive

CONFIDENTIAL

# Unresponsive

CF0002575

G-214-029

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

Commerce Fabric, Inc

Form 4797, Page 1 Detail
=====================================================================================================================
Line 10 - Ordinary Gains and Losses
=====================================

| Property Description | Date Acq | Date Sold | Sales Price | Depreciation | Cost or Basis | Gain or Loss |
|---|---|---|---|---|---|---|
| Impairment of Crypt | VARIOUS | VARIOUS | | | | -35,170,016. |
| Extinguishment of Li | VARIOUS | VARIOUS | | | | 1,292,000. |
| | | | | | | ---------------- |
| Part II 4797 Ordinary Gains and Losses | | | | | | -33,878,016. |
| | | | | | | =============== |

CONFIDENTIAL

CF0002578

G-214-032

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CF0002582

G-214-036

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

CF0002586

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

CF0002588

G-214-042

**Unresponsive**

CONFIDENTIAL

CF0002589

G-214-043

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CF0002595

G-214-049

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

# Unresponsive

CONFIDENTIAL

CF0002599

G-214-053

# Unresponsive

CONFIDENTIAL

CF0002600

G-214-054