The Honorable Tana Lin

1

2

3

4

5

6

7     UNITED STATES DISTRICT COURT FOR THE
      WESTERN DISTRICT OF WASHINGTON
8                    AT SEATTLE

9

10    UNITED STATES OF AMERICA,                NO. CR23-084 TL

11                        Plaintiff,            UNITED STATES'
12            v.                                SENTENCING MEMORANDUM

13    NEVIN SHETTY,

14                        Defendant.

15

16        Nevin Shetty orchestrated a massive fraud on the company where he was a senior

17    executive, then spent years doing everything possible to avoid the consequences of his

18    crime. He made the victim company—already reeling from its losses from his fraud—

19    contribute millions more to his legal defense by falsely claiming he did nothing wrong. He

20    worked tirelessly before this Court to shift blame to anyone but himself. In the end, none

21    of it worked, and a jury of his peers found him guilty of all counts. The Court should now

22    sentence Shetty to 108 months in prison—the low end of his applicable Guidelines range.

23    The Court should also order full restitution of $35,000,100 to Company A.

24                                **BACKGROUND**

25    **A.    Shetty's Massive Fraud**

26        In March 2022, Shetty had been the CFO at Company A for roughly a year but

27    learned his time there was coming to an end. PSR ¶¶ 8, 10. The board of directors had

Sentencing Memo - 1
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

grown increasingly dissatisfied with his performance and decided he was no longer the right person for the job. PSR ¶ 10; *see also, e.g.*, Trial Tr. Oct. 28, 2025, at 205:22–206:25; Trial Tr. Oct. 30, 2025, at 189:24–190:21. Shetty agreed to leave Company A within a few months. PSR ¶ 10.

With time suddenly short, Shetty put in motion a brazen scheme to enrich himself with Company A's money. He had recently started working on the side on a small company called HighTower Treasury. PSR ¶ 10. Shetty envisioned that HighTower would offer investments in a corner of the cryptocurrency markets called decentralized finance (commonly shortened as "DeFi"), which promised exceptionally lucrative returns through stablecoin lending protocols and other esoteric instruments. *Id*. HighTower would keep most of those lucrative returns for itself while giving a fixed percentage to its customers. *Id*. Shetty would need tens of millions of dollars for HighTower to generate a sizable profit, yet in March 2022, HighTower was still in development and had no customers. Trial Tr. Nov. 4, 2025, at 71:18. Shetty decided to steal Company A's money to turbocharge HighTower's launch. What began as an idea about perhaps taking $10 million from Company A ballooned to an astonishing $35 million. *Id*. at 89:3–9; PSR ¶ 12.

Shetty secretly moved that massive sum from Company A to HighTower in early April 2022. PSR ¶¶ 13–15. He went to a Chase bank branch near his home on Mercer Island to order the wires after learning the alternative method would require approval from a second person at Company A. *Id*.; *see also* Trial Tr. Oct. 28, 2025, at 176:5–178:21. In all, he took $35,000,100. PSR ¶ 15; Trial Ex. G-208. He told no one else among Company A's leadership what he was doing. PSR ¶¶ 15, 18. In fact, he had only recently concluded an effort with the board of directors to memorialize the company's conservative intentions for its cash. PSR ¶ 9. In that effort, Shetty repeatedly assured board members that Company A would secure its cash with three banks where it would earn interest of a fraction of a percent. *Id*.; *see also, e.g.*, Trial Ex. G-82. Yet through HighTower, Shetty secretly placed Company A's stolen money into cryptocurrency protocols that promised returns at least 50

times higher. PSR ¶ 17. Shetty had everything to gain from those investments while Company A had everything to lose.

For a few weeks, it looked like Shetty's scheme would reward him handsomely. In a Slack message to his HighTower business partner in early May 2022, Shetty gushed about already having earned $133,000 for themselves with Company A's money. PSR ¶ 19.

The scheme rapidly unraveled. The investments Shetty made with Company A's stolen funds, including placements in DeFi protocols associated with an algorithmic stablecoin called UST, started to decline in value in mid-May. PSR ¶ 19. If Company A had known what was happening and pulled back its money at that point, it might have reclaimed much of the $35 million. PSR ¶ 20. But for roughly a week, as market conditions grew increasingly dire, Shetty said nothing to Company A. *Id*. Shetty finally confessed what he had done on May 13, 2022, after Company A's money was almost completely lost. PSR ¶ 21.

### 1.    Chrono Capital

Separate from HighTower Treasury, Shetty managed investments for some of his friends and family members through a fund called Chrono. Trial Tr. Nov. 4, 2025, at 123:1–14. As he did with Company A's stolen funds, Shetty placed some of Chrono's funds into HighTower. The amount was approximately $2.5 million. Trial Ex. G-208. And in a further parallel with Company A's experience, many Chrono investors were blindsided when they learned what he did and that nearly all their money was lost in stablecoin protocols. Several of them reported their stories to law enforcement.

One Chrono investor said he had understood that Chrono made "conservative" investments in index funds and the like. Kopczynski Decl. Ex. C. He learned for the first time that Shetty put Chrono's funds into cryptocurrency after the UST crash. *Id*. Shetty called him to say he "lost everything," and that "he was in so much trouble" because he had taken Company A's money and lost it too. *Id*. This investor, who happened to be a

Sentencing Memo - 3
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

sitting criminal court judge, advised Shetty not to say anything further "without counsel present." *Id*.

A different Chrono investor said he had specifically asked Shetty about potential investments in cryptocurrency. *Id*. Shetty told this investor that Chrono did not invest in cryptocurrency because cryptocurrency investments "could go to zero." *Id*. Shetty also falsely assured this investor that Chrono's funds were invested in "technology companies" before later telling him—when it was too late—that nearly everything was lost in the UST crash. *Id*.

A third Chrono investor reported being convinced that Shetty acted in "bad faith." *Id*. This investor said he never had any indication that Shetty was investing in cryptocurrency, and he would not have given money to Chrono if he knew the truth. *Id*.

**B.    Indictment and Pretrial Proceedings**

The grand jury returned the indictment against Shetty in May 2023. Dkt. 1. It charged four counts of wire fraud, corresponding to the four wire transfers Shetty secretly sent from Company A's bank account to the cryptocurrency account he had opened for HighTower at Circle. *Id*.

Shetty aggressively challenged the charges against him and the government's evidence. His first major challenge was a motion to supress. He claimed all the evidence obtained from the search of his home had to be suppressed because the search warrant affidavit contained "false and misleading facts." Dkt. 41 at 1. He accused the affiant of material misrepresentations and, voicing what would become a persistent defense theme, he claimed he was guilty of, at most, self-dealing and a breach of a company policy. *Id*. at 2, 13. The Court denied his motion. Dtk. 95.

Shetty next filed a motion to dismiss the entire case. He insisted that much of the indictment was "false," but even accepting it as true, the case amounted to nothing more than an "unprecedented" prosecution of a corporate officer for making a bad investment. Dkt. 52 at 2. The parties exhaustively briefed these issues across many dozens of pages,

including in a "supplemental brief regarding corporate law" from Shetty as well as an *amicus* brief from an outside group. Dkts. 88, 92. The Court also heard oral argument. Dkt. 97. The Court ultimately denied the motion, Dkt. 101, but its ruling was not the last word. Shetty moved for reconsideration, which the government opposed, and the Court denied that motion too. Dkts. 105, 110, 113.

Shetty also moved to compel the production of voluminous discovery related to the prosecution of UST-founder Do Kwon. Shetty first sought this discovery as purported *Brady* material. Dkt. 73. As that dispute was playing out, Shetty abruptly moved for sanctions, asking for dismissal with prejudice and baselessly accusing the government of "deliberate indifference to constitutional obligations" and "flagrant misbehavior." Dkt. 112 at 2. The Court denied that motion. Dkt. 118. The Court then resolved the *Brady* dispute in a way that Shetty found unsatisfactory, even though it agreed with him on some points, so Shetty filed a new motion to compel production of the same discovery under Rule 16. Dkt. 127. The Court denied that motion too. Dkt. 130.

The discovery dispute did not end with the denial of Shetty's second motion to compel. He next filed a motion for clarification in which he claimed the Court's reasoning in these rulings was plagued with "contradictions and inconsistencies." Dkt. 131 at 7. The Court responded with an 11-page order explaining why he was wrong, Dkt. 138, but Shetty was again unsatisfied, and this time he turned to the Ninth Circuit Court of Appeals with a blistering petition for a writ of mandamus. His petition criticized this Court for creating a "Kafkesque paradox" and harboring a "fundamental misunderstanding of criminal discovery law" that needed to be corrected before it "metastasizes" across the nation. Dkt. 139-1 at 6, 9–10. Both the facts and binding precedent stood in the way of his petition, and the Ninth Circuit summarily rejected it. Dkt. 167.

Through all this motion practice, Shetty sought seven continuances of his trial date. *See* Dkts. 143 (recounting first five motions for continuances), 150 (responding to sixth motion for continuance), 168 (responding to seventh motion for continuance). As the

Sentencing Memo - 5
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

continuance requests piled up, a pattern emerged: "Shetty repeatedly claim[ed] that he must have more time to see through some endeavor that [was] essential to his defense, only for it later to become clear that his claim was overstated." Dkt. 168 at 2.[1]

### 1.    Continued Victimization of Company A

Shetty's many failed efforts to knock out this case cost Company A dearly. As a former officer of Company A, an indemnification agreement covered Shetty for expenses arising from his work there. That agreement offered generous protection to Company A's directors and officers so long as they acted in good faith. It was not drafted with the possibility in mind that someone like Shetty would so badly betray the company's trust.

In February 2024, Shetty demanded indemnification under the agreement for his expenses in defending against this criminal case. He wrote in a signed statement to Company A that he "acted in good faith and in a manner [he] reasonably believed to be in or not opposed to the best interests of the Company." Kopczynski Decl. Ex. B. He added that he had no "reasonable cause to believe [his] conduct was unlawful." *Id*. He demanded over $400,000 for his expenses to date plus reimbursement for all future expenses. *Id*. Shetty's counsel threatened legal action if Company A did not pay them immediately. Kopczynski Decl. Ex. A.

Upon receiving Shetty's demand, Company A faced the prospect of a protracted and expensive fight over his entitlement to indemnification. He would benefit in that fight from a strong presumption of good faith written into the indemnification agreement—a reality that remains even after conviction. Company A decided to settle. Under their settlement,

---

[1] Shetty fought this case in still more ways not recounted above, including by filing a motion for a bill of particulars, Dkt. 192; a motion to exclude evidence about the interstate element of his crimes, Dkt. 225; a motion to compel the testimony of Do Kwon in his defense, Dkt. 148; and a motion to force the government to enter a stipulation about Kwon's fraud, Dkt. 228. The Court denied all these and other defense motions. Dkts. 175, 214, 234, 241. Shetty also noticed six expert witnesses, totaling 114 pages of disclosures, litigated the inclusion of each noticed statement, and then ultimately did not call a single expert (or fact) witness at trial. *See* Dkts. 58, 60, 62, 103.

Sentencing Memo - 6
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Company A agreed to pay a flat fee, which increased if certain litigation markers were met. Because Shetty went to trial, Company A paid out well over $3 million to fund Shetty's legal defense. Kopczynski Decl. ¶ 4.

Shetty's indemnification demand was another way he victimized Company A. The evidence indisputably shows that Shetty did not act in good faith nor believe his conduct was lawful, yet he took millions of dollars from Company A to fund his desperate fight against that reality.

**C.    Trial**

Trial began in October 2025. The government presented the mountain of evidence showing how Shetty took $35 million from Company A to "line his own pockets." Trial Tr. Nov. 5, 2025, at 45:22. From the first moments after Shetty's fraud came to light, the victims of his deception at Company A recognized his actions as criminal. Trial Tr. Oct. 27, 2025, at 170:2–5. Trial witnesses variously described his taking from Company A as "shock[ing]," "completely outside the guidelines," "directly opposite" to the company's goals, "completely blindsid[ing]," "stunn[ing]," and "patently ridiculous." Trial Tr. Oct. 27, 2025, at 183:7; Trial Tr. Oct. 28, 2025, at 161:18, 198:21; Trial Tr. Oct. 29, 2025, at 33:1–5, 112:16, 221:18; Trial Tr. Oct. 30, 2025, at 202:12.

The member of Company A's board who worked most closely with Shetty on developing the investment policy testified that Shetty fully understood the company's conservative intentions for its cash when he secretly plunged tens of millions of dollars into cryptocurrency. As that director explained:

> [T]he concept was very clear. And I think the other thing that was very clear to him was what the expectation of return was on this capital. We were not looking for interest rate at all. If you're getting .15 percent to .4 percent, effectively you're getting nothing. So the number one, again, two, three thing, was to keep the capital secure. And [Shetty] understood it.

Trial. Tr. Oct 29, 2025, at 206:12–18.

Sentencing Memo - 7
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Like in many cases where the evidence is strong, a core defense strategy was to attack the government. From the first words of his opening statement, Shetty's counsel claimed the FBI had rushed to conclude he was guilty "without any investigation." Trial Tr. Oct. 27, 2025, at 29:17. Whatever investigation that did later occur, according to Shetty, was "simple and unsophisticated." *Id.* at 34:11; *see also id.* at 39:8–9 ("when you presume someone is guilty, you stop analyzing the actual evidence"). And the government prosecutors, in Shetty's description, were "manipulat[ing]" the facts and trying to "trick" the jury with "flat lies." *Id.* at 29:20–21, 32:10.

When an agent who had sometimes assisted the main case agent in Shetty's case suffered a mental health episode mid-trial, Shetty doubled down on this theme. His counsel launched a self-described "attack" on "the folks at the FBI who decided that this case, my client, his rights, weren't important enough for a competent team of investigators." Trial Tr. Nov. 5, 2025, at 98:18–20. Using offensive language reflective of his win-at-all-costs mentality, defense counsel pointed to the agent who "freaked out" as demonstrating this supposed incompetence. *Id.* at 99:6.

Another key part of Shetty's trial defense involved impugning Company A's motivations. He claimed, for example, that Company A "hired high-priced lawyers" after discovering his fraud, and those lawyers "lobb[ied] federal authorities to bring criminal charges." Trial Tr. Oct. 27, 2025, at 29:13; Dkt. 208 at 1; *see also, e.g.*, Trial Tr. Oct. 27, 2025, at 157:5–19. Any lawyer would find it unremarkable that a company hired outside counsel with experience in government investigations after learning it was the victim of a $35 million embezzlement, but no lawyers were on Shetty's jury. Shetty mischaracterized these facts to spin up a nefarious plot to "blame him" for Company A's mistakes. *Id.* at 29:12; *see also id.* at 34:23–24 ("Why are we here? Because [Company A] needs someone to blame."). Shetty also baselessly pointed to Company A's tax filings as evidence that Company A fabricated a story that the money had been stolen because doing so was "helpful to them." *Id.* at 39:15–22; *see* Trial Tr. Nov. 5, 2025, at 111:16–112:8.

Sentencing Memo - 8
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As Shetty argued throughout pretrial litigation, Shetty also argued to the jury that he was a victim of Do Kwon's fraud and therefore could not be held accountable for taking Company A's money and losing it. He devoted multiple hours at trial to admitting Kwon's tweets, articles about Kwon, and other similar materials—materials that the defense never established that Shetty saw, much less relied upon, prior to taking the $35 million. *See generally* Trial Tr. Oct. 30, 2025, at 28–126.

Shetty's only defense that attempted to directly address the facts of his embezzlement was a claim that he could have done anything with Company A's money because, as CFO, he had unfettered access to its cash. Time and time again, Company A's board members and executive team explained that access, or signature authority, was not carte blanche. *See, e.g.*, Trial Tr. Oct. 29, 2025, at 192:7–21 (board member testifying that Shetty was not allowed to do "whatever he thought was best with" Company A's money and that the investment policy served as "guardrails" for Shetty); *id.* at 237:1–14 (another board member testifying that Shetty did not have complete discretion over Company A's money); Trial Tr. Oct. 30, 2025, at 189:17–23 (another board member testifying to same). Nonetheless, Shetty proceeded arguing that he was entitled to move Company A's money into cryptocurrency, or seemingly anything else, because he had signature authority on the Chase bank account—the account Shetty ultimately stole the $35 million from—and was CFO. *See, e.g.*, Trial Tr. Nov. 4, 2025, at 290:21–291:20.

The jury saw through Shetty's defenses, his victim blaming of Company A, scapegoating with Do Kwon, and maligning of law enforcement, and unanimously found him guilty of all counts. Dkt. 287. In reaching its verdicts, the jury found beyond a reasonable doubt that Shetty intended to deceive and cheat Company A, and that he acted beyond the scope of his authority as CFO. *See* Dkt. 279 at 18, 22 (final jury instructions regarding elements of wire fraud and scope of authority).

Sentencing Memo - 9
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**SENTENCING RECOMMENDATION**

**A.    Sentencing Guidelines**

The government agrees with the Sentencing Guidelines calculation in the presentence report. The total offense level is 31. PSR ¶ 41. Because Shetty has no criminal history, the advisory sentencing range is 108 to 135 months. USSG § 5A; PSR ¶¶ 45, 111.

Shetty objects to three parts of the Sentencing Guidelines calculation: the inapplicability of the acceptance-of-responsibility reduction, the enhancement for loss amount, and the enhancement for use of sophisticated means. The Court should overrule each of his objections.

**1.    Acceptance of Responsibility**

Shetty has not accepted responsibility for his crime. He aggressively challenged this prosecution for years, including through an 11-day trial, where he strenuously argued that he did nothing wrong. He began a campaign to shift blame to Do Kwon and others from the first trial witness. *See* Trial Tr. Oct. 27, 2025, at 142:10–23. And he falsely claimed that he only intended to help Company A, and that both the government and Company A's witnesses were vilifying him through misrepresentations and lies. *See, e.g.*, Trial Tr. Nov. 5, 2025, at 72:1–12.

The jury rejected Shetty's arguments and found him guilty of all counts. Yet even now Shetty persists in his failed defense of his criminal conduct. PSR ¶ 27. He is still deflecting blame and claiming he wanted to "benefit" Company A. *Id*. And his purported acceptance of "full responsibility for the loss of $35 million of Company A's funds," *id.*, is nothing more than a repeat of one of his arguments at trial. At trial, he acknowledged he made a "terrible" investment for Company A while insisting he had no intent to defraud. Trial Tr. Nov 5, 2025, at 93:19. That is not acceptance. Jurors were instructed that it was a complete defense if Shetty acted within his authority as CFO. Dkt. 279 at 22. Jurors were also instructed they had to find Shetty intended to deceive and cheat Company A, not "benefit" it. *Id*. at 18. Jurors rejected Shetty's arguments and defenses because they saw

Sentencing Memo - 10
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

this case for what it is—a fraudulent taking, not an ill-advised investment intended to bolster Company A's profits. Shetty must acknowledge the same.

The absurdity of Shetty's claim that he has accepted responsibility is also seen in his taking of over $3 million from Company A to fund his legal defense. If Shetty is truly now accepting responsibility for defrauding Company A, is he also renouncing his former attestation of good faith and preparing to pay Company A its millions in indemnification funds back? Of course not.

The law is clear that a defendant needs to accept responsibility for the totality of his crimes to earn a reduction of the offense level. *See United States v. Jeter*, 236 F.3d 1032, 1034 (9th Cir. 2001); *United States v. Sanchez*, 908 F.2d 1443, 1451 (9th Cir. 1990). This includes showing "genuine contrition for his actions." *United States v. Rodriguez*, 851 F.3d 931, 949 (9th Cir. 2017). It is a "rare" case in which a defendant who goes to trial can meet this standard. USSG § 3E1.1 n.2. Shetty has not come remotely close, and he is not entitled to the reduction for acceptance of responsibility.

### 2. Loss Amount

Shetty's objection to the 22-level enhancement for loss amount is unfounded. Shetty took $35,000,100 from Company A and gave it to his cryptocurrency startup, HighTower Treasury. Shetty then placed that money in complex cryptocurrency protocols so that he, through HighTower, could earn substantial returns. Company A did not want high-yield holdings, it did not want to invest in HighTower, and it certainly did not want cryptocurrency. Company A would have stopped Shetty if it knew what he was doing. But, by design, Company A did not know what he was doing. Shetty misled every decision-maker at the company about where Company A's money would be and intentionally deceived the few employees (all of whom reported to him) who knew he moved money to a "treasury account" at HighTower. In this way, Company A lost $35,000,100 the moment Shetty secretly moved this money away from its bank account. What happened to the stolen funds afterwards makes no difference.

Sentencing Memo - 11
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Numerous decisions by courts of appeals support this conclusion. In *United States v. Reichel*, 911 F.3d 910 (8th Cir. 2018), for example, the defendant used lies to convince people to invest in his company. These investors later lost money when the company collapsed. The defendant argued "that some of the investors' losses were due to market forces rather than [his] fraud." *Id.* at 917. The Eighth Circuit held that this argument "misses the point: the investors would not have given any money to [the defendant's company] were it not for [his] fraud, so all of the money invested and lost is properly included in the actual loss calculation." *Id.* at 917–18; *see also United States v. Crowe*, 735 F.3d 1229, 1237 (10th Cir. 2013) ("[I]t is irrelevant in this case whether or not [the defendant], at the time she [obtained home loans by fraud], reasonably anticipated a precipitous decline in the real estate market that might result in the original lender or successor lenders being unable to recoup their losses from the sale of pledged collateral should she default."). So too here, Company A would not have transferred any money to HighTower but for Shetty's fraud. The foreseeability of HighTower's collapse is immaterial.

Accepting the defense's position on the loss amount would subvert the Guidelines' provisions on credit against loss. Under those provisions, if Shetty had not lost all the misappropriated funds, and had instead paid Company A its money back, then he might have an argument for offsetting Company A's loss by the amount paid back. *See* USSG § 2B1.1 n. 3(D)(i). But that is not what happened. Company A lost $35,000,100—its actual loss—and never received a cent back. Shetty's argument about whether it was foreseeable that he would be unable to pay back Company A is irrelevant. The Ninth Circuit has explained that the calculation of credit against loss "is made without any consideration of reasonable foreseeability." *United States v. Morris*, 744 F.3d 1373, 1375 (9th Cir. 2014).

Additionally, Shetty's entire argument about loss proceeds from a false factual premise—a premise rejected by the jury. The premise of his argument is that Company A made an investment in cryptocurrency through HighTower, and its investment lost value

due to the unforeseen events involving Do Kwon's fraud. But as the government pointed out for the jury at trial, "the idea of [Company A] being a customer of HighTower is a sham. That's the core of this fraud. HighTower never got [Company A] as a legitimate customer. . . . So the defense cannot rely on that sham to say that: Oh, no, it was [Company A]'s money all along." Trial Tr. Nov. 5, 2025, at 136:4–10. The jury agreed with the government on this point by finding Shetty guilty.

Even if Shetty's premise were correct, however, and Shetty's taking were seen as an investment in HighTower on behalf of Company A, Company A's actual loss would still be $35,000,100. HighTower's failure was reasonably foreseeable. The Guidelines require that the loss be "a potential result," not the certain or even most likely result. USSG § 2B1.1(b)(1)(C)(iv). The Ninth Circuit has held that this is an expansive standard that goes as far as encompassing the costs of remedial measures undertaken by the victim. *See, e.g.*, *United States v. May*, 706 F.3d 1209, 1213 (9th Cir. 2013) (costs of post office's theft prevention efforts were foreseeable loss from mail theft); *United States v. Warr*, 530 F.3d 1152, 1159 (9th Cir. 2008) (millions of dollars spent on fire suppression were foreseeable loss from wildland arson).

Here, at the time Shetty took Company A's money, HighTower was a half-baked startup with no customers in the niche field of decentralized finance. Its holdings involved esoteric instruments like mirrored Polkadot. Every member of Company A's board explained at trial that they would stay away from all forms of cryptocurrency, even stablecoins, because of many well-understood risks. *E.g.*, Trial Tr. Oct. 30, 2025, at 194:5–195:12. Shetty was well aware of the board's blatant rejection of cryptocurrency investments due to these risks. *See* Trial Ex. G-83. Even Shetty himself warned would-be customers on the HighTower website that they could lose everything. Trial Tr. Nov. 4, 2025, at 276:7–10; Trial Ex. G-129 ("Do not deploy more capital than you are willing to lose."). This potential for total loss, according to Shetty, arose from the "risks" associated with "any yield-generating DiFi product." *Id*. Shetty stated bluntly in a FAQ on the website,

Sentencing Memo - 13
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  responding to the question whether there were "risks" of investing with HighTower: "Yes,

2  many." Kopczynski Decl. Ex. E.[2] Of course, the cryptocurrency investments Shetty made

3  through HighTower turned out to be far riskier than he knew because of Kwon's fraud, but

4  the record is still clear that Shetty "knew or, under the circumstances, reasonably should

5  have known" of the risk of loss. USSG § 2B1.1(b)(1)(C)(iv).

6      **3.**    **Sophisticated Means**

7      The trial record amply supports the two-level enhancement of the offense level for

8  sophisticated means. USSG § 2B1.1(b)(10)(C); PSR ¶ 34. As summarized by the

9  government in closing argument, Shetty used at least eight different carefully constructed

10  false narratives—each delivered to a different audience—to carry out his scheme, "avoid[]

11  detention," and "line his own pockets." Trial Tr. Nov. 5, 2025, at 46:12–22. This included

12  deception of junior members of Company A's finance team. *See, e.g.*, Trial Tr. Oct. 27,

13  2025, at 273:8–274:3; Trial Tr. Oct. 28, 2025, at 31:4–13. Additionally, the scheme was

14  ongoing and active for several months. Shetty moved money among multiple accounts

15  before his taking, and he later put the stolen funds into exceptionally complicated financial

16  instruments like the Mirror Protocol to try to earn huge profits for himself. Trial Ex. G-

17  208. Ninth Circuit precedent supports the application of this enhancement even in fraud

18  cases that are not highly complex, *see United States v. Terabelian*, 105 F.4th 1207, 1219–

19  20 (9th Cir. 2024), and Shetty's case easily qualifies.

20

21

22

23

---

24  [2] Although the government opted not to offer the computer-generated transcripts of
   Shetty's conversations with HighTower's competitors at trial, the Court has discretion to
25  consider them now. *See* Fed. R. Evid. 1101(d)(3). They are another window into Shetty's
   thinking about the risks of DeFi. In one conversation, he explained to the representative of
26  Meow who testified at trial that persuading Company A to invest in DeFi would be "all
27  about risk tolerance." Dkt. 184-1 at 6.

Sentencing Memo - 14
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.    Recommended Term of Imprisonment**

Like many cases involving economic crimes, this case presents difficult questions about fairness and consistency in prison sentences. Will a defendant like Shetty, who stole $35 million and caused dozens of people to lose their jobs, be punished as severely as a defendant who sold 50 grams of methamphetamine or illegally possessed a firearm? Will a defendant like Shetty, who obtained an advanced degree and built an impressive resume, have his motives and intentions scrutinized in the same way as a defendant who dropped out of high school? Will a defendant like Shetty, who comes from a wealthy suburb and mounted a multimillion-dollar legal defense, be seen as needing the same punishment and deterrence as a defendant from the inner-city who's represented by appointed counsel?

The Sentencing Guidelines are the starting point for answering these questions. Unjustifiable disparities specifically in the sentencing of white-collar criminals were a factor behind the adoption of the Sentencing Guidelines nearly 40 years ago. *See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 20–23 (1988); *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989). The Sentencing Commission created a detailed system for fashioning sentences based on objective facts, like loss amount, as well as societal considerations like the gravity of the offense, while giving no weight to a defendant's class, race, or other improper influences. *See* 28 U.S.C. § 994(c)–(e).

The Sentencing Guidelines are now advisory, but a district court must still begin every sentencing hearing by correctly calculating the Sentencing Guidelines range. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The district court must treat the Guidelines range as the "starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). And as the district court proceeds to consider a defendant's individualized circumstances under 18 U.S.C. § 3553(a), it must keep the range "in mind throughout the [sentencing] process." *Carty*, 520 F.3d at 991.

Sentencing Memo - 15
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The work of achieving fairness and consistency in sentencing is never-ending, as the Sentencing Commission itself recognizes. The Sentencing Commission has recently found, among other trends, that college graduates receive shorter sentences, and defendants convicted of fraud offenses receive larger downward variances than defendants convicted of the other major categories of federal offenses (drug trafficking, firearms, and immigration). *See* U.S. Sentencing Comm'n, *Demographic Differences in Federal Sentencing*, at 25, available here; U.S. Sentencing Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, Table 40, available here. These statistics raise important questions about whether "white-collar offenders are uniquely positioned to elicit empathy from a sentencing court." *United States v. Edwards*, 622 F.3d 1215, 1216 (9th Cir. 2010) (Gould, J., dissenting from denial of rehearing en banc); *see also United States v. Sample*, 901 F.3d 1196, 1199–1200 (10th Cir. 2018) (collecting cases addressing how wealth and class impact sentencing).

The Guidelines sentence for Shetty is 108 to 135 months. With that range as the benchmark, the individual facts of his case reveal no reason to vary downward. To impose a sentence below the range—let alone substantially below the range—would create unwarranted disparities with other cases and grossly minimize the seriousness of Shetty's crime. Roughly two-fifths of defendants nationwide receive a within-Guidelines sentence in fraud cases, and there is every reason for Shetty to join that group. *See* U.S. Sentencing Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, Table E-7, available here. The Court should sentence Shetty to 108 months in prison, as the following discussion of the most salient § 3553(a) factors shows.

### 1.     Nature and Circumstances of the Offense

Shetty's fraud was massive in scope. He singlehandedly carried out his complex scheme to prop up HighTower with Company A's stolen cash. He was motivated only by greed, or perhaps also by a tinge of resentment at being shown the door. His scheme spectacularly failed and left Company A with a staggering $35 million loss. That money

Sentencing Memo - 16
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

represented, as the government showed at trial, "a year of the company's life." Trial Tr. Nov. 5, 2025, at 45:3.

Company A has submitted a detailed victim impact statement describing the "profound harm Mr. Shetty caused the company." Adapting to the massive loss from Shetty's fraud required Company A to lay off 60 people. Those are 60 people whose lives and careers were irrevocably damaged by Shetty's greed. The company also suffered reputational harm from Shetty's fraud that endures to this day, and "[f]or a startup, reputational harm can be existential." Company A's statement rightly calls out how preposterous and craven it is for Shetty to claim he had authority for his taking.

The huge damage to Company A and its employees from Shetty's fraud puts this case in rare company even by the standards of complex federal prosecutions. In the most recent year for which nationwide sentencing data is available, the average loss in this category of cases was just over $3 million and the median loss was around $200,000. *See* U.S. Sentencing Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, Table E-6, available here. Only two percent of defendants caused losses greater than $25 million. *See* U.S. Sentencing Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, Table E-2, available here. Shetty's fraud is exceptional by this and many other measures, and his sentence should be commensurate with his crime.

### 2.    History and Characteristics of the Defendant

Shetty's history and characteristics stand out for what they do not contain. Unlike so many defendants who appear before this Court, Shetty had a comfortable upbringing on Mercer Island with all his material needs met. PSR ¶ 54. He attended college, then graduate school, and started his career in finance in New York. PSR ¶¶ 57–58, 94, 98. A shift to the tech industry eventually led him to Company A, where he enjoyed a handsome salary, a large annual bonus, and an array of benefits. PSR ¶¶ 98–99; Kopczynski Decl. Ex. D. There is nothing mitigating about Shetty's history.

Sentencing Memo - 17
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Shetty's comfortable circumstances are reflected in his ACE score of one. PSR ¶ 84. Many defendants appearing before this Court have very different personal stories. Robby Robinson, sentenced by this Court to an above-Guidelines sentence for a road rage episode in which he shot at another car, had an ACE score of nine. *See United States v. Robinson*, No. 22-CR-212 TL, Dkts. 153, 168 (W.D. Wash.). Jennifer Sauzo, sentenced by this Court to 30 months in prison for causing a $107,472 loss in a bank fraud and identity theft case, reported a long history of hard drug abuse, sexual assault, and homelessness. *United States v. Sauzo*, No. 22-CR-114 TL, Dkts. 34, 39 (W.D. Wash.).

In his presentence interview, Shetty reported "problematic" use of alcohol. PSR ¶ 86. He also reported taking steps in recent years to address that problem. PSR ¶ 91. But there is no indication that drinking contributed to his offense. On the contrary, the testimony of his HighTower business partner and other evidence at trial showed Shetty working rapidly and with intense focus during the monthslong fraud scheme. And as this Court recognizes, a commitment to treatment and sobriety on pretrial release, while commendable, does not excuse criminal conduct. A defendant sentenced by this Court last year for distribution of narcotics and money laundering asked for a sentence of a year and a day by pointing to drug treatment he completed while on pretrial release as well as gainful employment and volunteer work at the Salvation Army. *See United States v. Graves*, No. 23-CR-218 TL, Dkt. 182 (W.D. Wash). The Court sentenced him to 60 months. *Id.* at Dkt. 194.

### 3.    Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Shetty's serious crime deserves stern punishment. This was a calculated scheme motivated by greed and meticulously carried out over many months. Shetty created a web of lies. He lied to people up and down the chain of command at Company A, people at outside institutions like Stifel and Chase, and to his HighTower business partner.

Sentencing Memo - 18
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Shetty defrauded Company A to line his own pockets and build up his future with HighTower. Shetty had a great salary, substantial savings, a beautiful home on Mercer Island, and yet it was not enough. Even after Shetty learned he was losing his job as CFO, he did not act out of desperation or need. Shetty was well-educated, well-connected, and had an impressive resume; he easily could have found another job in finance or tech. Company A was even willing to let him stay on while he looked for that next job. *See* Trial Tr. Oct. 27, 2025, at 63:14–64:4. Shetty shunned those possibilities and chose instead the path of his brazen fraud. His self-interestedness and greed in the face of so many opportunities are aggravating factors that set this case apart. *See United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."); *United States v. McClatchey*, 316 F.3d 1122, 1134 (10th Cir. 2003) (observing that a white-collar defendant's "education and enviable career" are not grounds for a downward departure but rather show "he should have 'known better'").

Another component of Shetty's offense that should stand out now at sentencing is how he abused his position of trust at Company A for his personal gain. Shetty only had access to Company A's money because he was CFO, and he could successfully hide his theft with lies and omissions to Company A because he was CFO. Incredibly, Shetty continues to abuse his fiduciary role at Company A as a shield to accountability. A junior employee at Company A could never make Shetty's wildly counterintuitive claim that embezzling $35 million was really about helping the company. The record is overwhelmingly clear that Company A did not want the "substantial profit" that Shetty says he hoped to make. PSR ¶ 27. Yet Shetty uses his position as CFO as a toehold for advancing his false narrative about having had discretion to invest Company A's money however he saw fit. In reality, it was Shetty who wanted a substantial profit for himself and

Sentencing Memo - 19
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  who stood to benefit from his "grandiosity." *Id.* The jury saw through his prevarications;

2  the Court should too.

3      By the same token, a persistent defense theme in this case has been that Shetty

4  expected his cryptocurrency "investments" to succeed. If that had happened, he says,

5  Company A could have received its money back. There are at least three reasons why this

6  claim has no place in the calculus of Shetty's punishment.

7      First, Company A did not, in fact, receive its money back. Not a single cent. And

8  even if the UST crash were to be assumed away, there is no evidence of when, if ever,

9  Shetty was going to give Company A its money back. For instance, Shetty never told his

10  HighTower business partner that Company A's money (which represented nearly all

11  HighTower's funds) was going to be returned to Company A. This entire line of thinking

12  is based only on Shetty's say-so. The evidence is clear, meanwhile, that Shetty had to have

13  Company A's money in HighTower to generate huge profits for himself, so the only

14  incentive to give that money back was if he was caught.

15      Second, it is no consolation to Company A to say that Shetty may have intended to

16  someday give the money back. Company A's $35 million is gone either way—vaporized

17  in cryptocurrency holdings it never approved of, knew about, or wanted. One Company A

18  director explained at trial that if he had known what was happening, he would have worried

19  about one of the risks that in fact materialized: so-called "rug-pull risk," or the idea that

20  crypto projects "that seem[] authentic" turn out to be fraud. Trial Tr. Oct. 30, 2025, at

21  194:21–195:12. Another director explained that in his view, UST, as an algorithmic (rather

22  than asset-backed) stablecoin, was not a stablecoin at all, because "to be a stable currency,

23  you have to hold U.S. dollars." Trial Tr. Oct. 28, 2025, at 160:12–13. These directors—

24  who also owned the company—are whose views mattered, and Shetty kept them totally in

25  the dark to carry out his fraud. It is cold comfort to tell them now about what Shetty might

26  have done in some alternate universe where UST did not crash.

27

Sentencing Memo - 20
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Third, the fact that Shetty wanted the cryptocurrency investments he made through HighTower to succeed is not unusual. Many fraudsters plan for their schemes to succeed. A businessowner lying on an application to get a bank loan may plan to repay the loan after the business grows. A bookkeeper taking money from a company account to support a gambling habit may plan to put the money back after a big win at the casino. This reality about fraud offenses is a reason why the Ninth Circuit has squarely held that "[i]ntent to repay . . . is not a defense to wire fraud." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020). The same principle applies equally to sentencing. One of Shetty's fellow executives saw this plainly: she explained that Shetty's culpable act was stealing Company A's money, not whatever he did with it afterward. *See* Trial Tr. Oct. 27, 2025, at 144:7–11, 163:16–19.

### 4. Need for the Sentence to Afford Adequate Deterrence

General deterrence is of special importance in cases like Shetty's. *See Sample*, 901 F.3d at 1200. The public pays attention to what happens in cases involving large-scale fraud or other economic crimes. Commentators have linked souring views of the justice system since the financial crisis to "the widespread belief that criminals can often escape punishment if they are rich and well-connected." Simon St-Georges et al., *Jobs and Punishment: Public Opinion on Leniency for White-Collar Crime*, 76 Pol. Res. Q. 1751 (Dec. 2023), available [here](here). The Department of Justice has important work to do in this regard through its charging decisions and other practices, but the courts play an invaluable role too. This Court can send a powerful message by treating a corporate officer like any other defendant, and by imposing a sentence that recognizes fraud as just as damaging as many other serious crimes.

### 5. Need for the Sentence to Protect the Public

It is always the hope that a first-time offender's crime is aberrational. This is true for Shetty as much as for anyone else, but the record in his case reveals considerable reasons for doubt. Chief among them is his complete lack of remorse. The jury's

Sentencing Memo - 21
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

unanimous guilty verdicts on all counts have not humbled him or caused the slightest change of course. He persists in his yearslong effort to deflect blame, deny bad intent, and minimize the damage he did to Company A. His steadfast refusal to accept responsibility signals that a long sentence is needed to deter him from committing future crimes. *See United States v. Broxmeyer*, 699 F.3d 265, 295 (2d Cir. 2012) (observing that a "lack of remorse" expands "the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); *United States v. Thompson*, No. 20-11094, 2021 WL 3877713, at *5 (11th Cir. Aug. 31, 2021) (unreported) ("A pronounced lack of remorse" is "an important sentencing consideration" that relates to, among other factors, "specific deterrence and the likelihood that the defendant will commit more crimes.").

Another concern about specific deterrence arises the sheer amount of deception Shetty engaged in as part of his crime. His fraud was not a spontaneous or impulsive act, but rather a campaign of lies carried out over several months. He burned so many people at Company A who had trusted and advocated for him. Remarkably, the same is true for several of his friends who invested with him through Chrono. These friends never wanted or expected he would sink their money into cryptocurrency, and he left them feeling disgusted and deceived when they learned the truth of what he had done. Shetty's willingness to lie in all phases of his life is a profound cause for concern about recidivism.

### 6.    Need to Avoid Unwarranted Sentence Disparities

"[T]he Guidelines help avoid sentencing disparities," and "a significant variance from the Guidelines must be supported by a correspondingly persuasive justification." *United States v. Thompson*, 130 F.4th 1158, 1168 (9th Cir. 2025).

A significant variance from the Guidelines in Shetty's case would be unjustified. Many fraud defendants in this district have received sentences of comparable severity to the 108-month sentence Shetty should receive here. This Court sentenced Shane Moore to 30 months in prison—just three months below the Guidelines range—for a Ponzi scheme

Sentencing Memo - 22
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that caused $387,000 in losses. *United States v. Moore*, No. 24-CR-014 TL, Dkts. 139, 148 (W.D. Wash.). Judge Coughenour sentenced Mohammed Zafaranchi to 120 months in prison for a call center scheme that caused $2.6 million of losses. *United States v. Zafaranchi*, No. 22-CR-122 JCC, Dkts. 265, 270 (W.D. Wash.). And Judge Martinez sentenced Volodimyr Pigida to 156 months in prison for a Ponzi scheme that caused $11 million in losses. *United States v. Pigida*, No. 18-CR-294 RSM, Dkts. 292, 295 (W.D. Wash.). Every case has its own facts, of course, but a sentence significantly below 108 months for Shetty would represent an unwarranted disparity from other cases in this district.

The same point is seen in national data. Fraud cases sentenced in 2024 under Section 2B1.1 of the Sentencing Guidelines had a median loss of $210,000. *See* U.S. Sentencing Comm'n, *FY 2024 Quick Facts: Theft, Property Destruction, and Fraud*, available here. A little over 41% of defendants in these cases received a within-Guidelines sentence, while the average sentence—22 months—was nine months below the Guidelines range. *Id*. These data show that a sentence at or near 108 months for Shetty is amply justified. His fraud loss is more than a hundredfold larger than the national median, plus he receives enhancements for aggravating factors like abusing a position of trust.

For all these reasons, this is a case in which the Sentencing Guidelines should be both the starting and ending place of the analysis. The low end of the Guidelines range is 108 months, and the individual facts of the case show that that is the appropriate sentence. The Court should sentence Shetty to 108 months in prison.

## C.    Recommended Term of Supervised Release

The Court should order a three-year term of supervised release to begin upon Shetty's release from prison. In addition to the conditions recommended by Probation, the Court should bar Shetty from serving as an officer or director of any company other than his own while under supervision. The Court should also bar Shetty from managing money

for other people, professionally or otherwise, without the prior approval of the probation officer.[3] These and the other conditions will protect the public and promote rehabilitation.

**D.    Recommended Fine**

While Shetty reports that he voluntarily stopped working well over a year ago and is therefore insolvent, PSR ¶¶ 100, 105, his employment history and education show he has the earnings capacity to pay a fine in the future. *See* 18 U.S.C. § 3572(a)(1) (factors to be considered in imposition of a fine include "earning capacity"); USSG § 5E1.2(a) ("The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."). A fine is an appropriate component of the sentence for an economic offense like Shetty's that was motivated by pure greed. The Court should impose a fine of $30,000, which is the low end of the Guidelines fine range. USSG § 3E1.2(c)(3).

**E.    Restitution**

The trial record amply supports an order of restitution for Company A in the amount of $35,000,100. The government expects there to be no dispute on this point. Company A has elected not to ask for restitution for its millions of dollars of additional losses, but the Court should order restitution for the full amount of the fraud loss with interest.

*//*

---

[3] Discussion of special conditions like these, including sample language, is available here from the Administrative Office of the U.S. Courts.

Sentencing Memo - 24
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## CONCLUSION

Shetty committed a massive fraud and has shown no remorse. The Court should impose a Guidelines sentence of 108 months in prison, three years of supervised release, and a $30,000 fine. The Court should also order full restitution for Company A.

DATED: February 4, 2026

Respectfully submitted,

*s/ Philip Kopczynski*
PHILIP KOPCZYNSKI
GRACE ZOLLER
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970
philip.kopczynski@usdoj.gov
grace.zoller@usdoj.gov

Sentencing Memo - 25
*United States v. Shetty* / CR23-084 TL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970