The Honorable Tana Lin

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

        Plaintiff,

v.

NEVIN SHETTY,

        Defendant.

No. 2:23-cr-00084-TL

**NEVIN SHETTY'S SENTENCING MEMORANDUM IN SUPPORT OF A SENTENCE OF PROBATION OR, IN THE ALTERNATIVE, HOME CONFINEMENT**

CORR CRONIN LLP

*/s/ Jeffrey B. Coopersmith*
Jeffrey B. Coopersmith, WSBA No. 30954
Kristin E. Bateman, WSBA No. 54681
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Ph: (206) 625-8600 | Fax: (206) 625-0900
jcoopersmith@corrcronin.com
kbateman@corrcronin.com

LITSON PLLC

*/s/ Alex Little*
J. ALEX LITTLE
ZACHARY C. LAWSON
54 Music Square East, Suite 300
Nashville, Tennessee 37203
(615) 985-8205
alex@litson.co
zack@litson.co

*Attorneys for Nevin Shetty*

February 4, 2026

NEVIN SHETTY'S SENTENCING MEMORANDUM - 1
(No. 2:23-cr-00084-TL)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 3

BACKGROUND .................................................................................................. 6

    A.  Nevin Shetty's Personal Life .......................................................... 6

    B.  The Nature of the Offense ............................................................... 9

    C.  Events Following the Offense ........................................................ 12

I.        ARGUMENT IN SUPPORT OF A SENTENCE OF PROBATION
          OR, IN THE ALTERNATIVE, HOME CONFINEMENT ......................... 15

    A.  A SENTENCE OF PROBATION OR HOME CONFINEMENT
        AVOIDS A SENTENCING DISPARITY ..................................... 15

         *i.*  Similarly situated defendants have been sentenced to
             probation or home confinement ........................................ 15

    B.  THE HISTORY AND CHARACTER OF NEVIN SHETTY ...................... 20

    C.  THE PURPOSES OF SENTENCING AND COLLATERAL
        CONSEQUENCES OF CONVICTION ......................................... 26

    D.  THE KINDS OF SENTENCES AVAILABLE  .......................................... 30

        *Probation* ................................................................................. 30

        *Home Confinement* .................................................................... 33

        *Imprisonment* ............................................................................. 34

    E.  PERTINENT POLICY STATEMENTS ....................................... 35

II.      CONCLUSION ............................................................................... 36

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**INTRODUCTION**

Nevin Shetty comes before this Court having accepted responsibility for his conduct. But this is not like any other wire fraud investment case, which usually involve a defendant siphoning victims' funds to fund a lavish lifestyle. This case is about Mr. Shetty's attempt to be a hero, to save Fabric from its budget crisis, to save his job at Fabric, and to propel a young startup, HighTower Treasury, to success. Despite his best efforts to make money for Fabric, HighTower, and himself, Mr. Shetty failed in each aspect, losing Fabric $35 million, losing his job, collapsing the startup, losing his and others' life savings, and losing his marriage.

The conduct at issue stands as a stark aberration in Mr. Shetty's otherwise exemplary 42-year life, one defined by hard work, ambition, and the pursuit of excellence—in this case, to his detriment. The fact that this is unlike any other fraud case, Mr. Shetty's immediate remorse for his actions and efforts to remediate the investment loss, his demonstrated progress to correct the behavior that led to his actions, and his compliance with pretrial release conditions demonstrate that this conduct represents an isolated lapse in judgment, rather than conduct requiring incarceration.

If Mr. Shetty pleaded guilty, the government agreed to recommend no more than 48 months of incarceration. This would have been a 55% departure from the low end of Probation Office's calculated Guidelines Range (which Mr. Shetty has objected to) of 108 to 135 months. (Revised Presentence Report ("PSR") at ¶ 111.) Now, after

**CORR CRONIN** LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Mr. Shetty went to trial, the government seeks a sentence of 108 months, more than double the sentence recommendation in its plea offer.[1]

Probation's sentencing recommendation of 24 months, after reviewing the evidence and testimony at trial, highlights the unique circumstances in this case. This recommendation is a 78% departure from the low end of Probation's own Guidelines Range.

The Court should slightly depart from Probation's sentencing recommendation and order a sentence of probation, or in the alternative, home confinement. There are at least four compelling reasons why a sentence of probation or, in the alternative, home confinement, is appropriate in this case:

*First*, this is unlike any other fraud case this District has ever seen. This was not a scheme to skim money from Fabric to fund an extravagant lifestyle. This was a short-sighted attempt to make everyone (Fabric, HighTower, and himself) money: a mistake in judgment coupled with an unforeseeable investment crash, caused by Do Kwon's independent fraud.

---

[1] The drastic increase in the government's sentencing recommendation after a defendant takes his case to trial is called the "trial penalty." Some courts, including Judge Rakoff from the Southern District of New York have expressed concerns at the conflict between the trial penalty and the Sixth Amendment right to a jury trial. *See, e.g., United States v. Tavberidze*, 769 F.Supp.3d 264, 267 (S.D.N.Y. 2025) ("In a small effort to try to mitigate the trial penalty, this Court, where appropriate (as in cases involving a single crime or unified criminal activity where no mandatory minimum is involved), typically informs an accused that if he goes to trial and is convicted, the Court will not impose a greater sentence than if he pleads guilty to the same activity.")

NEVIN SHETTY'S SENTENCING MEMORANDUM - 4
(No. 2:23-cr-00084-TL)

*Second*, Mr. Shetty has already faced severe consequences for his actions. He lost his job and his career, his marriage, his life savings, and the life savings of family and friends. Beyond these losses, he faces devastating collateral consequences, including the complete destruction of his career, severe financial hardship, and a federal conviction that will follow him for life. Mr. Shetty will likely be insolvent for the rest of his life. As a result, incarceration is not necessary to deter him or others from engaging in similar conduct in the future.

*Third*, Mr. Shetty's history and characteristics demonstrate that he is exactly the kind of defendant for whom probation is appropriate. Mr. Shetty has no criminal history. He led an honest life in his rising business career. Following the conduct at issue in this case, he began the process of rehabilitation before even knowing that he had criminal exposure. To do so, Mr. Shetty sought to address the factors that led him to make the HighTower investment, proactively seeking professional mental health and cognitive behavioral counseling, successfully participating in Alcoholics' Anonymous, and completely abstaining from alcohol.

*Fourth*, Mr. Shetty's model compliance for almost three years demonstrates that he can be successfully supervised in the community. He has followed every condition imposed, from travel restrictions to financial monitoring. While complying with these conditions is expected, his compliance demonstrates that he is the type of defendant to follow any terms of probation or home confinement, proving them to be both punitive to Mr. Shetty and protective of society.

NEVIN SHETTY'S SENTENCING MEMORANDUM - 5
(No. 2:23-cr-00084-TL)

1

**BACKGROUND**

2

3      While Mr. Shetty acknowledges his conviction for wire fraud, his conduct must

4      be understood in the context of a life defined by resilience, professional achievement,

5      and a recent but profound commitment to personal rehabilitation following years of

6      unaddressed alcohol dependence.

7      **A. Nevin Shetty's Personal Life**

8

9          Nevin was born on February 10, 1984, in Huntsville, Alabama, to parents

10     Sudhakar and Sudha Shetty. (PSR at ¶ 51.) When Nevin was one, his family relocated

11     to Saudi Arabia for his father's employment. (PSR at ¶ 52.) His earliest childhood

12     memories include the family's urgent departure from Saudi Arabia during the first

13     Gulf War, when they were forced to abandon their vehicle at the airport due to the

14     dangerous conditions. (PSR at ¶ 52.)

15         After leaving Saudi Arabia, the Shetty family settled in Mercer Island,

16     Washington, where Mr. Shetty's father worked at Boeing, and his mother remained

17     at home to care for Nevin and his brother. (PSR at ¶ 53.) Mr. Shetty's childhood was

18     marked by isolation and discrimination. He was one of only two children of color in

19     his entire school, and the only person of color in his class. (PSR at ¶ 53.) He was

20     frequently taunted and bullied by his classmates because of his race and ethnicity.

21     (PSR at ¶ 53.) When he shared his feelings of alienation and loneliness with his father,

22

23     he was told, "You have to be better than them." (PSR at ¶ 53.) Mr. Shetty took this

24     advice to heart, channeling his pain into excellence in both academics and athletics.

25

**CORR CRONIN** LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

(PSR at ¶ 53.)

At the age of ten, Mr. Shetty's parents unexpectedly separated and divorced. (PSR at ¶ 54.) The divorce proceedings were contentious, with lengthy legal disputes over custody. (PSR at ¶ 54.) Mr. Shetty and his brother were ultimately placed in a joint custody arrangement that required them to shuttle between their mother's and father's homes every week. (PSR at ¶ 55.) Both parents later remarried. (PSR at ¶ 55.) Despite these challenges, Mr. Shetty is grateful for how well his parents raised him, teaching him the values of kindness and hard work.

Nevin excelled in high school, joining the varsity soccer team during his freshman year. (PSR at ¶ 56.) It was during this period that he was first exposed to alcohol, which quickly became a significant problem. (PSR at ¶ 56.) Mr. Shetty and his teammates frequently drank to intoxication, though his parents remained unaware and his academic and athletic performance did not initially suffer. (PSR at ¶ 56.)

Mr. Shetty went on to enroll at the University of Washington, where he joined a fraternity during his freshman year. (PSR at ¶ 57.) His alcohol consumption escalated dramatically—he drank daily, often to intoxication, following a routine of attending classes during the day and drinking heavily from 9:00 p.m. until midnight. (PSR at ¶ 57.) This pattern continued for six years, throughout his undergraduate and graduate studies. (PSR at ¶ 57.) Mr. Shetty did not recognize his alcohol use as problematic because he continued to excel academically. (PSR at ¶ 57.) He graduated

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

with a Bachelor of Arts in Business Administration in 2006 and a Master of Professional Accounting degree in 2007, both from the University of Washington. (PSR at ¶ 94.)

After graduation, Mr. Shetty moved to New York City and found work in the financial industry. (PSR at ¶ 58.) He first worked for PriceWaterhouseCoopers (PwC) before moving to three different investment firms. (PSR at ¶ 98.) The corporate culture of his new environment normalized and even encouraged heavy drinking, further reinforcing his belief that he did not have a problem. (PSR at ¶ 58.) He continued his pattern of working throughout the day and consuming alcohol into the early morning hours. (PSR at ¶ 58.)

In 2016, Mr. Shetty returned to Seattle, where he started a technology company and was able to be closer to his family. (PSR at ¶ 59.) He married Serina Shetty, with whom he has two daughters, Saana, age six, and Syra, age three. (PSR at ¶ 59.) Both daughters were born with dysphagia, a serious medical condition that affects their ability to swallow and causes aspiration of food and liquid into their lungs. (PSR at ¶ 59.) Syra's condition was particularly severe and required a feeding tube. (PSR at ¶ 59.)

Mr. Shetty's technology company was acquired by David's Bridal in 2018, where he continued to work until 2020. (PSR at ¶ 60, 99.) The onset of the coronavirus pandemic and related shutdowns contributed to a dramatic increase in the frequency and severity of his alcohol consumption. (PSR at ¶ 60.) Mr. Shetty regularly drank

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

alone to an intoxicated state, which profoundly affected his overall mood and disposition. (PSR at ¶ 60.) He found himself frequently irritable, less compassionate, and generally unhappy. (PSR at ¶ 60.) This deterioration, combined with the stress of the pandemic and his daughters' serious medical conditions, placed unbearable strain on his marriage. (PSR at ¶ 60.)

**B. The Nature of the Offense**

In March 2021, Mr. Shetty was named Chief Financial Officer of Fabric, an e-commerce company based in Seattle, Washington. (PSR at ¶ 8.) Before hiring Nevin, Fabric had grown rapidly and required its first CFO and a structured finance team. Fabric eventually raised approximately $300 million in capital from venture capital firms, of which $240 million of capital was raised when Mr. Shetty was CFO. *See id.*

Nearly a year after becoming Fabric's CFO, on February 14, 2022, Nevin, along with two co-founders, incorporated HighTower Treasury Corporation ("HighTower"), a decentralized finance (DeFi) investment platform. (PSR at ¶ 10.) HighTower was created to provide a platform for corporate customers to invest their money in safe and stable cryptocurrency, which would then be invested through safe and stable cryptocurrency protocols. (PSR at ¶ 10.) Customers would receive a portion of the interest, either six or nine percent, while the co-founders would retain the remaining interest as profit, split equally among them. (PSR at ¶ 10.) Mr. Shetty owned a 33% equity share of HighTower. (PSR at ¶ 10.) Adam Brazg owned the remaining 67% equity share of HighTower, and Brazg agreed to split half of any profits he received

NEVIN SHETTY'S SENTENCING MEMORANDUM - 9
(No. 2:23-cr-00084-TL)

with co-founder Ross Dzikovsky. (PSR at 22.)

In early 2022, Fabric's board of directors tasked Mr. Shetty with drafting an investment policy. (PSR at ¶ 8.) In late March 2022, the board adopted an investment policy with four primary objectives: preserve capital, be liquid, diversify, and generate returns. (Gov't. Exh. 89.) The investment policy did not explicitly prohibit cryptocurrency. (*Id.*) Around the same time, Mr. Shetty, Fabric's CEO, and Fabric's COO agreed that Mr. Shetty would exit Fabric around June 2022. (PSR at ¶ 10.)

In early 2022, Fabric had approximately $230 million in cash on hand. But after rapidly growing from 50 employees to 350 employees, Fabric had a budget crisis. The board mandated a budget reduction, but Fabric's CEO wanted to hire more engineers, not less, to ensure Fabric could deliver the products it had promised to customers. In April 2022, the same month of the wire transfers in this case, Fabric had a budget shortfall of millions of dollars *per month*. (Def. Exh. 88.) With the company's budget and his job on the line, Mr. Shetty believed he had found an opportunity to be the hero, resolve the budget crisis, and earn his job back.

That opportunity was investing in UST. UST advertised itself as an investment that was as safe and stable as a traditional money-market savings account. By early 2022, institutional and individual investors around the country had rallied around UST. By the time of the market crash, over $40 billion of capital from outside investors was invested in the TerraLuna ecosystem.

Mr. Shetty believed so much in the safety and stability of UST that he invested

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

his life savings and the life savings of close family and friends, through his hedge fund, Chrono Capital. Mr. Brazg, HighTower's co-founder, also invested a significant amount of money in HighTower/UST through his company, Bilberrry.

As a company, Fabric could not just directly invest in UST like an individual investor. It required a platform suitable for corporate investments, where multiple users could log in and view the account balance denominated in U.S. dollars. Fabric also required a platform where account statements and reports could be generated for tax purposes. Mr. Shetty saw HighTower as a platform that could fill that gap, allowing corporate investments into safe and stable cryptocurrency.

As CFO, Mr. Shetty believed that it was in Fabric's best interests to invest about 15% of its cash, $35 million, in UST. Mr. Shetty invested $35,000,100 of Fabric's money through HighTower into UST. He informed Fabric accountant Alice Leung that he invested money from Fabric in HighTower, but he did not inform her that HighTower was his company or that Fabric was investing in UST, a stablecoin. (Gov't Exh. 188 at 2.) Fabric's HighTower investment was logged in its QuickBooks. (Def. Exh. 97; *see* Def. Exh. 93.) The investment performed extremely well in its first month, accumulating thousands of dollars of interest daily, as logged in Fabric's QuickBooks. (Def. Exh. 93.)

In early May 2022, UST de-pegged from the dollar. Initially, Mr. Shetty (along with other investors across the globe) was confident that it would repeg to the dollar, like it did after the May 2021 depeg. Several days after the initial depeg, Mr. Shetty,

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

along with other UST investors, realized the UST market would not recover. Rather than hide the issue and go on paternity leave, Mr. Shetty disclosed the crash to Fabric's CEO and COO one business day before starting six weeks of paternity leave. Even after being terminated from Fabric, Mr. Shetty begged Fabric to sell the UST while it still had some value. All of Fabric's UST was transferred from HighTower's wallet to a Fabric wallet. The day the UST was received in Fabric's wallet, it had recovered a significant amount of value and was worth $18 million (Def. Exhs. 128, 129.) Mr. Shetty also lost his life savings, and the life savings of his mother, father, brother, brother-in-law, close friends, and professional mentors in the same UST investment.

Do Kwon, the architect of the UST ecosystem, was charged in the Southern District of New York with masterminding the fraud that ultimately led to the market collapse. (Def. Exh. 112.) Kwon defrauded investors of over $40 billion in what the SDNY U.S. Attorney called "one of the largest frauds in history." (Def. 113.) Kwon pleaded guilty and was sentenced to 15 years' imprisonment.

Fabric trusted Mr. Shetty with its funds, and Mr. Shetty thought he knew what was best for Fabric. But Mr. Shetty's ambition and arrogance clouded his judgment, and he made a mistake that hurt Fabric, its employees, and its investors.

## C. Events Following the Offense

After the loss of their life savings in the UST crash, Mr. Shetty and his wife separated. (PSR at ¶ 61.) Their divorce was finalized soon after. (PSR at ¶ 61.) Despite

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

the dissolution of their marriage, Mr. Shetty and his former wife remain on amicable terms and are committed to a healthy co-parenting relationship. (PSR at ¶ 61.) Mr. Shetty currently sees his daughters every day to help with their feeding and to drive them to and from school. (PSR at ¶ 61.) He is profoundly grateful for this arrangement and the opportunity to remain actively involved in his daughters' lives. (PSR at ¶ 61.)

Approximately two years ago, a friend suggested that Mr. Shetty attend a sober support meeting. (PSR at ¶ 62.) The experience was transformative. Mr. Shetty was deeply moved by the stories shared by others at an Alcoholics Anonymous meeting, which helped him achieve "a level of gratitude" he had never before appreciated. (PSR at ¶ 62.) He realized that his singular focus on work had caused him to overlook the importance of his relationships with family, particularly his children. (PSR at ¶ 62.) Since that time, Mr. Shetty has maintained his sobriety and focused on rebuilding these relationships. (PSR at ¶ 62.) He has completely abstained from alcohol use for about two-and-a-half years, since August 20, 2023. (PSR at ¶ 86.) He attends two to three meetings per week, holds the position of Secretary, and is actively involved with a sober support sponsor. (PSR at ¶ 91.) Mr. Shetty's sustained sobriety represents a significant personal accomplishment. (PSR at ¶ 79.)

Mr. Shetty currently resides with his father in Mercer Island, Washington. (PSR at ¶ 51.) Mr. Shetty's father has witnessed remarkable positive changes in his son over the past two years, particularly Mr. Shetty's recommitment to his role as a

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

father and his newfound willingness to openly express gratitude and appreciation. (PSR at ¶ 81.)

In October 2023, Mr. Shetty began receiving mental health treatment services from Sound Behavioral Health for major depressive disorder. (PSR at ¶ 73.) He successfully completed treatment in September 2025 after achieving "prolonged symptom management" and completing all goals outlined in his treatment plan. (PSR at ¶ 75.) Mr. Shetty also has participated in individual treatment sessions with mental health counselor Eric Embrey for the past two-and-a-half years, focusing on his decision-making processes, past feelings of grandiosity, and rationalizations he employed in relation to his conduct while employed by Company A. (PSR at ¶ 76.) He intends to continue treatment services with Mr. Embrey. (PSR at ¶ 77.)

Since 2023, Mr. Shetty has been actively engaged with the Aleph Institute, an organization dedicated to working in the realm of criminal sentencing and the development of effective alternative sentencing options. (PSR at ¶ 78.) According to Rabbi Yossi Bryski, Director of Alternative Sentencing for The Aleph Institute, Mr. Shetty has demonstrated a recommitment to his role as father, has addressed his character through completion of an ethics certification course, and has committed to serving within his community. (PSR at ¶ 79.) Rabbi Bryski has committed to using Mr. Shetty's particular skills to give back, including work with nonprofit organizations, presenting 12 "deterrence talks," and participation in The Aleph Institute's "Crime and Consequence Class." (PSR at ¶ 79.)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## I.    ARGUMENT IN SUPPORT OF A SENTENCE OF PROBATION OR, IN THE ALTERNATIVE, HOME CONFINEMENT

After *United States v. Booker*, 543 U.S. 220 (2005), the overarching legislative command for district courts at sentencing is that a sentence must be sufficient, but not greater than necessary, to comply with the sentencing goals mandated by Congress, including punishment, respect for the law, and deterrence. *See* 18 U.S.C. § 3553(a). A sentence of probation in this case meets that directive.

Mr. Shetty has filed objections to the PSR, including objecting to the $35 million loss amount, on the grounds that Do Kwon's fraud and resulting market crash were not reasonably foreseeable to Mr. Shetty. Regardless of the Court's calculation of Mr. Shetty's offense level, as Mr. Shetty explains below, the Guidelines range proposed by the Probation Office does not serve the overarching goals of sentencing mandated by Congress. Justice requires that the sentence should vary downward from the guidelines to a sentence of probation or, in the alternative, home confinement.

### A. A SENTENCE OF PROBATION OR HOME CONFINEMENT AVOIDS A SENTENCING DISPARITY.

Sentencing Mr. Shetty to probation or home confinement would not create a sentencing disparity.

#### i.    Similarly situated defendants have been sentenced to probation or home confinement.

Pursuant to § 3553(a)(6), district courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

been found guilty of similar conduct." In the Ninth Circuit, courts have consistently recognized that this provision aims to ensure nationally uniform sentences while preserving discretion for downward departures in appropriate cases.

To avoid sentencing disparities in this case, the Court should consider sentences imposed on similarly situated defendants in comparable cases, particularly within the Ninth Circuit. Throughout the Circuit, district courts have shown a willingness to impose probation or alternative sentences in cases involving financial crimes, particularly where defendants have minimal criminal history. Two cases in this very District demonstrate just that.

Paige Thompson was convicted of wire fraud and computer fraud at trial after committing "the second largest data breach in United States history at the time, causing tens of millions of dollars in damage and emotional and reputational harm to numerous individuals and entities." *United States v. Thompson*, 130 F.4th 1158, 1161 (9th Cir. 2025). Thompson stole data from at least 30 entities, including obtaining personally identifying information of 98 million Americans from victim Capital One alone. (*Id.*) Part of Thompson's hacking scheme involved planting cryptocurrency mining software on the victims' servers, with the cryptojacking proceeds going to Thompson's wallet.[2] After the hacking, Thompson "bragged about

---

[2]    *Former hacker sentenced for stealing computer power to mine cryptocurrency and stealing the personal information of more than 100 million people*, U.S. JUST. DEP'T, Oct. 4, 2022, https://www.justice.gov/usao-wdwa/pr/former-hacker-sentenced-stealing-computer-power-mine-cryptocurrency-and-stealing.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

possessing [the hacked data], and encouraged others to hack vulnerable accounts." (*Id.*) Thompson also "blamed her breaches on the [victim] companies' inadequate cybersecurity." (*Id.*)

Judge Lasnik sentenced Thompson to time served,[3] five years of probation with three years of home confinement, and 250 hours of community service. *United States v. Thompson*, No. 19-CR-159-RSL (W.D. Wash. 2022), at Dkt. 384. The government appealed the sentence, and the Ninth Circuit reversed and remanded for resentencing, finding that the district court had not sufficiently made a record of its consideration of the § 3553(a) factors. *Thompson*, No. 19-CR-159-RSL, at Dkt. 463.

Judge Lasnik resentenced Thompson to effectively the same sentence: time served, five years of supervised release with three years of home confinement, and 250 hours of community service. (*Id.* at 2.) At resentencing, Thompson's Guidelines range was 135 months to 168 months. (*Id.* at 6.) The government recommended a sentence of 84 months of imprisonment. (*Id.*) Judge Lasnik ordered the non-custodial sentence even after finding that Thompson "committed a terrible crime" but did "not intend[] to cause tens of millions of dollars in damages." (*Id.* at 7, 8.) Judge Lasnik imposed the same non-custodial sentence even though Thompson's performance on probation was "marginal," *id.* at 9, with numerous violations of her probation and several revocation hearings. In justifying the sentence, Judge Lasnik emphasized

---

[3]     Thompson was briefly detained pending trial before being released on bond.

NEVIN SHETTY'S SENTENCING MEMORANDUM - 17
(No. 2:23-cr-00084-TL)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

that Thompson had not reoffended and was seeing a therapist for struggles with mental health. (*Id.*)

Thompson's systematic, continued fraud was much more egregious than Mr. Shetty's isolated conduct. And unlike Thompson's frequent breach of her probation before her re-sentencing, Mr. Shetty has been a model defendant in compliance with his bond conditions. Similar to Thompson, Mr. Shetty has not reoffended and has been seeing both a mental health therapist and cognitive behavioral therapist.

Another case in this district involves defendants Sergei Potapenko and Ivan Turogin. The defendants pleaded guilty to wire fraud conspiracy for orchestrating a $577 million cryptocurrency Ponzi scheme that victimized hundreds of thousands of people across the world.[4] The defendants used the over $400 million they personally received to purchase luxury real estate and vehicles. (*Id.*) Judge Lasnik agreed with the government, calculating the defendants' offense level at 42, with a Guidelines range of 360 months to life. *United States v. Sergei Potapenko, et al.*, No. 22-CR-185-RSL (W.D. Wash. 2025), at Dkt. 237 at 70:14-20. The government requested a sentence of ten years of imprisonment for each defendant. (*Id.* at 24:15-20.) Judge

---

[4]    *Two Estonian Nationals Plead Guilty in $577M Cryptocurrency Fraud Scheme*, U.S. JUST. DEP'T, Feb. 13, 2025, https://www.justice.gov/opa/pr/two-estonian-nationals-plead-guilty-577m-cryptocurrency-fraud-scheme.

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Lasnik sentenced both defendants to time served,[5] three years of supervised release, 120 hours of community service, and imposed a $25,000 fine. (*Id.* at 70:22-71:12.) In reaching his sentence, Judge Lasnik found the seriousness of the defendants' crimes "indisputable," but considered "how well they handled . . . pretrial release." (*Id.* at 71:13, 22-23.) Judge Lasnik found "no question" that the sentence satisfied specific and general deterrence. (*Id.* at 72:3-11.)

Potapenko's and Turogin's $577 million fraud was also much more egregious than Mr. Shetty's isolated conduct. Mr. Shetty did not pocket a single penny, let alone use over $400 million in fraud proceeds to purchase luxury real estate and cars. Like both defendants, Mr. Shetty has handled his pretrial release extremely well, showing his ability to comply and thrive with a non-custodial sentence.

Another disparity is relevant to Mr. Shetty's sentencing: presidential pardons. The U.S. Department of Justice oversees U.S. Attorney's Offices, including the Office that prosecuted this case. The DOJ also oversees the Office of the Pardon Attorney, which vets applications for clemency and makes pardon and commutation recommendations to the president. President Trump has pardoned dozens of white-collar crime defendants, representing over half of the individual pardons he has issued this term.[6]

---

[5]    The defendants were detained in Estonia, their native country, and later released on bond in the United States. *See id.* at 24:25-25:3, 48:17-21.

[6]    *Trump's pardons forgive financial crimes that came with hundreds of millions in punishments*, NBC NEWS, Jan. 20, 2026, https://www.nbcnews.com/politics/trump-

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   The dozens of white-collar crime pardon recipients include Changpeng Zhao,

2   sentenced to four months in custody in this District for an over $4 billion

3   cryptocurrency scheme. Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory

4   Dyer, founders and employees of the BitMEX cryptocurrency exchange that operated

5   as a money laundering platform, all received probationary sentences but were also

6   pardoned. 31-year-old Ross Ulbricht created Silk Road, a dark web marketplace for

7   drugs with purchases made in cryptocurrency and was sentenced to two life sentences

8   plus forty years. He too was pardoned. These are just some examples of recent

9   pardons by the Executive Branch for much more egregious conduct than it prosecuted

10  Mr. Shetty for.

11

12

13          **B. THE HISTORY AND CHARACTER OF NEVIN SHETTY**

14          "[I]f ever a man is to receive credit for the good he has done, and his immediate

15  misconduct assessed in the context of his overall life hitherto, it should be at the

16  moment of his sentencing, when his very future hangs in the balance." *United States*

17  *v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). That's how one district court

18  aptly summarized the importance of a defendant's history and characteristics as part

19  of the § 3553(a) analysis. The crime for which Mr. Shetty was convicted is an

20  aberration in his otherwise law-abiding life.

21

22

23

24

25

administration/trumps-pardons-forgive-financial-crimes-came-hundreds-millions-
punishm-rcna248277.

NEVIN SHETTY'S SENTENCING MEMORANDUM - 20
(No. 2:23-cr-00084-TL)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

When Mr. Shetty was nine years old, his parents went through a contentious divorce, a defining moment that profoundly affected him. During a family trip shortly after the divorce, his aunt recalls him "crying through the night, missing his parents and worrying about what would happen to him and his brother." (Letter of Bharathi Shetty at 1.) Rather than letting this trauma define him, Mr. Shetty told his cousin Abhinaya that he intended to "work twice as hard to ensure the hardship wouldn't define him" and that he was going to "use this as a push to do more and make a good life." (Letter of Abhinaya Shetty at 1.) This early adversity instilled in him a determination that family unity must be preserved at all costs—a value that has driven his fierce dedication to his own daughters.

Mr. Shetty's character shone through from an early age. His mother recalls an incident when he was seven years old that captured his innate sense of right and wrong:

> When Nevin was around seven, he found a few coins between the sofa cushions. They were probably from my purse, and when he asked me if they were mine, I said I wasn't sure. So he went into the kitchen, brought a mason jar, put the coins into it, and placed it on the dresser in his room. He called it the Orphan Jar because "this money doesn't have anybody." From then on, whenever he found coins in the car, a penny on the street, or in the couch, they went into the Orphan Jar. I asked him why he didn't put it into his "saving bank?" He said, "Mom, those coins are not my money." He did not take it because it did not belong to him.

(Letter of Sudha Shetty at 2.) His mother continued: "I remember that moment very clearly because I realized then that my child would be just fine in this world. His

NEVIN SHETTY'S SENTENCING MEMORANDUM - 21
(No. 2:23-cr-00084-TL)

future was bright; he knew the value of right and wrong. That is why this [case] is completely at odds with his character and personality." (*Id.*)

Throughout his life, Mr. Shetty has been defined by his commitment to serving others. His father involved him in community service from a young age through organizations, like the India Association of Western Washington (IAWW). Dr. Shetty recalls: "Nevin was always eager to volunteer at these community events like the Indian Diwali function and Holi functions. I have seen him volunteer hundreds of hours of his time for the community at large. In particular, Nevin always pressured me to go early so we can help the host in setting up the venue." (Letter of Dr. Sudhakar Shetty at 1.)

When Mr. Shetty moved to New York, he continued this pattern of service, volunteering with multiple organizations: United Prosperity (microfinance); Seeds of Peace (connecting youth across conflict zones); and the America India Foundation. (*Id.* at 2.) But what stood out most to his father was his work teaching financial literacy to immigrant women in the Bronx: "Through a translator, he taught about 40 Latina women about personal finance and building credit. I remember him telling me how meaningful experience was—I could hear the excitement in his voice. That moment really stuck with me." (*Id.* at 2.)

After moving back to Seattle, Mr. Shetty joined the board of Splash, a nonprofit providing clean water to 400,000 children daily across eight countries. (Letter of Shelby Stoner at 2.) In 2018, he helped plan a major fundraiser that raised over

$540,000 for clean water projects. A friend who attended recalls: "That night, Nevin talked our ears off about preventable waterborne disease in poor communities and explained how Splash's scaling approach to philanthropy works." It was easy to see his passion." (*Id.* at 1-2.)

Mr. Shetty has volunteered as a tutor for nearly three years at PAX Learning Center. (Letter of Alex Herrbold at 1.) One of Mr. Shetty's students who successfully received his GED credited Mr. Shetty, saying without him, he likely would have quit the educational program. (*Id.* at 2.)

Mr. Shetty's generosity extended to countless individual acts of kindness. Miles Godwin, a friend of over 30 years, recalls witnessing Mr. Shetty intervene when a helpless student was being violently bullied in high school: "Nevin, immediately, and lovingly, intervened and diffused the situation in front of a large group of onlookers . . . [h]e reacted first, quickly, selflessly and valiantly. He had nothing to gain from intervening, other than an interest in maintaining peace and a sense of what was just and what was right." (Letter of Miles Godwin at 1.)

When friend Christopher Gonzales and his wife suffered a devastating miscarriage in 2019, Mr. Shetty was "the only person who reached out to me. He didn't offer clichés; he just stayed on the line and helped me process the shock. In a moment where I felt completely isolated, Nevin's compassion was a lifeline." (Letter of Christopher Gonzales at 2.)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Not long after marrying the love of his life, Mr. Shetty's wife, Serina, was diagnosed with infertility. What followed were years of IVF treatment that Mr. Shetty helped manage while building his technology startup:

> I was incredibly overwhelmed with emotion and guilt, but Nevin focused on execution and learning as much as he could to help us make informed decisions throughout the process. Nevin was meticulous in how he studied the detailed calendars, timelines and medical injections associated with each cycle, both with egg retrievals and embryo transfers. It was a rollercoaster of emotions, with unspoken moments every time we received bad news and drove home in silence. But Nevin never gave up. Nevin administered almost every injection for me. In total, I went through 12 cycles of treatment, 4 pregnancies, 2 miscarriages and delivered my 2 miracle baby girls. This dream would have never been possible without Nevin's support through the uncertainty, sadness, stress, guilt and shared hope of becoming parents.

(Letter of Serina Shetty at 1-2.) Their daughters, Saana (now 6) and Syra (now 3), represent the center of Mr. Shetty's world. Syra was born on April 25, 2022—just weeks before the Terra Luna collapse. (*Id.*) Not long after birth, Syra lost 14% of her body weight and was diagnosed with a "failure to thrive." (*Id.*) Both daughters were diagnosed with dysphagia and aspiration when drinking milk, but Syra's condition was especially severe, requiring hospitalization and a feeding tube.

Serina learned of the loss of their life savings and Fabric's money in the UST crash only weeks after Syra was born. (*Id.*) She kicked Mr. Shetty out of the house, but Syra's life-threatening condition required them to cooperate. (*Id.*) Serina continued: "Nevin could have spiraled into a mental health crisis and left it up to me to manage Syra, but Nevin stepped up for his infant daughter who needed him more

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

than ever. While in this unprecedented situation and state of mind, Nevin prioritized his daughter's health above all else." (*Id.* at 2-3.)

Several months later, in October 2022, the FBI raided the Shetty home with the family present. Once again, Mr. Shetty's focus was only on his daughters: "With the little control he had left, Nevin asked the agents if he could take Saana to school to maintain 'normalcy' and not further burden me with the task. The agents agreed and Nevin dropped Saana to school on time, making her feel safe, before coming back to the house." (*Id.* at 4.)

Today, years later, Mr. Shetty's devotion to his daughters remains, despite the divorce and his criminal conviction. Serina's demanding job requires Mr. Shetty to serve as the children's primary caregiver:

> Nevin manages all logistics coordination and routine management every morning and evening for Saana and Syra. From waking them up, brushing teeth, dressing, helping with breakfast and school drop-off at two locations, to picking them up in the evenings, and helping with dinner, bathtime and bedtime. Syra still has difficulty eating, requiring extra hands to feed her. Regardless of the divorce and his work, Nevin is there to make sure she grows—he is reliable, loving and essential to her development.

(*Id.* at 5.) Mr. Shetty's involvement extends far beyond basic care. He enrolled Saana in and takes her to Hindi language class and drives her to soccer, tennis, math class, and chess club, where he volunteers. (*Id.*)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1
2

## C. THE PURPOSES OF SENTENCING AND COLLATERAL CONSEQUENCES OF CONVICTION

3
4
5
6
7
8
9
10
11
12
13
14
15

Numerous Courts of Appeals have recognized the importance of considering the collateral consequences a conviction may have on a particular defendant when determining a sentence. *See e.g.*, *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007). Many of these collateral consequences are statutorily mandated. In fact, one federal court has noted that "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons." *United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5 (E.D.N.Y. May 24, 2016). The court further opined, "[t]here is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences." *See id.* at *1.

16
17
18
19
20
21
22
23
24
25

In addition to the statutory restrictions, Mr. Shetty will face "the general reluctance of private employers to hire ex-convicts." *Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5 (citing Harry J. Holzer, Steven Raphael & Michael A. Stoll, *Will Employers Hire Ex-Offenders? Employer Preferences, Background Checks, and Their Determinants*, at 7-18, *available at* http://www.irp.wisc.edu/publications/dps/pdfs/dp12 4302.pdf (using empirical data to conclude private "employers reveal considerable reluctance to hiring workers with criminal histories.")). Undoubtedly, Mr. Shetty's

NEVIN SHETTY'S SENTENCING MEMORANDUM - 26
(No. 2:23-cr-00084-TL)

criminal record will be a subject of any job interview he may get and will follow him for the rest of his life.

More generally, the far-reaching consequences of a conviction undermine an ex-convict's ability to rehabilitate and reintegrate into society. The result of an ex-convict's inability to obtain lawful employment often results in an inability to obtain housing, a loss of child custody, and a vicious cycle of recidivism. *See id.* (citing Gwen Rubinstein & Debbie Mukamal, *Welfare and Housing—Denial of Benefits to Drug Offenders*, INVISIBLE PUNISHMENT: THE COLLATERAL CONSEQUENCES OF MASS IMPRISONMENT, 49 (Marc Mauer & Meda Chesney-Lind eds. 2002).

Peer-reviewed research demonstrates that incarceration itself is a direct cause of premature death, fundamentally altering a person's life trajectory in a manner wholly disproportionate to the goals of sentencing. A landmark study published in the American Journal of Public Health, analyzing New York State parolees over a decade, found a clear "dose-response" relationship: each additional year served in prison increased the odds of post-release death by 15.6%, which translates to a staggering two-year decline in life expectancy for every single year of incarceration. Evelyn Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, Am. J. Public Health 2013 Mar;103(3):523–528. A prison sentence is not merely a loss of liberty for a fixed period; it is a substantial forfeiture of future life, health, and potential. Sentencing Mr. Shetty to incarceration would

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

therefore be sentencing him to a significantly higher risk of early death, a consequence that far exceeds the offense before this Court.

While some Courts of Appeal have expressed concerns that the consideration of collateral consequences may disproportionately assist individuals with privileged backgrounds, numerous federal circuits have embraced collateral consequences as appropriate sentencing considerations consistent with § 3553(a)'s directive that sentences reflect adequate deterrence and just punishment. *See United States v. Musgrave*, 761 F.3d 602 (6th Cir. 2014); *but see United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (holding that the loss of a defendant's teaching certificate and his state pension as a result of his conviction was an appropriate sentencing consideration).

For example, the Second Circuit has held that, because the conviction made it doubtful that the defendant could pursue his career as an academic or translator, the need for deterrence was lessened such that the defendant was properly sentenced to 20 months despite a guidelines range of 78 to 97 months. *See United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). Additionally, in *United States v. Nesbeth*, the court rendered a non-jail sentence to a woman with a drug trafficking conviction carrying a guidelines range of 33-41 months. *See* No. 15-CR-18 (FB), 2016 WL 3022073, at *1 (E.D.N.Y. May 24, 2016). There, the district court incorporated the many statutory collateral consequences in the balancing of the 18 U.S.C. § 3553(a) in determining that "because the collateral consequences [the defendant] will suffer, and is likely to suffer—principally her likely inability to pursue a teaching career and her goal of

**CORR CRONIN** LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

becoming a principal, [state statute omitted]—has compelled me to conclude that she has been sufficiently punished, and that jail is not necessary to render a punishment that is sufficient but not greater than necessary to meet the ends of sentencing." *Id*. at *14.

A sentence of incarceration is *not* necessary in this case to "reflect the seriousness of the offense" or "to promote respect for the law." *Id*. at 7. The indictment and conviction have imposed substantial collateral consequences on Mr. Shetty. He is now financially ruined. In addition, he now has a felony criminal record that will follow him for the rest of this life. This means that he is now subject to hundreds, if not thousands, of statutorily mandated restrictions affecting his daily life and hopes of future employment.

Together, these collateral consequences convey the seriousness of this offense and provide significant punishment for it. Courts have granted departures or variances in similar circumstances—where, for example, a defendant lost a prized job, his business, his good reputation, or even his marriage as a result of the criminal charges. *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (finding variance appropriate where defendant was already collaterally punished by loss of his position, loss of his reputation, and the widespread media coverage of his case); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant had lost good public sector job).

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Moreover, there is no evidence showing that recidivism is a concern. As detailed above, this case concerns an isolated event in Mr. Shetty's otherwise law-abiding life. And the case itself is more than enough of a reminder to him of the penalties for breaking the law. *See, e.g.*, *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (upholding home detention sentence for defendant convicted of insider trading in light of reputational damage, "deterrent effect caused by proceedings," and loss of employment). Mr. Shetty has been financially ruined by the investment. And given the media attention surrounding this case, his reputation has been irreparably harmed. There is no reason to believe incarceration is necessary to prevent him—or others—from repeating his conduct.

### D. THE KINDS OF SENTENCES AVAILABLE

#### *Probation*

A sentence of probation is appropriate here. Notably, Mr. Shetty has already served over two and a half years under similar conditions while he has been released pending trial and sentencing. The terms of that release have operated, in effect, as a probationary sentence already. For example, for over two and a half years, Mr. Shetty has complied with many restrictions on his liberty, the violation of which would have placed them in additional jeopardy. He is prohibited from travelling outside the Western District of Washington, supervised by U.S. Pretrial Services, required to surrender his passport to Pretrial Services, prohibited from possessing a firearm, required to maintain employment, prohibited from opening new lines of credit or

NEVIN SHETTY'S SENTENCING MEMORANDUM - 30
(No. 2:23-cr-00084-TL)

bank accounts without permission from Pretrial Services, and required to notify his employer of his offense and provide written proof of his notification to Pretrial Services. (Dkt. 10.)

The severity of these conditions should not be underestimated and closely mirror what would be required of Mr. Shetty on probation; the Supreme Court has described such conditions as "substantially restrict[ing a defendant's] liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007).

Specifically, the Court stated:

> Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty . . . Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

(*Id.*) Mr. Shetty has proven the ability to comply with probation conditions. There is no reason to believe these restrictions on his liberty are insufficient to effectuate to purposes of sentencing.

Mr. Shetty worked two jobs after his termination from Fabric. (PSR at ¶ 100.) He left his most recent job, Occulus, a real estate development company, to focus his attention on trial. Mr. Shetty is welcome to return to Occulus, but he is waiting until after sentencing to make that decision. A sentence of probation would allow Mr. Shetty to return to his job. If he is sentenced to imprisonment, he will lose his job and be unable to make payments toward restitution, if this Court were to impose it. Once

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

released, he would have difficulty obtaining a new, well-paying job as a convicted felon. A probationary sentence would be in the best financial interest of the victim in this case, allowing Mr. Shetty to maintain his job and help support himself and his family. Likewise, a probationary sentence would be in the best interest of Mr. Shetty, allowing him to continue being a productive member of society and making amends for his conduct.

As Judge Lasnik referenced in the sentencings of Potapenko and Turogin, non-custodial sentences can serve as sufficient general and specific for the purposes of sentencing. *Sergei Potapenko, et al.*, No. 22-CR-185-RSL (W.D. Wash. 2025), at Dkt. 237 at 72:3-11. The Ninth Circuit has recognized that Section 3553(a) "does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards,* 595 F.3d 1004, 1016 (9th Cir. 2010) (affirming sentence of probation for defendant convicted of bankruptcy fraud and false statements to a bank with a previous conviction for theft from banks). Scholarship published by the Department of Justice's own National Institute of Justice highlights scientific research that "[s]ending an individual convicted of crime to prison isn't a very effective way to deter crime" and "compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement." *Five Things About Deterrence*, NAT'L INSTITUTE OF JUST., Jun. 5, 2016, https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### *Home Confinement*

Should the Court find that some form of confinement is necessary to achieve the purposes of sentencing, home confinement represents an appropriate middle ground. Courts are statutorily authorized to impose sentences of home confinement, which requires that a defendant "remain at his place of residence during nonworking hours and, if the court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices." 18 U.S.C. § 3563(b)(19). Home confinement is a substantial restriction on freedom that serves many of the same purposes as incarceration, while allowing defendants to maintain employment and make restitution payments.

As discussed above, at least three defendants *in this District*, including Thompson, Potapenko, and Turogin—with conduct much more egregious than Mr. Shetty—have received non-custodial sentences.

Home confinement would allow Mr. Shetty to continue his employment, allowing him to make payments toward restitution, should the Court impose it. The electronic monitoring component would ensure strict compliance with the terms of confinement, providing both punishment and deterrence. Mr. Shetty has already demonstrated his ability to comply with significant restrictions on his liberty during his pretrial release period, making him an excellent candidate for home confinement.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

### *Imprisonment*

Although the Sentencing Guidelines call for a sentence of imprisonment, they are advisory only and the Probation Office itself recommends 24 months, a 78% downward variance. As stated above, at least three defendants in this District have been sentenced to non-custodial sentences for conduct more severe than Mr. Shetty's.

Case law recognizes that the sentencing analysis is individualized and permits large departures from the Guidelines range where, for example, the Guidelines recommended by the Probation Office are based on loss tables that are far removed from the actual conduct, and a defendant has an otherwise exemplary record, demonstrating the aberrant nature of his crime. Here, for the reasons above, imprisonment is not necessary to achieve the purposes of sentencing.

### E. PERTINENT POLICY STATEMENTS

Although there are no pertinent policy statements, there is widespread criticism of the loss table in the Sentencing Guidelines, which "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, D.J., concurring). Instead, the loss table is used as a clumsy proxy for the seriousness of the offense, even though it fails to account for any of the substantive aspects of the crime, including its means and the defendant's motivation. As a result, U.S. Sentencing Commission studies demonstrate that more than half of sentences that involve the loss table for economic crimes depart below the recommended

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

guidelines range. *See, e.g.*, Mark Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent. R. 1, 19-27 (2013). According to Mr. Allenbaugh, "[s]everal types of evidence indicate that a primary reason for judicial dissatisfaction with § 2B1.1, at least as it applies to fraud offenses, is that loss amount (in combination with the many other upward adjustments provided by the guideline) frequently inflates sentences far more than necessary to achieve the purposes of sentencing." *Id.* at 21.

## II.    CONCLUSION

As the Court considers what constitutes a reasonable sentence under § 3553(a), it should keep in mind the Supreme Court's admonition that "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 1240 (2011) (cleaned up) (citing *Williams*, 337 U.S., at 247). In *Koon v. United States*, 518 U.S. 81, 113 (1996), the Supreme Court observed, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." In this context, a sentence of probation or, in the alternative, home confinement achieves the purposes of sentencing.

WHEREFORE, based upon the information contained in this memorandum and at the sentencing hearing, Mr. Shetty respectfully requests that the Court order a sentence of probation or, in the alternative, home confinement.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Respectfully submitted,

CORR CRONIN LLP

*/s/ J. Alex Little*
Jeffrey B. Coopersmith, WSBA No. 30954
Kristin E. Bateman, WSBA No. 54681
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Ph: (206) 625-8600 | Fax: (206) 625-0900
jcoopersmith@corrcronin.com
kbateman@corrcronin.com


LITSON PLLC

J. Alex Little, *admitted pro hac*
Zachary C. Lawson, *admitted pro hac*
54 Music Square East, Suite 300
Nashville, TN 37203
alex@litson.co
zack@litson.co

*Attorneys for Defendant Nevin Shetty*

NEVIN SHETTY'S SENTENCING MEMORANDUM - 36
(No. 2:23-cr-00084-TL)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900