1

2

3

4

5

6

7

8

9

10

11

12

13

The Honorable Tana Lin

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

           Plaintiff,

v.

NEVIN SHETTY,

           Defendant.

No. 2:23-cr-00084-TL

**DEFENDANT NEVIN SHETTY'S
OBJECTIONS TO THE PSR**

14

15

    Defendant Nevin Shetty, through undersigned counsel, respectfully files his

objections to the Revised Pre-Sentence Report ("PSR"):

16

17

### I.    Mr. Shetty Should Receive Credit for Acceptance of Responsibility.

18

19

20

21

    The PSR states that Mr. Shetty "has not clearly demonstrated acceptance of

responsibility" and thus does not qualify for a decrease in his offense level. (PSR at ¶

28.) Mr. Shetty took full responsibility for his conduct. As such, he is entitled to a two-

level decrease in his offense level.

22

23

24

25

    The PSR correctly notes that, Mr. Shetty "took full responsibility for the loss

of $35 million of Company A's funds." (PSR at ¶ 27.) Mr. Shetty explained why he

committed the conduct underlying the offense, including attributing the conduct to

his "grandiosity." (PSR at ¶ 27.) The PSR appears to conclude that Mr. Shetty "does

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

not take responsibility for the criminal nature of his acts as found at trial" because of a letter from Mr. Shetty's counsel, in the PSR's words, "outlining . . . there was no criminal intent to defraud Company A." (PSR at ¶ 27.)

There is no dispute that the jury unanimously found Mr. Shetty had criminal intent to defraud Company A. Counsel's letter did not attempt to dispute that fact. Instead, the letter distinguished Mr. Shetty's case from other fraud cases in this district, concluding that this case was "very different" from a traditional fraud case of "a CFO taking $35 million and using the money to buy personal items or other goods or services unrelated to the company."

As the PSR notes, the Court is "entitled to great deference" when determining if the defendant has accepted responsibility. Commentary to USSG §3E1.1, Application Note 5. As Application Note 2 describes:

> Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

Mr. Shetty exercised his constitutional right to a trial and asserted and preserved issues for appeal. He should not be punished for doing so. The countless character letters provided to the Court confirm that Mr. Shetty has expressed remorse and accepted responsibility for the circumstances that led to his conviction.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1
2

Because Mr. Shetty takes responsibility for his conduct, he is entitled a two-level decrease in his offense level for acceptance of responsibility.

3
4

## II.    Mr. Shetty's Loss Amount is Not $35 Million.

5
6
7

The PSR recommends a loss amount of $35 million. (PSR at ¶ 27.) But because the $35 million loss was not reasonably foreseeable, Mr. Shetty's loss amount cannot be $35 million.

8
9
10
11
12
13

Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." (USSG § 2B1.1(b)(1)(C)(i).) Reasonably foreseeable pecuniary harm is defined as "pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." (USSG § 2B1.1(b)(1)(C)(iv).)

14
15
16
17
18
19
20
21
22
23
24
25

As the Eleventh Circuit has explained, "[w]hen calculating actual loss . . . the district court should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant." *United States v. Stein*, 846 F.3d 1135, 1155 (11th Cir. 2017) (citation omitted). In *Stein*, the defendant, a lawyer, was convicted of orchestrating a fraud that falsely inflated the price of his client's stock. (*Id.* at 1139.) The defendant argued that his PSR's calculation of the actual loss was too high because "specific events unrelated to the fraud . . . caused the stock price to decline during the fraudulent period, including the 2008 financial crisis and the rampant short selling of [the company's] stock." (*Id.* at 1145.) Neither the PSR nor the district court accounted for these intervening events.

DEFENDANT'S OBJECTIONS TO THE PSR - 3
(No. 2:23-cr-00084-TL)

**CORR CRONIN** llp
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1
2
3
4
5

(*Id.* at 1156.) The Eleventh Circuit vacated the defendant's sentence and ordered that the district court recalculate the actual loss an determine whether the intervening events were "reasonably foreseeable," and if not, "subtract from the actual loss amount the monetary effect of such intervening event." (*Id.* at 1156.)

6
7
8
9
10
11
12
13
14
15
16
17
18
19

FBI Forensic Accountant and cryptocurrency expert Daniel Booth testified at trial that Do Kwon, the mastermind of the UST cryptocurrency, pleaded guilty to fraud resulting in the collapse of the UST market. While losses in some investments are reasonably foreseeable, the losses from Kwon's massive fraud were not reasonably foreseeable. That is why the government in SDNY charged Kwon with defrauding UST investors out of over $40 billion. *See* Def. Ex. 113, DOJ Press Release Announcing Kwon's Indictment. ("Do Kwon used the technological promise and investment euphoria around cryptocurrency to commit one of the largest frauds in history.") Mr. Shetty was one of those investors, and Company A's money was among the billions of dollars lost.[1] Kwon's fraud was an intervening event, not reasonably foreseeable to Mr. Shetty, that caused the loss of majority of the $35 million investment.

20
21
22
23

The government argues that Mr. Shetty's "foreseeability argument" relies on a false premise because, according to the government, the jury necessarily decided his investment in HighTower was not an investment at all—that it was a "sham." This,

24
25

---

[1]    Had Mr. Shetty invested Company A's money in Silicon Valley Bank ("SVB"), as several of its board members wished, that money, too, would have been lost when SVB collapsed in March 2023. Similarly to Kwon's UST fraud, the collapse of SVB was an intervening event not reasonably foreseeable to any of its customers.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

of course, is not true. According to the jury instructions, the jury could have concluded that it was an investment he was not authorized to make under the company's investment policy.

All the trial evidence suggested this was a real investment. Mr. Shetty's investment of Fabric's money in UST generated thousands of dollars in interest daily, prior to the market collapse caused by the fraud. (Def. Ex. 93, Summary of Company A's QuickBooks.) There was zero reasonably foreseeable loss from Mr. Shetty's conduct. Instead, there was an actual pecuniary gain from the investment, which was later wiped out by Kwon's fraud. As Probation's response to Mr. Shetty's objections states, "[w]hether or not [the loss] was 'reasonably foreseeable' will be determined by the Court." For the reasons above, the Court should find that the $35 million loss was not reasonably foreseeable.

While the actual, reasonably foreseeable loss was zero, the interest HighTower earned on the investment represents the intended loss. The government presented evidence at trial that HighTower generated $133,000 of interest (though it realized no profits because of the market crash) in the month of its operation before the UST market collapse. Mr. Shetty, as the 33% owner of HighTower, was entitled to 33% of HighTower's earned interest, or $44,333.33 in the first month. Mr. Shetty was to remain Fabric's CFO until June 2022—three months from the start of Fabric's HighTower investments in April 2022. Over those three months, assuming the UST market did not crash, Mr. Shetty stood to gain $44,333.33 per month from

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

HighTower's earned interest, as its partial owner. Across three months, that totals $133,000. At most, $133,000 is the intended loss of Mr. Shetty's conduct, corresponding to an eight-level increase in his offense level.

### III.    Mr. Shetty Should Not Receive The Sophisticated Means Enhancement.

The PSR applies the sophisticated means enhancement to Mr. Shetty, finding that he used "deception to initiate transfers from Company A to the HighTower account, and deception with a junior employee of Company A in an effort to substantiate the misappropriation of funds from Company A." (PSR at ¶ 34.) Because Mr. Shetty did not use sophisticated means, this enhancement should not be applied to him.

The Sentencing Guidelines Manual's definition and examples of sophisticated means show that Mr. Shetty does not qualify for this enhancement. The manual defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." (Commentary to USSG § 2B1.1, Application Note 9(B).) The Note gives several examples of sophisticated means: "locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction," and "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." (*Id.*)

Mr. Shetty's conduct did not involve multiple jurisdictions, hiding assets or transactions, or use fictitious entities, corporate shells, or offshore financial accounts.

DEFENDANT'S OBJECTIONS TO THE PSR - 6
(No. 2:23-cr-00084-TL)

His conduct did not involve especially complex or especially intricate means. Mr. Shetty simply made an investment, as was his everyday job as CFO.

Nor did Mr. Shetty use deception to initiate transfers from Company A to the HighTower account. Mr. Shetty, alone, could and did authorize those wire transfers, just as he could any other wire transfer as the CFO. (Gov't Ex. 215 ("Mr. Shetty contends and the government does not contest that the banks at issue in this case did not require more than one authorized signer to approve wire transfers.").) As established above, Mr. Shetty did not need to deceive anyone at Company A to gain secondary authorization of the wire transfers because he alone could and did authorize those wires.

It is unclear what "deception" of "a junior employee of Company A" the PSR refers to. Multiple employees at Company A were aware of a Fabric account at HighTower. Mr. Shetty told accountant Alice Leung when he moved money from Fabric's Chase account to the HighTower account. (Gov't. Ex. 188 at 2.) Multiple employees were given logins to access the account on HighTower's website. Leung successfully logged into the HighTower account. The wire transfers from Fabric to HighTower were posted openly on Fabric's QuickBooks, and employees, like controller Lucy Harrington, saw those transactions on the QuickBooks.

A recently proposed amendment to the Sentencing Guidelines supports Mr. Shetty's argument. The amendment revises the definition of "sophisticated means" to mean "committing or concealing an offense with a greater level of complexity than

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

typical for an offense of that nature." *Proposed Amendments to the Sentencing Guidelines*, U.S. SENTENCING COMM'N, Dec. 12, 2025, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf, at 65. The proposed amendment addresses concerns that the current sophisticated means enhancement "is applied too broadly and for conduct that is not complex or intricate." (*Id.*) The Sentencing Commission has heard concerns that "the enhancement is often based on conduct that is inherent in economic crime offenses and therefore is captured by the base offense level." (*Id.*) Mr. Shetty's conduct did not have the greater level of complexity than typical for a wire fraud offense involving cryptocurrency. Under the proposed amendment to the Guidelines, Mr. Shetty would not receive the sophisticated means enhancement. Nor should he receive the enhancement under its current definition.

Conduct involving mere "deception" cannot satisfy the sophisticated means enhancement. A significant number of crimes, especially financial crimes, involve deception. The Manual's definition and examples of sophisticated means illustrate that these crimes do not all automatically qualify for this enhancement, nor does Mr. Shetty's conduct qualify.

## IV.    Factual Objections to the PSR

Mr. Shetty submits the following factual objections to the PSR. He objects to Paragraph 8, which states that the investment policy was intended to limit Company A's investments to "low-yield, low-risk," and "established banks." This incorrectly

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

describes the investment policy, which had four primary objectives: "preservation of capital; provide sufficient liquidity to satisfy operational and capital needs; maintain appropriate diversification; and generate returns based on the Company's investment policy parameters and market." (Gov't Ex. 89, Fabric's Investment Policy.) The investment policy was not intended to limit investments to established banks. In fact, the policy allowed investments in "US Treasury Obligations," "US Federal Agencies or Gov. Sponsored Enterprises," "Corporate Obligations," "Commercial Paper," and "Municipal Securities," which are not typically available at established banks. *See* Gov't Ex. 89.

Mr. Shetty objects to Paragraph 9, which states that the investment policy indicated that "Company A would invest capital in treasury accounts with three banks Company A had a pre-existing financial relationship." Nowhere in the investment policy does it indicate that Company A would invest only in the three banks it had a pre-existing financial relationship. (Gov't Ex. 89.)

Mr. Shetty objects to Paragraph 10, which states that Mr. Shetty created HighTower "[d]uring the time" that Company A and Mr. Shetty agreed that he would exit the country. Mr. Shetty, along with HighTower's co-founders, incorporated HighTower on February 14, 2022, Gov't. Ex. 174, *prior* to the March 17, 2022 conversation about his eventual exit from Company A.

Mr. Shetty further objects to Paragraph 10, which states "Mr. Shetty and his co-founder would keep the majority of the remaining interest as profit" and the

1
2
3
4
5
6
7
8
9
10
11
12

"profits were split as equal percentages between the defendant, the co-founder, and HighTower." Mr. Shetty was a 33% equity owner of HighTower Treasury and entitled to receive one-third of its profits. HighTower's co-founder, Adam Brazg, received two-thirds of the equity and profits, but planned to split his share with HighTower's third co-founder. In other words, each of HighTower's co-founders each received one-third of its profits. This sentence in the PSR is misleading because it does not reflect that Mr. Shetty only received a third of HighTower's profits, as did the other co-founders. This sentence should be edited to reflect that the remaining interest was to be HighTower's profit, to which Mr. Shetty and his co-founders were each entitled to a third of.

13
14
15
16
17
18
19
20
21
22
23
24
25

    Mr. Shetty objects to Paragraph 11, which states that "Mr. Shetty and the co-founder of HighTower had limited experience in cryptocurrency investment." It is inaccurate and should be removed. Mr. Shetty invested in cryptocurrency starting in 2017 and had considerable experience in cryptocurrency investing. Mr. Shetty further objects to this paragraph which states "When asked by these DeFi companies about Company A's plan to invest, Mr. Shetty told them any investment would require approval of Company A's board and executive team." At trial, the representative from the DeFi company, Cyrus Shirazi, could not remember who at Company A Mr. Shetty said he would "socialize" the DeFi company with. (Oct. 29, 2025 Tr. Trans. at 170:10-13.)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  Mr. Shetty objects to Paragraph 13, which states that "On April 1, 2022, Mr.

2  Shetty authorized a $100 a wire transfer of Company A's funds to HighTower. During

3  this time, other wire transfers had been authorized by Company A's board and

4  executive and finance teams because of a change in payroll systems. Further, the

5  transfers were made at the beginning of a new financial quarter, which would avoid

6  line-item scrutiny until the end of the quarter, which was set to take place on June

7
8  30, 2022."

9  Paragraph 13 leaves the reader with the mistaken impression that Mr. Shetty

10  attempted to hide the initial $100 wire transfer among wire transfers related to

11  Company A's change in payroll systems. The cross-examination of Ryan Bartley

12  illustrated that Mr. Shetty did not provide a false narrative and that it was mere

13  coincidence that the initial HighTower wire transfer occurred while Company A

14  switched payroll systems at the direction of Company A's HR department, not Mr.

15
16  Shetty. (Oct. 29, 2025 Tr. Trans. at 48:6-15.)

17  Paragraph 13 also leaves the reader with the misimpression that the transfers

18  were deliberately made at the start of a new financial quarter to avoid detection. No

19  evidence at trial supports this misimpression. Instead, evidence at trial indicated that

20  Mr. Shetty attempted to initiate the first wire transfer at the end of March 2022,

21  during the end of the first quarter. A delay outside of his control caused this transfer

22  to occur on April 1, at the start of the second quarter. Additionally, an FBI-302 of

23  Company A controller Lucy Harrington indicated that she noted a HighTower

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

balance from the transfers during "the April 2022 end of month review"—not at the end of quarter, June 30, 2022. The evidence and testimony at trial do not support Paragraph 13.

## V.    Conclusion

For the reasons above, Mr. Shetty requests that the Court sustain his objections to the PSR.


Date:  February 4, 2026

Respectfully submitted,

CORR CRONIN LLP

*/s/ J. Alex Little*
Jeffrey B. Coopersmith, WSBA No. 30954
Kristin E. Bateman, WSBA No. 54681
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Ph: (206) 625-8600 | Fax: (206) 625-0900
jcoopersmith@corrcronin.com
kbateman@corrcronin.com

LITSON PLLC

J. Alex Little, *admitted pro hac*
Zachary C. Lawson, *admitted pro hac*
54 Music Square East, Suite 300
Nashville, TN 37203
alex@litson.co
zack@litson.co

*Attorneys for Defendant*

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900