UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:23-cr-00084-TL |
| Plaintiff, | |
| v. | ORDER ON AMOUNT OF RESTITUTION |
| NEVIN SHETTY, | |
| Defendant. | |

Before the Court are the Government's request for an award of restitution (*see* Dkt. No. 317 (Government's Sentencing Memorandum) at 24) and Defendant Nevin Shetty's Notice of Authority and Motion Opposing Judicial Imposition of Restitution (Dkt. No. 321). The Court heard oral argument on the issue of Restitution at Mr. Shetty's sentencing on March 5, 2026, and asked for additional briefing regarding a potential restitution offset. Dkt. No. 339 (Sentencing Transcript) at 18:21. Having considered the motion, the Government's response (Dkt. No. 326), Mr. Shetty's reply (Dkt. No. 327), the additional briefing provided by the Parties (Dkt. Nos. 338,

ORDER ON AMOUNT OF RESTITUTION – 1

342, 345), and the March 5, 2026, oral argument, the Court DENIES Mr. Shetty's motion, and ORDERS Mr. Shetty to pay restitution to the victim of his fraud in the full amount of their loss.

## I.    BACKGROUND

On November 7, 2025, Mr. Shetty was convicted of four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. *See* Dkt. Nos. 286 (sealed verdict form), 287 (redacted verdict form). The charges arose out of four wire transfers authorized by Mr. Shetty, then the chief financial officer of ecommerce company Fabric, to a small investment startup called HighTower, which Mr. Shetty partly owned. The transferred money, which totaled $35,000,100, was ultimately converted without Fabric's knowledge into a cryptocurrency called "Terracoin" or "UST." While the UST initially gained in value, it began to lose value in early May 2022. On May 13, 2022, Mr. Shetty informed Fabric that its money had been transferred to HighTower, invested in UST, and largely lost. Evidence was introduced at trial that on May 26, 2022, a "digital wallet" containing the remaining UST were transferred to Fabric's control as part of a negotiated agreement between Fabric's and HighTower's attorneys. At sentencing, the Government and Mr. Shetty agreed that, to their knowledge, the UST in this wallet have never been sold. *See* Dkt. No. 339 at 15:2–12, 19:3–4.

The jury unanimously found that Mr. Shetty committed the offense of wire fraud as follows: (1) a $100 wire transfer on or about April 1, 2022; (2) a $14,500,000 wire transfer on or about April 4, 2022; (3) a $5,400,000 wire transfer on or about April 5, 2022; and (4) a $15,100,000 wire transfer on or about April 12, 2022. Dkt. Nos. 286, 287. As to the elements of wire fraud, the jury was instructed that the Government must prove four elements beyond a reasonable doubt:

> *First*, the defendant knowingly devised or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations,

or promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

*Second*, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

*Third*, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

*Fourth*, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

Dkt. No. 279 (Final Jury Instructions) at 18. The jury was further instructed:

It is a complete defense to the charges in this case if Nevin Shetty acted within the authority granted to him as Chief Financial Officer by the Board's Resolution adopting the Investment Policy . . . If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the actions at issue in this case exceeded his authority, it is your duty to find the defendant not guilty.

*Id.* at 22.

## II.    LEGAL STANDARD

In 1996, Congress passed the Mandatory Victims Restitution Act ("MVRA"). Pub. L. No. 104-132 § 204, 110 Stat. 1214, 1227 (codified at 18 U.S.C. § 3663A). Under the MVRA, "defendants convicted of certain federal crimes must pay monetary restitution to the victims." *Ellingburg v. United States*, 607 U.S. 163, 164 (2026). "Congress intended restitution under the MVRA to both punish and compensate." *Id.* at 168.

The MVRA requires the district court to "order restitution to each victim in the full amount of each victim's losses as determined by the court[.]" 18 U.S.C. § 3664(f)(1)(A). "[T]he Court is required to order full restitution to victims of a convicted offense when the offense is committed by fraud or deceit, without consideration of the defendant's economic circumstances or ability to pay." *United States v. Holmes*, 673 F. Supp. 3d 1049, 1054 (N.D. Cal. 2023) (citing

ORDER ON AMOUNT OF RESTITUTION – 3

18 U.S.C. §§ 3663A(c)(1), 3664(f)(1)(A)), *aff'd*, 129 F.4th 636 (9th Cir. 2025), *opinion amended and superseded on denial of reh'g*, 163 F.4th 547 (9th Cir. 2025). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by a preponderance of the evidence." 18 U.S.C. § 3664(e). Under the MVRA, it is the government's burden to prove the amount of loss for restitution purposes under this standard. *Id.* "The government must also show by a preponderance of the evidence that an individual is a victim of the crime on which the defendants were convicted, and that the victim's losses were caused by the defendants' offense conduct." *Holmes*, 673 F. Supp. 3d at 1054 (citing *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010)). However, "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). Courts in the Ninth Circuit have placed the burden on a defendant to present evidence establishing any "offsets" that reduce the amount of restitution below the value of the victim's loss. *See, e.g., United States v. Gagarin*, 950 F.3d 596, 608–09 (9th Cir. 2020) (affirming district court's decision not to offset restitution order because defendants failed to meet their burden where proposed offset amounts were simply speculative "estimates which do not affect the calculation of the loss").

### III.   DISCUSSION

#### A.   Whether Restitution Should Be Awarded

Mr. Shetty brings his motion opposing restitution under the recent Supreme Court decision in *Ellingburg. See* Dkt. No. 321. In that case, Mr. Ellingburg was convicted of a crime committed before the MVRA was enacted in 1996. By the time Mr. Ellingburg was sentenced, however, the MVRA had become law, and he was ordered to pay restitution under the law. *Ellingburg*, 607 U.S. at 164–65. Reversing the Eighth Circuit, the Court found that MVRA

restitution "is plainly criminal punishment for purposes of the Ex Post Facto Clause," and was therefore unconstitutional as applied to Mr. Ellingburg. *Id.* at 166.

Here, Mr. Shetty reasons that, under the Sixth Amendment, "if restitution is a criminal punishment, then loss must be found by a jury." Dkt. No. 321 at 1 (citing *Hester v. United States*, 586 U.S. 1104, 1107 (2019) (Gorsuch, J., dissenting from the denial of certiorari); *United States v. Leahy*, 438 F.3d 328, 339 (3rd Cir. 2006) (McKee, J., concurring)). Further, Mr. Shetty asserts, the jury that convicted him "never found facts necessary to impose a restitution order against him." *Id.* at 1–2. To order restitution, his argument continues, the Court would now have to "find additional facts that the jury did not find." *Id.* at 6. Yet to do so, Mr. Shetty argues, would violate the Sixth Amendment, as interpreted by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). *See id.* at 6–7.

      **1.**      **Mr. Shetty's Constitutional Argument Is Foreclosed by Controlling Law**

In *Apprendi*, the Supreme Court held that, other than the existence of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Because the question in *Apprendi* related to the "statutory maximum" penalty for a crime, it applies only to what are known as *determinate* sentences—that is, sentences with upper limits set by statute. *See id.* at 490; *Blakely v. Washington*, 542 U.S. 296, 308–09 (2004) (distinction between determinate and indeterminate sentencing "makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned"). There can be no "*Apprendi* violation where no maximum is prescribed." *S. Union Co. v. United States*, 567 U.S. 343, 353 (2012).

The Ninth Circuit has held that the amount of a restitution award is *indeterminate*: "Restitution carries with it no statutory maximum; it's pegged to the amount of the victim's loss. A judge can't exceed the non-existent statutory maximum for restitution no matter what facts he

ORDER ON AMOUNT OF RESTITUTION – 5

finds, so *Apprendi*'s not implicated." *United States v. Green*, 722 F.3d 1146, 1150 (9th Cir. 2013).

Mr. Shetty disagrees with this Circuit's precedent and asks the Court to find that a "statutory maximum" for purposes of restitution is set by a jury's verdict and findings of fact— and that "[b]ased on the jury's findings of fact and verdict, the statutory maximum for restitution in this case is zero." Dkt. No. 321 at 6. Mr. Shetty finds support for this interpretation in several dissents written by Justice Gorsuch and a Third Circuit concurrence. *See id.* at 1 (citing *Hester*, 586 U.S. at 1107; *Leahy*, 438 F.3d at 339); *id.* at 3–4 (citing *Rimlawi v. United States*, 145 S. Ct. 518 (2025) (Gorsuch, J., dissenting from denial of certiorari).[1]

In Justice Gorsuch's view, shared by Justice Sotomayor,[2] restitution does have a statutory maximum: the amount of the victim's actual loss. *See Hester*, 586 U.S at 1106–07. The logic of *Apprendi* therefore requires a *jury*, not a judge, to find a maximum value of any victim's loss, above which restitution may not be awarded. *See id.* As currently awarded under the structure of the MVRA, then, "the statutory maximum for restitution is usually *zero*, because a court can't award *any* restitution without finding additional facts about the victim's loss. And just as a jury must find any facts necessary to authorize a steeper prison sentence or fine, it would seem to follow that a jury must find any facts necessary to support a (nonzero) restitution order." *Hester*, 586 U.S. at 1107 (citing *Blakely*, 542 U.S. at 303 ("[T]he . . . statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose based *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.")). In *Hester* (a Ninth Circuit appeal), Justices Gorsuch and Sotomayor urged their colleagues to adopt this view and overturn the Ninth

---

[1] All citations to *Hester* in this Order are to Justice Gorsuch's dissent.

[2] Justice Sotomayor joined Justice Gorsuch's dissent from the denial of certiorari in *Hester*, 586 U.S. at 1105. Justice Gorsuch wrote alone in dissenting from the denial of certiorari in *Rimlawi*.

ORDER ON AMOUNT OF RESTITUTION – 6

Circuit rule excluding restitution from *Apprendi*'s ambit. *See id.* at 1105–07. But the Supreme Court declined to grant certiorari, and Justice Gorsuch's view (and Mr. Shetty's) remains the opposite of the law this Court must apply.

Or that *was* the state of the law, Mr. Shetty urges—until the Court's *Ellingburg* opinion, in holding that restitution is criminal punishment, overturned *Green* and other Ninth Circuit precedents. *See* Dkt. No. 321 at 5. This Court does not agree. The fact that restitution is punishment—whether for *ex post facto* purposes or for all purposes—says nothing about whether the framework for restitution under the MVRA is determinate or indeterminate. That question was not at issue in *Ellingburg*, and the Supreme Court has repeatedly denied cert on it—from *Hester* in 2019, to *Rimlawi* in 2025, to *Stroud v. United States*, No. 24-7486, 2026 WL 79762 (U.S. Jan. 12, 2026), just eight days before issuing the *Ellingburg* opinion. As such, the Ninth Circuit rule still stands, and that is the law this Court must apply.

Finally, the Court notes that Mr. Shetty's interpretation would require this Court to find that the rule established by *Ellingburg* not only tacitly overturned *Green* and its siblings (in every Circuit from the First to the Eleventh[3]), but also dictates that the MVRA itself is unconstitutional on its face, at least insofar as it provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). Mr. Shetty has not demonstrated that *Ellingburg* compels this result.

---

[3] *See United States v. Milkiewicz*, 470 F.3d 390, 403–04 (1st Cir. 2006); *United States v. Reifler*, 446 F.3d 65, 114–20 (2d Cir. 2006); *Leahy*, 438 F.3d at 337–38 (3rd Cir.) (en banc), *cert. denied*, 549 U.S. 1071 (2006); *United States v. Day*, 700 F.3d 713, 732 (4th Cir. 2012); *United States v. Rosbottom*, 763 F.3d 408, 420 (5th Cir. 2014), *cert. denied*, 574 U.S. 1078 (2015); *United States v. Churn*, 800 F.3d 768, 782 (6th Cir. 2015); *United States v. George*, 403 F.3d 470, 473 (7th Cir.), *cert. denied*, 546 U.S. 1008 (2005); *United States v. Carruth*, 418 F.3d 900, 902–04 (8th Cir. 2005); *United States v. Visinaiz*, 428 F.3d 1300, 1316 (10th Cir. 2005), *cert. denied*, 546 U.S. 1123 (2006); *United States v. Williams*, 445 F.3d 1302, 1310–11 (11th Cir. 2006), *abrogated on other grounds by United States v. Lewis*, 492 F.3d 1219 (11th Cir. 2007) (en banc).

ORDER ON AMOUNT OF RESTITUTION – 7

Therefore, the Court finds that *Ellingburg* left intact controlling Ninth Circuit precedent, which holds that Sixth Amendment concerns about statutory maximum punishments do not apply to the indeterminate framework established by the MVRA.

**2.      The Jury Found that Fabric Lost $35,000,100**

Even if Mr. Shetty's constitutional argument is correct, and restitution cannot be ordered above a "maximum" loss found by the jury, his logic would not allow the Court to deny restitution, but merely to cap it at $35,000,100. That is because the jury already found facts to establish a loss by Fabric up to $35,000,100 when it found Mr. Shetty guilty, beyond a reasonable doubt, of wiring that amount of money out of Fabric's account, without the authority to do so, in order "to carry out or attempt to carry out an essential part of [a] scheme" to "defraud for the purpose of obtaining money or property . . . ." *See* Dkt. No. 279 at 18, 22; *see also* Dkt. Nos. 286, 287.

Mr. Shetty argues in his motion that the jury "never found facts necessary to impose a restitution order against him." Dkt. No. 321. at 1–2.  As the Government points out, "Shetty does not say which 'facts' relating to restitution the jury did not find here. There are three apparent possibilities—the existence of a victim, the existence of a pecuniary loss, and the amount of the pecuniary loss—but all three are inherent in the jury's verdict." Dkt. No. 326 at 5 n.4 (internal citation omitted). On reply, Mr. Shetty does not dispute the existence of a victim or a loss but argues, for the first time and without support, that "[t]he MVRA requires" that the jury make specific findings related to the value of the UST purchased by HighTower with the proceeds of Mr. Shetty's fraud and "Fabric's receipt of its UST" in the May 26, 2022, UST transfer. Dkt. No. 327 at 6–7. Because "[t]he Jury did not (and cannot now) make" findings regarding this after-the-fact transfer of UST, Mr. Shetty appears to argue, no restitution can therefore be ordered without violating *Ellingburg*. *See id.* at 7.

Mr. Shetty's argument relies on an assumption that Fabric lost, or might have lost, *less* than $35,000,100 because "Fabric received all of its UST that was invested by HighTower (though it had lost most of its value) years ago." Dkt. No. 327 at 6. Mr. Shetty continues:

> The Act requires that a defendant return property to its owner. 18 U.S.C. § 3663A(b)(1)(A). . . . The Act also lays out two options of how restitution should be calculated if the return of property is "impossible, impracticable, or inadequate." 18 U.S.C. § 3663A(b)(1)(B). But the jury never found whether Fabric's receipt of its UST was "impossible, impracticable, or inadequate" for the purposes of Mr. Shetty's restitution, due to the market crash caused by Mr. Kwon. Nor did the jury find the value of the property on the date of the loss, whether it be the value of the wire transfers or the value of the UST before, during, or following the market crash. The MVRA requires that these findings be made for the purpose of restitution, but the jury did not (and cannot now) make them. Once again, the government disregards relevant authority and draws a summary conclusion.

*Id.* at 6–7.

This argument fails. To the extent that Mr. Shetty argues that the transfer of UST from Fabric to HighTower means that Fabric was never deprived of $35,000,100, the jury necessarily rejected this argument in finding Mr. Shetty guilty. The jury found that Mr. Shetty committed fraud in conducting four wire transfers totaling $35,000,100. *See* Dkt. Nos. 286, 287. The evidence at trial established that these four transfers moved money out of accounts held at Chase Bank by Fabric and into accounts owned by HighTower and controlled by Mr. Shetty. The elements of wire fraud necessarily mean that each of these "wire communication[s] . . . actually occurred in furtherance of" a "scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts." *See* Dkt. No. 279 at 18–19. The crime was completed the moment the wirings occurred; that is when Fabric's property was lost, and there is no ambiguity as to the amount of that loss. The doubts Mr. Shetty raises go not to the amount of Fabric's loss, but to procedural questions

ORDER ON AMOUNT OF RESTITUTION – 9

regarding whether Mr. Shetty has already provided partial restitution by "return[ing] the property," 18 U.S.C. § 3663A(b)(1)(A), or "any part of the property," § 3663A(b)(1)(B)(ii), to his victim, such that he is entitled to an offset of restitution due.

Restitution offsets are discussed *infra* Section III.B. Relevant here, any offset is a classic sentencing question that is beyond the purview of the jury and poses no fairness concerns within the meaning of *Ellingburg*—especially because no answer to the question can increase Mr. Shetty's restitution liability above the loss value the jury already found.

### 3.    Mr. Shetty's Additional Arguments Are Disregarded as Untimely

At oral argument, the Court informed the Parties that it would be denying Mr. Shetty's motion opposing judicial imposition of restitution (Dkt. No. 339 at 5:8) but requested additional briefing on the issue of any possible restitution offset (*id.* at 18:21–23). *See infra* Section III.B. Mr. Shetty accordingly filed a Brief in Support of Offset of Restitution (Dkt. No. 338), which was followed by the Government's response (Dkt. No. 342) and Mr. Shetty's reply (Dkt. No. 345). The title of his brief (and the Court's instructions) notwithstanding, Mr. Shetty spends several pages arguing that "Mr. Shetty's Restitution Should be Zero" because Mr. Shetty, though convicted of fraudulently taking $35,000,100 from his victim, is not the proximate cause of Fabric's loss. *See* Dkt. No. 338 at 5–7. The Government argues—with no rebuttal from Mr. Shetty—that this is a new, untimely argument *against the imposition of restitution*, not in favor of an offset, and should not be considered. Dkt. No. 342 at 5–6. The Court agrees. The time to raise this argument was in Mr. Shetty's original motion opposing restitution, and he did not do so.

Even if this argument were timely, however, it could not succeed. Mr. Shetty's crime was completed the moment he completed the fraudulent wire transfers of which he was convicted, and it was at that point that Fabric's loss occurred. The fact that Mr. Shetty intended to return the

ORDER ON AMOUNT OF RESTITUTION – 10

principal after profiting by investing it does not change this, nor does the fact that his plans were thwarted due to the fraud perpetrated by Terracoin founder Do Kwon. By analogy, consider a person who steals a car with the intention of returning it some weeks or months later. The theft (and the loss) occurs the moment the car is stolen, although subsequent events out of the thief's control may greatly influence his ability to complete his plan, return the car, and lessen (or avoid) punishment. For example, if another reckless driver causes a crash that destroys the car before it can be returned, the plan is foiled: the thief can no longer mitigate the loss—which occurred the moment he took the car—by returning the stolen property in full. The collision may not be his fault, but it does not interrupt the causal chain between the crime and the loss (which occurred at the moment the car was stolen and before the car was damaged)—it only prevents the thief from mitigating the loss he already caused.

**B.      Whether Any Offset Should Be Applied to the Restitution Amount**

In advance of Mr. Shetty's sentencing hearing. the Court asked the Parties to be prepared to discuss the application of two cases to the restitution question: *Robers v. United States*, 572 U.S. 639 (2014), and *United States v. Holmes*, 673 F. Supp. 3d 1049 (N.D. Cal. 2023), which applied the *Robers* holding. *See* Dkt. No. 339 at 5:6–7.

In *Robers*, a loan fraud case, the Supreme Court rejected the defendant's argument that "part of the property" the victim banks lost due to his fraud was "returned" to them when they took title to the houses the defendants had purchased with the fraudulently obtained loans. 572 U.S. at 641. The Court relied on a plain reading of the MVRA, reasoning that where "the specific property lost by a victim" is money, "no 'part of the property' is 'returned' to the victim until" the victim receives *money*—either directly from the defendant or by liquidating a non-monetary asset the victim has received from the defendant. *Robers* 572 U.S. at 640–41 (quoting 18 U.S.C. § 3663A(b)(1)(B)). The only value that can reduce the amount of restitution in such a case is the

value of money received by a victim from selling the asset—*not* the value of the asset on the day the victim takes possession of it. While the *Robers* majority allowed that, in the context of a collateralized loan, an "unexpected natural disaster that destroys collateral" might be treated differently from "normal[]" "market fluctuations" in considering who should bear a loss in value of the collateral (*id.* at 646), it did not explain *how* such a disaster should be handled in light of its overall holding that where money is lost due to a crime, "the property returned must also be the money" (*id.* at 643 (citation modified)) and not the replacement asset or substitute for the money.

In *Holmes*, 673 F. Supp. 3d 1049, the Northern District of California applied *Robers* in the context of securities fraud, with facts closely analogous to the facts in the instant case. There, in a widely publicized crime, defendants Elizabeth Holmes and Ramesh "Sunny" Balwani had convinced investors to invest in their company, Theranos, by fraudulently misrepresenting the capabilities of Theranos's signature technology. At sentencing, both defendants argued that the victims' losses should be offset by the value of Theranos stock the victims retained. Applying *Robers*, the Court disagreed, in an opinion affirmed by the Ninth Circuit:[4]

> Although the MVRA does permit in certain circumstances for a deduction of "the value (as of the date the property is returned) of any part of the property that is returned," this section simply does not apply here. Specifically, this section only applies if returning the property would be "impossible, impracticable, or inadequate," § 3663A(b)(1)(B), and there is no basis for the Court to conclude that Defendants' return of lost fungible money would meet that standard. *See Robers*, 572 U.S. at 643 ("Money being fungible, however, 'the property . . . returned' need not be the very same bills or checks.")

*Holmes*, 673 F. Supp. 3d at 1057.

---

[4] *United States v. Holmes*, 163 F.4th 547 (9th Cir. 2025).

At oral argument, the Court asked the Parties to discuss "the applicability of the *Robers* and *Holmes* opinions, with respect to restitution, and the issue of how to value the Terra coins that were transferred from HighTower to Fabric." Dkt. No. 339 at 6:19–22. The Court acknowledged the undisputed facts "that that the wallet containing the Terra coins was turned over to Fabric, and that the coins were still worth at least $1 million at the time a warrant was sought, . . . but that had Fabric liquidated the coins shortly after receiving them, the coins were still possibly worth several million dollars at that point" (*id.* at 7:8–14), and asked the Parties (1) if it was known whether Fabric has ever liquidated the Terracoins it received from Hightower, (2) if so, on which date Terracoins should be valued for purposes of offsetting restitution, and (3) if the Terracoins had *not* been liquidated, how a restitution order should account for Fabric's continued possession of them (*id.* at 8:2–8). The Parties agreed that, to the best of their knowledge, the Terracoins had never been sold. *Id.* at 15:6–11, 19:3–4. After oral argument, the Court requested "further briefing . . . with cites to the record" on the valuation of the Terracoin wallet for purposed of restitution, specifically including a discussion of whether Fabric had failed to convert the Terracoins to cash within a reasonable time. *Id.* at 18:1–3. Both Parties took the position that no further evidentiary hearing on restitution was necessary. *See id.* at 11:25–12:9 (Mr. Shetty), 13:25–14:1 (Government), 18:5–17 (Mr. Shetty). The Court now considers the Parties' arguments regarding an offset to restitution.

As the Court explained at oral argument, a straightforward application of the core holding of *Robers* does not allow it to consider the Terracoin wallet transferred back to Fabric control as "property" "return[ed]" within the meaning of 18 U.S.C. § 3663A(b)(1). *See* Dkt. No. 339 at 7:15–18. Generally, property transferred from a victim to a defendant can reduce the monetary value of restitution owed only once it is sold by the victim. However, the Court indicated that it was open to arguments regarding the application of portions of Justice Sotomayor's concurrence

in that case, which the Court "tend[s] to agree with . . . as a caveat on [the] applicability of *Robers*. *Id.* at 7:24–8:1. Justice Sotomayor, while agreeing with the majority in the case before her, indicated she would rule differently in a case where a defendant presented evidence proving "that a victim delayed unreasonably in selling collateral, manifesting a choice to hold the collateral" "as an investment rather than reducing it to cash." *Robers,* 572 U.S. at 648–49 (Sotomayor, J., concurring).

The *Robers* Court also briefly considered in the hypothetical a situation analogous to the one presented here, in which "a victim has not sold the collateral by the time of sentencing," concluding that "other provisions" of the MVRA give a  court "adequate authority to count, as part of the restitution paid, the value of collateral previously received but not sold," referring to such adjustments as "credits against an offender's restitution obligation to prevent double recovery to the victim." 572 U.S. at 644–45 (citation modified) (citing 18 U.S.C §§ 3664(f)(2), (3)(A), (4)). In the Ninth Circuit, establishing such "credits"—i.e. offsets—is the defendant's responsibility. *See Gagarin*, 950 F.3d at 608–09. Relatedly, although Justice Sotomayor's concurrence is not binding, the Court finds its reasoning compelling as a guide for distinguishing certain cases in which "a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time," thereby assuming the risk of market fluctuations after the date by which they should reasonably have sold if they did not intend to keep the asset as an investment. *Id.* at 647 (Sotomayor, J., concurring). "In such cases," Justice Sotomayor wrote, she "would place on the defendant the burden to show—with evidence specific to the market at issue—that a victim delayed unreasonably in selling collateral, manifesting a choice to hold the collateral." *Id.* at 649.

Upon review of the additional briefs submitted by the parties, it is clear that Mr. Shetty has not met his "burden to show—with evidence specific to the market at issue—that [Fabric]

ORDER ON AMOUNT OF RESTITUTION – 14

delayed unreasonably in selling collateral, manifesting a choice to hold the collateral," or that a restitution offset is otherwise appropriate. The Court considers Mr. Shetty's arguments in turn.

First, Mr. Shetty argues that he should owe no restitution because Do Kwon, not he, was the proximate cause of Fabric's loss. The Court rejects this argument (which is not really about a restitution offset) *supra* Section III.A.3, but writes briefly here to explain why Mr. Shetty's appeal to the *Robers* majority's potential exception for an "unexpected natural disaster that destroys collateral" misses the mark. Dkt. No. 338 at 7 (quoting 572 U.S. at 646). Mr. Shetty argues that the crash of Terracoin is more akin to an unpredictable natural disaster than typical fluctuations in the real estate market and urges that he "cannot be held responsible for [Do] Kwon's actions, which destroyed the value of Fabric's UST." *Id.* But this portion of the *Robers* opinion is not helpful to Mr. Shetty. First, as the Government points out, "the UST Shetty gave to Fabric was not 'collateral'"—that is, "property that is pledged as security against a debt." Dkt. No. 342 at 9 (citing "Collateral," Black's Law Dictionary (12th ed. 2024)). Rather, it was an asset purchased, without Fabric's knowledge or consent, using the money Mr. Shetty had fraudulently and secretly taken from Fabric. That puts Fabric in a fundamentally different position than a bank that is in the business of giving loans secured by real property as collateral (and knowingly consenting to the attendant risk). Thus, while the core holding of *Robers*—that a loss of *money* must be repaid in *money*—is clearly controlling here, any caveats regarding normal risks to be borne by a victim bank regarding collateral properties are not plainly applicable. Second, even if this portion of the *Robers* holding does apply here, the value of UST was already in chaos when the UST wallet was transferred to Fabric on May 26, 2022. Although its future trajectory could not be predicted, its continuing chaos and ultimate devaluation is nothing like a "unexpected natural disaster."

ORDER ON AMOUNT OF RESTITUTION – 15

Second, Mr. Shetty argues that "If the Court Ordered Any Restitution, It Must Be Offset by $18,812,622.05," the highest value reached by UST on May 26, 2022, the day Fabric took possession of the UST wallet. Dkt. No. 338 at 8, 10. For this argument, Mr. Shetty relies on Justice Sotomayor's concurrence in *Robers*, quoting from the following passage:

> In other cases, however, a defendant might be able to show that a significant delay in the sale of collateral evinced the victim's choice to hold it as an investment rather than reducing it to cash. Suppose, for example, that a bank received shares of a public company as collateral for a fraudulently obtained loan. Common stock traded on a national exchange is readily convertible into cash, so if the bank waited more than a reasonable time to sell the shares, a district court could infer that the bank was not really trying to sell but instead was holding the shares as investment assets. If the shares declined in value after the bank chose to hold them, it would be wrong for the court to make the defendant bear that loss. As the Government acknowledged at oral argument, a victim's choice to hold collateral—rather than selling it in a reasonably expeditious manner—breaks the chain of proximate causation. If the collateral loses value after the victim chooses to hold it, then that "part of the victim's net loss" is "attributable to" the victim's "independent decisions." The defendant cannot be regarded as the "proximate cause" of that part of the loss and so cannot be made to bear it.

579 U.S. at 648–49 (citation modified) (portions quoted by Dkt. No. 338 at 8–9). As Mr. Shetty points out, "Fabric never sold its UST to attempt to recoup any of its losses." Dkt. No. 338 at 9. However, although Mr. Shetty insists that the UST is "like the stocks Justice Sotomayor referenced" and was "readily convertible to cash" when Fabric received it (*id.*), he does not support this with evidence, as both the logic of Justice Sotomayor's concurrence and Ninth Circuit precedent require. Mr. Shetty points to four pieces of evidence in his attempt to demonstrate that Fabric unreasonably held onto the UST instead of converting it to cash, but none suffices to make the case. That UST was worth over $18,000,000 at some moment on May 26, 2022, obviously does not mean that Fabric could have sold it for that price. At the Government points out, Fabric received the UST wallet late in the day, possibly after that value

ORDER ON AMOUNT OF RESTITUTION – 16

had already been reached. Mr. Shetty's other figure from that day, an "average" UST value of $10,250,751.10, (Dkt. No. 338 at 4), shows that the value of UST was swinging wildly. And that fact that "over $117 million worth of UST was traded on the market" that day (Dkt. No. 338 at 4 (citing Dkt. No. 298-4 at 574 (Defendant's Exhibit 128)) only shows that *some* holders of UST were able to sell and chose to do so. It says nothing about whether Fabric had the same opportunity, or whether opting not to sell amid such turmoil was unreasonable. The Court agrees with the Government that Mr. Shetty's figures "do nothing but underscore the volatility of the UST market on May 26 and the improbability that a company that had never purchased or sold cryptocurrency previously could navigate liquidity pools to sell $35 million worth of UST." Dkt. No. 342 at 11. This is especially so in light of trial evidence that demonstrated that selling UST at that time was a complicated multistep process. *See id.* at 11–12. Indeed, a May 14, 2022, email from Mr. Shetty himself suggested to Fabric that liquifying the UST may already be unachievable. *See* Dkt. No. 298-1 at 30–31 (Gov. Ex. 29).

Mr. Shetty's final piece of evidence is this very email, which he as argues is proof that he "repeatedly begged the company to allow him to sell Fabric's UST while it still retained significant value." Dkt. No. 338 at 1 (citing Dkt. No. 298-1 at 30–31). Based on this single communication, Mr. Shetty's characterization is wildly inaccurate. Far from "begging" Fabric to "allow him to sell" the UST (which was still in HighTower's possession at that time), Mr. Shetty reported that the UST "market continues to be volatile" and he was not even certain whether there was "enough liquidity at various exchanges to actually facilitate [a] conversion" from "UST to USD." Dkt. No. 298-1 at 30–31. He opined that there would "not be a right or wrong answer on when to *attempt* to exit," and requested Fabric's "marching orders," concluding, "Unless I hear differently, we plan to use our best judgment to decide when to *attempt* to sell . . . ." *Id.* (emphasis added). Mr. Shetty reports that "Fabric never responded" to this email.

Dkt. No. 338 at 1. Presumably, then, HighTower and Mr. Shetty used their own best judgement for the nearly two weeks the UST remained in their control—and they either did not or could not sell it during that time.[5] Altogether, this email and the figures Mr. Shetty cites are no evidence that UST was "readily convertible into cash" during or after May 2022, or that Fabric's ultimate failure to sell it was unreasonable. To the contrary, Mr. Shetty's evidence suggests that doing so may not ever have been feasible, even for a "sophisticated company with hundreds of millions of dollars on the balance sheet and access to legal counsel and financial professionals[.]" Dkt. No. 345 at 7. While Mr. Shetty is correct that the Government "does not establish that it was impossible" for Fabric to liquidate the UST (Dkt. No. 345 at 8), that is not the question. The question is whether *Mr. Shetty* (who bears the burden to establish an offset, *see Gagarin*, 950 F.3d at 608–09) has shown that it was not only *possible* for Fabric to sell, but *unreasonable* not to do so. Mr. Shetty has not made this showing, and he certainly has not demonstrated Fabric intended to keep the Terracoin as an investment, especially in light of extensive evidence at trial that the volatility of cryptocurrencies was anathema to the company's investment strategy.

For these reasons, the Court finds that Mr. Shetty has not carried his burden to show that any offset related to the value of the UST wallet is warranted. The *Holmes* court reasoned, under similar circumstances in the context of investor fraud:

> An investor victim's loss is the full amount of the property given (*i.e.*, money) at the time of the fraudulently induced investments, irrespective of any shares the victims received or the value of those shares. Per § 3663A(b)(1)(B) and *Robers*, Defendants would only be entitled to a restitution deduction if the investor victims had hypothetically sold their Theranos shares and received money in return; the proceeds from that sale may be deducted from the restitution amount. Here, neither Defendant has presented evidence to support such a deduction, *cf. Gagarin*, 950 F.3d at 607 (placing

---

[5] Even if Mr. Shetty *had* urged Fabric to sell, the Court could not find that it was unreasonable for Fabric to decline to follow the advice of its fired employee just days after learning he had defrauded the company of tens of millions of dollars.

> the burden on defendants to establish a right to a statutory restitution offset), nor have they presented a meaningful basis for distinguishing *Robers* other than the fact that *Robers* involved loan fraud instead of investor fraud. The Court, accordingly, finds that Defendants are not entitled to the § 3663A(b)(1)(B) offset because they have not returned "any part of the property" the investor victims had lost.

673 F. Supp. 3d at 1058. [6] The Ninth Circuit affirmed the district court's ultimate restitution award but found that the Court "should have also considered possible credits against Defendants' restitution obligation—given that the victims still owned their Theranos shares—by accounting for the residual value of the shares after the fraud came to light." *United States v. Holmes*, 163 F.4th 547, 577 (9th Cir. 2025). Ultimately, however,

> any error by the district court was harmless because the district court's factual findings compel the conclusion that the victims' actual losses were equal to the total amount of their investments. Most importantly, the court found that the victims were unable to liquidate their shares after the fraud came to light. In other words, for restitution purposes, the victims were never able to recover any amount of residual value that the stock may have retained. One investor who testified at both trials explained that he had no opportunity to sell his stock "once the cascade of negative publicity was unleashed" and that "there was never a legitimate opportunity from the company or from a third party to buy my stock." The evidence Holmes and Balwani cite—which suggests, at best, that there was some opportunity to sell shares to some parties at some unidentified time—is not enough to render the district court's finding clearly erroneous.

*Id.* Here, the security in question was devastated by a similar "cascade of negative publicity," and Mr. Shetty has presented similarly thin evidence that it ever could have been or could be liquid. There is no evidence before the Court that the victim has sold its devalued securities or will *ever* be able to do so. Further, there is evidence in the record that Mr. Shetty himself

---

[6] Mr. Shetty was asked to address the application of *Holmes* but chose not to discuss or even mention the case at oral argument or in his briefing. *See generally Dkt. Nos.* 338, 339, 345. The Court therefore considers him to have waived any opportunity to distinguish the case or argue that it was wrongly decided.

believed that that liquifying the UST may already have been unachievable by the time Fabric received them. Govt Ex. 29.

Moreover, unlike the *Holmes* defendants, Mr. Shetty does not seek "credit" for an "in-kind payment" under 18 U.S.C. § 3664(f)(3)(A); he has asked only for a reduction of restitution for "return[ed]" property under Section 3663(b)(1)(A). *See* Dkt. No. 338 at 5. In other words, he has not asked for the offset *Robers* instructed he *may* receive under "other provisions" of the MVRA, *see* 572 U.S. at 644 (nor has he provided any evidence of the UST wallet's current value), but has only persisted in arguing for the 18-million-dollar offset to which he is clearly not entitled.

For all these reasons, the Court finds that Mr. Shetty is not entitled to a § 3663A(b)(1)(B) offset because [he has] not returned "any part of the property" the [victim] had lost. The Court also does not find on the record before it that an offset under Section 3664(f)(4) is appropriate, as Mr. Shetty has neither requested such a credit nor offered evidence that any residual value of the UST in Fabric's possession can ever be realized.

**C.      Whether Interest Should Be Waived**

Mr. Shetty asks the Court to "waive interest pursuant to 18 U.S.C. § 3612(f)(3) because, and as detailed in the Presentence Report, Mr. Shetty has no ability to pay interest." Dkt. No. 338 at 11. The Government opposes this request. Dkt. No. 342 at 13–15. While the Court agrees with the Government that Mr. Shetty's "cursory" briefing on this point (a single sentence) is "insufficient" (*id.* at 13), it finds that Mr. Shetty is unable to pay interest and that this constitutes an "extreme case" (*id.* at 14)—not because Mr. Shetty is uniquely destitute but because his financial obligation here is uniquely massive, particularly considering the joint imposition of

//

//

ORDER ON AMOUNT OF RESTITUTION – 20

forfeiture and restitution and the fact that Mr. Shetty no longer possesses any of the property in question.[7] Therefore, the Court WAIVES interest the restitution Mr. Shetty must pay to Fabric.

**D.     Potential for Amendment of Order**

If Fabric can and does ultimately sell the Terracoins it received from Hightower and receives any funds from the sale, a restitution offset will be appropriate and the Court will consider a motion for amendment of its judgment with regard to restitution.

Mr. Shetty also requests, for the first time in his reply brief on the topic of a restitution offset, that the "Court must order Fabric and the government to update the Court if Fabric receives any financial award from the arbitration" between Fabric and Chase Bank regarding Chase's potential liability for Fabric's loss. Dkt. No. 345 at 9 n.1. Mr. Shetty is incorrect. For one thing, Fabric is not a Party here subject to the Court's orders. For another, under the MVRA, "[n]o victim shall be required to participate in any phase of a restitution order." 18 U.S.C. § 3664(g)(1). More to the point, the MVRA is clear that "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B).

### IV.     CONCLUSION

Accordingly, the Court DENIES Mr. Shetty's Motion Opposing Judicial Imposition of Restitution (Dkt. No. 321) and SETS the amount of restitution owed by Mr. Shetty to Fabric at $35,000,100, without interest. In the event the Government learns that Fabric has liquidated any

---

[7] The Court previously granted the Government's Motion for Forfeiture. Dkt. No. 328. In its Motion for Forfeiture, the Government citing controlling case law that requiring both restitution and forfeiture of the same loss is not an "impermissible 'double recover.'" Dkt. No. 310 at 18 (quoting *United States v. Newman*, 659 F.3d 1235, 1241–42 (9th Cir. 2011), *abrogated on other grounds by Honeycutt v. United States*, 581 U.S. 443 (2017)). Mr. Shetty does not dispute the state of the law allowing both restitution and forfeiture. *See generally* Dkt. No. 314 (Response to Motion for Forfeiture of Property).

Although the Court's hands are tied on this issue, it has grave concerns about the fairness of the state of the law requiring Mr. Shetty to repay twice the amount he took in the commission of his crimes. Should the Ninth Circuit reconsider its precedent, perhaps in light of the *Ellingburg* decision, the Court will readily entertain a motion to reconsider its judgment as to the dual imposition of restitution and forfeiture.

ORDER ON AMOUNT OF RESTITUTION – 21

or all of the contents of the UST wallet, it SHALL inform Mr. Shetty and the Court as soon as practicable.

Dated this 3rd day of June, 2026.

Tana Lin
United States District Judge